# ATTACHMENT A

1  JEFFREY M. SHOHET (Cal. Bar No. 067529)
   Jeffrey.shohet@dlapiper.com
2  VERONICA L. JACKSON (Cal. Bar No. 243095)
   veronica.jackson@dlapiper.com
3  DLA PIPER LLP (US)
   401 B Street, Suite 1700
4  San Diego, CA 92101-4297
   Tel: 619.699.2700
5  Fax: 619.699.2701

6  Attorneys for Plaintiff

7

8                    UNITED STATES DISTRICT COURT

9          NORTHERN DISTRICT OF CALIFORNIA, SAN JOSE DIVISION

10 GSI TECHNOLOGY, INC., a Delaware          CASE NO.
   Corporation,
11                                           **COMPLAINT FOR DECLARATORY
            Plaintiff,                       RELIEF AND DAMAGES**
12
        v.                                   **DEMAND FOR JURY TRIAL**
13
   UNITED MEMORIES, INC., a Colorado
14 Corporation,

15          Defendant.

16

17      Plaintiff GSI Technology, Inc. ("GSI") complains and alleges as follows against defendant

18 United Memories, Inc. ("UMI"):

19                          <u>THE NATURE OF THIS ACTION</u>

20      1.      GSI seeks declaratory, injunctive, and monetary relief from UMI for breach of its

21 contract with GSI (the "Agreement") for the design and development of a Low Latency DRAM

22 Product (defined below) to GSI's requirements and specifications and unfair competition in

23 violation of section 17200 *et seq.* of the California Business and Professions Code.

24      2.      As alleged more fully below on information and belief, UMI has violated, and

25 continues to violate specific provisions of the Agreement that preclude UMI from involvement in

26 the design or development of a competing Low Latency DRAM Product (as defined below) and

27 to maintain the confidentiality of GSI's confidential information.

28 /////

                                      -1-

                                                                          COMPLAINT

## THE PARTIES AND JURISDICTION

3. Plaintiff GSI is a corporation organized under the laws of Delaware, with its principal place of business located at 1213 Elko Drive, Sunnyvale, CA 94089. GSI designs, develops and markets a broad range of high performance memory products for networking, military, medical, automotive and other applications. GSI offers both Static Random Access Memory products and Low Latency Dynamic Random Access Memory ("LLDRAM") products.

4. Defendant UMI is a corporation organized under the laws of Colorado, with its principal place of business located at 4815 List Dr., Colorado Springs, CO 80919. UMI provides integrated circuit design and layout services to a broad range of customers, including within the State of California. UMI is experienced in the development and design of semiconductor memory components, specializing in DRAM design. GSI is informed and believes that at all times relevant herein, UMI is and was doing business in California including, but not limited to, the design of a LLDRAM Product for GSI.

5. GSI is informed and believes, and thereon alleges that UMI regularly does business in Santa Clara County, and elsewhere in California. GSI is further informed and believes that UMI has and continues to regularly provide integrated circuit design and layout services to technology companies located in Santa Clara County and elsewhere in California. In addition, from May 2008 to December 2008,UMI completed the performance of its obligations under the first four milestones of the Agreement by delivering design plans and related work product to GSI's headquarters in California as required by the Agreement.

6. This Court has original jurisdiction under 28 U.S.C. § 1332, in that it is a civil action between citizens of different states in which the matter in controversy exceeds, exclusive of costs and interest, seventy-five thousand dollars.

### VENUE

7. Venue is proper in the Northern District of California because a substantial part of the events or omissions giving rise to the claims occurred in this District in that the contract at issue was made and performed, in part, by UMI in this district.

/////

-2-

## GENERAL ALLEGATIONS

8.    In or around Spring 2008, GSI sought to retain UMI to perform design and development services for an LLDRAM chip according to GSI's specifications. Although UMI had experience in the design of DRAM chips, it did not at that time have any building block, history or capability in the design of LLDRAM chips. GSI had the necessary knowledge and experience in LLDRAM technology and imparted its knowledge to UMI in the course of performance of the Agreement. UMI promoted itself as particularly appropriate for the project based on its affiliation with its parent company, ProMOS, one of the few LLDRAM chip fabrication facilities ("fab") essential to the success of the project as more fully alleged below. UMI stated it could leverage its experience with its parent company to efficiently and effectively complete the project.

9.    At the time of contracting, UMI and GSI both understood that the low latency/high random address rate DRAM market is an extremely small and highly specialized segment of the DRAM market and was expected to remain a small and highly specialized, high performance segment of the DRAM market.

10.    In the course of performing the design and development services contemplated under the contract with UMI, UMI would be exposed to GSI's highly confidential, proprietary information and trade secrets including, but not limited to, the specifications and performance characteristics of the LLDRAM Product (defined below) under development by GSI; foundation information on chip design; chip design review analysis; and improvements and corrections to circuitry design. During a December 18, 2008 design review discussion, for example, GSI provided proprietary non-public, trade secret information and advice on how to better design an LLDRAM chip based on GSI's unique knowledge on how such chips work. GSI also sent UMI one of its own engineers to perform simulation and circuit verification for two months, which significantly advanced UMI's LLDRAM capability.

11.    Although UMI does not itself compete with GSI in the markets for the LLDRAM products contemplated to be produced in accordance with its designs, UMI's ability to use such information to assist GSI's competitors to GSI's detriment rendered it necessary for any

-3-

agreement between GSI and UMI to contain provisions precluding UMI from designing, developing or contributing to the design or development of an LLDRAM product for itself or others. UMI acknowledged that GSI would not enter into any agreement with UMI without a non-compete provision in place precluding UMI from participating in the design and development of an LLDRAM product either for its own account or in collaboration with another party for a reasonable period of time.

*The Agreement*

12.     On or around May 1, 2008, GSI and UMI entered into the Agreement titled "UMI – GSI Product Design and Development Agreement, 576 Mb Low Latency DRAM". A true and correct copy of the Agreement is attached as <u>Exhibit A</u>.

13.     The Agreement required UMI to design an LLDRAM chip according to the specifications set forth in Exhibit A to the Agreement (the "Product" or "LLDRAM Product") and to complete the project milestones set forth in Exhibit B to the Agreement on or before the milestone completion date. In exchange for UMI's design services, the Agreement required GSI to pay UMI $75,000 concurrently with the execution of the Agreement, and certain specified amounts at the successful completion of each milestone. The total contemplated payments to UMI for the performance of all of its obligations under the Agreement was $850,000.

14.     Because each fabrication facility or foundry where DRAM chips are made develops and observes different design rules and manufacturing protocols, it is customary to select a specific fabrication facility ("fab") for the manufacture of chips under development. If the selected fab becomes unavailable for the manufacture of chips, all of the design work must be redone to conform to the design rules and manufacturing protocols of the replacement fab unless the replacement fab uses the same manufacturing process and design rules as the original fab.

15.     GSI and UMI agreed that the LLDRAM chips to be designed under the Agreement would be manufactured at the ProMOS fab owned by UMI's parent company. UMI's relationship with ProMOS was an important consideration for GSI in contracting with UMI. The Hynix process and associated design rules used by the ProMOS fab cannot be used by a fab using the Elpida process and associated design rules, for example, which is why the Agreement required

-4-

GSI to provide design rules and associated parameters if the LLDRAM "Product is designed for manufacture at a Fab other than ProMOS." Agreement, § II.1.2(b). As discussed below, UMI proceeded to design the LLDRAM chip for manufacture at ProMOS according to its rules and protocols.

16.     The Agreement's Recitals memorialize the importance of the confidentiality and non-compete provisions as material inducements for GSI to contract with UMI.

17.     Article VI.1 of the Agreement obligated UMI to keep all of GSI's confidential information strictly confidential, and not use or disclose GSI's confidential information except as necessary to exercise its rights and fulfill its obligations under the Agreement (the "Confidentiality Obligation").

18.     Article III.6 of the Agreement (the "Non-Compete Obligation") obligated UMI as follows:

> [Except for the Product being designed and developed by UMI for GSI hereunder,] UMI agrees it shall not, directly or indirectly, design or develop, or contribute to the design or development of, a Low Latency DRAM Product (as defined below) during the term of this Agreement. "Low Latency DRAM Product" means a latency optimized and/or address rate optimized memory product that employs a capacitive charge-based memory cell technology, including, but not limited to, RLDRAM and FCRAM products.

19.     Pursuant to Article VII.2, the term of the Agreement began on May 1, 2008 and ends the close of business on the day five (5) years from May 1, 2008, "unless earlier terminated by either party pursuant to this Article VII." However, because of the importance of preserving the protections afforded to GSI under the Non-Compete and Confidentiality Obligations in the event of an early termination of the Agreement, Article VII.5 of the Agreement provides the following survival provisions: "[t]he provisions of Articles III [which includes the Non-Compete Obligation] ... of this Agreement shall survive expiration or termination of this Agreement permanently. Article VI [which includes the Confidentiality Obligation] shall survive for ten (10) years any expiration or termination of this Agreement."

20.     Under Articles VII.3 and VII.4, early termination of the Agreement is allowed

-5-

1    only on the other party's bankruptcy or insolvency or for a material breach of the Agreement.

2        21.    Paragraph X.9 of the Agreement provides that in the event of any controversy,

3    claim or dispute between the parties arising out of or relating to the Agreement, the prevailing

4    party shall be entitled to recover reasonable expenses, attorneys' fees and costs.

