1   JEFFREY M. SHOHET (Cal. Bar No. 067529)
    Jeffrey.shohet@dlapiper.com
2   CHRISTOPHER J. BEAL (Cal. Bar No. 216579)
    cris.beal@dlapiper.com
3   VERONICA L. JACKSON (Cal. Bar No. 243095)
    veronica.jackson@dlapiper.com
4   **DLA PIPER LLP (US)**
    401 B Street, Suite 1700
5   San Diego, CA  92101-4297
    Tel:  619.699.2700
6   Fax:  619.699.2701

7   RAJIV DHARNIDHARKA (Cal. Bar No. 234756)
    rajiv.dharnidharka@dlapiper.com
8   **DLA PIPER LLP (US)**
    2000 University Avenue
9   East Palo Alto, CA  94303-2214
    Tel:  650.833.2000
10  Fax:  650.833.2001

11  Attorneys for Plaintiff

12

13                  UNITED STATES DISTRICT COURT

14      NORTHERN DISTRICT OF CALIFORNIA, SAN JOSE DIVISION

| | |
|---|---|
| 15   GSI TECHNOLOGY, INC., a Delaware Corporation, | CASE NO.  13-CV-1081-PSG |
| 16 | **GSI TECHNOLOGY, INC.'S** |
| 17            Plaintiff, | **MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF *EX*** |
|             v. | ***PARTE* APPLICATION FOR (1)** |
| 18 | **TEMPORARY RESTRAINING ORDER;** |
| 19   UNITED MEMORIES, INC., a Colorado Corporation, | **(2) ORDER TO SHOW CAUSE REGARDING PRELIMINARY INJUNCTION; AND (3) EXPEDITED** |
| 20            Defendant. | **DISCOVERY IN THE ALTERNATIVE** |
| 21 | Date:   March 26, 2013 |
| 22 | Time:   Ex Parte |
|   | Judge:  Ex Parte |
| 23 | |

24

25

26

27

28

DLA PIPER LLP (US)
SAN DIEGO

WEST\240726259.3

GSI'S MEMO OF P&A ISO PLAINTIFF'S EX PARTE APPLICATION FOR TEMPORARY RESTRAINING
ORDER / CASE NO. 13-CV-1081-PSG

# TABLE OF CONTENTS

**Page**

I.    INTRODUCTION ............................................................................................... 1

II.   STATEMENT OF FACTS ................................................................................. 3
    A.   The Parties, the Project, and the Product ............................................... 3
    B.   The Agreement ....................................................................................... 4
    C.   UMI Begins Designing the LLDRAM Product in Collaboration with GSI
         Tech ...................................................................................................... 8
    D.   ProMOS's Insolvency .......................................................................... 10
    E.   UMI Purports to Terminate the Agreement Before Expiration of Its Five-
         Year Term and After It Had Already Anticipatorily Breached the
         Agreement ............................................................................................ 11
    F.   The Customer Removes GSI Tech from the Project ............................. 11
    G.   UMI Violates the Non-Compete and Confidentiality Obligations ....... 11
    H.   GSI Tech Seeks Assurances from UMI That It Is Not Working on an
         LLDRAM Product for a Competitor or Otherwise .............................. 12

III.  THE STANDARDS FOR GRANTING PRELIMINARY INJUNCTIVE RELIEF
      FAVOR GRANTING GSI TECH RELIEF IN THIS CASE .......................... 12
    A.   GSI Tech Is Likely to Succeed on the Merits ..................................... 13
         1.   GSI Tech Is Likely to Succeed on Its Breach of Contract Claims ........... 14
              a.   Existence of a Contract ................................................. 14
              b.   Performance by the Plaintiff or Some Justification for
                   Nonperformance ........................................................... 18
              c.   Failure to Perform the Contract by the Defendant ......... 19
              d.   Resulting Harm to the Plaintiff ..................................... 20
         2.   GSI Tech Will Likely Succeed on Its UCL Claim ................................ 20
    B.   Absent Preliminary Relief, GSI Tech Will Be Irreparably Harmed .................... 21
    C.   The Balance of Equities Tips in Favor of GSI Tech ............................. 22
    D.   The Public Interest Favors GSI Tech's Request for TRO/Preliminary
         Injunction ............................................................................................. 23

IV.   ALTERNATIVELY, THE COURT SHOULD ALLOW EXPEDITED
      DISCOVERY .................................................................................................. 23

V.    CONCLUSION ............................................................................................... 25

# TABLE OF AUTHORITIES

**Page**

**CASES**

*Alliance for the Wild Rockies v. Cottrell*,
   632 F.3d 1127 (9th Cir. 2011)...................................................................... 13

*Am. Legalnet, Inc. v. Davis*,
   673 F. Supp. 2d 1063 (C.D. Cal. 2009)........................................................ 24

*Bank of America, N.A. v. Lee*,
   2008 WL 4351348 (C.D. Cal. Sept. 22, 2008)............................................. 23

*Beals v. Tri-B Associates*,
   644 P.2d 78 (Colo. App. 1982) .................................................................... 18

*Berda v. Grand Lodge of IAM*,
   584 F.2d 308 (9th Cir. 1978)........................................................................ 14

*Campbell Soup Co. v. ConAgra, Inc.*,
   977 F.2d 86 (3rd Cir. 1992) ......................................................................... 21

*Cel-Tech Communications, Inc. v. Los Angeles Cellular Tel. Co.*,
   20 Cal. 4th 163 (1999) ................................................................................. 20

*Dimension Data N. Am. v. NetStar-1, Inc.*,
   226 F.R.D. 528 (E.D. N.C. 2005) ................................................................ 24

*Gilder v. P.G.A. Tour, Inc.*,
   936 F.2d 417 (9th Cir. 1991)........................................................................ 13

*Grand River Enterprise Six Nations, Ltd. v. Pryor*,
   481 F.3d 60 (2d. Cir. 2007).......................................................................... 22

*Jewel Tea Co. v. Watkins*,
   26 Colo. App. 494, 145 P. 719 (1915) ......................................................... 16

*Joseph DiLoreto, Inc. v. O'Neill*,
   1 Cal. App. 4th 149 (1991)........................................................................... 20

*Lamb-Weston, Inc. v. McCain Foods*, Ltd.,
   941 F.2d 970 (9th Cir. 1991)........................................................................ 13

*Latona v. Aetna U.S. Healthcare, Inc.*,
   82 F. Supp. 2d 1089 (C.D. Cal. 1999).......................................................... 23

*Lillge v. Verity*,
   2007 WL 2900568 (Oct. 2, 2007 N.D. Cal.)................................................. 22

1

2

### TABLE OF AUTHORITIES
#### (continued)

Page

3

4

*M.R. Mansfield Realty, Inc. v. Sunshine,*
   561 P.2d 342 (Colo. App. 1976) ................................................................ 16

5

*Massingill v. State Farm Mut. Auto. Ins. Co.,*
   176 P.3d 816 (Colo. App. 2007) ......................................................... 17, 18

6

7

*Merrill Lynch, Pierce Fenner & Smith, Inc. v. Chung,*
   2001 WL 283083 (C.D. Cal. Feb. 2, 2001) ............................................... 23

8

9

*MySpace, Inc. v. Wallace,*
   498 F. Supp. 2d 1293 (C.D. Cal. 2007) .................................................... 22

10

*North Atlantic Instruments, Inc. v. Haber,*
   188 F.3d 38 (2nd Cir. 1999) ..................................................................... 21

11

12

*Premier Indus. Corp. v. Texas Indus. Fastener Co.,*
   450 F.2d 444 (5th Cir. 1971) .................................................................... 13

13

14

*Rent-A-Center, Inc., v. Canyon Television & Appliance Rental, Inc.,*
   944 F.2d 597 (9th Cir. 1991) .................................................................... 22

15

*Rodriguez v. Wet Ink, LLC,*
   2011 WL 1059541 (D. Colo., Mar. 22, 2011) ......................................... 15

16

17

*Rohauer v. Little,*
   736 P.2d 403 (Colo. App. 1987) ............................................................... 18

18

19

*Saini v. Int'l Game Tech.,*
   434 F. Supp. 2d 913 (D. Nev. 2006) ......................................................... 22

20

*Saunders v. Superior Court,*
   27 Cal. App. 4th 832 (1994) ..................................................................... 21

21

22

*Semitool, Inc. v. Tokyo Electron America,*
   208 F.R.D. 273 (N.D. Cal. 2002) .............................................................. 24

