JEFFREY M. SHOHET (Cal. Bar No. 067529)
Jeffrey.shohet@dlapiper.com
CHRISTOPHER J. BEAL (Cal. Bar No. 216579)
cris.beal@dlapiper.com
VERONICA L. JACKSON (Cal. Bar No. 243095)
veronica.jackson@dlapiper.com
**DLA PIPER LLP (US)**
401 B Street, Suite 1700
San Diego, CA 92101-4297
Tel: 619.699.2700
Fax: 619.699.2701

RAJIV DHARNIDHARKA (Cal. Bar No. 234756)
rajiv.dharnidharka@dlapiper.com
**DLA PIPER LLP (US)**
2000 University Avenue
East Palo Alto, CA 94303-2214
Tel: 650.833.2000
Fax: 650.833.2001

Attorneys for Plaintiff

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA, SAN JOSE DIVISION

| | |
|---|---|
| GSI TECHNOLOGY, INC., a Delaware Corporation,<br><br>Plaintiff,<br><br>v.<br><br>UNITED MEMORIES, INC., a Colorado Corporation,<br><br>Defendant. | CASE NO. 13-CV-1081-PSG<br><br>**DECLARATION OF LEE-LEAN SHU IN SUPPORT OF GSI TECHNOLOGY, INC.'S *EX PARTE* APPLICATION FOR (1) TEMPORARY RESTRAINING ORDER; (2) ORDER TO SHOW CAUSE REGARDING PRELIMINARY INJUNCTION; AND (3) EXPEDITED DISCOVERY IN THE ALTERNATIVE**<br><br>Date: March 26, 2013<br>Time: Ex Parte<br>Judge: Ex Parte |

I, Lee-Lean Shu, declare and state as follows:

1. I am Chief Executive Officer and President of GSI Technology, Inc. ("GSI Tech"), the Plaintiff in this matter. I make this declaration in support of GSI Tech's Ex Parte Application for Temporary Restraining Order; Order to Show Cause Regarding Preliminary Injunction; and Expedited Discovery. I have personal knowledge of each of the facts set forth in this declaration and if required, could and would competently testify thereto.

2. GSI Tech designs, develops, and markets a broad range of high performance memory products for networking, military, medical, automotive, and other applications. It specializes in memory products featuring very high transaction rates, high density, low latency, high bandwidth, fast clock access times, and low power consumption.

3. As more particularly described in the Declaration of Didier Lasserre, filed in connection with the present application for Temporary Restraining Order ("Lasserre Declaration"), in approximately July 2007, GSI Tech and another chip maker was selected by a router manufacturer (the "Customer") to design, develop, and manufacture a "low latency / high random address rate" Dynamic Random Access Memory chip (a "LLDRAM Product"). This particular LLDRAM Product was a "Type III" LLDRAM Product.

4. After the specifications for the Customer's Type III LLDRAM Product were determined, GSI Tech engaged Defendant United Memories, Inc. ("UMI") to provide design and development services for a different class of LLDRAM Product. This new product was a LLDRAM Type II versus the LLDRAM Type III, which was defined and intended for the Customer.

5. Because UMI lacked experience with LLDRAM technology, and because the process technology then available to GSI Tech and UMI was not sufficiently advanced to begin the design of the LLDRAM Type III Product, we engaged UMI in the project to design the less sophisticated Type II chip for the benefit of the knowledge and experience that would be gained in the project. We believed that, by first beginning with the Type II Product, UMI would gain valuable knowledge and experience in LLDRAM design that could later be applied to the LLDRAM Type III Project for the benefit of GSI Tech.

6. UMI, through John Faue and Robert Gower, promoted itself as particularly appropriate for the project based on its affiliation with its parent company, ProMOS. ProMOS operated one of a handful of "fabs," a factory where integrated circuits can be manufactured and tested. Having access to a fab was essential to the success of the project, both for the testing phase of the prototype chip and the ultimate manufacture of the LLDRAM Product for sale to the Customer. Mr. Faue and Mr. Gower claimed that UMI could leverage its experience with its

1  parent company to efficiently and effectively complete the project.

2      7.    GSI Tech and UMI ultimately entered into a "UMI-GSI Product Design and Development Agreement" (the "Agreement").  Attached to the Complaint as Exhibit A is a true and correct copy of the Agreement.

3      8.    UMI began work on the LLDRAM Type II Product in approximately May 2008.

