Pages 1 - 63

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

Before The Honorable Paul S. Grewal, Magistrate Judge

|  |  |
|---|---|
| GSI Technology, Inc., | ) |
| | ) |
| | ) No. CV13-01081 PSG |
| Plaintiff, | ) |
| vs. | ) |
| | ) |
| United Memories, Inc., | ) |
| | ) |
| Defendant. | ) |
| | ) |
| | ) |
| _____ | ) |

San Jose, California
Thursday, March 28, 2013

**TRANSCRIPT OF PROCEEDINGS OF THE OFFICIAL ELECTRONIC SOUND RECORDING**

**APPEARANCES:**

For Plaintiff:

DLA Piper US LLP
401 B Street, Suite 1700
San Diego, CA 92101-4297
BY:  **JEFFREY M. SHOHET**
**CHRISTOPHER J. BEAL**
**ATTORNEYS AT LAW**

For Defendant:

Hogan Lovells US LLP
3 Embarcadero Center, Suite 1500
San Francisco, CA 94111
BY:  **KORULA T. CHERIAN**
**ATTORNEY AT LAW**

Transcribed By:    Stacy Wegner
Transcriber
smwtyping@yahoo.com
(502)603-2776

1  Thursday, March 28, 2013                                9:56 a.m.

2

3       **THE CLERK:**  Calling GSA Tech -- GSI Technology, Inc.

4  versus United Memories, Inc., Case Number CV13-1081 PSG.

5       Matter on for Plaintiff's ex parte application for

6  temporary restraining order, order to show cause regarding

7  preliminary injunction, and expedited discovery in the

8  alternative.

9       Counsel, please state your appearances.

10      **MR. SHOHET:**  Good morning, Your Honor.  Jeffrey

11  Shohet, DLA Piper, appearing for the Plaintiff in this matter.

12      Also appearing with me is Mr. Chris Beal and Didier

13  Lasserre who works with the company as counsel for Plaintiff.

14      **THE COURT:**  Good morning, counsel.

15      **MR. SHOHET:**  Thank you.

16      **MR. CHERIAN:**  Good morning, Your Honor.  Korula

17  Cherian for UMI.

18      **THE COURT:**  Mr. Cherian, good morning to you as

19  well, sir.

20      **MR. CHERIAN:**  Thank you.

21      **THE COURT:**  All right.  Gentlemen, I wanted to begin

22  by just noting that although we do not have the benefit of a

23  court reporter this morning, we are recording this morning's

24  proceedings, so in the event a transcript is necessary, you

25  will be able to request one.  I just wanted to make that very

1  clear.

2       I have in front of me a motion for a TRO.  Actually,

3  it's an ex parte application for TRO, but we're, obviously,

4  all well aware that counsel is present for both -- both sides.

5       I'd like to begin with the Plaintiffs, since this is

6  their request, and obviously, I'm going give Mr. Cherian a

7  full opportunity to respond as well.

8         **MR. SHOHET:**  Sure, Your Honor.  Thank you very much.

9         **THE COURT:**  Go ahead, sir.

10        **MR. SHOHET:**  May it please the Court, I think our

11  papers -- we spent some time on our papers, and I think our

12  papers completely set forth our position in this matter.

13       I want to take the time to respond to a few of the

14  issues that came up in the Defendant's opposition brief.

15        **THE COURT:**  Go ahead, Mr. Shohet.  The floor is

16  yours.

17        **MR. SHOHET:**  Thank you.  So I want to start by

18  setting the stage with the contractual provisions that we

19  relied upon for the relief that we've requested.

20       And there are really three prongs to the contract,

21  and they operate in many ways to accomplish the same result,

22  which is protect the valuable IP of our client, but they do it

23  in different ways, and I think there's been some confusion in

24  the Defendant's papers on this, and I want to make it clear.

25       The three prongs are the -- what we call the

1  noncompete obligation, which is set forth in Paragraph 3.6 of

2  the agreement.

3          There's the confidentiality obligation, which is set

4  forth in Article XI, generally.  There's several provisions.

5  The definition of confidential is in 1.1 of the contract.

6          And then there's the provision declaring the

7  ownership of the intellectual property to be the owner -- to -

8  - to be in GSI, our client.

9          Now, they operate differently, and I want to -- I

10 think it's important to make it clear.  Although I think it's

11 pretty obvious, but I think it's important just to set the

12 stage and be sure we all understand.

13         The noncompete is a fairly simple and objective

14 provision.  It doesn't require any findings of any particular

15 harm.  It doesn't require a determination that there's any

16 confidential information that's actually being used.  It

17 stands on its own.

18         And it provides that for the term of the contract,

19 which is defined in the contract and is -- and operates

20 through the end of this this month, through April 30, May 1,

21 for the term they simply they cannot engage in an LLDRAM

22 project for their own account or for any person's account,

23 period.

24         **THE COURT:**  And -- and as I read the -- the term and

25 understand your position, the LLDRAM product, as defined in

1   that clause, is not specific to one particular flavor or

2   species or LLDRAM.

3           **MR. SHOHET:**  Correct.  It's an L --

4           **THE COURT:**  Is that correct?

5           **MR. SHOHET:**  Exactly right.  The definition is in

6   the contract, and it talks about the performance

7   characteristics of an LLDRAM as the definition of an LLDRAM

8   project.

9           But of course, it's -- that is the only requirement

10  is that they not compete, meaning not get engaged in, for

11  their own account or others, design work in connection with an

12  LLDRAM, period, and that runs until the end of April.

13          And by the way, I should mention that the case law

14  would support the notion that if you engage in a violation

15  within that period of the operation of the noncompete, then

16  that violation and the injunction that attaches to it extends

17  beyond the expiration of the noncompete.  We cite cases for

18  that proposition, Your Honor.

19          Then you have the confidentiality obligation.  The

20  confidentiality obligation -- oh, and I should mention that,

21  just to, again, set the table.  I know it's in the papers.

22          **THE COURT:**  Uh-huh.

23          **MR. SHOHET:**  That the noncompete is -- lasts for the

24  term of the contract, which was set at five years from the

25  inception or April 30.  That's the end of the term of the

1   contract.

2          That's a reasonable period of time, we would

3   suggest, and it's a period of time that the parties agreed to

4   as reasonable.  So I think it -- it's a presumption that

5   that's a reasonable period of time for the broader policy

6   questions about how long a noncompete should operate.

7          Then we have the confidentiality provision.  The

8   confidentiality provision prevents them from using,

9   exploiting, disclosing confidential information specifically.

10          So this is a different version, in that it's a

11   little more narrow and requires a more of a showing of the

12   underlying harm, that is the use of the confidential

13   information, but under the survival provision that can last

14   beyond the termination of the contract and for a period of ten

15   years.

16          **THE COURT:**  And this particular obligation is

17   mutual, correct?  At the same time as they are precluded from

18   utilizing any of your confidential information, I take it

19   under this -- under this provision, you are similarly barred

20   from using --

21          **MR. SHOHET:**  I don't --

22          **THE COURT:**  -- any of theirs?

23          **MR. SHOHET:**  It's a fair question, Your Honor.

24   That's not how I read the provision.

25          **THE COURT:**  It does say "each party."

1    **MR. SHOHET:** Yeah.

2    **THE COURT:** And it talks about receiving and

3 disclosing parties, so isn't that indicative that there's a

4 mutual, binding obligation here?

5    **MR. SHOHET:** Well, I mean, each party has

6 responsibilities in the performance of that provision. I

7 would say it this way, though, because all of the IP -- we

8 call the GSIP -- all of the product of the work that is being

9 done is our property, which means everything that's done

10 during the course of that project, the developments, the

11 innovation, the IP that's generated, the know-how, that

12 belongs to us. That's our IP. And that's what's being

13 protected by the confidentiality obligation.

14    **THE COURT:** I tend to read that provision in the

15 same way as you do, but it would seem to me conceptually each

16 party could bring to this marriage, relationship, set of

17 dates, however you want to characterize it, each party could

18 bring to it each own confidential information. The net or the

19 resulting work product, as you read it, all belongs to you.

20    **MR. SHOHET:** Right. I think that's a -- Your Honor,

21 I hadn't thought about it the way you just did, but I think

22 it's a fair interpretation --

23    **THE COURT:** It may not be relevant --

24    **MR. SHOHET:** -- of that.

25    **THE COURT:** -- to your claim here today but --

1    **MR. SHOHET:**  That's the point.

2    **THE COURT:**  Yeah.

3    **MR. SHOHET:**  I'm not -- I'm not sure it's -- I

4    didn't mean to cut you off.  I'm sorry.

5    **THE COURT:**  No.  I was only going ask.  I just

6    wanted -- before we get to the claims themselves, I just want

7    make sure I'm reading the language properly.

8        And I -- I -- I take it you don't see this as

9    material to your claim, even if it is true that you have

10   certain obligations under Section 6.1 as well?

11   **MR. SHOHET:**  No.  And I -- I think it's a fair

12   reading, if -- were they to bring some specific confidential

13   know-how technique or property -- intellectual property, then

14   I could -- I could see in the hypothetical the reading of the

15   contract the way the Court reads it.

16       But I say this:  They brought nothing to the

17   project.  This is the first LLDRAM project that they had

18   worked on that -- whatever value they created for themselves

19   in the learning and skill in -- in -- in -- in provide design

20   services was acquired up through our -- through the projects

21   that they worked on with us.  We were the first.