5        *UMI Begins Designing The LLDRAM Chip For Manufacture At PromMOS, But ProMOS*

6        *Becomes Insolvent In December 2008.*

7        22.    UMI began its performance of design and development services under the

8    Agreement in May 2008, shortly after the Agreement was executed. UMI designed the LLDRAM

9    chip for manufacture at ProMOS. GSI provided UMI foundation information on chip design. In

10   order to facilitate design of the LLDRAM Product, and considering that UMI had no prior history

11   with LLDRAM products, GSI sent UMI one of its engineers to UMI's Colorado facilities to

12   perform simulation and circuit verification for two months. GSI participated in chip design

13   review meetings and suggested critical improvements and corrections to UMI's circuitry design

14   during a December 18, 2008 design review meeting at UMI's Colorado headquarters attended by

15   GSI and UMI engineers and executives. The information provided by GSI to UMI in the course

16   of UMI's performance under the Agreement constituted GSI's confidential trade secrets.

17       23.    GSI sent full and complete payment to UMI for all project milestones through

18   milestone number 4, which had a completion date of October 30, 2008, and UMI sent the required

19   documentation for each completed milestone to GSI's California headquarters. GSI also made

20   payments to UMI for additional work pursuant to Article II of the Agreement. The last payment

21   sent to UMI (before UMI's purported termination of the Agreement as discussed below) was on

22   December 18, 2008. As of that date, GSI had paid UMI a total of $542,400 which constituted full

23   payment for all services performed by UMI to that point.

24       24.    Milestone number 5, the next phase of services contemplated under the

25   Agreement, involved the testing of the LLDRAM Product designed by UMI. Under the terms of

26   the Agreement, milestone number 5 was to be completed by January 30. 2009[1]. During December

27   _____

28   [1] The Agreement mistakenly references the completion date for this Milestone as January 30, 2008.

-6-

1  2008, however, news reports in trade and technology publications such as EE Times reported that

2  ProMOS was insolvent and seeking bailouts from the Taiwanese government. *See, e.g.,*

3  http://eetimes.com/electronics-news/4080816/Rumor-mill-TSMC-Micron-Nanya-eye-ProMOS.

4      25.   Around the same time, and in light of ProMOS' reported insolvency, GSI

5  expressed concerns about UMI's ability to proceed to the completion of the remaining milestones

6  (5 and 6) which called for manufacturing and testing at the ProMOS fab. Because it was not

7  possible to design in the ProMOS-Hynix environment and then port that design over to a different

8  process technology, it made no economic sense to incur the costs of completion of milestones 5

9  and 6 in accordance with the ProMOS design rules given ProMOS' potential insolvency.

10      26.   During the course of many meetings, phone conversations and in email

11  correspondence between representatives of UMI, GSI and ProMOS in or about December 2008

12  through January 2009, the parties discussed and agreed that UMI could no longer proceed in

13  accordance with the Agreement due to ProMOS' financial difficulties and potential insolvency.

14      27.   Because of ProMOS' unavailability, GSI never issued the wafer starts to ProMOS

15  as contemplated by the Agreement. The more than $540,000 GSI spent for the LLDRAM Product

16  under the Agreement was largely wasted because GSI would have to start over with a different

17  fab using its unique design rules and processes. Because time-to-market is an important

18  competitive advantage, GSI lost more than six months working with UMI.

19  *UMI Seeks To Terminate The Agreement Before The Five-Year Term And After It Had*

20  *Already Anticipatorily Breached The Agreement.*

21      28.   On July 20, 2009, UMI sent GSI a letter (the "Letter") purporting to terminate the

22  Agreement based on GSI's alleged material breach in failing to "[p]rovide sufficient wafer

23  starts." Attached hereto as Exhibit B is a true and correct copy of the Letter.

24      29.   The testing and manufacturing of the Product designed by UMI was for GSI's

25  benefit. Although GSI was obligated to provide sufficient wafer starts to facilitate UMI's

26  performance of testing work under milestone 5, GSI was relieved of any such obligation due to

27  ProMOS' insolvency as alleged above. In any event, any failure on the part of GSI to issue the

28  wafer starts would simply relieve UMI of its obligations under milestone 5 but would not

-7-

1   constitute a material breach on the part of GSI. Because UMI had already anticipatorily breached

2   the Agreement due to ProMOS' insolvency, and GSI was working on developing the LLDRAM

3   Product using another design and fab, GSI did not respond to the Letter.

4   *GSI Suspects UMI Of Violating The Non-Compete And Confidentiality Obligations And Seeks Assurances From UMI.*

5

6        30.     The Non-Compete Obligation of the Agreement remains in effect at least until

7   April 30, 2013[2] (the stated term of the Agreement) regardless of whether or not UMI's purported

8   termination for material breach by UMI was proper.

9        31.     GSI is informed and believes that in or around December 2012, UMI entered into

10  an agreement with one of GSI's competitors to design an LLDRAM Product in violation of the

11  Non-Compete Obligation and the Confidentiality Obligation.

12       32.     Because LLDRAM products are a unique market segment, competition is

13  concentrated. Sales are usually made through a bidding process. Bidders may partner with a

14  design company like UMI to provide a value-added product at an attractive price point for

15  customers.

16       33.     In or around December 2012, GSI lost a bid in connection with an LLDRAM

17  program in which GSI had previously been involved. Based on comments made by the customer

18  to the effect that an experienced DRAM designer had been selected and because UMI had also

19  previously been involved with the customer, GSI became concerned that UMI was acting in

20  violation of the Non-Compete Obligation.

21       34.     Because of the similarity between the LLDRAM Product contemplated by the

22  Agreement and market rumors, GSI sent UMI a letter dated January 14, 2013 reminding it of its

23  Non-Compete and Confidentiality Obligations. The letter explains that UMI's 2009 Letter did not

24  terminate the Agreement before the five-year term. Moreover, even if the Agreement had been

25  properly terminated by UMI as of July, 2009, the survival provision preserved the Non-Compete

26

27  [2] April 30, 2013 marked the end of the stated "term" of the Agreement which, as specified in Article III.6, reflected the Agreement of the Parties as to a reasonable period of time for the Non-
28  Compete Obligation to remain in effect.

-8-

1   Obligation and Confidentiality Obligation at least through April 30, 2013. This letter sought

2   assurances from UMI that the Agreement had not expired or terminated and that UMI is not

3   acting in violation of the Non-Compete and Confidentiality Obligations. Attached hereto as

4   Exhibit C is a true and correct copy of this letter.

5        35.   UMI responded to this letter on January 25, 2013. Its response did not answer

6   GSI's questions regarding UMI's suspected involvement in the design of an LLDRAM Product or

7   provide any of the requested assurances. Rather, it claims the Agreement was terminated for

8   GSI's material breach. It further claims that the Agreement was abandoned, and that the Non-

9   Compete and Confidentiality Obligations ended when the Agreement was terminated or

10   abandoned. Finally, UMI claims that it does not have any of GSI's confidential information and

11   that the survival provision is unenforceable. Attached hereto as Exhibit D is a true and correct

12   copy of this letter. UMI's response leaves little doubt that UMI is in fact partnering with a

13   competitor in violation of the Non-Compete and Confidentiality Obligations.

### FIRST CLAIM FOR RELIEF
14

**(Declaratory Relief, 28 U.S.C. § 2201 *et seq.*)**
15

16        36.   GSI incorporates the allegations of paragraphs 1 through 35 by reference as though

17   fully set forth herein.

18        37.   An actual and immediate controversy has arisen and now exists between the

19   parties regarding the validity, interpretation and enforceability of the Agreement.

20        38.   GSI seeks a judicial determination of the parties' respective rights and obligations

21   under the facts and Agreement alleged herein. Specifically, GSI requests an entry of judgment in

22   its favor declaring that (a) GSI's failure to provide wafer starts was not a material obligation on

23   its part under the Agreement; (b) even if it were a material obligation, (1) UMI's prior breach (A)

24   relieved GSI of such dependent duty under the Agreement and (B) estopped UMI from

25   subsequently claiming GSI breached the Agreement or (2) UMI failed to initiate a meet and

26   confer process which was a condition precedent to claiming material breach of the Agreement;

27   and (c) even if the Agreement terminated early, the survival clause provides that the Non-

28   Compete Obligation and Confidentiality Obligation remain in effect through at least April 30,

-9-

1   2013.

2      39.    A judicial declaration is necessary and appropriate at this time for each party to

3   ascertain its rights and obligations to each other and to avoid the hardship caused on the parties by

4   a protracted dispute and further delay.

### SECOND CLAIM FOR RELIEF
#### (Breach of Contract)

7      40.    Plaintiff incorporates the allegations of paragraphs 1 through 38 by reference as

8   though fully set forth herein.

9      41.    The Agreement is a valid, enforceable contract between GSI and UMI.

10      42.    GSI has performed all conditions, covenants, and promises required to be

11   performed on its part under the Agreement or GSI's performance has been excused.

12      43.    UMI was obligated to test and manufacture the LLDRAM Product at the ProMOS

13   fab. On or about December 18, 2008, UMI anticipatorily breached the Agreement when it

14   admitted that its affiliate, ProMOS, would be unable to proceed to testing due to its insolvency.

15   UMI's inability to proceed to testing relieved GSI of any dependent obligations relating to testing,

16   such as to provide wafer starts.