23

24

*Stuhlbarg Int'l Sales Co., Inc. v. John D. Brush & Co.,*
   240 F.3d 832 (9th Cir. 2001) .............................................................. 13, 22

25

*Tallman v. Smith,*
   112 Colo. 217, 148 P.2d 581 (1944) ......................................................... 16

26

27

*Think-Village Kiwi, LLC v.Adobe Sys., Inc,*
   2009 WL 3837270 (N.D. Cal., Nov. 16, 2009)......................................... 20

28

DLA Piper LLP (US)
SAN FRANCISCO

-iii-

GSI'S MEMO OF P&A ISO PLAINTIFF'S EX PARTE APPLICATION FOR TEMPORARY RESTRAINING
ORDER / CASE NO. 13-CV-1081-PSG

1

## TABLE OF AUTHORITIES
### (continued)

2
**Page**

3   *TMX Funding, Inc. v. Impero Technologies, Inc.*,

4       2010 WL 1028254 (March 18, 2010 N.D. Cal.) .................................................. 22

5   *Union Pacific R.R. Co. v. Mower*,
    219 F.3d 1069 (9th Cir. 2000) .......................................................................... 22

6

7   *W. Distrib. Co. v. Diodosio*,
    841 P.2d 1053 (Colo. 1992) ............................................................................ 14

8   *Western Directories, Inc. v. Golden Guide Directories, Inc.*,
    2009 WL 1625945 (June 8, 2009 N.D. Cal.) .............................................. 22, 23

9

10   *Wilson v. Watt*,
    703 F.2d 395 (9th Cir. 1983) ........................................................................... 13

11   *Winter v. Natural Res. Def. Council, Inc.*,

12       555 U.S. 7 (2008) ........................................................................................... 13

13   STATUTES

14   Cal. Bus. & Prof. Code § 17200 ...................................................................... 2, 20, 21

15   Cal. Bus. & Prof. Code § 17203 ...................................................................... 21, 20

16   OTHER AUTHORITIES

17   Fed. R. Civ. P. 26 ........................................................................................... 23, 24

18   Fed. R. Civ. P. 30(b)(6) ......................................................................................... 25

19   Rest. 2d Contr. § 265 & Cmt. a.......................................................................... 16, 18, 19

20

21

22

23

24

25

26

27

28

1  **I.      INTRODUCTION**

2          In or about July 2007, Plaintiff GSI Technology, Inc. ("GSI Tech") was selected by one of

3  its largest customers (the "Customer") to participate in a project to develop, manufacture, and

4  supply a unique "Type III" low latency / high access rate Dynamic Random Access Memory chip

5  (the "LLDRAM-III Product"), to the Customer's specifications (the "LLDRAM-III Project").

6  The preliminary specifications for this product were determined initially by the Customer and

7  agreed to, within design tradeoffs, by GSI Tech and Defendant United Memories, Inc. ("UMI"),

8  which was then working as a contract designer for GSI Tech.

9          UMI had no experience designing any LLDRAM products.  For that, and other reasons,

10  GSI Tech decided that it would first engage UMI to provide design services in connection with a

11  "Type II" LLDRAM product (the "LLDRAM-II Product"), a standard, less sophisticated chip that

12  could be marketed and sold generally.  Part of the rationale of engaging UMI on an LLDRAM-II

13  Product was for the valuable knowledge and experience that could be gained before proceeding

14  with the Customer's LLDRAM-III Product.  GSI Tech also chose UMI, in part, because its parent

15  company, ProMOS, owned a "fab," a factory where devices such as semiconductors are

16  manufactured, and it could manufacture any LLDRAM product developed by GSI Tech and UMI.

17          Since UMI had no previous experience designing any LLDRAM products, GSI Tech was

18  significantly involved in UMI's design efforts, lending its valuable confidential, proprietary, and

19  trade secret information to UMI.  Because of UMI's exposure to GSI Tech's confidential,

20  proprietary, and trade secret information, the parties' written contract included significant

21  protections for the benefit of GSI Tech:  (1) any work product from the LLDRAM Project was to

22  remain proprietary as to GSI Tech; (2) UMI agreed that it would not design or develop any other

23  LLDRAM Product during the term of the contract, which was to last five years; and (3) UMI

24  agreed not to disclose any of GSI Tech's confidential information.

25          Work proceeded on the LLDRAM-II Product and UMI met four of the six milestones

26  identified in the parties' contract.  At that time, however, word leaked through the media that

27  ProMOS, UMI's parent company, was under financial distress and facing insolvency.  Because

28  UMI's design of the LLDRAM-II Product was tailored to the unique manufacturing processes of

1   ProMOS's fab, and because ProMOS's insolvency meant that its fab would no longer be available

2   to manufacture the prototype chips for the testing milestones under the contract and ultimately the

3   finished chip, these events meant that GSI Tech's time and money spent with UMI had been

4   virtually wasted.  In early 2009, GSI Tech and UMI agreed and understood that UMI would not

5   continue with the LLDRAM-II Project.  Ultimately, as it turned out, because of the significant

6   delays caused by ProMOS's insolvency, the Customer terminated GSI Tech's involvement in the

7   LLDRAM-III Project as well.

8        In approximately mid-2012, howeer, the Customer again decided that it required a second

9   source supplier for the LLDRAM-III Product.  It invited several companies, including GSI Tech,

10   to submit bid proposals for the development and supply of the LLDRAM-III Product.  GSI Tech

11   submitted a proposal, but was not awarded the LLDRAM-III Project.  In post-bid discussions, the

12   Customer would not disclose which of GSI Tech's competitors actually won the bid.  It did,

13   however, provide certain identifying information that left no doubt that UMI was involved in the

14   winning bid proposal.

15        That is, the Customer's information revealed that UMI is providing design services to a

16   competitor of GSI Tech's for the design of the very same LLDRAM-III Product with which GSI

17   Tech had originally involved UMI.  In doing so, it is almost certainly using GSI Tech's

18   confidential, proprietary, and trade secret information, and thus misappropriating that information

19   for the benefit of a competitor.  UMI's acts constitute breaches of its contractual obligations and

20   constitutes unfair competition under California Business & Professions Code section 17200.

21        Under these circumstances, GSI Tech respectfully seeks a temporary restraining order

22   ("TRO") from the Court pending a hearing on a preliminary injunction.  All of the factors

23   warranting such relief are present here.  First, GSI Tech is likely to succeed on the merits because

24   UMI has breached is contractual obligations and is unfairly competing against GSI Tech.

25   Second, California courts routinely presume irreparable harm from the misappropriation of a

26   business's confidential, proprietary, and/or trade secret information.  Third, the balance of

27   equities tips in favor of GSI Tech, because UMI has no legitimate right to using GSI Tech's

28   confidential, proprietary, and/or trade secret information, whereas GSI Tech has a vital interest in

1   protecting it from disclosure to a competitor.  Finally, the public interest favors protecting

2   confidential, proprietary, and trade secret information, and thus would support issuance of

3   injunctive relief here.

4   **II.      STATEMENT OF FACTS**

5          **A.      The Parties, the Project, and the Product**

6          Plaintiff GSI Tech designs, develops, and markets a broad range of high performance

7   memory products for networking, military, medical, automotive, and other applications.

8   (Declaration of Didier Lasserre in Support of Ex Parte Application, ¶ 2 ["Lasserre Decl."].)  It

9   specializes in memory products featuring very high transaction rates, high density, low latency,

10  high bandwidth, fast clock access times, and low power consumption.  (Lassere Decl., ¶ 2.)

11         In July 2007, GSI Tech and NEC Electronics (later merged into Renesas Technology

12  ("Renesas")), were selected by a router manufacturer (the "Customer") to design, develop, and

13  manufacture a "Type III" low latency / high random address rate Dynamic Random Access

14  Memory ("LLDRAM-III") chip (the "LLDRAM-III Product").  (Lasserre Decl., ¶ 3.)  An

15  LLDRAM chip is a high end device, particularly well-suited for advanced data networking

16  applications.  (Lasserre Decl., ¶ 4.)  In computing, memory latency is the time between initiating

17  a query and the retrieval of the queried information.  (*Id.*)  Latency is a fundamental measure of

18  the speed of memory, so that the less the latency, the faster the reading operation.  (*Id.*)

19         The Customer sought to secure two vendors who could supply the LLDRAM-III Product

20  according to its unique needs, but allowed for the possibility that the vendors could later market

21  and sell the final LLDRAM-III Product to others as well.  (Lasserre Decl., ¶ 5.)  The preliminary

22  specifications were determined initially by the Customer and agreed to, within design tradeoffs,

23  by GSI Tech, UMI (working as GSI Tech's contract designer), and Renesas.  (*Id.* )  Those

24  specifications defined various elements of the chip, including its size; operating current; pin count

25  and placement; interface; commands, addresses, and control signals; as well as other features and

26  functionality.  (*Id.*)

27         Although UMI was and is a contract memory design service provider, holding itself out as

28  specializing in the design of DRAM chips, at that time it had no history or experience in

1   designing LLDRAM chips, much less the kind of sophisticated, customized chip as the

2   LLDRAM-III sought by the Customer.  (Lasserre Decl., ¶ 6.)  GSI Tech, on the other hand, had

3   the necessary knowledge and experience in high transaction rate memory design and could impart

4   that knowledge to UMI in the course of the anticipated project.  (*Id.*)

5          For these reason, and because the process technology then available was not sufficiently

6   advanced to begin design of the LLDRAM-III Product, GSI Tech engaged UMI to provide design

7   and development services for a "Type II" LLDRAM product (the "LLDRAM-II Product").