4      9.    As noted above, GSI Tech had selected UMI for this work, in part, because of its relationship with ProMOS and the availability of ProMOS's fab.  Because each fab where DRAM chips are made develops and observes different design rules and manufacturing process, chip designers must select a specific fab to manufacture the chips under development.  That is, in developing the design of the chip, it must be tailored to the unique manufacturing process observed by the manufacturing fab.  And if the selected fab becomes unavailable, the design work must be redone to conform to the design rules and manufacturing process of the replacement fab unless the replacement fab uses the same manufacturing process and design rules as the original fab.

5      10.    As UMI began development work, UMI and GSI Tech understood that the LLDRAM chips would be manufactured at the ProMOS fab owned by UMI's parent company, where UMI's design experience was.  UMI therefore designed the LLDRAM chip for manufacture at ProMOS.

6      11.    Prior to its involvement in this project, UMI had no experience in designing any LLDRAM device, much less the specific LLDRAM Product for which it was engaged by GSI Tech.  Rather, its experience lay in designing standard DRAM, which had become a commoditized, undifferentiated market by 2008.  The LLDRAM market, by contrast, was a very small and highly specialized segment of the DRAM market, as it remains today, with relatively few manufacturers or suppliers.  The LLDRAM market was and is a small market because, while LLDRAM enjoys higher performance characteristics than DRAM, that performance comes with a higher price as well.

7      12.    When GSI Tech engaged with UMI, we were concerned that UMI would be exposed to our confidential, proprietary, and trade secret information and know-how concerning

LLDRAM technology. We understood that UMI had no previous experience with such chips. And we were concerned that, as a contract manufacturer, it might exploit the knowledge that it gained through working with us for its own advantage and to the benefit of our competitors. For that reason, included in the Agreement were several protections intended to allay this concern.

13. In order to facilitate design of the LLDRAM Product, and considering that UMI had no prior history with LLDRAM products, GSI Tech sent UMI one of its engineers, Ramaa Iyer to perform simulation and circuit verification for two months, significantly advancing UMI's LLDRAM capability. Although we relied upon UMI to perform the design, Ms. Iyer was sent to UMI to assist in verifying the designing and to build a circuit verification model for post-silicon verification. GSI Tech considered the information shared by its engineer with UMI to be non-public, sensitive business information and would have expected UMI to treat it as confidential, as required by the Contract, and not to be used by UMI or shared with others except as necessary to perform its responsibilities under the Contract.

14. I, David Chapman, Vice President of Marketing, Paul Chiang, Vice President of DRAM Design, and Ramaa Iyer, DRAM design engineer, also participated in chip design review meetings and suggested critical improvements and corrections to UMI's circuitry design. For example, during a December 18, 2008 design review meeting attended by GSI Tech and UMI engineers and executives, I noted a design flaw in the boundary scan design. I suggested an alternate design to avoid the problem, which was then implemented by UMI. These improvements and other feedback provided by myself and other GSI Tech representatives during these review meetings constituted confidential, proprietary, and non-public information that could not be used by UMI or shared with others.

15. GSI Tech fully paid UMI for all project milestones under the Agreement up to and including milestone four. We also made payments to UMI for additional work pursuant to Article II of the Agreement. As of December 18, 2008, GSI Tech had paid UMI a total of $542,400, which constituted full payment for all services performed by UMI to that point.

16. In late 2008, we learned through news reports that ProMOS was facing insolvency and seeking bailouts from the Taiwanese government. In light of ProMOS's apparent insolvency,

we questioned UMI about it and its parent company's ability to complete the project, which required manufacturing and testing of the LLDRAM Product at ProMOS's fab.

17. During the course of many meetings, phone conversations, and email correspondence between representatives of UMI, GSI Tech, and ProMOS, in or about December 2008 through March 2009, we discussed and agreed that UMI could no longer proceed with the LLDRAM Project due to ProMOS' financial difficulties and potential insolvency. Because it was not possible to design in the ProMOS-Hynix environment and then port that design over to a different process technology, it made no economic sense to proceed with milestones 5 and 6 in accordance with the ProMOS design rules given its apparent insolvency. Indeed, the more than $540,000 GSI Tech spent for the LLDRAM Product under the Agreement was largely wasted because GSI Tech determined that it would have to start over with a different fab using its unique design rules and processes.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. Executed this 26th day of March, 2013.

_____
Lee-Lean Shu