22       So I would say hypothetically that's probably right,

23   but in the practical world, at least before we get into the

24   trial and the discovery, at this stage I think it's a fair

25   presumption to make that the way the stage is set they really

1  didn't have anything that was protected under that.

2          **THE COURT:**  All right.

3          **MR. SHOHET:**  So we talked about the confidentiality

4  provision.  And I can see that I don't have spend too much

5  time going through these because the Court's --

6          **THE COURT:**  No.  No.

7          **MR. SHOHET:**  -- familiar with it.

8          **THE COURT:**  Take whatever time you need.  I want to

9  make sure I understand each side's position clearly.

10          **MR. SHOHET:**  Thank you.

11          Then the other provision that I think is a prong

12  that's important is the ownership provision itself, 3.1.  3.1

13  -- I think it's interesting to think about 3.1 because 3.1

14  says whatever is done in this project belongs to us, whatever

15  innovations, whatever IP is generated.

16          And so -- so the -- the significance of that to me

17  is it means that all of that is confidential, regardless of

18  whether it's marked confidential or not.  And I can talk about

19  that in a second.  There was an opportunity to mark specific

20  documents or tangible things as confidential and protect --

21          **THE COURT:**  So as to resolve any doubt at all?

22          **MR. SHOHET:**  As to resolve doubt, but there's the

23  provision that says, "But obviously things that are reasonably

24  known by the party to be confidential are confidential."

25          And since it's declared that everything that's done

1   is our property, and our property becomes part -- that -- that

2   would -- that would give them fair notice that that's also

3   confidential because it belongs to us, and without our

4   permission, you shouldn't be disclosing our valuable IP.

5          So I want -- that's our reading of that, and I think

6   it's important that we all understand how these various

7   provisions work together.

8          For my purposes, therefore, everything that was done

9   on the project that had any value because it was our property

10  was also confidential and, therefore, could not be used by

11  them in the exploitation -- could not be used by them because

12  of the protections that property has under the confidentiality

13  provision.

14         **THE COURT:**  But -- but, counsel, would you agree

15  that, as we were discussing a minute ago, it is entirely

16  plausible, perhaps even likely, that your client brought to

17  this relationship certain confidential information, but also

18  certain general know-how that is not proprietary to your

19  client, but that the other side may not have understood prior

20  to the relationship?

21         **MR. SHOHET:**  Absolutely.

22         **THE COURT:**  Okay.  And if that's the case, it would

23  seem to me if it's ex-ante general know-how that under the

24  terms of -- of the contract that's not information, which they

25  are precluded from using in any future commercial activity.

1      **MR. SHOHET:**  They, our client, or the --

2      **THE COURT:**  I'm sorry.  I'm ambiguous in my use --

3      **MR. SHOHET:**  Okay.

4      **THE COURT:**  -- of the word "they."  I meant the

5  Defendant.

6      **MR. SHOHET:**  Well, I suppose, Your Honor, that if

7  it's going to be become IP protected by virtue of the

8  ownership provision of the contract, it has to be --

9      **THE COURT:**  Well, but the --

10      **MR. SHOHET:**  Yeah.

11      **THE COURT:**  -- but the IP ownership clause relates

12  specifically to deliverables and the product.  It doesn't

13  speak to nonproprietary general know-how that your client may

14  have brought to this series of engagements.

15      **MR. SHOHET:**  Well, I suppose -- okay.  So I suppose

16  that's probably right.  I hadn't thought about it, but if our

17  client had been in -- in -- because -- because of its

18  participation in these projects had general know-how, but it

19  wasn't something that was particularly confidential or

20  proprietary because it was generally known, then that probably

21  would not rise to something that would qualify as confidential

22  information or something that we would claim ownership rights

23  to.  I would agree with that.

24      **THE COURT:**  Okay.  Nevertheless --

25      **MR. SHOHET:**  I think in the hypothetical I would say

1   that.  I'm not sure -- the answer -- I think I've answered

2   your question.

3           THE COURT:  Okay.  So -- so -- and again, I -- I

4   appreciate that your -- your reason for coming into court this

5   morning is you believe that there's information at -- at -- at

6   issue here that clearly falls within the scope --

7           MR. SHOHET:  Well --

8           THE COURT:  -- of either the ownership or the

9   confidential?  I want to make sure.

10          MR. SHOHET:  You know, it's a fair question.  And

11  the point is we come into this a little blind.  You know, we

12  haven't had any discovery yet on what they're actually doing,

13  so we don't really know what specific techniques or

14  innovations or -- or skills they're bringing to the -- to the

15  projects they're working on.

16          We do now know from their papers that they are

17  violating those provisions, that is that they are engaged in a

18  project.  They wouldn't answer that question.  We know at

19  least that much.  They could have told us that in the letter

20  that we wrote that they responded to us.

21          The first indication that we actually knew, we had a

22  suspicion, was when we saw in their papers where they said

23  will they be forced to be breeching "contract or contracts" if

24  the -- if the injunction was issued.

25          And since the injunction only applies to projects

1   that they're engaged in that involve LLDRAM, which is the

2   definition predicate for the noncompete --

3            **THE COURT:**  Uh-huh.

4            **MR. SHOHET:**  -- they are -- they are engaged in --

5   in -- in -- in projects that would violate the noncompete,

6   absent whatever defenses that they raise.

7            **THE COURT:**  I wanted -- I interrupted you, so I want

8   to go back to the point you were -- or just to complete the

9   point you were addressing on ownership.

10           So as I understand it, if we're talking about

11   activity during the relationship, which I take it from my

12   timeline is sometime in 2008 --

13            **MR. SHOHET:**  May of 2008.

14            **THE COURT:**  May of 2008?

15            **MR. SHOHET:**  That's correct.

16            **THE COURT:**  Okay.  During -- let's assume we're

17   talking about the -- the -- the several months where, as I

18   understand it from your papers, one or more of your engineers

19   was working with the Defendant to get the LDRAM II project up

20   and running?

21            **MR. SHOHET:**  That's right.

22            **THE COURT:**  During the course of that activity, your

23   view would be that any IP generated would certainly belong to

24   you and you alone?

25            **MR. SHOHET:**  That's true.

1    **THE COURT:**  But that the ownership clause goes

2  beyond just patents, copyrights --

3    **MR. SHOHET:**  Yes.

4    **THE COURT:**  -- etcetera?  It actually relates to any

5  information fixed in a --

6    **MR. SHOHET:**  Yeah.  I think the --

7    **THE COURT:**  -- in a tangible medium?

8    **MR. SHOHET:**  -- the definition -- well, since

9  (inaudible), but yes.

10    **THE COURT:**  Okay.

11    **MR. SHOHET:**  It says, you know, we're bringing you -

12  - I guess in real life terms --

13    **THE COURT:**  Yeah.

14    **MR. SHOHET:**  -- as human beings behaving to try to

15  be reasonable with each other but protect themselves, the way

16  I would describe it is, "Look, we're bringing you into a new

17  world as our contract.  You've not been -- you've done DRAM

18  projects, but they're pretty generalized, you know, kind of

19  commoditized.  This is now where the game is now being played.

20  This is, you know, above the RAM work."

21    **THE COURT:**  Yeah.

22    **MR. SHOHET:**  "And we're ahead.  We're -- we're --

23  we're fair up the food-chain, but we'd like to have your help.

24  You bring some unique skills and design skills to the table,

25  but we want to protect ourselves from, you know, competing

1   with you for some reasonable period of time, and from having

2   to face you in the competitive marketplace, which apparently

3   we now are, having disclosed things to you that are of value."

4           THE COURT:  And -- and among the things or assets

5   that the Defendant brought to this relationship, in your view,

6   was their relationship with this -- with the fab, with ProMOS?

7           MR. SHOHET:  Yes.  That was an important part of the

8   deal is they -- they -- because the work -- the design work

9   would require two -- first thing, as we say in the papers --

10  and I'm probably saying something because I can see how

11  familiar the Court is with this stuff, but just to be sure --

12  the design work that goes on for a particular chip is specific

13  to the fab in which it is going to be manufactured.

14          THE COURT:  Right.

15          MR. SHOHET:  So the first point is if you're going

16  to start down the road of designing a chip, you need to know

17  the processes and the protocols and the design requirements

18  for the fabrication of that chip.  You can only do it with a

19  single fab.

20          Secondly, even before you get to the manufacture of

21  the chip for the customer, the testing work and the proving of

22  the specification requirements of the chip in the milestone

23  phases, which were the next milestone actually -- the fifth

24  milestone -- we'd gone through one through four -- actually

25  required that you have a chip that -- and the chip has to be

1   manufactured by the fab in accordance with the design of the -

2   - of that chip to complete that phase.

3            So the fab is important, not only for the ultimate

4   manufacture and sale of the chip, but for --

5            **THE COURT:**  But for some of the initial milestones -

6   -

7            **MR. SHOHET:**  Yeah.

8            **THE COURT:**  -- or intermediate milestones as well?

9            **MR. SHOHET:**  Or for the next milestone.

10           **THE COURT:**  Right.  Right.

11           **MR. SHOHET:**  And so that's why -- you know, that

12  explains -- you know, they make a big point about this, and

13  I'll get to it, but they make a very big point -- and it's

14  kind of -- I don't understand it, Your Honor.  I have to say,

15  it doesn't make any sense to me.  I don't mean to be

16  dismissive or derogatory, but they say this point that we've

17  had no contact since 2009 when they wrote their purported

18  termination of the contract.

19           And the point -- and now all of sudden we come

20  running to court, as if this is a big surprise, because

21  nothing has happened since 2009.  The contract was supposed to

22  be done in 2009.  There wasn't supposed to be anymore work on

23  the contract by 2009.