17      44.    As a result of UMI's breach of contract and inability to proceed to milestones 5

18   and 6, GSI incurred damages. GSI had to start over with another design intended for another fab

19   using different protocols. Not only did GSI lose significant time-to-market competitive advantage

20   because it had to effectively scrap UMI's work but it also had to spend additional sums and

21   resources to obtain the benefit of the bargain it contracted for under the Agreement.

22      45.    UMI negotiated and agreed to the Non-Competition and Confidentiality

23   Obligations for the protection of GSI's trade secrets.

24      46.    As set forth in more detail above, UMI agreed not to design or develop or

25   contribute to the design or development of an LLDRAM Product or otherwise use GSI's

26   confidential, proprietary and know-how information provided to UMI by GSI for at least the term

27   of the Agreement which ends on April 30, 2013.

28      47.    GSI is informed and believes and therefore alleges that commencing in or around

-10-

December 2012, UMI breached and continues in breach of the Non-Compete and Confidentiality

Obligations by collaborating with a competitor of GSI for the design of an LLDRAM Product.

48.     As a direct and proximate result of UMI's breaches of the Non-Compete and

Confidentiality Obligations, which breaches are, on information and belief, continuing at least to

the date of this Complaint, GSI has been deprived of the material benefits of the Agreement and

has suffered monetary damages in an amount unknown to GSI at this time but in excess of

$75,000 exclusive of interest and costs. Also as a direct and proximate result of UMI's breaches

as alleged herein, UMI has been unjustly enriched and GSI has been irreparably injured and

damaged in amounts not fully capable of determination including but not limited to lost profits,

loss of goodwill and reputation. Unless the actions of UMI in violation of the Non-Compete and

Confidentiality Obligations are enjoined, GSI will continue to suffer irreparable injury and

damages. Accordingly, GSI is entitled to an injunction to prevent further conduct in violation of

the Non-Compete and Confidentiality Obligations until at least the expiration of the five-year

period provided by the Non-Compete Obligation.

## THIRD CLAIM FOR RELIEF
### (Unfair Competition, Violation of California Business & Professions Code §§ 17000 *et seq.*)

49.     Plaintiff incorporates the allegations of paragraphs 1 through 48 by reference as

though fully set forth herein.

50.     UMI's actions discussed herein constitute unfair competition within the meaning

of California Business and Professions Code § 17200.

51.     UMI's violation of the Confidentiality Obligation takes advantage of knowledge

UMI developed and acquired through its work for GSI under the Agreement and is outside the

boundaries of fair competition especially in light of the Non-Compete Obligation.

52.     On information and belief, UMI profited from and intended for its activities, as

alleged above, to result in GSI's proprietary LLDRAM specification and the design services

commissioned and paid for by GSI to be used by GSI's competitors in competition with GSI.

53.     As a result of UMI's foregoing alleged actions, UMI has been unjustly enriched

and GSI has been injured and damaged in amounts not fully ascertainable. Unless the foregoing

-11-

1    alleged actions of UMI are enjoined, GSI will continue to suffer injury and damage including

2    monetary damages as well as the loss of reputation, goodwill and other intangibles .

3        54.    Pursuant to California Business and Professions Code § 17203, GSI is entitled to

4    preliminary and permanent injunctive relief ordering UMI to cease its acts of unfair competition

5    and disgorge all profits resulting therefrom.

6                                **PRAYER FOR RELIEF**

7        1.    UMI be preliminarily and permanently enjoined and restrained from:

8            •    directly or indirectly, designing or developing, or contributing to the design or

9                 development of, a Low Latency DRAM Product until after April 30, 2013;

10           •    divulging, furnishing, or making accessible to any person GSI's confidential

11                information or trade secrets or any trade secret or confidential information; and

12           •    engaging in "unfair competition" in violation of California Business and

13                Professions Code Sections 17200 and 17203 by using GSI's confidential

14                information in providing design services o GSI's competitors.

15       2.    Compensatory damages according to proof.

16       3.    Disgorgement of UMI's gains, profit and advantages derived by it from the

17   activities complained of herein

18       4.    For attorneys' fees and costs of suit herein pursuant to statute or as otherwise may

19   be allowed by law.

20       5.    Such other and further relief as the Court may deem just and proper.

21                                **JURY DEMAND**

22       GSI hereby demands a trial by jury for each and every one of the foregoing claims for

23   relief so triable.

24   Dated: March 8, 2013                  DLA PIPER LLP (US)

25                                         By

26                                         JEFFREY M. SHOHET
                                           VERONICA L.JACKSON
27                                         Attorneys for Plaintiff

28
                                         -12-

                                                              COMPLAINT

## TABLE OF CONTENTS – EXHIBITS

| Exhibit | Description | |
|---------|-------------|---|
| A | Agreement Between GSI and UMI | Pages 13-30 |
| B | Letter to GSI From UMI | Pages 31-32 |
| C | Letter to UMI from GSI | Pages 33-35 |
| D | Letter to GSI from UMI | Pages 36-40 |

**EXHIBIT A**

# UMI – GSI Product Design and Development Agreement
## 576 Mb Low Latency DRAM

THIS PRODUCT DESIGN AND DEVELOPMENT AGREEMENT is between United Memories, Inc., a Colorado U.S.A. corporation ("UMI"); and GSI Technology, Inc., a Delaware corporation ("GSI").

## W I T N E S S E T H:

### RECITALS:

A.     UMI is experienced in the development and design of semiconductor memory components and UMI's employees based at UMI's headquarters facility in Colorado Springs, Colorado, U.S.A. have expertise in the design of semiconductor memory components.

B.     GSI is experienced in the production, packaging, and sales of semiconductor memory components.

C.     GSI wishes to retain UMI to design a DRAM chip according to the specifications set forth in Exhibit A attached hereto and incorporated herein by this reference (the "Product").

D.     UMI is willing to undertake the design of the Product in consideration of payments provided herein.

E.     UMI and GSI wish to set forth herein certain agreements covering and relating to their respective rights and obligations with respect to the Product and other matters as provided herein.

F.     UMI and GSI acknowledge that the low latency / high random address rate DRAM market is a very small and highly specialized segment of the DRAM market and is expected to remain a small and highly specialized, high performance segment of the DRAM market.

G.     UMI and GSI acknowledge that because of UMI's position as a contract memory design service provider, the exposure UMI will gain in the course of providing contract design services to GSI's confidential, proprietary information and trade secrets, and UMI's potential ability to use said information to assist potential competitors to GSI to produce low latency / high random address rate DRAMs to compete with GSI, make the non-compete provisions of this Agreement is necessary to protect GSI's trade secrets and legitimate and significant business interests.  In the absence of the restrictions contained in this Agreement, GSI would not have considered selecting UMI to manufacture produce low latency / high random address rate DRAM products and would not have considered sharing GSI's trade secrets with UMI.

NOW, THEREFORE, in consideration of the Recitals and the mutual covenants contained herein and for other good and valuable consideration, the receipt and adequacy of which are hereby acknowledged, UMI and GSI hereby agree as follows:

# UMI – GSI Product Design and Development Agreement
## 576 Mb Low Latency DRAM

ARTICLE I:   Definitions.

When used in this Agreement, the following terms shall have the following respective meanings:

1.1   "Confidential Information" means all non-public information that the party disclosing the information (the "Disclosing Party") designates at the time of disclosure as being confidential, or if disclosed orally or visually is identified as such prior to disclosure and summarized, in writing, by the Disclosing Party to the receiving party (the "Receiving Party") within thirty (30) days, or which, under the circumstances surrounding disclosure, the Receiving Party knows or has reason to know should be treated as confidential without the need to be marked as "confidential."

1.2   "Dollars" or "$" means United States Dollars.

1.3   "Effective Date" has the meaning set forth in Section 7.1.

1.4   "Fab" means a factory where devices such as semiconductors are manufactured.

1.5   "Project" means the design and testing of the Product.

1.6   "Project Patent" has the meaning set forth in Section 4.1.

1.7   "Product" has the meaning set forth in Recital C and as specified in Exhibit A.

1.8   "Trade Secret" means information, including a formula, pattern, compilation, program, device, method, technique or process, that:

(a)   Derives independent economic value, present or potential, from not being generally known to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from its disclosure or use; and

(b)   Is the subject of efforts that are reasonable under the circumstances to maintain its secrecy.

1.9   "Manufacturing Release" means the product has passed GSI internal qualification requirements (GSI Spec B-004.2, Appendix 1) and is achieving repaired probe yield within 10 percentage points of ProMOS product of similar density in the same process technology.

ARTICLE II:   The Project: Development and Design of the Product and UMI's Remuneration.

II.1   In order for UMI to design and develop the Product as soon as possible, UMI and GSI shall undertake and carry out their respective responsibilities with respect to the Project as described in Sections 2.1.1 and 2.1.2, and shall assist and cooperate with each other in the performance of their respective tasks, in commercial good faith and with the goal of completing the Project as soon as possible, but in no event later than the completion date set forth in the development schedule set forth on Exhibit B.

Exhibit A, Page 15

# UMI – GSI Product Design and Development Agreement
## 576 Mb Low Latency DRAM

II.1.1   UMI shall do the following:

(a)   Design the Product (including, without limitation, circuit simulation and layout), at UMI's Colorado facility, including any future minor design modifications required to make the Product meet the requirements of Exhibit A. If the requirements of Exhibit A are changed after the Effective Date and, as a result, a major product design modification or redesign is required in order to meet the revised requirements, such as circuit resimulation and redesign of peripheral circuits, then any agreed upon supplemental payments to UMI for such major design modifications will be incremental to the payments already provided for in this Agreement. The amount of any supplement payments will be negotiated in good faith between GSI and UMI, if and when necessary as a result of a material change in the time or cost for performance. If such a redesign is required, the due dates for all remaining milestones that have not been attained shall also be renegotiated in good faith. No changes to the amounts payable under this Agreement or the due dates for performance shall be effective and binding on the parties unless agreed upon in writing by the other party in a written amendment to this Agreement.