8   (Declaration of Lee-Lean Shu in Support of Ex Parte Application, ¶ 5 ["Shu Decl."].)  GSI Tech

9   believed that, through this project, it would gain valuable knowledge and experience in LLDRAM

10  design that could later be applied to the LLDRAM-III Project.  (*Id.*)

11         Despite its lack of experience with LLDRAM, UMI promoted itself as particularly

12  appropriate for the project based on its affiliation with its parent company, ProMOS.  (Shu Decl.,

13  ¶ 6.)  ProMOS operated one of a handful of "fabs," a factory where integrated circuits can be

14  manufactured and tested.  (*Id.*)  Having access to a fab was essential to the success of the project

15  both for the testing phase of the Agreement and the ultimate manufacture of the product for sale

16  to the Customer.  (*Id.*)  UMI claimed that it could leverage its experience with its parent company

17  to efficiently and effectively complete the project.  (*Id.*)

18         **B.     The Agreement**

19         On May 1, 2008, GSI Tech and UMI entered into the "UMI-GSI Product Design and

20  Development Agreement" (the "Agreement").  (*See* Agreement, attached as Exhibit A to GSI

21  Tech's Complaint.)  In entering into the Agreement, GSI Tech placed particular emphasis and

22  importance on protecting its confidential, proprietary information and trade secrets, to the extent

23  that the parties included the following acknowledgment in Paragraph G of the Agreement's

24  recitals:

25                 UMI and GSI acknowledge that because of UMI's position as a
                  contract memory design service provider, the exposure UMI will
26                gain . . . to GSI's confidential, proprietary information and trade
                  secrets, and UMI's potential ability to use said information to assist
27                potential competitors to GSI to produce [LLDRAMs] to compete
                  with GSI, make the non-compete provisions of this Agreement . . .
28                necessary to protect GSI's trade secrets and legitimate and

WEST\240726259.3                                    -4-

significant business interests.

(Complaint, Ex. A, p. 14.)  Indeed, UMI acknowledged that "[i]n the absence of the restrictions [concerning GSI's confidential, proprietary information and trade secrets] contained in this Agreement, GSI would not have considered selecting UMI to manufacture [LLDRAM] products."  (*Id.*)  Thus, UMI's contractual promises to respect GSI Tech's confidential information, trade secrets, and GSI IP (as defined below) were material inducements to GSI Tech's entering into the Agreement.

The Agreement provides several protections and rights that are relevant here:

**<u>Ownership of Work Product from LLDRAM-II Product Development (GSI IP)</u>**

Article III assigns to GSI Tech ownership of the project and all work product generated from the project, whether by GSI Tech or UMI (with the sole exclusion of "Project Patents" not relevant here):

> GSI shall have sole ownership of all deliverables and the Product, and all associated intellectual property rights . . . and all other works of authorship, information fixed in any tangible medium of expression (whether or not protectable under copyright laws), inventions (whether or not protectable under patent laws), discoveries, designs, developments, suggestions, ideas, improvements, know-how, and other intellectual property rights conceived, developed or reduced to practice by GSI, alone or with others, during the course of the Project (collectively, the "GSI IP").

(Complaint, Ex. A, p.5 [Agreement, ¶ III.1].)  Thus, with one limited exception not relevant here, the parties agreed that all work product created in the course of developing the LLDRAM-II Product would remain the sole property of GSI Tech.  Moreover, the provision makes clear that GSI IP was not to be narrowly construed as the types of "intellectual property" normally protectable under applicable copyright, patent, or trade secret laws.  Rather, it included those forms of intellectual property and more—any works of authorship or any information fixed in any tangible medium of expression, as well as inventions, discoveries, designs, ideas, and the like developed "during the course of the Project."  (*Id.*)  All such "GSI IP" was to remain proprietary to GSI Tech and under the terms of this provision, "UMI hereby irrevocably transfers, conveys and assigns to GSI all of its right, title and interest in and to all GSI IP."  (*Id.*)

When construed in light of the parties' recital above, the Non-Compete Obligation

1   (discussed immediately below), and the Confidentiality Provision (discussed further below), the

2   purpose of assigning to GSI Tech all of the "fruits" of the project was to prevent UMI from using

3   the knowledge and experience it gained from GSI Tech to subsequently provide LLDRAM design

4   services to GSI Tech's competitors.

5               **Non-Compete Obligation**

6       That Article III, including the GSI IP provision above, was intended to protect GSI Tech

7   from UMI's using the know-how it gained from the project to benefit a competitor is further

8   demonstrated by Article III.6, which prohibits UMI from undertaking **any** other LLDRAM work

9   during the term of the Agreement:

10          [Except for the Product being designed and developed by UMI for
            GSI hereunder,] UMI agrees it shall not, directly or indirectly,
11          design or develop, or contribute to the design or development of, a
            Low Latency DRAM Product (as defined below) during the term of
12          this Agreement. "Low Latency DRAM Product" means a latency
            optimized and/or address rate optimized memory product that
13          employs a capacitive charge-based memory cell technology,
            including, but not limited to, RLDRAM and FCRAM products.
14

15   (Complaint, Ex. A, p.6 [Agreement, ¶ III.6]) (hereinafter, the "Non-Compete Obligation.")

16              **Confidentiality Obligation**

17      Moreover, the Agreement also obligated UMI to keep all of GSI's confidential

18   information strictly confidential, and not use or disclose it except as necessary to exercise its

19   rights and fulfill its obligations under the Agreement:

20          Each party acknowledges that in the course of the performance of
            this Agreement, it may obtain the Confidential Information of the
21          other party.  The Receiving Party shall keep in confidence all of the
            Disclosing Party's Confidential Information received by it.  All
22          Confidential Information received by the Receiving Party shall be
            kept strictly confidential and shall not be used or disclosed to any
23          person or entity by the Receiving Party except as necessary to
            exercise its rights and fulfill its obligations under this Agreement.
24

25   (Complaint, Ex. A, p.6 [Agreement, ¶ VI.1]) (hereinafter, the "Confidentiality Obligation.")

26   Under the Agreement, "Confidential Information" is defined as

27          all non-public information that the party disclosing the information
            . . . designates at the time of disclosure as being confidential, or if
28          disclosed orally or visually is identified as such prior to disclosure

and summarized, in writing, by the Disclosing Party to the receiving party . . . within thirty (30) days, or which, under the circumstances surrounding disclosure, the Receiving Party knows or has reason to know should be treated as confidential without the need to be marked as 'confidential.'

(Complaint, Ex. A, p.2 [Agreement, ¶ I.1]).  Thus, while the Agreement exhorted the parties to in some way designate Confidential Information as "confidential," not doing so would not thereby render the information nonconfidential where the Receiving Party knew or should have known that the information should be treated as confidential.  For this reason, Section VI.3 required the parties to use "customary and reasonable endeavors" to mark documents and other materials containing confidential information "to indicate the secret, proprietary and confidential nature thereof," but by its own terms, Section VI.3 was "in furtherance" of the Confidentiality Obligation, "but not in limitation" of it.  (*Id.*)  That is, the failure to designate confidential information would not preclude it from being Confidential Information under the terms of the Agreement.

Moreover, given the broad language of Article VI, regarding "Confidentiality," and the definition of Confidential Information, UMI should reasonably have known that any GSI IP was to be maintained as confidential as well, lest the economic value of that information dissipate.