24           The period of time extending the contract to April

25  30 was precisely to define and protect the noncompete

1  provision.  It said the term is going to be until 2013, but

2  that's not going to be any work to be done.  The work is all

3  over in 2009 and --

4          THE COURT:  And since you -- since you've turned to

5  2009, I want to just speak to that time period as well, or ask

6  about that, if I could?

7          MR. SHOHET:  Sure.

8          THE COURT:  I take it that the last communication in

9  2009 that was exchanged between the parties was a letter from

10  UMI to your client.

11          From that, I -- from your comments just now, I -- I

12  understand as well that sometime prior to that you got word

13  from the customer that this opportunity wasn't going to

14  happen; is that -- I'm characterizing it.

15          MR. SHOHET:  No.  Well --

16          THE COURT:  But tell me -- tell me where I have it

17  right or wrong.

18          MR. SHOHET:  Well -- well -- well, what -- well, you

19  may be right, but that's not our position or we're not

20  standing on that.  I'm not sure about that.  What happened is

21  --

22          THE COURT:  Yeah.  That's really what I'm just

23  trying to figure out --

24          MR. SHOHET:  Okay.

25          THE COURT:  -- is what happened.

1     **MR. SHOHET:** What -- what -- what happened is that

2    in December of 2008 we began to understand that ProMOS, the

3    fab, that is the parent of UMI, was having -- I believe it's

4    in Taiwan -- was having very severe financial problems. There

5    was solvency issues, and that was public. That came out in

6    the news reports.

7     Now, because -- if we're going to go down any

8    further on this contract, A, we need a fab to make the wafers.

9    We didn't issue the wafer starts. They call that a breach on

10    our part. We -- we were the -- we were the bad guys.

11    **THE COURT:** You would call that throwing good money

12    after bad?

13    **MR. SHOHET:** That's what we do -- yeah, we wouldn't

14    call it that. It is that, because for -- the fact is that you

15    got to have a fab to do the work to complete the milestones,

16    and that's also got to be the fab that you want to use to

17    manufacture the chip.

18     Why would we take one step further in this project

19    until that was resolved? And it never was resolved.

20    **THE COURT:** And since -- since you directed us on

21    the timeline back to December of 2009, as I understand --

22    **MR. SHOHET:** December 2008.

23    **THE COURT:** I'm sorry, December 2008.

24     As I understand it, at that same time as you're

25    coming to learn of potential solvency issues with ProMOS,

1  you're engaging in some design review meetings with the other

2  side?  In other words, the timeline is a little bit fuzzy to -

3  - in my mind.

4          **MR. SHOHET:**  I think not, Your Honor.  I don't know.

5  It's not in the papers.  Let me tell you what I do know.

6          **THE COURT:**  Yeah.

7          **MR. SHOHET:**  I don't want to speculate on what I

8  don't know.  What I do know is at that point milestone 4 had

9  been all but completed.  I think it was complete.

10          **THE COURT:**  Right.

11          **MR. SHOHET:**  The next milestone was us -- was -- was

12  -- the next step forward was to go down to milestone 5, which

13  required --

14          **THE COURT:**  Which was a January 20, 2009 --

15          **MR. SHOHET:**  Correct.  That would require --

16          **THE COURT:**  -- requirement?

17          **MR. SHOHET:**  -- us to actually issue the wafer

18  starts, which was our obligation under the contract --

19          **THE COURT:**  Right.

20          **MR. SHOHET:**  -- and they make a big deal about that,

21  but that would require -- then there's -- that would then set

22  up the fabrication of the chip for testing purposes.  Again,

23  this is my understanding.  I'm not an engineer.  This is a

24  simple kind of my -- my view of it.

25          And so what happened at that point is the solvency

1  issue became on the table, and we were have -- then we entered

2  into discussions with UMI about that.

3       We take the position that it was their obligation,

4  since they presented the parent company as the reason we

5  should hire them so that we could get this work done, both for

6  the testing phase and for the ultimate manufacture of the

7  chips, but regardless of whether it was something that was

8  just a failure of a -- of -- of a condition that was

9  presupposed, but where nobody was -- it doesn't constitute a

10  breach or whether it was their breach, which we think it was,

11  the fact is it stopped the project and reasonably so.

12       In fact, the parties agreed at that point.  And we

13  will offer into evidence if we ever get into a trial emails

14  and other communications that demonstrate that we all

15  understood it didn't make any sense to go forward at that

16  point.  The project was stopped.  That was the end of it, from

17  our point of view.  We went our --

18       **THE COURT:**  And it --

19       **MR. SHOHET:**  We went -- we went away.

20       **THE COURT:**  And as I understand your earlier point,

21  the project stopped basically in January of 2009 or

22  thereabouts?

23       **MR. SHOHET:**  Right.

24       **THE COURT:**  A few months later, July 2009, you get a

25  letter from them purporting to terminate, but in your view

1  both because the project had stopped in '09, and even if the

2  project had continued and been fished, the relationship was

3  anticipated to be done in '09?

4          MR. SHOHET:  The relationship was done, but that

5  didn't relieve them of their obligations of the noncompete.

6          THE COURT:  Right.

7          MR. SHOHET:  And that's right, Your Honor.  And

8  that's -- you're -- you're exactly right.  That is what --

9  what was going on is at this point we were kind of surprised

10  to get that letter because we had gone our way.

11          And we actually started to work on the design work

12  in-house to pull that in -- to try to salvage something out of

13  this project so, you know, we went on with it, but we didn't

14  think we needed to have anymore discussions with them.

15          And we were surprised when they sent us that

16  termination letter, and we sort of ignored it.  We said,

17  "Well, you know, you're purporting to terminate.  You claim we

18  breached.  We didn't really breach, and if it's going to be a

19  breach, you got get us to sign it.  And we're supposed to have

20  a meet and confer, but you know, come on.  We're busy people.

21  What's the point?  You're going your way.  We're going our

22  way."  So you know, they make a point of us, I don't know --

23          THE COURT:  And in the -- I'm sorry to interrupt

24  you.

25          MR. SHOHET:  That's okay.

1    **THE COURT:**  I was wanting to ask, in the termination

2    or purported termination, in your view, which was tendered in

3    July of '09, did they point to the failure to deliver the

4    wafers as essentially the -- the key breach, which gives rise

5    to the termination?

6    **MR. SHOHET:**  They didn't say that in the letter.  I

7    -- I'm -- the -- that came up, you know, when I sent them the

8    letter a few months ago in January.

9    **THE COURT:**  Oh, okay.

10   **MR. SHOHET:**  Then they came back.  We started to

11   debating a breach.  No, that didn't come up.  Their letter

12   just said, "We hereby terminate the contract.  It's apparent

13   that there's" -- something like that.  Well, it's very simple.

14   It says -- this is the letter of July 20, 2009, and

15   it says, "It's apparent that the intent of the agreement no

16   longer exists.  That GSA does not plan to satisfy Condition

17   11.26," throwing it on us.  That somehow 2.2, which was our

18   obligation to give them the wafer starts so they could then do

19   --

20   **THE COURT:**  Okay.  So they at least flagged it.  I

21   don't know if it matters one bit to your --

22   **MR. SHOHET:**  Yeah.

23   **THE COURT:**  -- claim, but I just wanted to make sure

24   that their -- this issue of wafer delivery was -- was at least

25   raised.

1    In your view, again, it would make no sense to send

2    wafers to a -- to a -- to a partner that didn't have access to

3    a fab because the fab was bankrupt?

4         **MR. SHOHET:**  Well, not only that, but we had

5    discussed that.  We had discussed it, and we will offer

6    evidence of that, but we say it in our work papers and we got

7    the -- there were discussions about the implications about

8    ProMOS's insolvency.

9         And the parties kind of agreed that, "Well, you

10   know, I get your point.  We can't do the design work, so

11   there's really no reason for us to issue wafer starts."  I

12   can't represent to the Court that it was that clear, having

13   seen those documents.

14        **THE COURT:**  Yeah.

15        **MR. SHOHET:**  But I can represent to the Court that

16   there was discussion, and the outcome of that discussion is,

17   "We're kind of done for now."  Maybe ProMOS could get itself

18   healthy and something could happen in the future, but we

19   started to pull the design in-house at that point to try to

20   salvage what had become a terrible situation for the

21   investment we had made.

22        We paid $540,000 that we had washed down the drain

23   at that point.  We were going to salvage that, but there was

24   nothing more to do with them, so we didn't see any need to

25   respond to the letter.  I think they call that laches or some,

1 | you know, delay on our part or something.

2 |      I mean, in -- in the world where human beings do

3 | their business, human -- our -- I -- I don't think our client

4 | had any reason or obligation to respond to that letter --

5 |      **THE COURT:** So --

6 |      **MR. SHOHET:** -- given the situation.

7 |      **THE COURT:** So as I -- as I understand it from

8 | there, as you indicated, some -- some effort was made to try

9 | to do the design in-house. It turns out that was not

10 | successful. The bid is awarded to somebody else?

11 |      **MR. SHOHET:** I mean, you know, I -- I haven't

12 | followed the thread much beyond that.

13 |      **UNIDENTIFIED SPEAKER:** Different families. That's

14 | LL II versus --

15 |      **MR. SHOHET:** Right. That the end of -- yeah, of the

16 | LL II. We started to pursue -- we went back to the LL III

17 | protect, which -- and I can get into that. It's a

18 | complication. It's not well developed in our papers, but if

19 | the Court is interested, the answer is it never really went

20 | anywhere, the LL -- the LL II project, or did it? Where did

21 | that end up?