(b)   Deliver the items listed in Exhibit B (attached hereto and incorporated herein by this reference) on or before the milestone dates indicated; and

(c)   Provide adequate and sufficient work space at the Colorado Springs facility for GSI engineer(s) participation in the Project according to the schedule of Exhibit C.

(d)   Provide consulting support of failure analysis efforts undertaken by GSI on a timely basis at fees negotiated in good faith for a period of three (3) years after Manufacturing Release.

II.1.2   GSI shall do the following:

(a)   Provide sufficient wafer starts (at GSI's expense) to perform the required development and provide all necessary raw materials, including masks and reticles; and

(b)   If the Product is designed for manufacture at a Fab other than ProMOS, provide design rules, electrical rules, HSPICE parameters on each transistor, layout rules, layer tables, DRC/LVS rule file, sheet resistances, contact resistances, and parasitic capacitances for the chosen Fab.

II.2   At the completion of each item of 2.1.1 and Exhibit B, UMI shall deliver to GSI the relevant deliverables accompanied by a written certification of the completion of such item. At the completion of each item of 2.1.2, GSI shall, upon request, deliver to UMI written certification of the completion of such item. If either party believes an item of 2.1.1, Exhibit B or 2.1.2 is incomplete, the parties shall meet and resolve the issue in good faith negotiations.

II.3   During the Project, representatives of UMI and GSI shall meet as frequently as may be required to assess the progress of the Project against the time line schedule on Exhibit B

Exhibit A, Page 16

# UMI – GSI Product Design and Development Agreement
## 576 Mb Low Latency DRAM

for their respective performances of services as provided in Sections 2.1.1 and 2.1.2 and Exhibit B (Project Milestones). In addition, it is expected that GSI engineers will participate in the Project as outlined in Exhibit C.

      II.4      For and in consideration of UMI's services to be rendered as provided in this Article II, GSI shall pay to UMI the following amounts according to II.5:

      II.4.1    Seventy Five Thousand Dollars ($75,000) concurrently with the execution of this Agreement.

      II.4.2    One Hundred Thousand Dollars ($100,000) at the successful conclusion of the preliminary design review specified by Project Milestone No. 2 of Exhibit B.

      II.4.3    One Hundred Fifty Thousand Dollars ($150,000) at the successful tape out of the database specified by Project Milestone No. 3 of Exhibit B.

      II.4.4    Two Hundred Thousand Dollars ($200,000) at the successful conclusion of the final design review specified by Project Milestone No. 4 of Exhibit B.

      II.4.5    Two Hundred Fifty Thousand Dollars ($250,000) at the successful conclusion of the testing of the Product specified by Project Milestone No. 5 of Exhibit B.

      II.4.6    Seventy Five Thousand Dollars ($75,000) at Manufacturing Release specified by Project Milestone No. 6 of Exhibit B.

      II.5      At the successful completion of each Project Milestone described in Section 2.4, UMI shall invoice GSI at the address given in 10.8 herein. GSI shall pay such invoice within thirty (30) calendar days or shall object in writing within thirty (30) days to UMI to such payment. If GSI objects to payment, UMI has ten (10) calendar days to prove such payment is due. If a disagreement still exists, the two parties shall meet within twenty (20) calendar days to resolve the issue in good faith negotiations. If the parties cannot resolve the disagreement or issue within three (3) business days after commencement of such meeting, then a party may pursue any rights or remedies available to it under this Agreement, at law or in equity. For the avoidance of doubt, any payments based on completion of the any milestone shall not be payable until GSI's acceptance of the relevant deliverable associated therewith, as set forth in Section 2.7 below.

      II.6      UMI acknowledges and agrees that time is of the essence for the provision of services hereunder and that the full and timely provision of all services hereunder is a material condition of this Agreement. Notwithstanding the foregoing, the due date for any deliverable, the performance of which was delayed on account of failure of GSI to complete any of its prerequisite obligations in timely fashion, shall be extended by one (1) day for each day of GSI's lateness, except to the extent GSI's lateness is due to an act or omission of UMI. Further, the due date for any deliverable to be provided by GSI to UMI under the development schedule, performance of which was delayed on account of failure of UMI to complete any of its prerequisite obligations in timely fashion, shall be extended by one (1) day for each day of

# UMI – GSI Product Design and Development Agreement
### 576 Mb Low Latency DRAM

UMI'S lateness. Any such extension of time for GSI's performance hereunder shall be in addition to any other rights or remedies of GSI, whether available under this Agreement, at law or in equity.

II.7     Upon delivery of each deliverable to GSI, GSI will review the applicable deliverable to determine whether it conforms to the applicable portions of the specifications and the requirements of this Agreement. GSI will accept or reject each deliverable in writing within thirty (30) days after receipt; provided, however, that if a particular deliverable reasonably cannot be reviewed and tested within such 30-day period, GSI shall have such additional time to perform acceptance testing on that deliverable as may reasonably be required. If GSI fails to accept or reject a deliverable in writing within the specified time period, then, within thirty (30) days of a request by UMI, GSI must provide written notice of acceptance or rejection. Otherwise the deliverable will be considered accepted. GSI may reject any deliverable that does not conform to the applicable portions of the specifications or the requirement of this Agreement. GSI may provide notice to UMI describing such deliverable's deficiencies ("Deficiencies"). Within thirty (30) days of receiving each report regarding Deficiencies (or such longer period of time that may be authorized by GSI in writing) (the "Correction Period"), UMI shall correct the Deficiencies so that the applicable deliverable conforms to the applicable portion of the specifications and the requirements of this Agreement. Following correction, UMI shall immediately redeliver the corrected deliverable to GSI, which corrected deliverable shall be subject to the approval procedure set forth in this Section 2.7. This acceptance testing procedure will be repeated with respect to each revised deliverable until it is accepted by GSI. Notwithstanding the foregoing, if GSI rejects a deliverable after two (2) or more correction attempts by UMI, GSI shall have the right to terminate this Agreement immediately upon written notice to UMI. In such case, UMI shall immediately refund to GSI all fees paid by GSI under this Agreement. The foregoing remedy shall be in addition to any other rights or remedies of GSI, whether available under this Agreement, at law or in equity. Payment shall not constitute acceptance.

ARTICLE III:     Ownership.

III.1     GSI shall have sole ownership of all deliverables and the Product, and all associated intellectual property rights (excluding solely any Project Patents that UMI owns under the terms of Article IV) and all other works of authorship, information fixed in any tangible medium of expression (whether or not protectable under copyright laws), inventions (whether or not protectable under patent laws), discoveries, designs, developments, suggestions, ideas, improvements, know-how, and other intellectual property rights conceived, developed or reduced to practice by GSI, alone or with others, during the course of the Project (collectively, the "GSI IP")  This includes, without limitation, the following:  the specification of the Product, the layout (database) of the Product, circuit simulations and/or HDL descriptions of the Product. UMI hereby irrevocably transfers, conveys and assigns to GSI all of its right, title and interest in and to all GSI IP.  UMI will execute such documents, render such assistance, and take such other action as GSI may reasonably request, at GSI's reasonable expense, to apply for, register, perfect, confirm and protect GSI's rights to the GSI IP.  UMI hereby grants to GSI, under all of UMI's intellectual property rights, a worldwide, non-exclusive, perpetual, irrevocable, fully paid,

# UMI – GSI Product Design and Development Agreement
## 576 Mb Low Latency DRAM

royalty-free, transferable license, under all UMI's intellectual property rights (including, without limitation, any Project Patents) to (a) make, have made, use, offer for sale, sell, have sold and import products and to practice any methods, and (b) use, reproduce, modify, distribute, perform, display, create derivative works of, offer for sale, sell, have sold, import, make, have made and otherwise fully exploit any and all intellectual property that has been created, conceived, developed, reduce to practice, licensed, or otherwise acquired by UMI prior to the execution of, or independent from, this Agreement that is incorporated by UMI into the Product or other deliverables owned by GSI hereunder in any manner and through any medium, whether known or to become known. GSI shall also have the right to sublicense the foregoing rights and licenses granted herein through multiple tiers.

III.2     UMI hereby waives any and all moral rights, including, without limitation, any right to identification of authorship or limitation on subsequent modification that UMI (or its employees, agents or consultants) has or may have in any GSI IP and any derivatives, improvements or modifications thereof.

III.3     UMI agrees that if, GSI is unable because of UMI's unavailability, dissolution or incapacity, refusal to act or failure to act in a timely manner such that intellectual property rights protection may be impaired, to secure UMI's signature to apply for, or pursue, any application for any United States or foreign patents or mask work or copyright registrations covering the GSI IP assigned to GSI in Section 3.1 above, UMI hereby irrevocably designates and appoints GSI and its duly authorized officers and agents as UMI's agent and attorney in fact, to act for, and in UMI's behalf and stead, to execute and file any such applications and to do all other lawfully permitted acts to further the prosecution and issuance of patents, copyright and mask work registrations thereon with the same legal force and effect as if executed by UMI.