### Term and Termination of the Agreement; Survivability

Pursuant to Article VII.2, the term of the Agreement began on the "Effective Date," May 1, 2008 according to Exhibit B to the Agreement, and "shall expire and be ended at the close of business on the day five (5) years from the Effective Date," or April 30, 2013, "unless earlier terminated by either party pursuant to this Article VII."  (Complaint, Ex. A, p. 11[ Agreement, ¶ VII.2].)

Under Articles VII.3 and VII.4, early termination of the Agreement is allowed only upon "default or breach of or with respect to any material provision of this Agreement" (Article VII.3) or upon the other party's bankruptcy or insolvency (Article VII.4).  (Complaint, Ex. A, p.11.) Importantly, Article X.6 significantly curtails a party's ability to unilaterally terminate the Agreement: "Any change, revision, termination, or attempted waiver of any of the provisions

1  contained in this Agreement shall not be binding unless in writing and signed by the party against

2  whom the same is sought to be enforced." (Complaint, Ex. A, p. 11 [Agreement, Art. VII.3]

3  (emphasis added).)

4       Moreover, because of the importance of preserving the protections afforded to GSI under

5  the GSI IP Provision, the Non-Compete Provision, and the Confidentiality Obligations, Article

6  VII.5 provides the following survival provision: "[t]he provisions of Articles III [which includes

7  the GSI IP Provision and Non-Compete Provision]. . . of this Agreement shall survive expiration

8  or termination of this Agreement permanently. (Complaint, Ex. A, p.11.) Article VI [which

9  includes the Confidentiality Obligation] shall survive for ten (10) years any expiration or

10  termination of this Agreement," (the "Survival Clause".) (Complaint, Ex. A, p.11.)

11       **Governing Law Provision**

12       Finally, the Agreement provides that it shall "be construed and enforced according to, and

13  be governed by, the laws of the State of Colorado." (Complaint, Ex. A, p.13 [Agreement, Art.

14  X.5].)

15       C.    **UMI Begins Designing the LLDRAM Product in Collaboration with GSI
             Tech**

16

17       UMI began performance under the Agreement in May 2008, shortly after it was executed.

18  (Shu Decl., ¶ 8.) Because each fab where DRAM chips are made develops and observes different

19  design rules and manufacturing protocols, chip designers must select a specific fab to

20  manufacture the chips under development. (*Id.*) That is, in developing the design of the chip, it

21  must be tailored to the unique processes and manufacturing protocols observed by the

22  manufacturing fab. And if the selected fab becomes unavailable, all of the design work must be

23  redone to conform to the design rules and manufacturing protocols of the replacement fab unless

24  the replacement fab uses the same manufacturing process and design rules as the original fab.

25  (*Id.*)

26       As noted above, GSI Tech had selected UMI for this work, in part, because of its

27  relationship with ProMOS and the availability of ProMOS's fab. (Shu Decl., ¶ 9.) As UMI

28  began development work, the parties understood that the LDRAM chips would be manufactured

1  at the ProMOS fab owned by UMI's parent company.  (Shu Decl., ¶ 10.)  UMI therefore designed

2  the LLDRAM chip for manufacture at ProMOS according to its unique design rules and

3  protocols.  (Shu Decl., ¶ 10.)

4  Also as noted above, UMI had no experience in designing any LLDRAM device, much

5  less the LLDRAM-II Product for which it was engaged by GSI Tech.  Rather, its experience lay

6  in designing DRAM, which had become a commoditized, undifferentiated market by 2008.  (Shu

7  Decl., ¶ 11.)  The LLDRAM market, by contrast, was a very small and highly specialized

8  segment of the DRAM market, as it remains today, with relatively few manufacturers or

9  suppliers.  (*Id.*)  The LLDRAM market was and is a small market because, while LLDRAM

10  enjoys higher performance characteristics than DRAM, that performance comes with a higher

11  price as well.  (*Id.*)

12  In order to facilitate design of the LLDRAM-II Product, and considering that UMI had no

13  prior history with LLDRAM products, GSI sent UMI one of its engineers to perform simulation

14  and circuit verification for two months, significantly advancing UMI's LLDRAM capability.

15  (Shu Decl., ¶ 13.)  The information and work shared by this engineer with UMI was of a type that

16  UMI knew or should have known was non-public, sensitive business information that should not

17  be generally shared with others outside of the LLDRAM-II Project, and therefore constituted GSI

18  Tech's confidential trade secrets.  (*Id.*)

19  GSI also participated in chip design review meetings and suggested critical improvements

20  and corrections to UMI's circuitry design during a December 18, 2008 design review meeting

21  attended by GSI Tech and UMI engineers and executives.  (Shu Decl., ¶ 14.)  During this

22  meeting, GSI Tech provided proprietary non-public, trade secret information and advice on how

23  to better design an LLDRAM chip based on GSI Tech's unique knowledge on how such chips

24  work.  (*Id.*)  Again, the information provided by GSI Tech to UMI in the course of these meetings

25  constituted Confidential Information under the Agreement.  (*Id.*)

26  GSI sent full and complete payment to UMI for all project milestones through milestone

27  number 4, which had a completion date of October 30, 2008.  (Shu Decl., ¶ 15.)  GSI Tech also

28  made payments to UMI for additional work pursuant to Article II of the Agreement.  (Shu Decl.,

¶ 15.)  As of December 18, 2008, GSI had paid UMI a total of $542,400—on a contract of $850,000—which constituted full payment for all services performed by UMI to that point.  (Shu Decl., ¶ 15.)

### D.     ProMOS's Insolvency

Milestone 5 involved the testing of the LLDRAM-II Product designed by UMI and was to be completed by January 30, 2009.  (Compl., Ex. A, pp. 3, 16.)  In December 2008, however, GSI Tech learned through news reports that ProMOS was under severe financial distress and seeking bailouts from the Taiwanese government.  (Shu Decl., ¶ 16.)  In light of ProMOS's reported insolvency, GSI Tech expressed concerns about UMI's ability to proceed to the completion of the project, which called for manufacturing and testing at the ProMOS fab.  (Shu Decl., ¶ 16.)

During the course of many meetings, phone conversations and email correspondence between representatives of UMI, GSI Tech, and ProMOS in or about December 2008 through January 2009, the parties discussed and agreed that UMI could no longer proceed in accordance with the Agreement due to ProMOS' financial difficulties and potential insolvency.  (Shu Decl., ¶ 17.)  Because it was not possible to design in the ProMOS-Hynix environment and then port that design over to a different process technology, it made no economic sense to proceed with milestones 5 and 6 in accordance with the ProMOS design rules given its apparent insolvency. (*Id.*)

Because of ProMOS's insolvency and unavailability, GSI Tech never issued wafer starts to ProMOS as contemplated under Section II.1.2(a) of the Agreement.  (Shu Decl., ¶ 17.) Indeed, the more than $540,000 GSI Tech spent for the LLDRAM-II Product under the Agreement was largely wasted because GSI Tech determined that it would have to start over with a different fab using its unique design rules and processes.  (*Id.*)

### E.     UMI Purports to Terminate the Agreement Before Expiration of Its Five-Year Term and After It Had Already Anticipatorily Breached the Agreement

On July 20, 2009, UMI sent GSI Tech a letter purporting to terminate the Agreement based on GSI Tech's "failure" to provide sufficient wafer starts as contemplated under Section II.1.2(a) of the Agreement.  (Compl., Ex. B [July 20, 2009 UMI Letter].)  The legal effect—there

1    is none—of UMI's letter is discussed in greater detail in Section III.A.1.a below.  Because the

2    parties had already discussed and agreed that the project could not move forward in light of

3    ProMOS's insolvency, and because GSI Tech had determined to move forward using its internal

4    design team implementing a different fab protocol, GSI Tech did not respond to UMI's letter.

5         **F.       The Customer Removes GSI Tech from the Project**

6              Because of the delay caused by UMI and its parent company, GSI Tech was substantially

7    delayed in beginning design and development work on the Customer's LLDRAM-III Product.

8    (Lasserre Decl., ¶ 8.)  Following this delay, the Customer dropped GSI Tech as one of its two

9    suppliers for the LLDRAM-III Product, deciding that it would depend upon Renesas as sole

10   source.  (*Id.*)

11        **G.       UMI Violates the Non-Compete and Confidentiality Obligations**

12             In or about mid-2012, the Customer determined that it would still need a second source

13   for the LLDRAM-III Product.  (Lasserre Decl., ¶ 9.)  For that reason, it invited certain DRAM

14   suppliers, including GSI Tech, to bid to become the Customer's second source supplier.  (*Id.*)

15   GSI Tech, however, was not awarded the bid.  (*Id.*)  Following the bid, the Customer would not

16   identify which company had been selected as its second source for the LLDRAM-III Product.