22 |      **UNIDENTIFIED SPEAKER:** The LL II we brought in-house

23 | and had to redesign it to a new fab that was --

24 |      **MR. SHOHET:** Right.

25 |      **UNIDENTIFIED SPEAKER:** -- had not become insolvent.

1    **MR. SHOHET:** But do we have -- we don't have an LL -
2    - we had an LL II project after the -- that's now --
3           **UNIDENTIFIED SPEAKER:** That we are just now
4    sampling.
5           **MR. SHOHET:** Okay. There's the answer to your
6    question.
7           **THE COURT:** Okay.
8           **MR. SHOHET:** The LL II project, they went in-house.
9    They had to get a new fab. They did. And they are just at
10   the point of being able to offer that, but they tried to
11   salvage it, but that was the contract.
12          Now, the LL III one is the one that we're now, you
13   know, which -- and it's interesting because they were
14   consulting with us on the LL III project before LL II.
15          And then we switched them to LL II as a kind of
16   training ground for that and -- and now we find -- I think, we
17   haven't heard it yet -- I'm surprised they didn't tell us in
18   the letter what they're doing, if they think it's legal, and
19   I, quite frankly, have to say, Your Honor, I'm surprised they
20   didn't disclose it in their papers. They all but disclosed
21   it. But they continue to refuse to tell us what they're doing
22   and with who they're doing it.
23          **THE COURT:** Since you -- you addressed the
24   distinction between LL II and LL III, I want to make sure I
25   appreciate this.

1       What I don't quite understand from the papers is the

2   -- is -- is the -- is the relationship or the nature of the

3   work in LL II and how it compares to the LL III opportunity

4   that followed.

5       **MR. SHOHET:**  Well, the LL III came up first.

6       **THE COURT:**  Right.

7       **MR. SHOHET:**  They were engaged and -- and -- and the

8   -- the customer Cisco on the LL -- on the LL -- they -- they -

9   - they criticized for not naming the customers in the papers.

10  They're name doesn't matter, and I didn't see any reason to

11  drag the names of other folks involved in this into this

12  record and dispute, but it was Cisco that was involved in the

13  LL III project, which goes back to July of 2007, and maybe

14  even before, so it's before the LL III -- LL II project became

15  an opportunity for them.

16      That's a much more complicated project, and since

17  this was their first project, as we were talking with them --

18  and they actually attended meetings in California with Cisco

19  and were working with us to -- to -- to try to, you know,

20  position for the LL III work as a second source.

21      Then the LL II project, which is not for a customer.

22  That was just something we were doing specific --

23      **THE COURT:**  Oh, that's an important question.

24      **MR. SHOHET:**  Yeah.

25      **THE COURT:**  So I wanted to understand.

1          **MR. SHOHET:**  Yeah.

2          **THE COURT:**  So the -- the customer, now we've

3     identified them as Cisco.  Cisco was not the customer for the

4     LL II work?

5          **MR. SHOHET:**  There was no specific customer, but

6     that --

7          **THE COURT:**  You, in some sense, were the customer or

8     there --

9          **MR. SHOHET:**  We -- we were making a part that we

10    thought the industry would --

11         **THE COURT:**  For broader market?

12         **MR. SHOHET:**  Exactly.

13         **THE COURT:**  Got it.  Okay.

14         **MR. SHOHET:**  And so we brought them to that, and

15    precisely because, I guess -- and I hadn't thought about this,

16    but because there wasn't a specific customer who we had to

17    satisfy, we were the customer, it would be a great opportunity

18    for us to work with them to develop their expertise to help

19    them understand what it would be because the world is a much

20    more rigorous place when you are a contractor to a customer

21    and you have a subcontractor on whom you depend to deliver

22    that performance to the customer.

23         So that was the LL III project.  So it was more

24    complex, and the success or failure -- or put it another way.

25    If this ProMOS meltdown had occurred while Cisco was expecting

1   us to be a second source to them by a date certain, our

2   client's name would be a lot worse in the industry than if it

3   was just a meltdown as it was on the LL II project where we

4   were the only party that was injured by their failure to

5   perform.

6          **THE COURT:**  So if -- if I understand this correctly,

7   when Cisco first indicated they wanted you to bid on -- on the

8   opportunity to serve as a second source on LL III, your

9   response was, "Okay, let's talk to UMI, but it turns out UMI

10  are not quite ready to play LL III -- in the LL III game yet.

11  Let's try an LL II project.  It doesn't have anything really

12  to do with Cisco, per se.  Let's just build a relationship and

13  develop your expertise."  Is that fair?

14         **MR. SHOHET:**  Exactly right.

15         **THE COURT:**  Okay.

16         **MR. SHOHET:**  I think that is fair.

17         **THE COURT:**  Okay.  And I take it, though, that as

18  that LL II work was -- was -- was going on you -- you -- your

19  client was continuing to pursue the LL III opportunity with

20  Cisco, right?  In other words, I'm trying to understand how

21  did you --

22         **MR. SHOHET:**  Yeah.

23         **THE COURT:**  -- continue to --

24         **MR. SHOHET:**  Yes.  Yes.  The answer was -- yeah, I

25  don't know all the timing of when that -- you know, whether

1  there was a stop and a start --

2          THE COURT:  Okay.

3          MR. SHOHET:  -- whether we were because of the --

4  because we had put the UMI in training, whether, you know,

5  that had delayed --

6          THE COURT:  Okay.

7          MR. SHOHET:  -- our -- our pitch to Cisco on that.

8  I don't know all that.  It's not in the record.

9          THE COURT:  Okay.

10         MR. SHOHET:  But I think generally that's probably

11 the way it worked.

12         THE COURT:  We don't have much of a record here, so

13 I -- I'm not going to --

14         MR. SHOHET:  Well, we -- you know.

15         THE COURT:  -- criticize you for that yet.

16         MR. SHOHET:  Yeah.

17         THE COURT:  That's -- that's why we're here at an

18 early stage.

19         MR. SHOHET:  Exactly.

20         THE COURT:  So -- so in any event, at some point you

21 came to learn from Cisco that you weren't going to be the one

22 serving as second source --

23         MR. SHOHET:  Yeah.

24         THE COURT:  -- on LL III, right?

25         MR. SHOHET:  And I want -- I'm glad you ask.  I

1    didn't mean to cut you off.

2              **THE COURT:**  No.  No.  That -- go ahead.

3              **MR. SHOHET:**  It's -- it's important because there's

4    a lot of confusion in their papers about this, and it needs to

5    be cleared up.

6              What happened is yes, we did learn that we did --

7    first thing we learned -- and they say it's six months of

8    delay from the time we learned.  That's wrong.  What happened

9    in mid-2012 is that the -- and it wasn't even the RFQ we

10   issued yet, but it was the sort of the invitation to sort of

11   participate as a second source.  The first indication that we

12   were go -- we had an opportunity to come back in was in mid-

13   2012.

14             It wasn't until -- and we probably -- I'm going to

15   take responsibility for being a little bit -- creating some

16   confusion here because it wasn't in our papers, but it is in

17   the complaint, Paragraph 33, Your Honor.  Paragraph 33 of the

18   -- the complaint says in or about -- I won't read it.

19             It's -- it -- it addresses the point, which is it

20   wasn't until December 2012 that we learned that the submission

21   that we had made had been rejected, and that Mr. Lasserre had

22   the conversation with the customer representative who said,

23   "Well, you know, it went to some -- one of the original guys

24   on the LL III project," which of course was -- could only have

25   been us, had he seen our (inaudible) or UMI.  So that was the

1  suspicion.

2      I think we've now got confirmation that -- that none

3  of this matters because we think that -- now they've all but

4  admitted that that's what they're doing.

5      So that's how that progressed, but -- so you raised

6  the point.  Yes, mid-December was when the invitation to

7  participate -- the RFQ followed, and then we submitted at some

8  point -- the record isn't exactly clear on that -- but mid-

9  December -- I'm sorry, mid-2012 is not the operative date from

10  which we were on notice that they were probably violating the

11  agreement.  That --

12      **THE COURT:**  Your view is that that notice really

13  came no earlier than December of 2012?

14      **MR. SHOHET:**  Exactly right.  No earlier than, and --

15  and we -- but we didn't have -- we -- we thought we had some

16  action -- we -- here's what -- here's -- let -- let me answer

17  the question that --

18      **THE COURT:**  Yeah.

19      **MR. SHOHET:**  -- if I were the Court, I'd put to me

20  is well, what happened after that?  Why -- what counts for the

21  delay?

22      So we certainly have some obligations to the Court

23  and to the -- to our client and to the -- to UMI, not to

24  accuse them of things that are based on half -- you know,

25  half-baked investigations, so we did what we could to try to

1  chase it around.

2        And remember, we wrote them a letter.  We wrote them

3  a letter reasonably promptly, mid -- mid-January.  And we

4  said, "Look, here's what we got.  We're really concerned about

5  it.  We're doing an investigation, you know, can you please

6  help us?  What are you doing" --

7        **THE COURT:**  I need to interrupt you just a moment.

8        **MR. SHOHET:**  Sure.

9        **THE COURT:**  Mr. Rivera.

10       I'm sorry, counsel, go ahead.

11       **MR. SHOHET:**  Give me a chance to get some water

12  here.  Thank you.

13       **THE COURT:**  Okay.

14       **MR. SHOHET:**  I'm talking a lot here.  So -- so I was

15  in talking about what we did.  Let's -- let's follow the --

16  let's follow the dates out.