III.4     Execution of this Agreement shall not include any rights for UMI to use, or any interest in or to, any trademark, service mark or trade name of GSI.

III.5     Execution of this Agreement shall not include any rights for GSI to use, or any interest in or to, any trademark, service mark or trade name of UMI.

III.6     [Except for the Product being designed and developed by UMI for GSI hereunder,] UMI agrees it shall not, directly or indirectly, design or develop, or contribute to the design or development of, a Low Latency DRAM Product (as defined below) during the term of this Agreement. "Low Latency DRAM Product" means a latency optimized and/or address rate optimized memory product that employs a capacitive charge-based memory cell technology, including, but not limited to, RLDRAM and FCRAM products.

ARTICLE IV:  Project Patents.

IV.1     If, during the course of the Project, a UMI engineer alone makes any patentable inventions in the course or performance of UMI's development obligations hereunder, that invention and any resulting patent shall be owned by UMI (each, a "UMI Project Patent"). All costs for the patent filing and prosecution with respect to a UMI Project Patent shall be UMI's responsibility.

Exhibit A, Page 19

# UMI – GSI Product Design and Development Agreement
### 576 Mb Low Latency DRAM

IV.2     If, during the course of the Project, a GSI engineer alone makes any patentable inventions in the course or performance of GSI's development activities, that invention and any resulting patent shall be owned by GSI (each, a "GSI Project Patent"). All costs for the patent filing and prosecution with respect to a GSI Project Patent shall be GSI's responsibility.

IV.3     UMI shall apply for, prosecute and maintain the UMI Project Patents at all times during and after the term of this Agreement. The application filings, prosecution, maintenance and payment of all fees and expenses, including legal fees, relating to the UMI Project Patents shall be the responsibility of UMI. Patent attorneys chosen by UMI shall handle all patent filings and prosecutions, on behalf of UMI; provided, however, that GSI shall be entitled to review and comment upon and approve all actions undertaken in the prosecution of all patents and applications. If UMI declines to apply for, prosecute or maintain any UMI Project Patent, GSI shall have the right to pursue the same at GSI's expense and UMI shall have no rights under GSI's interest therein.

IV.4     If UMI decides not to, abandons or fails to apply for, prosecute or maintain any UMI Project Patents (each, an "Abandoned Patent Right"), UMI shall give sufficient and timely written notice to GSI of not less than thirty (30) days so as to permit GSI to apply for, prosecute and maintain each such Abandoned Patent Right. GSI will have the option, at its sole election, to assume all rights and obligations with respect to the prosecution and maintenance of each such Abandoned Patent Right. In the event GSI exercises its option, UMI shall transfer and assign its rights in, to and under each such Abandoned Patent Right to GSI and transfer the file histories and GSI will then be responsible for assuming the prosecution and maintenance of each such Abandoned Patent Right at GSI's own expense. UMI will also provide GSI with all information necessary or useful for the filing and prosecution of each such transferred Abandoned Patent Right. UMI shall cooperate fully with GSI to perfect such assignment, including, without limitation, taking such actions and promptly executing such documents as may be necessary or reasonably required.

IV.5     If UMI learns of the infringement of any UMI Project Patent by a third party, UMI shall promptly notify GSI in writing and provide GSI with any evidence possessed by UMI of such infringement. At any time, GSI may ask UMI to file, prosecute, and settle any suit or action for any actual or suspected infringement of any UMI Project Patent and UMI agrees to take all such actions as requested by GSI or assign ownership of such UMI Project Patent to GSI, as instructed by GSI. UMI shall promptly execute all papers and perform all such other acts as may be reasonably required by GSI in order to bring such suits or actions or make such assignments to GSI.

# UMI – GSI Product Design and Development Agreement
## 576 Mb Low Latency DRAM

ARTICLE V:    Certain Warranties, Disclaimers of Warranties and Limitations of Liability.

V.1    The payments to UMI and the substance of the other rights and duties of GSI and UMI set forth in this Agreement have been negotiated in reliance on, and are based upon the applicability and enforceability of, the warranties, disclaimers of warranties and limitations of liability contained in this Article V.

V.2    UMI represents and warrants to GSI only, and not to any third party (including, but not limited to, any customers (retail or wholesale) or sub-licensees of GSI), that (i) UMI shall abide by the terms and conditions of this Agreement and perform its services to be rendered as provided in Article II in commercial good faith, and in a professional and workmanlike manner by qualified personnel in full compliance with all relevant laws, ordinances, rules and regulations; (ii) services to be performed by UMI will not constitute breach of contractual obligations of UMI with any third parties; and (iii) UMI's design of the Product shall conform in accordance with the specifications set forth in Exhibit A. In the event that within six (6) months from the completion of the Project pursuant to Article II, the Product supplied by UMI to GSI does not perform in accordance with the requirements of Exhibit A, UMI shall promptly correct or modify such deliverables so that they are so performing and without any additional charge to GSI. If UMI materially breaches the warranty contained in this Section 5.2, GSI shall have the right to terminate this Agreement by delivering to UMI written notice of such termination pursuant to Section 7.3, without limiting any other rights or remedies available to GSI, whether under this Agreement, at law or in equity.

V.3    Except specifically as provided in this Article V, UMI makes no warranties to GSI or to any other party by virtue of this Agreement and UMI expressly disclaims all warranties, whether express, implied or arising by usage of trade, including all implied warranties of merchantability and fitness for a particular purpose, with respect to UMI's services to be provided pursuant to this Agreement. GSI shall not make or pass on to its customers (wholesale or retail) or sub-licensees any warranty or representation on behalf of UMI. Except for a breach of confidentiality obligations under Article 6 or a claim for indemnification made under Section 5.5, a party shall not be liable to the other for any consequential, incidental, special or punitive losses or damages under any circumstances whatever, whether asserted as a claim in contract, tort, negligence, product liability or strict liability and whether arising out of or resulting from any matter, information or thing made available or not made available under this Agreement or the use thereof. Except as specifically provided in this Article V and without limiting any warranty made by UMI or other obligation of UMI hereunder, including, without limitation, those with respect to the design, development and correction of the Product, UMI has not undertaken, and shall not have, any responsibility or liability whatever for the inability of GSI to manufacture the Product on a commercial scale or for the quality or performance of any of the Product, or for any claims of any third parties arising from any use of any of the Product.

V.4    A party shall not be liable to the other or to any third party by reason of termination of this Agreement for compensation, reimbursement or damages on account of any loss of prospective profits on anticipated sales or on account of expenditures, investments, leases, employment or labor contracts or other commitments relating to the business or goodwill of such party notwithstanding any law to the contrary. Without limiting the generality of the foregoing,

# UMI – GSI Product Design and Development Agreement
## 576 Mb Low Latency DRAM

GSI assumes all risks arising out of or relating to its inability to meet any commitments made to, and/or perform any agreements entered into with, any customer (wholesale or retail) or sub-licensee of GSI in the event of any termination of this Agreement, and UMI assumes all risks arising out of or relating to its decision to hire any employees for performing under this Agreement and its inability to meet any commitments made to, and/or perform any agreements entered into with, any GSI contractor in the event of any termination of this Agreement .

V.5     UMI shall provide GSI with all information and services necessary or useful to support the defense of GSI, its officers, directors, affiliates, employees, agents, resellers, distributors and customers  from and against any claim, action, suit or proceeding brought by a third party alleging infringement, misappropriation or violation of that party's patent, copyright, trade secret or other intellectual property rights by any deliverables provided hereunder, including the Product.

V.6     If upon inspection of any/all deliverables the manufacture, use or sale of any Product and/or deliverable is, in GSI's opinion, likely to become subject to an infringement suit, UMI shall recommend and make such design modifications, as seem prudent to GSI and UMI and/or provide non-monetary support to GSI in GSI attempts to obtain licenses to necessary intellectual property

ARTICLE VI:   Confidentiality.

VI.1     Each party acknowledges that in the course of the performance of this Agreement, it may obtain the Confidential Information of the other party.  The Receiving Party shall keep in confidence all of the Disclosing Party's Confidential Information received by it. All Confidential Information received by the Receiving Party shall be kept strictly confidential and shall not be used or disclosed to any person or entity by the Receiving Party except as necessary to exercise its rights and fulfill its obligations under this Agreement.  The Receiving Party shall take all reasonable steps to prevent unauthorized disclosure or use of the Disclosing Party's Confidential Information and to prevent it from falling into the public domain or into the possession of unauthorized persons.  Only UMI and GSI personnel needing access to such Confidential Information to effect the intent of this Agreement shall receive such information and who have entered into written confidentiality agreements with the Receiving Party which protects the Confidential Information of the Disclosing Party, and then only to the extent needed. The Receiving Party shall immediately give notice to the Disclosing Party of any unauthorized use or disclosure of Disclosing Party's Confidential Information.  The Receiving Party agrees to assist the Disclosing Party in remedying such unauthorized use or disclosure of its Confidential Information.

VI.2     These obligations shall not apply to the extent that Confidential Information includes information which:

VI.2.1  was in the public domain at the time it was disclosed;

VI.2.2  was known to the receiving party at the time of disclosure absent an obligation of confidentiality;

# UMI – GSI Product Design and Development Agreement
## 576 Mb Low Latency DRAM

VI.2.3  is disclosed with the prior written approval of the disclosing party;

VI.2.4  is inherently disclosed by the Product once on sale (wholesale or retail);

VI.2.5  is developed by the Receiving Party without any use of, or reference to, the Confidential Information;

VI.2.6  becomes known to the Receiving Party from a source other than the Disclosing Party without breach of this Agreement by the Receiving Party and absent an obligation of confidentiality; or

VI.2.7  is disclosed to a third party by the Disclosing Party free of any obligation of confidence.