17   (Lasserre Decl., ¶ 10.)

18             The Customer did say, however, that in selecting its second source, it was "going with one

19   of our original guys," or words to that effect.  (Lasserre Decl., ¶ 10.)  Because the only "original

20   guys" were Renesas, GSI Tech, and UMI, and because Renesas was already a supplier and GSI

21   Tech's bid had been rejected, it was clear from the conversation with the Customer that its

22   selection of a second supplier of the LLDRAM-III Product included UMI.  (*Id.*)  That is, GSI

23   Tech surmised from the Customer's comments that the winning proposal included using UMI as

24   the design firm for the LLDRAM-III Product.  (*Id.*)

25        **H.       GSI Tech Seeks Assurances from UMI That It Is Not Working on an
                    LLDRAM Product for a Competitor or Otherwise**

26

27             Following the revelation from the Customer of UMI's involvement with a customer, GSI

28   Tech, through its counsel, sought assurances from UMI that it was complying with its contractual

1   obligations under the Agreement.  (Compl., Ex. C.)  In a January 14, 2013 letter, counsel sought

2   assurances that "UMI is not and has not during the term of the Agreement directly or indirectly,

3   designed or developed, and is not currently contributing to the design or development of a

4   [LLDRAM Product] or otherwise using confidential, proprietary and know-how information

5   provided to UMI by GSI in connection with bids against GSI on projects."  (Compl., Ex. C.)

6        Although UMI responded by a January 25, 2013 letter from its own counsel, it provided

7   no such assurances.  (Compl., Ex. D.)  Rather, it offered a strained interpretation of its

8   Confidentiality Obligation, essentially limiting that obligation to documents received from GSI

9   Tech that were marked "Confidential Information," and asserting that it had none.  (*Id.*)

10  Moreover, UMI's response completely ignored whether it was working with a competitor of GSI

11  Tech's to design any LLDRAM Product or whether it was working on the Customer's LLDRAM-

12  III Project with a competitor.  (*Id.*)

13  **III.   THE STANDARDS FOR GRANTING PRELIMINARY INJUNCTIVE RELIEF
           FAVOR GRANTING GSI TECH RELIEF IN THIS CASE.**

14

15       As more specifically set forth in its Proposed Order, GSI Tech seeks a narrowly-tailored

16  TRO and preliminary injunction (a) enjoining Defendant UMI from directly or indirectly,

17  designing or developing, or contributing to the design or development of any LLDRAM Product

18  for which UMI has been retained to provide such services (the "Pending Projects"); (b) enjoining

19  Defendant from using GSI IP in connection with Pending Projects, and (c) enjoining Defendant

20  from using, divulging, furnishing, or otherwise making accessible to any person GSI Tech's

21  confidential information or trade secrets in connection with the Pending Projects.

22       As GSI Tech notes in Section III.A.1.a, below, UMI's Confidentiality Obligation

23  technically expires on April 30, 2013.  Even so, "a court has equitable powers to enjoin

24  defendants for a time beyond the expiration of covenants not to compete to effectuate relief for

25  the time they violated the covenants."  *Premier Indus. Corp. v. Texas Indus. Fastener Co.*, 450

26  F.2d 444, 448 (5th Cir. 1971); *see also Lamb-Weston, Inc. v. McCain Foods*, Ltd., 941 F.2d 970,

27  975 (9th Cir. 1991) (noting that a court may enjoin defendants beyond expiration of noncompete

28  to effectuate relief for time the noncompete was violated) (*citing Premier Indus.*, 941 F.2d 970,

1   with approval).  For these reasons, with respect to the first category of preliminary relief above,

2   GSI Tech respectfully requests that the UMI be enjoined from continuing to design any

3   LLDRAM Product for some reasonable time beyond April 30, 2013. [1]

4          The legal standards for entry of either a temporary restraining order or preliminary

5   injunction are the same.  *See Stuhlbarg Int'l Sales Co., Inc. v. John D. Brush & Co.*, 240 F.3d

6   832, 839 n.7 (9th Cir. 2001).  In the Ninth Circuit, to obtain preliminary injunctive relief, the

7   moving party must show: (1) a likelihood of success on the merits; (2) a likelihood of irreparable

8   harm to the moving party in the absence of preliminary relief; (3) that the balance of equities tips

9   in the favor of the moving party; and (4) that an injunction is in the public interest.  *Winter v.*

10  *Natural Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008).  A court may apply a sliding scale test,

11  under which "the elements of the preliminary injunction test are balanced, so that a stronger

12  showing of one element may offset a weaker showing of another."  *Alliance for the Wild Rockies*

13  *v. Cottrell*, 632 F.3d 1127, 1131 (9th Cir. 2011).  Here, as discussed in detail below, all of the

14  factors that a court must consider in granting preliminary relief favor GSI Tech.

15      **A.      GSI Tech Is Likely to Succeed on the Merits**

16         To obtain a TRO or preliminary injunction, a plaintiff must show a likelihood of

17  prevailing on the merits.  *Wilson v. Watt*, 703 F.2d 395 (9th Cir. 1983).  However, a plaintiff need

18  not show how it will positively prevail on the merits.  *Gilder v. P.G.A. Tour, Inc*., 936 F.2d 417,

19  422 (9th Cir. 1991).  A reasonable probability—"fair chance" of success—is the standard for

20  granting preliminary injunctive relief.  *Berda v. Grand Lodge of IAM*, 584 F.2d 308, 315 (9th Cir.

21  1978).  Given the evidence before this Court, GSI Tech can demonstrate, at a minimum, a

22  reasonable probability of success on the merits on both its breach of contract and unfair

23  competition claims.

24         **1.      GSI Tech Is Likely to Succeed on Its Breach of Contract Claims**

25         Under Colorado law, which governs the Agreement under Article X.5, a party suing for

26

27  ───────────────
    [1] GSI Tech's second and third categories of injunctive relief are not similarly time-constrained.  Under the
28  Agreement, GSI Tech's ownership of GSI IP lasts in perpetuity, while its Confidential Information remains protected
    for ten years following expiration of the Agreement on April 30, 2013.

1  breach of contract must prove: (1) the existence of a contract; (2) performance by the plaintiff or

2  some justification for nonperformance; (3) failure to perform the contract by the defendant; and

3  (4) resulting damage to the plaintiff.  *W. Distrib. Co. v. Diodosio*, 841 P.2d 1053, 1058 (Colo.

4  1992).  Here, for purposes of the present application, GSI Tech identifies three distinct breaches

5  of the Agreement by UMI:  breach of the Non-Compete Obligation, breach of the Confidentiality

6  Obligation, and breach of the GSI IP Provision.

7                              **a.      Existence of a Contract**

8          UMI does not dispute that it entered into the Agreement.  Rather, in a January 25, 2013

9  letter from its counsel (the "2013 Letter"), UMI has taken the position that the Agreement was

10  unilaterally terminated by UMI in 2009.  (Compl. Ex. D, p. 37.)  The 2013 Letter refers to a

11  previous July 20, 2009 UMI letter (the "2009 Letter"), in which UMI stated that it "considers the

12  agreement titled UMI-GSI Product Design and Development Agreement, 576 Mb Low Latency

13  DRAM to be terminated 30 days after you receive this letter."  (Compl. Ex. B, p. 32.)  As a

14  purported justification for terminating the Agreement, the 2009 Letter further states, "It is

15  apparent that the intent of the agreement [no] longer exist[s] and that GSI does not plan to satisfy

16  section II.1.2(a) Provide sufficient wafer starts ….[sic]".  (*Id.*)  UMI's 2009 attempt to terminate

17  the Agreement was ineffective for several reasons.

18          First, months before UMI sent its letter, it was clear from discussions between GSI Tech

19  and UMI that the parties agreed it made no sense for the LLDRAM Project to move forward

20  considering ProMOS's insolvency.  (*See* § II.D, *supra*.)  The parties had already recognized and

21  agreed that it would have been futile to proceed.  (*Id.*)

22          Next, UMI had no legitimate cause to complain that GSI Tech would not provide wafer

23  starts under the terms of the Agreement, where UMI had already anticipatorily breached the

24  Agreement when it admitted in discussions during December 2008 - January 2009 that its

25  affiliate, ProMOS, would be unable to proceed to testing due to its insolvency.  (*See* § II.D,

26  *supra*.)  UMI's inability to proceed to testing relieved GSI of any dependent obligations relating

27  to testing, such as to provide wafer starts.  *Rodriguez v. Wet Ink, LLC*, No. 08–cv–00857, 2011

28  WL 1059541, at *4 (D. Colo. Mar. 22, 2011) ("Colorado law provides that if one party fails to

1   perform under a contract, and the failure is both material and unexcused, the other party may be

2   relieved of a duty to perform.") UMI provided chip design services tailored to ProMOS's unique

3   process specifications, with the understanding that ProMOS would undertake the fabrication and

4   manufacture of the LLDRAM Product on GSI Tech's behalf, and ProMOS's insolvency created a

5   considerable risk that UMI would likewise be cannibalized by ProMOS for an infusion of capital

6   to meet its debt requirements.