17       **THE COURT:**  Go ahead.

18       **MR. SHOHET:**  So mid-2012, we get involved.

19       December of 2012, we suspect, and we just have a

20  suspicious.  Now, if I -- if I had brought the TRO at that

21  point on those facts without having said I've done what I can

22  to investigate, I -- I haven't sent them a letter, I haven't

23  done other things that I can reasonably get more information,

24  you'd probably denied a TRO, and you'd be right because I

25  hadn't done what I should do and that's my obligation.

1          So at that point, we started to -- we wrote the

2    letter.  We -- well, first of all, we did what we could do in

3    the investigation.  I guess, there was some calls made and

4    some inquiries done and, you know, what could be done was

5    done.  And by mid --

6          THE COURT:  May I ask?

7          MR. SHOHET:  Sure.

8          THE COURT:  Was a -- was any communication initiated

9    with Cisco to -- to file --

10         MR. SHOHET:  I don't know the answer to that.  Well,

11   I mean -- did you?  What -- did we -- did we try to follow up

12   with Cisco on that or no?

13         UNIDENTIFIED SPEAKER:  They would not mention who

14   the competitor was or --

15         THE COURT:  But did we ask?  I'm just --

16         UNIDENTIFIED SPEAKER:  We -- well, I absolutely

17   asked who -- who's has been awarded this, and they would not

18   tell us.  They just said it was a -- they said it was an

19   experienced DRAM designer is all they said.

20         THE COURT:  Okay.  Go ahead.  I'm sorry.

21         MR. SHOHET:  So I don't -- I can't remember

22   specifically what was done, but we did what we could.  We

23   finally get a letter out on January 14.  We write them a

24   letter, and we asked them the pertinent questions.

25         And they didn't answer the pertinent questions.  In

1   fact, they threw it back on us.  "You breached.  You didn't

2   issue wafer starts.  It was a material breach," and blah,

3   blah, blah.  You know, come on.  "This was a benefit for us.

4   We paid you for work and you did the work, and when it became

5   unable for you to do the work because your parent screwed up,

6   you know -- you know, how did we materially breach?"  But that

7   was what they told us instead of telling us what they were

8   doing.

9           So that brings us to the end of January.  And then

10  we did some additional work then to get the complaint ready,

11  and we got the complaint finally on file on, what was it,

12  March 8th?

13          **UNIDENTIFIED SPEAKER:**  Correct.

14          **MR. SHOHET:**  And then here we are.  And you'll

15  notice that our investigation continued because the papers

16  that we filed in connection with this proceeding have

17  additional detailed facts that we didn't have in the

18  complaint, but, you know, we're trying to do this all in real

19  time.  So --

20          **THE COURT:**  Right.

21          **MR. SHOHET:**  -- you know, I know we have to act

22  quickly and we did the best we could.

23          **THE COURT:**  So standing here today on March 28th,

24  2013, what's the confidential information that they have

25  misappropriated or misused or trade secret that you believe

1  they have taken that belongs to you?

2       MR. SHOHET:  Well, we'd like to get some expedited

3  discovery to be able to answer that question.  We're kind of

4  flying blind.

5       But the question now is, based on what we have said

6  and what we do know, is there a reasonable basis to infer or

7  presume that they are using confidential information?

8       And let's not forget, Your Honor, that the -- that

9  the -- the noncompete obligation does not require such a

10  showing.  It's only the confidentiality obligation.

11       The noncompete, which should be entered -- which --

12  which would support the entry of the injunction today requires

13  a finding of the Court only that they are engaged in the

14  project involving an LLDRAM.

15       THE COURT:  And what evidence do I have in the

16  record that they have, in fact, violated?  As I understand it,

17  you have one comment from --

18       MR. SHOHET:  Well --

19       THE COURT:  -- Cisco indicating that an original guy

20  --

21       MR. SHOHET:  Let's look at their --

22       THE COURT:  -- was awarded the contract.

23       MR. SHOHET:  Let's look at their papers.

24       THE COURT:  Okay.

25       MR. SHOHET:  I think they're helping us a little bit

1   here.  Let's look at paragraph -- well, turn to page 11.

2           **THE COURT:**  All right.

3           **MR. SHOHET:**  Starting on line 10.  They go on and

4   talk about this projects, and then they say, "In other words,

5   GSI is asking this Court to issue an order that could expose

6   UMI to breach of existing contracts when there is nothing more

7   than unsubstantiated speculation that UMI even has GSI

8   confidential information, let alone is sharing it with a third

9   party."

10           Well, what's wrong with that statement is it

11   constitutes an admission by them because they're saying that

12   the injunction would expose them to a breach of contract.

13           The injunction would only expose them to a breach of

14   contract if they are acting in violation of the noncompete

15   because it says with the injunction we're asking is to "stop

16   any projects in which they are currently involved involving

17   LLDRAM technology."  I'm paraphrasing, but that was the intent

18   to deal with that.

19           So the issue in -- it won't hurt them if they're not

20   violating.  If they are violating, it will hurt them.  We

21   don't know, but we think that's a fair, at this stage, way to

22   protect everybody is to, you know, just have it done that way.

23           They're admitting in this statement and others --

24   they also, Your Honor, remember, in their papers they talk

25   about the balance of harm tipping in their favor because of

1  all the harm that would be visited upon them in shutting them

2  down on existing contracts if they were to be enjoined.

3         So there's two admissions in here that would support

4  the entry of the -- immediately of the TRO.

5         **THE COURT:**  So you're saying that by entering into a

6  -- or by acknowledging that there could be an existing

7  contract, they are acknowledging a breach of the noncompete?

8         **MR. SHOHET:**  Well, I think so, Your Honor, but you

9  know, I -- let me just deal with it at a higher level.

10        We asked them what they were doing.  They didn't --

11  they didn't tell us anything.  Apparently, they've got

12  something that concerns them, and they didn't even tell the

13  Court.

14        **THE COURT:**  Well, perhaps what's concerning them is

15  the possibility of a temporary restraining order, which unduly

16  infringes upon their right to engage in commercial activity?

17        **MR. SHOHET:**  Well --

18        **THE COURT:**  That -- that may be the concern I

19  suspect they have --

20        **MR. SHOHET:**  Absolutely.

21        **THE COURT:**  -- on top of mine.

22        **MR. SHOHET:**  And they should defend that on the

23  merits.  They -- if they -- if they have a defense to that,

24  then they should come out and say, "Yes, this is what we're

25  doing.  We're working with this customer.  Yes, it's a

1   competitive reviewer's, yes, it's an LLDRAM or no, it's not an

2   LLDRAM," but don't hide behind these words and -- you know, we

3   asked them the question.  Okay.  They blew us off.  That's why

4   we're here.

5           Then they came to the court, and they still haven't

6   answered the question, but they've said that the injunction

7   would kill them.  Now, how could the injunction kill them, in

8   terms of the balance of harm, if they're not doing the thing

9   that the noncompete prohibits?

10          Remember, the noncompete doesn't require any

11  confidential information be used.  It's clear and simple.

12  Don't work on an LLDRAM project, period.

13          THE COURT:  Well, it would -- it could -- it -- it -

14  - it could kill them or unduly harm them if there's no

15  contract enforced because, as I understand it, the noncompete

16  under the survival clause, if properly -- if the contract had

17  been properly terminated would not allow you to come in a

18  couple years after the fact?

19          MR. SHOHET:  No.  No.

20          THE COURT:  So your belief is that even if the

21  contract was absolutely properly --

22          MR. SHOHET:  Yes.

23          THE COURT:  -- terminated, the noncompete runs

24  through April 30th?

25          MR. SHOHET:  Yes.  It's the survival provision, Your

1   Honor.  The survival provision says -- look, it says that

2   those -- these are Article XI provisions.  It says that they -

3   - certain provisions survive the expiration of the contract,

4   and certain provisions last only to the -- to the expiration

5   of the contract.

6          The noncompete obligation in the survivability,

7   which is briefed in the -- in -- in our papers, and you can

8   read it.  I mean, I can -- if you want, I can -- we can read

9   it together, in case there's a question.  I don't think

10  there's much of a question on that one.  I don't think that's

11  controversial.  The provision -- Chris, do you know the

12  citation to this?

13         **MR. BEAL:**  7.5.

14         **MR. SHOHET:**  7.5.  So 7.5 -- 7.5 says, "The

15  provisions of Articles III, IV and V of this agreement," and

16  the noncompete is in -- I believe that's five, right?

17         **MR. BEAL:**  Three.

18         **MR. SHOHET:**  Three.  I can't get the numbers right,

19  but I get the concept, hopefully.

20         "The provisions of Articles III, IV and V of this

21  agreement shall survive expiration or termination of this

22  agreement permanently."  They live forever.

23         Now, that's broad group of things, some of which can

24  last forever and some of which cannot.  I can see their point

25  that a noncompete cannot last forever.

1       So the way I get there then is to say but it could -

2   - should certainly last the period of time they agreed it

3   would last, and that says for the term of the contract.  The

4   term of the contract expire -- has not expired.  The term of

5   the contract was five years.

6       And it says in the provision, Your Honor, that it

7   survives any termination, "right or wrong."  In other words

8   any purported termination, whether it was right or wrong -- we

9   think it was wrong because it was based on our --

10      **THE COURT:**  Sure.

11      **MR. SHOHET:**  -- material breach, which was not a

12  material breach.