A disclosure of Confidential Information that is disclosed pursuant to an order or requirement of a court, administrative agency, or other governmental body or otherwise required by law, shall not be considered to be a breach of this Agreement or a waiver of confidentiality for other purposes, provided that the receiving party shall as soon as practical give the disclosing party written notice of such order or requirement at least fourteen (14) days prior to disclosure of the confidential information to enable it to seek a protective order or otherwise prevent or limit such disclosure.

The burden of proof to establish that one of the foregoing seven exceptions applies shall be upon the Receiving Party.

VI.3     In furtherance, but not in limitation, of the provisions of Sections 6.1 and 6.2, each party shall use its customary and reasonable endeavors to cause all written materials and other physical documents and materials of all types relating to or containing confidential information or trade secrets disclosed by either party to the other under this Agreement, to be plainly marked to indicate the secret, proprietary and confidential nature thereof and to prevent the unauthorized use, disclosure or reproduction thereof, directly or indirectly.

VI.4     All the Confidential Information disclosed by GSI shall be and remain the sole property of GSI. Upon the earlier of termination of this Agreement or GSI's request, UMI agrees, within ten (10) days after the termination, to return to GSI all of the Confidential Information of GSI in its custody, possession or control, and any copies of the same. In lieu of returning Confidential Information of GSI, UMI may destroy such Confidential Information and promptly certify destruction in writing.

VI.5     Notwithstanding Section 6.1, GSI may disclose the confidential information and Trade Secret and materials of UMI to (i) its subsidiaries which exercise sub-license under Section 3.1 and (ii) its and its subsidiaries' respective contractors and other third parties for the design, development, layout, manufacture, testing and packaging of the Product or derivative of the Product to the extent necessary to exercise their duty, provided that such disclosures shall be made under reasonable terms of confidentiality.

# UMI – GSI Product Design and Development Agreement
### 576 Mb Low Latency DRAM

VI.6    Notwithstanding any term in this Agreement to the contrary, GSI shall be entitled to retain copies of all UMI Confidential Information reasonably required to continue to develop, maintain, support the Product or any derivative products or otherwise exploit the Product or to exercise any other surviving rights and obligations of GSI pursuant to this Agreement.

ARTICLE VII:   Term and Termination.

VII.1    The effective date of this Agreement shall for all purposes be the date this Agreement is executed by UMI and GSI (the "Effective Date").

VII.2    The term of this Agreement shall commence on the Effective Date and shall expire and be ended at the close of business on the day five (5) years from the Effective Date, unless earlier terminated by either party pursuant to this Article VII, or upon the expiration of the three (3) year support period detailed in Article II, paragraph 1.1 (d).

VII.3    Either party may terminate this Agreement on thirty (30) days' written notice to the other party if such other party is in default or breach of or with respect to any material provision of this Agreement; provided, however, that if the party receiving such notice of termination cures the breach or default prior to the expiration of the thirty (30) day period or, if the breach is such that it cannot be cured within the thirty (30) day period, diligently commences to cure the same within such thirty (30) day period and prosecutes such cure uninterruptedly to completion, this Agreement shall continue in full force and effect.  The aggrieved party's right to terminate this Agreement pursuant to this Section 7.3 shall be in addition to any other right, remedy or benefit the aggrieved party may have under this Agreement or applicable law.

VII.4    Notwithstanding any other provision of this Agreement and in addition to any other right, remedy or benefit a party may have under this Agreement or applicable law, such party shall have the unconditional right to terminate this Agreement, effective immediately, if at any time if the other party is adjudged by a court of law to be bankrupt or insolvent, or files a petition in bankruptcy or an answer admitting the material facts recited in such petition if filed by another, or is put, or makes an election to go, into dissolution or liquidation, or otherwise discontinues its business, makes an assignment for the benefit of its creditors or enters into any other general arrangement with its creditors, or has a receiver or custodian of any kind appointed to administer any substantial amount of its property, or is placed or enters into any comparable situation under the laws of any state or province in which its operations may be conducted, or otherwise seeks to take advantage of any bankruptcy or insolvency statute now or hereafter in effect in any country.

VII.5    The provisions of Articles III, IV and V of this Agreement shall survive expiration or termination of this Agreement permanently.  Article VI shall survive for ten (10) years any expiration or termination of this Agreement.  The definitions and all other rights, duties and obligations of the parties that by their nature continue and survive shall survive any termination or expiration of this Agreement.

# UMI – GSI Product Design and Development Agreement
## 576 Mb Low Latency DRAM

VII.6    GSI may terminate this Agreement at any time by written notice. In such case, GSI shall remain responsible for making payment for work successfully completed to that point that has been accepted by GSI.

VII.7    Immediately upon termination, UMI shall collect and deliver to GSI in a manner reasonably prescribed by GSI, whatever work product then exists with regard to the Product.

ARTICLE VIII: Governmental Requirements.

VIII.1    In performing their respective duties hereunder and in carrying out their activities as part of the Project, each of GSI and UMI shall comply with all applicable laws, regulations, procedures, ordinances and rulings of any governmental authority having jurisdiction over them.

ARTICLE IX:    Certain Costs and Expenses of the Project.

IX.1    Each of UMI and GSI shall bear their respective costs incurred in the performance of the Project, including all direct and indirect costs of all personnel involved in the Project from time to time.

ARTICLE X:    Miscellaneous.

X.1    Independent Contractors. It is understood and agreed that each of GSI and UMI are independent contractors and are, and shall continue to be, engaged in the conduct of their own respective businesses, including with respect to the design and development of the Product. Neither UMI nor GSI is to be considered the agent, joint venturer or employee of the other for any purpose, and neither party has the right or authority to enter into any contracts or assume obligations for the other or to give any warranty or make any representation on behalf of the other party except where and to the extent specifically authorized in writing to do so.

X.2    Entire Agreement. This Agreement (including all exhibits hereto) contains the entire and only agreement of GSI and UMI with respect to the subject matter hereof, and supersedes entirely any and all other prior or contemporaneous agreements, either oral or written, between the parties with respect thereto. No agreement, statement or promise relating to the subject matter of this Agreement which is not contained herein shall be valid or binding.

X.3    Assignment. This Agreement shall be binding upon and inure to the benefit of the parties hereto and their successors and permitted assigns; provided, however, that neither party may assign its rights under this Agreement, in whole or in part, whether by contract, operation of law or otherwise, or to delegate any duties hereunder without the prior written consent of the other, except that GSI may assign its rights under this Agreement in connection with a merger, acquisition, divestiture, corporate reorganization or sale of all or substantially all of its assets to which this Agreement relates. Any attempt by one party to assign its rights under this Agreement or to delegate any duties hereunder contrary to the provisions of this clause shall be null and void.

# UMI – GSI Product Design and Development Agreement
## 576 Mb Low Latency DRAM

X.4   Severability.  All agreements and covenants contained herein are severable and if any of them shall be held to be unenforceable or invalid, the remaining provisions or parts of this Agreement shall continue to remain in full force and effect and the unenforceable or invalid provision shall be amended to fulfill as closely as possible the original purpose of the unenforceable or invalid provision.

X.5   Governing Law.  This Agreement shall take effect under, be construed and enforced according to, and be governed by, the laws of the State of Colorado.

X.6   Changes or Amendment.  Any change, revision, termination, or attempted waiver of any of the provisions contained in this Agreement shall not be binding unless in writing and signed by the party against whom the same is sought to be enforced.  This Section 10.6 itself shall not be waived verbally.  This Agreement shall be amended or supplemented only by a written instrument duly executed by or on behalf of the parties hereto, and if and when so supplemented or amended shall include all such supplements and any amendments.

X.7   Construction Against Waiver.  No waiver of any term, provision or condition of this Agreement, whether by conduct or otherwise, in any one or more instances, shall be deemed to be or construed as a further or continuing waiver of any such term, provision or condition of this Agreement.

X.8   Notices.  All notices permitted or required to be given to the parties of this Agreement shall be in writing and delivered personally or sent by certified or registered airmail, return receipt requested, postage prepaid, by air courier, return receipt requested, or by telegram, telecopy or telex, addressed to the respective parties at the following addresses, unless another address is designated in writing in accordance with this Section 10.8:

UMI:   United Memories, Inc.
       4815 List Drive, Suite 109
       Colorado Springs, Colorado  80919
       Phone:  719-594-4238
       Fax:  719-594-4939
       Attention:  President & CEO

GSI:   GSI Technology, Inc.
       4131 Spicewood Springs Road
       Suite F-2
       Austin, TX  78759
       Phone:  512-346-7180
       Fax:  512-372-0446
       Attention:  David Chapman

Such notices shall be deemed to have been effectively given and received on the day of delivery if delivered personally, or, if by telegram, telecopy, telex, or air courier, on the next day following the sending of such notice by telegram, telecopy, telex, or air courier, and, if mailed, on the seventh (7th) business day following such mailing.

# UMI – GSI Product Design and Development Agreement
### 576 Mb Low Latency DRAM

X.9     Attorneys' Fees.  In the event of any controversy, claim or dispute between the parties hereto arising out of or relating to this Agreement, including, but not limited to, a controversy settled by arbitration, the prevailing party shall be entitled to recover from the losing party reasonable expenses, attorneys' fees and costs.