7       Further, UMI's purported termination was ineffective because the Agreement provides

8   that a party may terminate only where "such other party is in default or breach of or with respect

9   to any material provision of this Agreement" (Art. VII.3) or where the other party is insolvent or

10  bankrupt (Art. VII.4).  (Complaint, Ex. A, p.11.)  The failure to provide wafer starts under Article

11  II.1.2(a) would not constitute a material breach.  (*Id*.)  Even if it were, however, Article II.2

12  provides that that if a party believed any item from Article II.1.2 to be incomplete, then "the

13  parties shall meet and resolve the issue in good faith negotiations."  (Complaint, Ex. A, p.3.)

14  UMI made no request for a meeting or good faith negotiations to resolve its complaint with

15  respect to the wafer starts.

16      Likewise, UMI's purported unilateral termination and waiver of the good faith meet and

17  confer requirement was ineffective because Article X.6 provides that any such termination must

18  be agreed to by the other party:  "Any change, revision, termination, or attempted waiver of any

19  of the provisions contained in this Agreement shall not be binding unless in writing and signed by

20  the party against whom the same is sought to be enforced."  (Complaint, Ex. A, p.13.)  [emphasis

21  added].)  Article X.6 makes particular sense in light of the parties' requirement to meet and

22  confer to resolve disputes concerning each others' performance as set out in Articles II.1.1 and

23  II.1.2.  That is, the requirement of Article X.6 ensures that the meet and confer requirement would

24  also be met before any purported termination.

25      Finally, although GSI Tech was obligated to provide sufficient wafer starts to facilitate

26  UMI's performance of testing work under milestone 5, GSI Tech was relieved of any such

27  obligation due to ProMOS's insolvency as discussed above.  *See* Rest. 2d Contr. § 265 ("Where,

28  after a contract is made, a party's principal purpose is substantially frustrated without his fault by

1    the occurrence of an event the non-occurrence of which was a basic assumption on which the

2    contract was made, his remaining duties to render performance are discharged, unless the

3    language or the circumstances indicate the contrary.")  Here, UMI designed the LLDRAM chip

4    according to the unique design rules and manufacturing protocols of ProMOS's fab.  (Shu Decl.,

5    ¶ 17.)  ProMOS's insolvency frustrated this basic purpose of the Agreement, and thus GSI Tech's

6    further duties under the Agreement, such as providing wafer starts, was discharged.

7            Regardless, even if UMI had terminated the Agreement in 2009, the obligations and

8    provisions at issue here would have survived and remained in force and effect under Article

9    VII.5, the Survival Clause:  "The provisions of Articles III [which includes the GSI IP Provision

10   and Non-Compete Obligation] . . . shall survive expiration or termination of this Agreement

11   permanently.  Article VI [including the Confidentiality Obligation] shall survive for ten (10)

12   years any expiration or termination of this Agreement."  (Complaint, Ex. A, p.11.)

13           In its 2013 Letter, UMI argues that applying the Survival Clause to the 2009 termination

14   of the Agreement would convert the Non-Compete Obligation from a five-year duration—as

15   provided in Article III.6—to a permanent duration.  (Compl., Ex. D.)  UMI argues that, under

16   Colorado law, a noncompetition clause of unlimited duration would be void.  (*Id.*)  UMI's straw

17   man argument, however, runs afoul of two well-established principles of contract interpretation

18   under Colorado law:  a contract should be given that construction which will make it valid and

19   binding and courts should effectuate and not destroy contracts.  *M.R. Mansfield Realty, Inc. v.*

20   *Sunshine*, 561 P.2d 342, 344 (Colo. App. 1976) (*citing Tallman v. Smith*, 112 Colo. 217, 148 P.2d

21   581 (1944)) and *Jewel Tea Co. v. Watkins*, 26 Colo. App. 494, 145 P. 719 (1915)).

22           Here, the Survival Clause is a provision of general applicability to Articles III

23   ("Ownership"), IV ("Project Patents"), and V ("Certain Warranties, Disclaimers of Warranties

24   and Limitations of Liability").  (Compl., Ex. A, p. 11.)  The provisions in Articles III, IV, and V

25   generally—with the notable exception of the Non-Compete Obligation—do not themselves

26   provide how long the rights, representations, and obligations described therein were intended to

27   remain in effect.  (*Id.*)  For those provisions, then, the Survivability Clause was intended to clarify

28   that such rights, representations, and obligations were to remain effective into perpetuity.

1    The Non-Compete Obligation—unlike other provisions contained in Articles III, IV, and

2    V—specifically provides that UMI shall not design or contribute to the design of any other

3    LLDRAM Product "during the term of this Agreement," which was intended to run for five years.

4    (*See* Compl., Ex. A, p. [Art. VII.2].   Although the term of the Agreement was five years, the

5    parties expected performance under the Agreement to be concluded on or about May 1, 2009, the

6    completion date of the sixth and final milestone.  (*See* Compl., Ex. A, p.. [Agreement, Ex. B].)

7    Thus, the purpose of the five-year term of the Agreement was to provide a reasonable date by

8    which UMI's Non-Complete Obligation would end.  The parties did not intend, nor would it have

9    made sense for them, to provide a specific termination date for the Non-Complete Obligation—

10   and structure the term of the Agreement around that date—but then provide that the Non-

11   Compete Obligation should last in perpetuity through the general application of the Survival

12   Clause.  Likewise, under Colorado law, a more specific provision controls the effect of more

13   general provisions in a contract.  *Massingill v. State Farm Mut. Auto. Ins. Co.*, 176 P.3d 816, 825

14   (Colo. App. 2007).

15   Thus, the import of the Survival Clause vis-à-vis the Non-Compete Obligation is to make

16   clear that the Non-Compete Obligation was to survive any effective termination of the Agreement

17   prior to its natural expiration date, but that the Non-Compete Obligation itself would expire at the

18   end of five years following execution of the Agreement.

19                    **b.        Performance by the Plaintiff or Some Justification for
                                 Nonperformance**
20

21   As noted above, and pursuant to the terms of the Agreement, GSI Tech fully and

22   completely paid UMI for all project milestones that it had met through and including milestone 4.

23   (*See* § II.C, *supra*.)  In total, GSI Tech had paid $542,400 on a contract of $850,000 to UMI.  (*Id.*)

24   By the time the parties reached milestone 5, GSI Tech had learned of ProMOS's insolvency and

25   likely bankruptcy.  (*Id.*)  From December 2008 through January 2009, the parties discussed and

26   agreed that UMI could not proceed in accordance with the Agreement because of ProMOS's

27   financial difficulties.  (Shu Decl., ¶ 17.)

28   Here, GSI Tech either performed or substantially performed its obligations under the

1    Agreement.  Under Colorado law, which recognizes the doctrine of substantial performance, a

2    party may seek relief in contract when that party has performed all the major aspects of the

3    contract but has deviated in insignificant particulars that do not detract from the benefit which the

4    other party would derive from a literal performance.  *Rohauer v. Little*, 736 P.2d 403, 409 (Colo.

5    App. 1987).  Whether performance is "substantial" is generally a question of fact that depends on

6    the particular circumstances of the case.  *Id.*

7        Here, ProMOS's insolvency rendered useless almost all of the work undertaken by UMI

8    and moving further on the LLDRAM Project would have simply thrown good money out with the

9    bad.  Given the facts and circumstances—particularly ProMOS's insolvency—GSI Tech had at

10   least substantially performed its obligations under the Agreement.

11       Even if GSI Tech's performance were not found substantial, further performance

12   following discovery of ProMOS's insolvency would be excused under the doctrine of frustration

13   of purpose.  Colorado follows the Restatement (Second) of Contracts' articulation of the doctrine.