13      But even if it were a material breach, Your Honor,

14  and even if it were properly terminated, when you read that

15  provision, it says the -- it goes to the term of the contract,

16  whether it was early terminated or not, for good or bad

17  because that's the period of time that the parties reasonably

18  agree it would take to dissipate, if you will, or mitigate any

19  of the effects of the -- of -- of our bringing them up to

20  speed.

21      **THE COURT:**  So your theory is that they have

22  admitted their engaging activity, which it violates the terms

23  of this provision, the only -- is that correct?

24      **MR. SHOHET:**  Absolutely.

25      **THE COURT:**  Okay.  And that admission, as you

1  characterize it, comes about because you have brought a claim

2  accusing them of that very act, right?

3       MR. SHOHET:  Well, it's more than that.  It's

4  because they say that the Court shouldn't enter the injunction

5  because the effect of the injunction would be to force them

6  into a breach of contract.  How could that be?

7       THE COURT:  But your breach -- but your injunction

8  goes beyond simply -- at least as requested, goes beyond

9  simply enforcement of the noncompete provision, right?

10      MR. SHOHET:  Well --

11      THE COURT:  You're asking for an injunction relating

12  to your -- to the confidentiality clause as well?

13      MR. SHOHET:  We don't need that yet.  That's not --

14  today we should get --

15      THE COURT:  I understand.  In terms of understand

16  the effect or import of the admission of the other side,

17  right, you would agree with me that the injunction as

18  requested goes beyond the noncompete?

19      MR. SHOHET:  This is the first time I'm going to

20  disagree with the Court.  The non --

21      THE COURT:  Probably not the last, but go ahead,

22  yeah.

23      MR. SHOHET:  So if you'll allow me to?

24      THE COURT:  Go ahead.

25      MR. SHOHET:  The noncompete -- let's be clear about

1   that.  If they have violated noncompete by engaging in an

2   LLDRAM project today, we don't need the confidentiality

3   obligation.  They should be enjoined at -- all we have -- all

4   that has to happen to enter that injunction is the fact that

5   they've admitted virtually, and that is that they are engaged

6   in an LLDRAM project.  If they are, the term of the contract

7   has not expired.

8           Whether or not it was properly terminated in 2009

9   doesn't matter because it lasts until April 30, and it

10  supports the injunction independently, and this injunction

11  should survive beyond April 30 based on the case law we cited

12  before.

13          So these are alternatives -- the non -- the

14  confidentiality obligation and the common-law protection for

15  our own intellectual property, which is defined in the

16  contract, that's all irrelevant.  We don't need that.  Those

17  are fallback.

18          If you don't find the noncompete -- and I don't know

19  how you can find the noncompete invalid -- I don't mean to

20  presume -- because their position is that it -- it's not

21  enforceable because they terminated it.  Well, they didn't

22  terminate it correctly, and even if it did it doesn't matter.

23          And secondly, that it was -- the termination was

24  predicated on a material breach, which we didn't commit.

25          So we should get the injunction on the -- on the

1   noncompete, and the rest of it doesn't matter.  The question -

2   - and it should last forever as to these guys.  The point is

3   if we --

4           THE COURT:  Well, is that correct?

5           MR. SHOHET:  Yes.

6           THE COURT:  Are you saying that the injunction I

7   should issue at this stage would be a permanent injunction?

8           MR. SHOHET:  As to any projects that they are

9   currently engaged on.  Look at those cases we cite.  They have

10  -- if they have violated our rights, and they're currently --

11  it's all (inaudible).  The injunction we ask is only to stop

12  continuation of existing projects because we don't know more

13  yet.

14          THE COURT:  So in your view, if I issue the

15  injunction you wanted on the noncompete, could they start a

16  new project on May 15th?

17          MR. SHOHET:  Well, if they --

18          THE COURT:  Without violating the noncompete

19  provision?

20          MR. SHOHET:  The new project certainly wouldn't be

21  covered by the noncompete.  We'll concede that.

22          There's arguments we could make about -- because it

23  says last -- it says it would last permanently, but we think

24  permanent can't be broader than the period of time they

25  agreed, which was term of the contract.  I mean, we could make

1   arguments, but I don't want to make argument -- clever

2   arguments today.  I want to be real about it.

3           Probably that -- that project is done.  They say

4   "contract or contracts."  Whatever contracts are underway, our

5   position is the injunction should issue on the noncompete

6   subjective and that it should last indefinitely.  They're --

7   they're -- they're done with those projects.

8           But we also don't know what other mischief may be in

9   the works -- and I don't mean to be disparaging here -- but

10  whatever other projects that they may have in the works or

11  contemplated.  And were they to engage after April 30, then

12  the question would come up, well, are they in breach of the

13  non -- the confidentiality obligation, or what common-law

14  rights do we have because they are misusing potentially our

15  property?

16          That would come up -- the only thing I'd add to that

17  is, Your Honor, because everything they learned about DRAM

18  technology was done on our nickel.  As we said, at least in

19  the papers, this was their first project.

20          I wouldn't -- I would say that it's a fair

21  presumption that says if they're doing it after April 30 at

22  this point, it's all ours.  And -- and the presumption is that

23  they're using our confidential information because our

24  confidential information was everything they learned from us,

25  which is everything they know about LLDRAM, as far as we

1   should -- it's a fair presumption.

2           And maybe in two or three years whatever things they

3   learn on projects that they're not in violation of us, maybe

4   that would be a question of fact that would have to be sorted

5   out, and, you know, maybe we should do some discovery before

6   we make presumptions, but I think you start from the

7   proposition that it's going to be awhile after 2000 -- April

8   of 2008 before they get to do an LLDRAM project without

9   violating this contract.

10          **THE COURT:**  All right.  Mr. Shohet, I'm going give

11  an opportunity to rebuttal, but I would like --

12          **MR. SHOHET:**  Thank you.

13          **THE COURT:**  -- to hear from Mr. Cherian.  Thank you

14  very much.

15          Mr. Cherian, I suspect you have a different view?

16          **MR. CHERIAN:**  Yes, Your Honor.  But, Your Honor,

17  first I'd like to -- I know the Court would like to welcome a

18  new generation of lawyers all sitting here watching us.

19          **THE COURT:**  Here's your chance to either inspire or

20  completely discourage anyone from practicing law.

21          **MR. CHERIAN:**  We hope, Your Honor, they'll go back

22  home and -- and plan to become lawyers.

23          So Your Honor, there's a lot of statements that are

24  made here that are flat not true, unfortunately, not true.

25          And we can go through -- he tells you that his

1   client was the -- is an expert in LLDRAM, right, but his

2   papers don't tell you that because he not.  His papers never

3   tell you that he's an expert in LLDRAM.

4           He tells you that he contracted with us for a

5   design, and that design work ended in December of '08, and

6   that was it.  Flat wrong, Your Honor.

7           What he contracted with us for, he took a micron

8   part.  He took the specification of a micron part.  Why would

9   you do that if you're such an expert?  An existing micron

10  part, and he said, "Here's the spec" -- and it's in the

11  papers.  "Here's the spec.  Take it and build me something."

12  That's what he said.  That's a fair read.

13          Now he tells you all about ProMOS and it was all

14  because ProMOS was the parent company.  That's what he tells

15  you.  Well, let's look at it.  Let's -- let's look at -- it's

16  not true, simply not true.

17          Page 3 of the contract.  "If the product is designed

18  for manufacturer at a fab other than ProMOS, provide design

19  (inaudible).  So we just need to go look at the contract, Your

20  Honor.

21          Right now we look at the evidence before the Court.

22  We stand on our papers.  Why say there is no evidence of any -

23  - of any significance.  And I think, you know, it took a long

24  time to get those papers ready in a day, and we got it to you

25  as quickly as we could, and we stand on our papers, but that's

1  the first thing, see.

2        Contracts with us for a micron part because he

3  doesn't know how to do it, right.  Why would you want -- if

4  you could do it yourself, why do you want to give us any

5  money?

6        Second, he tells us he selected us because of

7  ProMOS.  No, he selected us because we are well known design

8  house.  We design DRAMs.  That's our business.  We do paper

9  designs.  That's what we do every day.

10        **THE COURT:**  Is it correct, Mr. Cherian, though, that

11  prior to this opportunity relationship, your client had not

12  done any LD III design work --

13        **MR. CHERIAN:**  Well --

14        **THE COURT:**  -- or LD II, for that matter?

15        **MR. CHERIAN:**  Well, we were working with Cisco

16  before we worked with them.  They came to us because they knew

17  we were working with Cisco, and they knew we were experts at

18  DRAM.  And they didn't know -- they don't know how to do an

19  LLDRAM.  They wouldn't give us this money.

20        Now, when he told you, Your Honor, which is really

21  regrettable, that, "Well, we got the design and that was the

22  end.  Go home."  Not true.

23        What -- if you go back and look at the -- you go

24  back and look at two paragraph -- I mean, Article II, it says,

25  "Provide consulting services of failure analysis efforts,

1  undertaken by GSI on a timely basis.  That these negotiated in

2  good faith for a period of three years after manufacture and

3  release."

4          So put this in perspective.  What he did is he came

5  to us.  He says, "Look, I want you to build me a particular

6  product.  The spec -- I don't know how to spec it.  I'll use

7  the micron spec," okay.  Because if he knew how to spec it, he

8  would given -- he would give me spec.  He says, "I'll use the

9  micron spec and you go build it," and he sets forth a series

10  of steps to manufacture.

11          And what he now does is he comes to a point after

12  that $540,000 has been spent and, for whatever reason, he

13  tells us it's because of ProMOS.  Well, if we go and did a

14  Google search -- and Google search is not evidence, so I guess

15  -- but we'll see that ProMOS was still selling these products

16  in '11 and '12.