X.10     Acts of God.  If the performance by any party of any of its obligations under this Agreement shall be in any way prevented, interrupted, or hindered as a result of any force majeure, including, without limitation, war, civil disturbance, legislation or restriction of any governmental or other authority, fire, unavailability of materials or finished goods, delay of carriers, Act of God or any other similar circumstances beyond the reasonable control of such party, the obligations of the party concerned shall be wholly or partially suspended during the continuance and to the extent of such prevention, interruption of hindrance; provided, however, that local commercial unavailability of materials or finished goods shall not alone constitute force majeure for purposes hereof if such materials or finished goods are otherwise (even if at a higher cost) available.  A party unable to perform timely its obligations under this Agreement due to any of the foregoing reasons must take all reasonable steps to remedy its nonperformance or delay in performance with the least possible delay, and by doing whatever may reasonably be done to mitigate the adverse affect of its nonperformance upon the other party to this Agreement. Such delay shall not be excused under this Section 10.10 for longer than sixty (60) days.

X.11     Counterparts.  This Agreement may be executed in counterparts, each of which shall be deemed an original for all purposes and all of which shall constitute one and the same Agreement.

X.12     Nature of Agreement and Relationship; Public Announcement.  The existence and terms of this Agreement are GSI's Confidential Information.  No public announcement or press release concerning this Agreement shall be made by UMI without GSI's prior written consent.

IN WITNESS WHEREOF, the parties have caused their duly authorized representatives to execute this Agreement as of the date set forth in the preamble hereof.

"GSI"                                           "UMI"

GSI Technology, Inc.                            United Memories, Inc.

By: _Lee. C SH_____              By: _Robt R. Gower___

Name: _LEE - LEAN SHU__          Name: _ROBERT L. GOWER__

Title: _CEO_____                  Title: _PRESIDENT & CEO__

# UMI – GSI Product Design and Development Agreement
### 576 Mb Low Latency DRAM

EXHIBIT A

PROJECT SPECIFICATION

Product Specification shall be as specified on the following two Micron Technologies, Inc. data sheets plus the associated IBIS and BSDL models:

Micron Data Sheet for Common I/O versions:
MT49H64M9
MT49H32M18
MT49H16M36
Date 03/08
Rev. D

Micron Data Sheet for Separate I/O versions:
MT49H64M9C
MT49H32M18C
Date 09/07
Rev. B

# UMI – GSI Product Design and Development Agreement
### 576 Mb Low Latency DRAM

## EXHIBIT B

## PROJECT MILESTONES

| Project Milestone | Date | Payment |
|---|---|---|
| 1. Signing of Contract | May. 01, 2008 | $75K |
| 2. Preliminary Design Review<br>　Chip Architecture Defined<br>　Chip Floor Plan<br>　1st Pass Design of Critical Path<br>　　Circuits<br>　1st Pass Critical Path Simulation<br>　　Results<br>　Layout of Some Critical Blocks<br>　　(Sense Amps, Row Decoder)<br>　Chip Size Estimate<br>　Preliminary Testing Plan | July 15, 2008 | $100K |
| 3. Tape Out of Database<br>　All Circuit Schematics<br>　HSPICE Schematics and Parasitics<br>　LVS Hierarchy<br>　HSPICE Hierarchy<br>　Signal/Circuit Matrix<br>　Pad Locations<br>　Fuse Locations<br>　Full Simulation Files | Oct. 15, 2008 | $150K |
| 4. Final Design Review<br>　All Circuits Designed<br>　Full Chip Simulation Results<br>　Test Circuits Designed<br>　Test Characterization Plan<br>　Final Chip Size | Oct. 30, 2008 | $200K |
| 5. Test Characterization of the Product<br>　Meets Target Specs | Jan. 30, 2008 | $250K |
| 6. Manufacturing Release<br>　Yielding within 10 points of ProMOS 512M<br>　product in same technology<br>　Passes GSI internal qual | May 1, 2009 | $75k |

## UMI – GSI Product Design and Development Agreement
### 576 Mb Low Latency DRAM

### EXHIBIT C

GSI Personnel Participation in Colorado Springs, CO.

| Type Engineer | Approximate Start Date | Months Duration |
|---|---|---|
| Design | June 15, 2008 | 1.0 |
| Layout | Aug 01, 2008 | 1.0 |
| Product | Nov. 01, 2008 | 0.5 |
| Test | Dec. 01, 2008 | 0.5 |

**EXHIBIT B**



UNITED MEMORIES, INC. _____

*REC*
*7/22/09*

Mr. David Chapman
July 20, 2009
GSI Technology, Inc.
4131 Spicewood Springs Road
Suite F-2
Austin, TX 78759

Dear David,

This letter is to inform GSI that UMI considers the agreement titled <u>UMI-GSI Product Design and Development Agreement, 576 Mb Low Latency DRAM</u> to be terminated 30 days after you receive this letter. It is apparent that the intent of the agreement on longer exist and that GSI does not plan to satisfy section II.1.2 (a) Provide sufficient wafer starts .....

To the best of our knowledge, no GSI confidential information has been given to UMI by GSI. If this is not a true statement please identify the confidential material(s) and we will promptly return them to GSI.

Sincerely,

Robert L. Gower
President and CEO
United Memories, Inc.

Exhibit B, Page 19

**EXHIBIT C**



**DLA Piper** LLP (US)
401 B Street, Suite 1700
San Diego, California 92101-4297
www.dlapiper.com

Jeffrey M. Shohet
jeffrey.shohet@dlapiper.com
T 619.699.2743
F 619.764.6743

January 14, 2013                                                   Our File No. 351479-900000
*VIA FEDERAL EXPRESS*

Mr. Jon Faue
President and CEO
United Memories, Inc.
4815 List Drive, Suite 109
Colorado Springs, CO 80919

**Re:   UMI's Continuing Obligations Under the UMI – GSI Product Design and Development
Agreement, 576 Mb Low Latency DRAM**

Dear Mr. Faue:

This law firm represents GSI, Technology, Inc. ("GSI"). As part of a periodic contract review procedure,
we reviewed the contract between United Memories, Inc. (referred to herein as "UMI"), and GSI titled
"UMI – GSI Product Design and Development Agreement, 576 Mb Low Latency DRAM" ("Agreement")
executed on or around May 1, 2008. A copy of this Agreement is enclosed for your convenience. The
purpose of this letter is to remind UMI of its continuing obligations to GSI under the Agreement.

In the Agreement, UMI agreed to certain confidentiality, non-compete and non-disclosure obligations
which remain in place to this day. More specifically, pursuant to Article III of the Agreement, UMI
expressly agreed that:

> [Except for the Product being designed and developed by UMI for GSI
> hereunder,] UMI agrees it shall not, directly or indirectly, design or
> develop, or contribute to the design or development of, a Low Latency
> DRAM Product (as defined below) during the term of this Agreement.
> "Low Latency DRAM Product" means a latency optimized and/or address
> rate optimized memory product that employs a capacitive charge-based
> memory cell technology, including, but not limited to, RLDRAM and
> FCRAM products.

Agreement, Art. III.6 (this provision will be referred to herein as the "Non-Compete Obligation").

UMI also agreed to keep all of GSI's confidential information strictly confidential, and not use or disclose
GSI's confidential information except as necessary to exercise its rights and fulfill its obligations under the
Agreement (referred to herein as the "Confidentiality Obligation"). Agreement, Art. VI.1.

The Agreement provides, as relevant, that the term of the Agreement begins on the "Effective Date
[May 1, 2008 when the Agreement was executed] and shall expire and be ended at the close of business
on the day five (5) years from the Effective Date, unless earlier terminated by either party pursuant to this
Article VII." Agreement, Art. VII.2. "The provisions of Articles III, IV and V of this Agreement shall survive
expiration or termination of this Agreement permanently. Article VI shall survive for ten (10) years any
expiration or termination of this Agreement." Agreement, Art. VII.5.



**DLA PIPER**

Mr. Jon Faue
January 14, 2013
Page Two

UMI sent GSI a letter dated July 20, 2009 (referred to herein as the "Letter"), purporting to terminate the Agreement based on GSI's failure under Article II.1.2 (a) to "Provide sufficient wafer starts." First, GSI's purported failure to issue wafer starts is not conduct that would support UMI's termination of its confidentiality and non-compete obligations. But even if it were, early termination of the Agreement is allowed only on the other party's bankruptcy or insolvency or for a material breach of the Agreement. Agreement, Arts. VII.3, VII.4. The Letter's reference to a failure under Article II.1.2 is presumably meant to claim such failure as a material breach. The Agreement expressly requires, "[i]f either party believes an item of 2.1.1, Exhibit B or 2.1.2 is incomplete, [that] the parties shall meet and resolve the issue in good faith negotiations." Agreement, Art. II.2. As a result, UMI's unilateral termination and failure to proceed under Article II.1.2 cannot constitute a material breach allowing for termination under Article VII because otherwise the requirement of a meeting and good faith negotiations required by Article II.2 would be superfluous. There was no request for a meeting and certainly no good faith negotiations relating to GSI's alleged failure to complete Article II.1.2. Therefore, the Non-Compete and Confidentiality Obligations remain in effect until the 5-year term of the Agreement expires on April 30, 2013.