14   *See Beals v. Tri-B Associates*, 644 P.2d 78, 80-81 (Colo. App. 1982) (citing Rest. 2d Contr. § 265

15   & Cmt. a).  According to the Restatement, the doctrine concerns situations where "a change in

16   circumstances makes one party's performance virtually worthless to the other, frustrating his

17   purpose in making the contract."  As explained therein, three elements must be present:  (1) the

18   purpose frustrated "must have been a principal purpose of that party in making the contract"; (2)

19   the frustration must be substantial and not merely that the transaction become less profitable; and

20   (3) "the non-occurrence of the frustrating event must have been a basic assumption on which the

21   contract was made."  *Id.* (cmt. a).

22       Here, all of these elements are met.  UMI was tailoring its design of the LLDRAM chip

23   according to the unique design rules and manufacturing protocols of ProMOS's fab.  That

24   ProMOS became insolvent and its fab unavailable defeated the purpose of contracting with UMI

25   to provide a design tailored to ProMOS's manufacturing protocols.  Thus, the ultimate purpose of

26   the Agreement—to design an LLDRAM Product that conformed to ProMOS's design rules and

27   could therefore actually be manufactured and sold—was itself frustrated by ProMOS's

28   insolvency.  At the time of ProMOS's insolvency, virtually all of UMI's work became worthless

1    and had to be redone so that the LLDRAM Product could be manufactured at a different fab.

2    ProMOS's solvency and the availability of its fab was a basic assumption on which the

3    Agreement was made.

4                 c.      **Failure to Perform the Contract by the Defendant**

5          GSI Tech reasonably believes UMI is working with a competitor on a LLDRAM

6    Product—and thus violating its Non-Compete Obligatin—based on (1) the post-bid comments by

7    the Customer and (2) UMI's failure to provide any assurances that it was not working on any

8    LLDRAM Product with a competitor when requested to provide such assurance by GSI Tech.  As

9    explained in more detail above and the accompanying Lasserre Declaration, the Customer

10   informed GSI Tech that in selecting the winning bid proposal, it was going with one of its

11   "original guys."  (Lasserre Decl., ¶ 10.)  Because those original vendors on the LLDRAM-III

12   Project were limited to Renesas, GSI Tech, and UMI, and because Renesas was already a supplier

13   and did not participate in the recent bid process, GSI Tech reasonably concluded that the

14   Customer was identifying UMI as part of the winning bid proposal.

15         In working with the winning supplier, UMI is in breach of the Non-Compete Obligation,

16   in which it agreed that "it shall not, directly or indirectly, design or develop, or contribute to the

17   design or development of, a [LLDRAM Product] during the term of this Agreement."  Thus, not

18   only is UMI working on **an** LLDRAM Product, it is working on **the very same** LLDRAM

19   Product for which GSI Tech had originally engaged its services.

20         Whether UMI is working on the same LLDRAM-III Product for the Customer or any

21   LLDRAM Product, it is almost certainly leveraging the experience and know how it gained from

22   the LLDRAM-II Project, including using GSI IP—the work product previously generated from its

23   collaboration with GSI Tech.  Evidence of use of confidential, proprietary, or trade secret

24   information "need not be direct, but may be circumstantial, as long as the evidentiary inferences

25   to be drawn are 'reasonably deducible from the evidence, and not such as are derived from

26   speculation, conjecture, imagination, or guesswork.'"  *Think-Village Kiwi, LLC v.Adobe Sys., Inc*,

27   2009 WL 3837270 at *3 (N.D. Cal., Nov. 16, 2009) (*citing Joseph DiLoreto, Inc. v. O'Neill*, 1

28   Cal. App. 4th 149, 161 (1991)).  Misappropriation of GSI IP to benefit GSI Tech's competitor

1    would breach the GSI IP Provision.

2          Finally, UMI's disclosure of GSI IP—as well as any other Confidential Information

3    provided by GSI Tech during its engagement with UMI—would breach its commitments under

4    the Confidentiality Obligation.  Again, whether working on the Customer's LLDRAM-III Product

5    or any other LLDRAM product, UMI is likewise almost certainly using GSI's Confidential

6    Information in that effort.

7                    **d.       Resulting Harm to the Plaintiff**

8          As a result of UMI's breaches of the GSI IP Provision, Non-Compete Obligation, and

9    Confidentiality Obligation, GSI Tech has and will be irreparably harmed.  The harm suffered by

10   GSI Tech is detailed below in the context of the second element required for obtaining

11   preliminary relief:  irreparable harm.

12               **2.       GSI Tech Will Likely Succeed on Its UCL Claim**

13         Under California's Unfair Competition Law, "[a]ny person who engages, has engaged, or

14   proposes to engage in unfair competition may be enjoined in any court of competent jurisdiction."

15   Cal. Bus. & Prof. Code § 17203.  The word "unfair" in Section 17200 reaches any conduct that

16   significantly threatens or harms competition, even conduct not specifically prohibited by some

17   other law.  *Cel-Tech Communications, Inc. v. Los Angeles Cellular Tel. Co.*, 20 Cal. 4th 163, 187

18   (1999).  "Unfair competition" is defined, in part, as "any unlawful, unfair or fraudulent business

19   act or practice."  Cal. Bus. & Prof. Code § 17200.  "Unlawful" practices are those prohibited by

20   law, whether civil or criminal; "unfair" practices are those whereby harm to the victim outweighs

21   its benefits; and "fraudulent" practices only require that the public is deemed likely to be

22   deceived.  *See Saunders v. Superior Court*, 27 Cal. App. 4th 832, 839 (1994).

23         UMI's design work on any LLDRAM Product for a competitor violates each of the three

24   separate prongs for finding a violation of California's Unfair Competition Law:  Defendant's

25   misappropriation of GSI Tech's trade secrets is unlawful under California's Uniform Trade Secret

26   Act.  In representing that it would not design an LLDRAM Product for a competitor, that it would

27   respect GSI Tech's proprietary rights to work product generated by the project, and that it would

28   maintain GSI Tech's Confidential Information, UMI deceived GSI Tech.  And UMI's receiving

that information and then using it to benefit a competitor constitutes a harm to GSI Tech that outweighs any benefits to UMI.

GSI Tech is thus likely to succeed on its unfair competition claim, because Defendant's misuse and unauthorized disclosure of GSI IP, trade secrets, and Confidential Information, as described herein, constitutes unlawful, deceptive and unfair competition and business practices in violation of the law.  Should this court not issue an injunction—relief specifically enumerated in the statute, *see* Cal. Bus. & Prof. Code § 17203—Defendants will continue to misuse Plaintiff's confidential and proprietary information and engage in similar acts of unfair competition in the future, to the harm of Plaintiff and the general public.  Plaintiff is likely to succeed on the merits of this claim.

**B.    Absent Preliminary Relief, GSI Tech Will Be Irreparably Harmed**

The courts consistently hold that disclosing confidential information or trade secrets would create irreparable injury:  "[A]n intention to make imminent or continued use of a trade secret or to disclose it to a competitor will almost always certainly show irreparable harm." *Campbell Soup Co. v. ConAgra, Inc.*, 977 F.2d 86, 92-93 (3rd Cir. 1992); *North Atlantic Instruments, Inc. v. Haber*, 188 F.3d 38, 49 (2nd Cir. 1999) (loss of trade secrets cannot be measured in money damages).  Disclosure of non-trade secret confidential information is similarly recognized as a serious harm.  *Union Pacific R.R. Co. v. Mower*, 219 F.3d 1069, 1071 n.1 (9th Cir. 2000).  These harms, which are not readily addressed through payment of economic damages, are sufficient to meet the irreparable injury requirement for a preliminary injunction. *Saini v. Int'l Game Tech.*, 434 F. Supp. 2d 913, 919 (D. Nev. 2006).

California courts have also presumed irreparable harm when proprietary information is misappropriated.  *TMX Funding, Inc. v. Impero Technologies, Inc.*, 2010 WL 1028254, at *7 (March 18, 2010 N.D. Cal.); *Western Directories, Inc. v. Golden Guide Directories, Inc.*, 2009 WL 1625945 at *6 (June 8, 2009 N.D. Cal.); *Lillge v. Verity*, 2007 WL 2900568 at *7 (Oct. 2, 2007 N.D. Cal.)  Here, Defendant has appropriated confidential information, trade secrets, and GSI IP, illicitly using that information to the benefit of a competitor.

Courts have also recognized that a loss of current or future market share may constitute

1  irreparable harm.  *Grand River Enterprise Six Nations, Ltd. v. Pryor*, 481 F.3d 60, 67 (2d. Cir.