17          **MR. SHOHET:**  Excuse me, Your Honor, just a quick

18  objection to the record.

19          There's no declarations in -- with their papers.

20  None of this is in evidence.  None of this is in record, so I

21  just want to preserve.  I don't know if --

22          **THE COURT:**  Your record is preserved.

23          **MR. SHOHET:**  Thank you.

24          **THE COURT:**  I -- I take your point.

25          Go ahead, Mr. Cherian.

1     **MR. CHERIAN:**  Your Honor, I appreciate it again.

2          So ProMOS was still in business, you see, so we

3     don't know -- that's what they say, and we -- what we have to

4     work with is the evidence they put forward before us.  That's

5     all the evidence is.

6          Now, with regard to them being experts, let's look

7     at the recitals of the -- of this contract.  This great

8     expertise that they have.  You know they're LLDRAM experts.

9     They know how to do it.  That's why they gave us the micron

10    part because -- and in the recitals they say -- and you know

11    we guys are just novices.  We just came up -- you know, we

12    fell off the turnip truck just yesterday, but the recital say

13    something else.

14         UMI is experienced in the development and design of

15    semiconductor memory components, you see, and UMI's employees

16    have expertise in the design of semiconductor memory

17    components.  Now, what's their experience?  What they recite.

18    It's their contract.

19         Their experience is in the production, not the

20    design, the production, packaging and sales, right.  There's a

21    big difference, Your Honor, in production, packaging and sales

22    versus design.

23         So a company who claims -- I'm not disparaging them

24    -- who claims to be able to produce these products wants

25    someone to design the products for them, presumably because

1  they don't have the expertise in-house.

2          THE COURT:  But Mr. Cherian, that's hardly unusual

3  that partners to a business arrangement would bring

4  complimentary skills --

5          MR. CHERIAN:  That's right.

6          THE COURT:  -- rather than overlapping skills,

7  right?

8          MR. CHERIAN:  That's right.  Absolutely.  It happens

9  every day in this valley.  Different people do different

10  things.  Okay.

11          But the point I want to make is -- is I want to put

12  on the table this notion that there was this great expertise.

13  There's nothing in the declarations that suggest it.  I'll go

14  out on a limb and suggest to you it's not true.  The a little

15  bit of research that I've done suggests it's not true.

16          And I will also tell you, Your Honor, that UMI has

17  done generations of DRAM design.  It's been involved in DRAM

18  designs.  That's their bread and butter.  That's what they

19  live for.

20          With respect to the admissions, I don't see the

21  admissions, Your Honor.  He wants discovery into all kinds of

22  contracts.

23          You, I think, seized on the Low Latency DRAM.  You

24  asked the question, which was not answered because I can't

25  answer it either.  What's the difference between LLDRAM II and

1  LLDRAM III, other than the obvious, the response time, which

2  is -- I'm guessing.

3         **THE COURT:**  I'm guess --

4         **MR. CHERIAN:**  I don't want to --

5         **THE COURT:**  I -- and I'm guessing too.  I take it

6  that the response time or latency of version III or generation

7  III is somewhat enhanced compared to generation II?  Can we

8  just --

9         **MR. CHERIAN:**  That's my presumption --

10         **THE COURT:**  Okay.

11         **MR. CHERIAN:**  -- also, Your Honor.  If I could just

12  take a moment?

13         And it's not defined.  There's no definition of that

14  -- and even though, Your Honor, you asked -- you know, it's

15  just common sense that if you're in the business of designing

16  and selling DRAMs, be it Samsung, High Max, anybody, LG, you

17  know, any of the LP -- anybody, you want to have a DRAM that

18  has a very short response time, right, because -- so Low

19  Latency II, Low Latency III, it doesn't mean something

20  specific to me, you know.  The -- the -- the (inaudible) are

21  not bound.

22         But more importantly, we need to -- you know, since

23  you -- you know, I suspect you want me to get into the merits?

24         **THE COURT:**  I am kind of interested in the merits,

25  Mr. Cherian, so -- so why don't we turn to the -- the

1    contract.

2             In particular, I think Mr. Shohet suggested, perhaps

3    even persuasively, that at -- at a very minimum, the

4    noncompete provision survives termination and runs through

5    April 30th.

6             Could you -- could you give me your view of how that

7    contract --

8             **MR. CHERIAN:**  Yeah.  We --

9             **THE COURT:**  -- provision works?

10            **MR. CHERIAN:**  We don't -- frankly, we disagree with

11   it with it, Your Honor.

12            There was a contract for five years where all five

13   years, or most of the five years, we would be productively

14   engaged, right.  For whatever reason -- maybe it's a breach,

15   maybe it's by mutual consent.  I can't make a representation

16   to the Court today.  But for whatever reason, the project

17   didn't go forward.

18            It did go forward on -- on projects that were in

19   their part, were -- that was in their (inaudible), and so that

20   ended it.  So -- so to -- to me, there's nothing more to do.

21   They ended the project.

22            And if you go back and look at the provision,

23   Kubida's -- Kubida's letter sets it forth, I think, very well,

24   Your Honor.  I think he sets it -- but if you go back and look

25   at 7.3, you got 30 days notice.  That's the notice provision.

1     So you've worked with these guys -- and we're not

2  enemies with these guys.  We want to work with them again.  I

3  mean, we -- that's our business.  We work -- we produce

4  designs for people who employ us.

5     So the design -- the work is done.  They've decided

6  not to go forward.  We didn't sue them for breach.  We did

7  nothing.  We sent them a letter, and we said pretty simple.

8  The letter is a two-liner, and I'm sure the -- I mean, it's a

9  four-liner.

10     It says, "This letter is to inform" -- it's very

11  polite -- "GSI that UMI considers the agreement titled" blah

12  "to be terminated 30 days after you received this letter."

13     Why?  Because nothing is happening.  You guys have

14  decided you don't want to product.  You know, you're not going

15  ahead.  We're good guys.  We understand, you know, these

16  things happen and -- but there's no contract.  You know,

17  there's nothing in us.  We'll go off and do other things.

18     **THE COURT:**  But even if that's true, doesn't the

19  noncompete run through the end of this month?

20     **MR. CHERIAN:**  We don't -- we don't -- we -- first of

21  all, Your Honor, we have to think about noncompete.  We gave

22  them a design.  We're in the business of making designs.  We

23  do -- everything is a custom design, right.  And so we get

24  into this business of Low Latency, High Latency, DRAM.  All

25  these things are terms that are not defined by them in their

1   papers.

2           So the termination -- you see, if we were working

3   with them, then there would be some basis for it.  And as

4   Kubida points out, once the agreement was terminated, all

5   rights and -- all obligations ended.

6           And what did they do with it, Your Honor?  They --

7   if you believe their papers, they took the work we gave them

8   and either did nothing with it, nothing with it, or they used

9   to go forward with that divide bid.  But, again, there's a

10  difference because their papers inform us there's this level

11  II latency and level III latency -- no, Low Latency II, low

12  latency III, so they went.  They lost it.

13          Now, they can't tell you one thing we've done that's

14  improper.  They can't.  They -- in the declaration -- one of

15  the -- the declarant says this woman did some simulation.

16  That's somehow trade secret.  Your Honor, you know what

17  simulation is.  A DRAM circuit is hundreds of pages, okay.

18  It's about this thick.  You know, I'm just -- this thick, long

19  papers.

20          And what you do in simulation and testing is you

21  take individual circuits to make sure that the electrical

22  parameters -- it's our -- it's our design.  They're just

23  assuring us that those things -- that the circuit works as

24  it's supposed to, the electrical metrics, for lack of a better

25  word, are correct.  That's this -- that's what they did for

1  us.

2        You see, it's our design.  The design is completely

3  ours, a customized design for a particular client that went

4  nowhere.  And now what they want to do years later is to come

5  back and prevent us from doing business.  That's what it's all

6  about.

7        **THE COURT:**  All right.  Mr. Cherian, do you want to

8  speak to the issue of discovery and what discovery would make

9  sense, in the event the Court were to decline the TRO, but set

10 a very short timeframe for a PI hearing?

11       **MR. CHERIAN:**  Well, Your Honor, we --

12       **THE COURT:**  I'm going to give Mr. Shohet a chance to

13 speak to it as well, but I want to hear your thoughts as well.

14       **MR. CHERIAN:**  Yeah.  To me, Your Honor, it seems

15 that we have shown to you conclusively there's no basis for a

16 TRO.  That there's no reason why this case can't proceed on

17 its normal -- on its normal course.

18        That the information, to the extent the information

19 is legitimately required if the suit goes forward, you know,

20 would have to be turned over, but there's no reason for this

21 sense of urgency.  There's not one iota of urgency, Your

22 Honor, for this, because, by their own admission, what they

23 tell you is well, this contract will -- we believe it

24 terminated in '09, but you know, even if you take their word

25 and you accept their argument in the -- what, in the next 30

1  days, or something, 34 days, this -- you know, by their own --

2  by their own accord, that's the end of the agreement.

3  　　　　But I think -- Your Honor, I think that Kubida --

4  the Kubida letter sets it forth clearly, you know.  You know,

5  we can give you the 30 days.  Here's the 30-day notice.  Good-

6  bye.

7  　　　　**THE COURT:**  All right.  All right.  Mr. Cherian, I

8  appreciate your argument.