It is important to GSI to ensure that UMI's understanding of its obligations is consistent with GSI's. Therefore, we request your confirmation that the Agreement has not expired or been terminated and, most importantly, that UMI is not and has not during the term of the Agreement directly or indirectly, designed or developed, and is not currently contributing to the design or development of, a Low Latency DRAM Product (as defined in the Agreement) or otherwise using confidential, proprietary and know-how information provided to UMI by GSI in connection with bids against GSI on projects. .

I am available to discuss this matter further if you have and questions or concerns. If not, we look forward to your prompt response to the confirmations requested above. If we have not received any response by January 31, GSI will take such action as it deems necessary and appropriate to enforce its rights under the Agreement.

Very truly yours,

DLA Piper LLP (US)

Jeffrey M. Shohet
Partner

Admitted to practice in California and Texas

JMS:saw
Enclosure

cc:     Mr. David Chapman, GSI Technology, Inc.

WEST\240332843.1

Exhibit C, Page 35

**EXHIBIT D**



**Hogan Lovells**

Hogan Lovells US LLP
Two North Cascade Avenue
Suite 1300
Colorado Springs, CO 80903
T +1 719 448 5900
F +1 719 448 5922
www.hoganlovells.com

January 25, 2013

**Via Federal Express**

Jeffrey M. Shohet, Partner
DLA Piper LLP (US)
401 B Street, Suite 1700
San Diego, CA 92101-4297

RE: UMI-GSI Product Design and Development Agreement 576 Mb Low Latency DRAM

Dear Mr. Shohet:

Your letter of January 14, 2013 to Mr. Jon Faue, President and CEO of United Memories, Inc. (UMI) has been referred to me for response.

Succinctly, the position you have taken that the self-denominated "non-compete provision" of Article III. 6 of the above-referenced agreement (the "Agreement") remains in effect until April 30, 2013 is without merit. The fact that GSI Technology, Inc. (GSI) now attempts to raise any issues regarding this Agreement nearly three and a half years after Mr. Gower's letter of termination dated July 20, 2009 (the "Letter") is particularly incredible as any objections, issues or questions GSI had regarding the contents or effect of the Letter should have been raised at the time of its receipt.

### The Agreement was Terminated in 2009

The Letter clearly puts forth the grounds for UMI's consideration of the Agreement being terminated within 30 days as Article II.1.2 (a).states that:

> "GSI shall do the following:
> (a) Provide sufficient wafer starts (at GSI's expense) to perform the required development and provide all necessary raw materials, including masks and reticles ..."

GSI's failure to provide any wafer starts "to perform the required development" [emphasis supplied] thereby directly precluded the parties from ever achieving the Test Characterization and Manufacturing Release milestones and milestone dates of Exhibit B of the Agreement as well as precluding UMI's receipt of the required payment from GSI for the same as per Articles II.4.5 and II.4.6; clearly material provisions of the Agreement.

Hogan Lovells US LLP is a limited liability partnership registered in the District of Columbia. "Hogan Lovells" is an international legal practice that includes Hogan Lovells US LLP and Hogan Lovells International LLP, with offices in: Alicante Amsterdam Baltimore Beijing Berlin Brussels Caracas Colorado Springs Denver Dubai Dusseldorf Frankfurt Hamburg Hanoi Ho Chi Minh City Hong Kong Houston London Los Angeles Madrid Miami Milan Moscow Munich New York Northern Virginia Paris Philadelphia Prague Rome San Francisco Shanghai Silicon Valley Singapore Tokyo Ulaanbaatar Warsaw Washington DC Associated offices: Budapest Jakarta Jeddah Riyadh Zagreb. For more information see www.hoganlovells.com

\\OS - 080480/000001 - 180336 v3

Article VII.3 states that:

> "Either party may terminate this Agreement on thirty (30) days written notice to the other party if such other party is in default or breach of or [sic] with respect to any material provision of this Agreement ..."

UMI's Letter set out the basis for termination and the requisite 30 day cure period to GSI as per the Agreement but received absolutely no response to the Letter and GSI never made any effort to attempt to cure its breach. If GSI desired to avoid termination and continue with the Agreement under Article VII.3, GSI was not at liberty to simply ignore UMI's letter for almost three and a half years. Instead, GSI was expressly required to either cure "... the breach or default prior to the expiration of the thirty (30) day period or, if the breach is such that it cannot be cured within the thirty (30) day period..." to diligently commence "...to cure the same within such thirty (30) day period and ..." to prosecute "...such cure uninterruptedly to completion." GSI neither cured its default within thirty days of UMI's letter, nor commenced, let alone diligently, any efforts to cure its default within that time-frame. Consequently, the Agreement was terminated 30 days following the 7th business day from the mailing of the Letter to GSI as per Article X.8.

While Article II.2 states that:

> "If either party believes an item of 2.1.1, Exhibit B or 2.1.2 is incomplete, the parties shall meet and resolve the issue in good faith negotiations."

GSI's performance under Article II.1.2 was not merely "incomplete", GSI never even attempted to perform, whether in whole or in part, let alone incompletely so. GSI simply did not perform at all with respect to its obligation for the provision of "sufficient wafer starts". Since the obligation to perform under Article II.1.2 was GSI's and not UMI's, if GSI believed that negotiations would have been potentially fruitful to fulfill their contractual obligations under this provision, it was incumbent upon GSI to at least suggest the same following UMI's identification of GSI's material breach of the Agreement in the Letter from UMI.

## Under Colorado Law the Agreement was also Abandoned

The parties also clearly abandoned the Agreement in 2009. Per Article X.5, the Agreement is expressly governed by Colorado law.

> "This Agreement shall take effect under, be construed and enforced according to, and be governed by, the laws of the State of Colorado"

In Colorado, "a contract may be abandoned by mutual consent" which consent "may be implied from the acts and conduct of the parties." See H.T.C. Corp. v. Olds, 486 P.2d 463, 466 (Colo. App. 1971); In re Marriage of Young, 682 P.2d 1233 (Colo. App. 1984) (same); Tripp v. Parga, 847 P.2d 165 (Colo. App. 1992) (same). "A contract will be treated as abandoned when the acts of one party, inconsistent with its existence, are acquiesced in by another." Id.; see also Lansdale v. Geerlings, 523 P.2d 133, 136 (Colo. App. 1974) ("[a] contract may be rescinded or discharged by acts or conduct of the parties inconsistent with the continued existence of the contract, and mutual assent to abandon a contract may be inferred from the attendant circumstances and conduct of the parties").

In this instance, UMI's Letter plainly informed GSI that, *inter alia*, (1) the Agreement would be terminated in thirty days from the date of the letter based on GSI's failure to comply with Section II.1.2 (a); (2) the "intent of the [A]greement no longer exist[s]"; and (3) UMI had, to the best of its

knowledge, not acquired any confidential information from GSI during the scope of the parties' relationship and advised that if GSI disagreed with UMI's position regarding confidential information that it should "please identify the confidential material[s] and we will promptly return them to GSI."

Therefore, UMI's July 20, 2009 Letter unquestionably reflected UMI's understanding that the Agreement would terminate in thirty days, and GSI clearly acquiesced to UMI's understanding by failing to respond to UMI's Letter for nearly three and a half years or otherwise failing to take any action to reaffirm the existence of the Agreement. Therefore, the parties abandoned the Agreement, and the Agreement and the provisions thereof coextensive with its term, are no longer enforceable or in force.

## The "Non-Compete Provision" Terminated with the Agreement

Article VII.5 states, *inter alia,* that the provisions of Article III of the Agreement shall survive the termination of the Agreement permanently. However, Article III.6 specifically specifies that:

> "... UMI agrees it shall not, directly or indirectly, design or develop or contribute to the design or development of a Low Latency DRAM Product (as defined below) during the term of this Agreement." [Emphasis supplied]

Because a noncompetition clause must satisfy the rule of reasonableness as to duration to be enforceable, a noncompetition clause of unlimited duration is *per se* void under Colorado law. See Nat'l Graphics Co. v. Dilley, 681 P.2d 546, 547 (Colo. App. 1984). Therefore, UMI's obligation to not design, develop or contribute to the design or development of a Low Latency DRAM under the terms of the Agreement cannot be permanent as per Article VII.5 and instead terminated in 2009 with the Agreement itself per Article III.6 due to GSI's material breach.

## UMI Has No Confidential Information of GSI Received Pursuant to the Agreement

The Letter from UMI to GSI clearly states:

> "To the best of our knowledge, no GSI confidential information has been given to UMI by GSI. If this is not a true statement please identify the confidential material(s) and we will promptly return them to GSI".

UMI stands by this statement and remains willing to return any identified GSI confidential information in its possession despite the three and a half years since the Letter was sent to GSI.

The Agreement at Article VI.3 states:

> "... each party shall use its customary and reasonable endeavors to cause all written materials and other physical document and materials of all types relating to or containing confidential information or trade secrets disclosed by either party to the other under this Agreement, to be plainly marked to indicate the secret, proprietary and confidential nature thereof ..."

Jeffrey M. Shohet                           - 4 -                          January 25, 2013

UMI had, at the time of the Letter (and has since receipt of your letter of January 14th) checked its records and files and found no materials or documents marked by GSI as being confidential, proprietary, secret or otherwise as specified in Article VI.3.

Very truly yours,

William J. Kubida

Partner
william.kubida@hoganlovells.com
D 719 448 5909

cc: Jon Faue, United Memories, Inc.