2  2007).  Similarly, the threat of the loss of prospective customers, goodwill, or reputation may

3  support a finding of irreparable harm.  *Rent-A-Center, Inc., v. Canyon Television & Appliance*

4  *Rental, Inc.*, 944 F.2d 597,603 (9th Cir. 1991); *Stuhlbarg Intern. Sales Co., Inc. v. John D. Brush*

5  *and Co., Inc.*, 240 F.3d 832, 841 (9th Cir. 2001).  These intangible injuries are irreparable

6  because quantifying their harm is impractical or impossible, and therefore such injuries cannot be

7  fully remedied with a financial award.  *See MySpace, Inc. v. Wallace*, 498 F. Supp. 2d 1293, 1305

8  (C.D. Cal. 2007).

9          **C.**      **The Balance of Equities Tips in Favor of GSI Tech**

10        The balance of hardships issue tips markedly in favor of GSI Tech.  GSI Tech has a vital

11  interest in protecting its confidential, proprietary, and trade secret information and preventing

12  competitors from using that information.  Moreover, UMI has no legitimate right to using

13  Plaintiff's proprietary information to its own benefit.  GSI Tech would be greatly harmed if

14  injunctive relief is not granted.  "[T]he risk of losing business and being deprived of the benefit of

15  its proprietary information constitutes a substantial hardship on the part of plaintiff."  *Lillge v.*

16  *Verity*, 2007 WL 2900568 at *7 (N.D. Cal. Oct. 2, 2007).  Absent a TRO and preliminary

17  injunction, Defendant UMI would be able to continue to illegally use GSI Tech's confidential,

18  proprietary, and/or trade secret information in furthering the interests of GSI Tech's competitors.

19  Such use would be inconsistent with the GSI IP Provision, Non-Compete Obligation, and

20  Confidentiality Obligation.

21        In contrast, UMI will not suffer legitimate hardship as a result of an issuance of an

22  injunction prohibiting it from doing what it could not lawfully do in the first instance.

23  "Defendants would not suffer hardship if the Court entered a narrowly tailored injunction

24  prohibiting them from employing unlawful means to compete against Plaintiff."  *Western*

25  *Directories, Inc. v. Golden Guide Directories, Inc.*, 2009 WL 1625945 at *7 (N.D. Cal. June 8,

26  2009) ); *see also Merrill Lynch, Pierce Fenner & Smith, Inc. v. Chung*, 2001 WL 283083 at *6

27  (C.D. Cal. Feb. 2, 2001) (stating that "the balance of hardships tips heavily in favor of granting

28  injunctive relief because an injunction merely prohibits Defendants from misappropriating the

trade secrets of [Plaintiff]").

### D. The Public Interest Favors GSI Tech's Request for TRO/Preliminary Injunction

Here, the public interest supports issuance of a TRO and Preliminary injunction. California courts routinely recognize that public interest favors the protection of trade secrets and other proprietary business information. *Chung*, 2001 WL 283083 at *6 (holding that injunction that protects "trade secret client lists and other confidential and trade secret information" promotes the public interest); *Bank of America, N.A. v. Lee*, 2008 WL 4351348 (C.D. Cal. Sept. 22, 2008) ("the public interest lies in favor of protecting plaintiffs' trade secrets"). Moreover, though California has a strong public policy in favor of vigorous competition, that interest "yields to California's interest in protecting a company's trade secrets." *Id.* (citing *Latona v. Aetna U.S. Healthcare, Inc.*, 82 F. Supp. 2d 1089, 1096 (C.D. Cal. 1999).

## IV. ALTERNATIVELY, THE COURT SHOULD ALLOW EXPEDITED DISCOVERY

If the Court finds the evidentiary record insufficient to grant preliminary relief in whole, then GSI Tech respectfully requests that it be authorized to undertake narrowly tailored, expedited discovery to establish the necessary evidence. Rule 26(d) of the Federal Rules of Civil Procedure allows the Court to authorize expedited discovery before a Rule 26(f) conference for "convenience and in the interest of justice." Fed. R. Civ. P. 26(d)(2); *see also* Advisory Committee Notes to the 1993 amendments to Rule 26(d) (Discovery before the Rule 26(f) conference "will be appropriate in some cases, such as those involving requests for a preliminary injunction . . ."). The standard for authorizing expedited discovery is "good cause." *Semitool, Inc. v. Tokyo Electron America*, 208 F.R.D. 273, 275-76 (N.D. Cal. 2002) ("[g]ood cause may be found where the need for expedited discovery, in consideration of the administration of justice, outweighs the prejudice to the responding party.").

Good cause for expedited discovery has been found in cases involving claims of unfair competition or in cases where the plaintiff seeks a preliminary injunction. *Semitol, Inc. v. Tokyo Electron America, Inc.*, 208 F.R.D. 273, 276 (N.D. Cal. 2002). In cases where preliminary injunction motions are pending, courts often permit expedited discovery designed to obtain

1  information required for the preliminary injunction." *See Dimension Data N. Am. V. NetStar-1,*

2  *Inc.*, 226 F.R.D. 528, 532 (E.D. N.C. 2005).

3        In considering whether good cause exists, factors courts may consider include "(1)

4  whether a preliminary injunction is pending; (2) the breadth of the discovery request; (3) the

5  purpose for requesting the expedited discovery; (4) the burden on the defendants to comply with

6  the requests; and (5) how far in advance of the typical discovery process the request was made."

7  *Am. Legalnet, Inc. v. Davis*, 673 F. Supp. 2d 1063, 1067 (C.D. Cal. 2009).  Under this standard,

8  GSI Tech's request for expedited discovery should be granted.  GSI Tech seeks the expedited

9  discovery in connection with its request for preliminary injunction.  GSI Tech would seek

10 narrowly tailored discovery into the following subject matter:

11        1.    UMI's designing or developing, whether directly or indirectly, or contributing to

12              the design or development of an LLDRAM Product after July 20, 2009.

13        2.    UMI work product generated as a result of the LLDRAM-II Project (the "Work

14              Product").

15        3.    UMI's use of Work Product after July 20, 2009.

16        4.    UMI's disclosure of Work Product to any GSI Tech competitor or other third

17              party.

18        5.    UMI's disclosure to any GSI Tech competitor or other third party of any

19              information received from GSI Tech during the LLDRAM Project.

20 GSI Tech's discovery requests would be limited to a request for documents and a Rule 30(b)(6)

21 deposition regarding the above subject matter.  The specific discovery requests are identified as

22 Exhibits A and B to the Declaration of Christopher J. Beal, filed in connection with this

23 application.

24        The purpose of discovery into the above areas is to establish the additional evidence

25 necessary, if any, to support a preliminary injunction prohibiting UMI from (a) directly or

26 indirectly, designing or developing, or contributing to the design or development of any Pending

27 Projects; (b) enjoining Defendant from using GSI IP in connection with Pending Projects, and (c)

28 enjoining Defendant from using, divulging, furnishing, or otherwise making accessible to any

1    person GSI Tech's confidential information or trade secrets in connection with the Pending

2    Projects.

3          Because the expedited discovery is narrowly tailored, there is little burden to Defendant,

4    particularly as UMI claims not to have retained any of GSI Tech's confidential information.  That

5    said, the expedited discovery has been necessitated by UMI's own actions in refusing to provide

6    GSI Tech with reasonable assurances that it is not violating the Non-Compete Obligation and the

7    Confidentiality Obligation.  Moreover, given the circumstances, evidence of Defendant's multiple

8    breaches and unfair competition is particularly within Defendant's knowledge and possession and

9    cannot be reasonably obtained by GSI Tech through other means.

10   **V.    CONCLUSION**

11         For all the reasons set forth above, GSI Tech respectfully requests that the Court (1) issue

12   a temporary restraining order restraining and enjoining UMI from (a) directly or indirectly,

13   designing or developing, or contributing to the design or development of any Pending Projects;

14   (b) enjoining Defendant from using GSI IP in connection with Pending Projects, and (c) enjoining

15   Defendant from using, divulging, furnishing, or otherwise making accessible to any person GSI

16   Tech's confidential information or trade secrets in connection with the Pending Projects; (2) issue

17   an order to show cause why a preliminary injunction should not issue; and/or (3) grant GSI Tech

18   leave to conduct expedited discovery.

19   Dated:  March 26, 2013                    DLA PIPER LLP (US)

20
                                              By  */s/ Rajiv Dharnidharka*
21                                                JEFFREY M. SHOHET
                                                  CHRISTOPHER J. BEAL
22                                                RAJIV DHARNIDHARKA
                                                  VERONICA L.JACKSON
23                                                Attorneys for Plaintiff

24

25

26

27

28