9  　　　　I'm going to give Mr. Shohet a chance to rebuttal.

10  　　　　Thank you very much, sir.

11  　　　　**MR. CHERIAN:**  Thank you, Your Honor.

12  　　　　**MR. SHOHET:**  Very quick a few points.  Very quickly,

13  Your Honor.  I know that we've probably taken up more than our

14  fair share of the Court's time this morning.

15  　　　　The recitals.  There's binding admissions between

16  the parties.  Mr. Cherian made an argument that somehow, you

17  know, we weren't anything special and there was no

18  understanding or obligation that -- that they were going to be

19  -- we were going to be imparting information that they could

20  use.

21  　　　　Recital G says -- and this is an admission of fact

22  by both parties.  That's the effective recital in the

23  contract.  "UMI and GSI acknowledge that because of UMI's

24  position as a contract memory design service provider, the

25  exposure UMI will gain in the course of providing contract

1  design services to GSI -- services to GSI's confidential

2  proprietary information and trade secrets, and you UMI's

3  potential ability to use said information to assist potential

4  competitors of GSI to produce low latency" -- you know, it

5  goes on, but the point is --

6          **THE COURT:**  I can read it.  I understand.  Yeah.

7          **MR. SHOHET:**  Yeah.  It completely contradicts Mr.

8  Cherian's major point that there was nothing special about

9  what we were going to do for them or with them, and that they

10  -- this is a surprise to them that somehow we're trying to

11  protect us.

12          The other thing I want to say -- the other provision

13  I wanted to talk about is they say it's not defined.  What it

14  -- their DRAM -- they've been doing lots of DRAM work, and

15  it's not defined what an LLDRAM -- it's specifically defined

16  in Section 3.6.

17          It says, "Except for the product being designed and

18  developed," blah, blah, blah, "they should not during the term

19  of this agreement being involved in" -- I'm just paraphrasing

20  -- "Low latency DRAM product means a latency optimized and/or

21  address rate optimized memory product that employs a capacity

22  charged based memory self-technology, including but not

23  limited to," and then it goes on.

24          I don't know what any of that means but I know this

25  --

1    **THE COURT:**  That makes two of us.

2    **MR. SHOHET:**  Okay.  But we do know this.

3    **THE COURT:**  Yeah.

4    **MR. SHOHET:**  It's the definition of what they're not

5    supposed to do.  Either they're doing that or they're not

6    doing that.  If they're not doing that, there's no problem.

7    There's no hardship to them.

8         If they're doing it, they got to stop.  They can't

9    do it, period.  It's not -- it doesn't require a lot of debate

10   or even discovery.  It's a simple question.  We asked them the

11   simple question.  They haven't told us and they haven't told

12   you.  I think we need an injunction right away.

13        The only other thing that I wanted to mention --

14   that's it.  Those are my only points.

15   **THE COURT:**  All right.

16   **MR. SHOHET:**  Thanks, Your Honor.  Well, wait -- wait

17   --

18   **THE COURT:**  Mr. Beal may have a different view?

19   **MR. SHOHET:**  Oh, did you want -- did you want me to

20   address --

21   **THE COURT:**  It's all right.  Just a minute.

22   **MR. SHOHET:**  Okay.  Sorry.

23   **THE COURT:**  Go ahead, counsel.

24   **MR. SHOHET:**  You wanted me -- maybe you wanted me to

25   address the discovery question?

1    **THE COURT:** I want to speak to discovery, yes.

2    **MR. SHOHET:** Yeah. So we don't see any reason why

3    the documents we requested can't be produced immediately, you

4    know, or within a matter of a few days from them.

5    These are the documents that would -- that were

6    described in -- I think -- did we not -- we described them

7    fairly accurately in the papers.

8    We'd like to see the basic documents. What did --

9    what's their contract terms? They can -- we can do it on a

10   confidentiality agreement. We can negotiate something. We

11   won't -- we'll keep it attorneys' eyes only, so that there's

12   no exposure at this point.

13   Who they're working with. What the -- what the

14   documents that reflect the deal and the exchange of

15   information and their performance. That will give us a start.

16   And I think we also asked for a 30(b)(6) witness

17   that's most knowledgeable about what they're doing and, you

18   know, can -- can speak to what it is that's going on.

19   And we would think that that could be done -- we'd

20   like to get the documents first and quickly, and then possibly

21   have a short deposition, all of which -- you know, obviously

22   the sooner the better, but you know, as long as we get -- if

23   we get the TRO, it doesn't matter. If we don't, the sooner

24   the better.

25   **THE COURT:** All right. Well, here's what we're

1   going to do.

2         I am not yet convinced that injunctive relief is

3   warranted.  My particular concern is I still at this point

4   don't have any understanding of what it is the Plaintiffs

5   believe the Defendants have done to trigger their obligations

6   under the agreement, so on that basis the TRO is denied.

7         However, I am concerned about these allegations, so

8   I do believe a preliminary injunction schedule is appropriate

9   and warranted.

10        I'd like to set a hearing for preliminary

11  injunction, and what I'd like to do is set that hearing for

12  something like three months from today, give or take.

13        I think limited discovery in support of that

14  preliminary injunction is warranted, mutual discovery, I

15  should say, including documents, email and depositions, but I

16  want to be very clear about what documents and depositions I

17  think are appropriate.

18        I don't see this as requiring massive scouring of

19  hard drives and email custodians.  I think a small number,

20  perhaps five or less, of -- of custodians for email purposes

21  is warranted.

22        I think limited targeted discovery regarding the

23  contract is warranted, and perhaps other contracts, as well,

24  and perhaps three, maybe four depositions, either 30(b)(6) or

25  individual, perhaps an expert or two.

1    From my comments, I think you can see that I am

2 inclined to set very strict limits, but I do want to give

3 counsel an opportunity to meet and confer on what they think

4 the right discovery should be within those general parameters

5 or with that general guidance.

6    So Mr. Rivera, can you suggest a hearing date

7 roughly three months from today?

8    **THE CLERK:** Yes, Your Honor. Tuesday, June 25th at

9 10 a.m. is available.

10    **THE COURT:** Okay. So we're going to set this for

11 hearing on Tuesday, June 25th at 10 a.m.

12    I'm going to ask counsel to meet and confer on a

13 discovery plan, consistent with the general guidance that I've

14 provided.

15    If you can't work it out, let's plan to have a

16 telephonic hearing in roughly a week for -- for status. I say

17 telephonic. I'm eager and always happy to have counsel here

18 in the courtroom, but if for some reason it's more convenient

19 to participate by phone, I'm open to that as well.

20    So does everybody understand the general parameters?

21    Mr. Rivera, can we just go ahead and set a status

22 right now so that everybody has it on their calendar?

23    **THE CLERK:** Yes, Your Honor. Tuesday, April 2nd at

24 10 a.m.

25    **THE COURT:** All right. So, gentlemen, do you

1   understand the basics of what we're talking about?

2           I'd like to meet and confer.  I'd like to have a

3   status conference in a week to understand whether you've been

4   able to work out the discovery plan or not.

5           If you haven't -- well, if you have, submit it, and

6   I'll -- and I'll -- submit it in the form of a stipulation and

7   I'll approve it.

8           If you haven't or can't, let's plan to address what

9   discovery makes sense at that status conference next week.

10  And with that, we'll get to discovery, and we'll eventually

11  get to a hearing.

12          Mr. Cherian, do you wish to say something?

13          **MR. CHERIAN:**  Yes, Your Honor.  With regard to the

14  date next week, I'm not available next -- I mean, for the -- I

15  have a federal circuit argument that I --

16          **THE COURT:**  If it doesn't work for you or for

17  opposing counsel, I'm happy to consider alternatives, either

18  if you want to propose a date today or if you want to reach

19  out to Mr. Rivera this afternoon or tomorrow.  I'm flexible in

20  this regard.  I want to accommodation everyone's calendar.

21          **MR. CHERIAN:**  A week -- a week from the date you

22  have would work for me.

23          **MR. SHOHET:**  Well --

24          **MR. CHERIAN:**  (inaudible) the ninth.

25          **MR. SHOHET:**  Why don't we do this, Mr. Cherian.  I

```
 1  don't know all the dates that may be perfect or conflict with
 2  my calendar.  Why don't we talk about that and propose some
 3  dates that make since within those parameters, talk outside?
 4            MR. CHERIAN:  Fine.
 5            MR. SHOHET:  Is that okay?
 6            THE COURT:  Okay.
 7            MR. SHOHET:  Is that okay with the Court?
 8            THE COURT:  That's more than okay.
 9            All right, gentlemen.  I appreciate the
10  presentations this morning.  Have a good morning.
11            MR. SHOHET:  Thank you, Your Honor.
12            MR. BEAL:  Thank you, Your Honor.
13            MR. CHERIAN:  Your Honor, are you going issue an
14  order?
15            THE COURT:  I will issue a very short order
16  consistent with my ruling here on the record.
17            MR. CHERIAN:  Okay.  Thank you, Your Honor.
18            THE COURT:  Okay.
19                 (Proceedings adjourned at 11:03 a.m.)
20
21
22
23
24
25
```

**CERTIFICATE OF TRANSCRIBER**

    I certify that the foregoing is a true and correct transcript, to the best of my ability, of the above pages of the official electronic sound recording provided to me by the U. S. District Court, Northern District of California, of the proceedings taken on the date and time previously stated in the above matter.

    I further certify that I am neither counsel for, related to, nor employed by any of the parties to the action in which this hearing was taken; and, further, that I am not financially nor otherwise interested in the outcome of the action.

_____     4/18/13

Signature of Transcriber     Date