1    JEFFREY M. SHOHET (Cal. Bar No. 067529)
     jeffrey.shohet@dlapiper.com
2    BROOKE KILLIAN KIM (Cal. Bar No. 239298)
     brooke.kim@dlapiper.com
3    KELLIN CHATFIELD (Cal. Bar No. 288389)
     kellin.chatfield@dlapiper.com
4    **DLA PIPER LLP (US)**
     401 B Street, Suite 1700
5    San Diego, CA  92101-4297
     Tel:     619.699.2700
6    Fax:    619.699.2701

7    RAJIV DHARNIDHARKA (Cal. Bar No. 234756)
     rajiv.dharnidharka@dlapiper.com
8    **DLA PIPER LLP (US)**
     2000 University Avenue
9    East Palo Alto, CA  94303-2214
     Tel:     650.833.2000
10   Fax:    650.833.2001

11   Attorneys for Plaintiff

12

13                       UNITED STATES DISTRICT COURT

14        NORTHERN DISTRICT OF CALIFORNIA, SAN JOSE DIVISION

15   GSI TECHNOLOGY, INC., a Delaware          CASE NO.  13-CV-1081-PSG
     Corporation,
16                                             **SECOND AMENDED COMPLAINT FOR
                        Plaintiff,             DECLARATORY RELIEF AND
17                                             DAMAGES**
                v.
18                                             **DEMAND FOR JURY TRIAL**
     UNITED MEMORIES, INC., a Colorado
19   Corporation, and INTEGRATED
     SILICON SOLUTION, INC., a Delaware
20   Corporation,

21                      Defendants.

22

23

24

25

26

27

28

1    Plaintiff GSI Technology, Inc. ("GSI Tech") complains and alleges as follows against

2    Defendants United Memories, Inc. ("United Memories" or "UMI") and Integrated Silicon

3    Solution, Inc. ("Integrated Silicon") (the "Defendants"):

4    **THE NATURE OF THIS ACTION**

5        1.    Defendants have engaged in anticompetitive conduct and conduct violating the

6    Racketeering Influenced and Corrupt Organizations Act, 18 U.S.C. § 1961, *et seq.* ("RICO"), by

7    among other things, conspiring to keep, and keeping, GSI Tech out of the high-performance

8    DRAM market, misappropriating GSI Tech's trade secrets, deceiving GSI Tech and third party

9    Cisco Systems, Inc. ("Cisco"), and concealing information from GSI Tech and Cisco.  Defendants

10   conspired to tortiously interfere with GSI Tech's prospective economic relationship with Cisco

11   and to misappropriate GSI Tech's trade secrets in violation of the Uniform Trade Secret Act.  In

12   remedy, GSI Tech seeks monetary damages, treble damages pursuant to 18 U.S.C. § 1964(c), and

13   an injunction preventing further tortious, anticompetitive, and criminal activity likely to occur in

14   the absence of this Court's intervention.

15       2.    GSI Tech also seeks declaratory, injunctive, and monetary relief from United

16   Memories for breach of its contract with GSI Tech for the design and development of a Low

17   Latency DRAM Product (as defined below) to GSI Tech's requirements and specifications and

18   for unfair competition in violation of section 17200 *et seq.* of the California Business and

19   Professions Code, fraud, and false promise.

20       3.    United Memories has violated, and continues to violate specific provisions of the

21   product design agreement between United Memories and GSI Tech, entitled "United Memories –

22   GSI Tech Product Design and Development Agreement, 576 Mb Low Latency DRAM" (the

23   "Agreement"), that (1) preclude United Memories from involvement in the design or

24   development of a competing Low Latency DRAM Product; (2) assign to GSI Tech certain

25   intellectual property; and (3) require United Memories to maintain the confidentiality of GSI

26   Tech's confidential information.

27   /////

28   /////

## THE PARTIES AND JURISDICTION

4.     Plaintiff GSI Tech is a corporation organized under the laws of Delaware, with its principal place of business located at 1213 Elko Drive, Sunnyvale, CA 94089.  GSI Tech designs, develops and markets a broad range of high-performance semi-conductor memory products for networking, military, medical, automotive, and other applications.  GSI Tech offers both static random access memory ("SRAM") products and low latency dynamic random access memory ("LLDRAM") products.

5.     Defendant United Memories is a corporation organized under the laws of Colorado, with its principal place of business located at 4815 List Drive, Colorado Springs, Colorado, 80919.  United Memories provides integrated circuit design and layout services to a broad range of customers, including customers located within the State of California.  United Memories is experienced in the development and design of semiconductor memory components, specializing in DRAM design.  GSI Tech is informed and believes that, at all times relevant herein, United Memories is and was doing business in California including, but not limited to, the design of a LLDRAM product for GSI Tech.

6.     GSI Tech is informed and believes, and thereon alleges that United Memories regularly does business in Santa Clara County, and elsewhere in California.  GSI Tech is further informed and believes that United Memories has and continues to regularly provide integrated circuit design and layout services to technology companies located in Santa Clara County and elsewhere in California including to Cisco and Integrated Silicon.  In addition, United Memories completed the performance of its obligations under the first four milestones of the Agreement by delivering design plans and related work product to GSI Tech's headquarters in California as required by the Agreement.

7.     Defendant Integrated Silicon is a corporation organized under the laws of Delaware, with its principal place of business located at 1623 Buckeye Drive, Milpitas, California, 95035.  Integrated Silicon designs, develops, and markets high-performance integrated circuits for the automotive, communications, digital consumer, industrial, medical, and military markets, with a primary focus on high speed / low power SRAM and low and medium density

1    DRAM.  GSI Tech is informed and believes that, at all times relevant herein, Integrated Silicon is

2    and was doing business in California.

3         8.      This Court has original jurisdiction under 28 U.S.C. § 1331, in that this is a civil

4    action arising under the laws of the United States.  Specifically, this action arises under Section 2

5    of the Sherman Antitrust Act, 15 U.S.C. § 2, and under the Racketeer Influenced and Corrupt

6    Organizations Act, 18 U.S.C. §§ 1961, *et seq.* ("RICO").  The Court has supplemental jurisdiction

7    over the remaining claims alleged herein pursuant to 28 U.S.C. § 1367.

8                                          **<u>VENUE</u>**

9         9.      Venue is proper in the Northern District of California because a substantial part of

10   the events or omissions giving rise to the claims occurred in this district in that the contract at

11   issue was made and performed, in part, by United Memories in this district, and the

12   anticompetitive and racketeering conduct alleged herein occurred in and originated from this

13   District.  In addition, venue is proper in the Northern District of California under 28 U.S.C.

14   §§1391(b)(1) and 1391(c)(2).

15                   **<u>BACKGROUND ON THE HIGH-PERFORMANCE DRAM MARKET</u>**

16        10.     Random access memory is a form of data storage.  It can be dynamic ("DRAM")

17   or static ("SRAM").

18        11.     High-performance DRAM differs from conventional DRAM and has distinctive

19   technological features serving a unique product market.  The random address rate of high-

20   performance DRAM is at least two times faster than conventional DRAM of approximately the

21   same density.  Reduced latency DRAM ("RLDRAM"), low latency DRAM ("LLDRAM"), and

22   fast cycle RAM ("FCRAM") are types of memory chips falling within the high-performance

23   DRAM market.  Atris, a chip based on a proprietary Cisco specification, is a type of LLDRAM.

24        12.     Conventional DRAM, high-performance DRAM, and SRAM are not substitutes

25   for each other, either technically or practically.  Despite similar descriptions in their names, they

26   are different and distinct products serving separate needs and markets.

27        13.     High-performance DRAM is substantially less expensive to produce on a bit-by-

28   bit basis than SRAM, which is even faster than high-performance DRAM.

14.     High-performance DRAM is primarily used in advanced data networking applications, while conventional DRAM is primarily used in personal computers and consumer electronic products.

15.     High-performance DRAM serves a separate and emerging market between conventional DRAM and SRAM.

16.     On a bit-by-bit basis, the pricing between conventional DRAM and high-performance DRAM varies by a factor of approximately ten, as does the pricing between high-performance DRAM and SRAM, so a small non-transitory price change in one product will not lead customers to purchase one of the other products.

17.     Presently, four competitors are engaged in the high-performance DRAM market: Micron Technology, Inc. ("Micron"); NEC Electronics Corporation, now known as Renesas ("Renesas"); Integrated Silicon; and GSI Tech. Micron was an early player in the high-performance DRAM market. Micron developed the specification for RLDRAM-II and -III, and owns the trademark to the term "Reduced Latency DRAM."

18.     Micron teams up with Integrated Silicon by licensing its RLDRAM-III technology to Integrated Silicon, which Integrated Silicon sells to customers. According to a Micron press release, Micron partnered with Integrated Silicon as its alternate supplier for RLDRAM-III to provide "assurance of commercial volume and longevity for networking customers."[1] In other words, Integrated Silicon is Micron's designated second source supplier solution for RLDRAM-III. Integrated Silicon also licensed the trademark to "RLDRAM" from Micron, and sells its own version of RLDRAM-II. As evidence of Integrated Silicon's growing success in this market, on January 26, 2011 earnings call, Integrated Silicon announced that its high-performance DRAM revenue had increased 54% over the December 2009 quarter.

19.     Renesas was one of GSI Tech's early competitors in the market. Renesas and GSI Tech worked jointly with Cisco to develop the specification for "Atris," the name given to the

---

[1] Micron, *Micron Announces Sample Availability for Its Third Generation RLDRAM ® Memory: Company Introduces Integrated Silicon Solution, Inc. as Second Source Partner* (May 26, 2011), *available at* http://news.micron.com/releasedetail.cfm?ReleaseID=581168 (last accessed 09/23/2013).

1   initial LLDRAM-III product used by Cisco.  Renesas was the first to market Atris, and is

2   presently the sole supplier of the Atris chip to Cisco, the largest customer for Atris and other

3   high-performance DRAM products.

4          20.     High-performance DRAM is a highly-technical product and the entry barriers to

5   the high-performance DRAM market are significant.  First, a prospective competitor must already

6   have or acquire the expertise in the design, development, and production of similar products.

7   High-performance DRAM is a complex technology with sophisticated architecture borrowing

8   design theories from both SRAM and traditional DRAM technologies.  Knowledge of both

9   SRAM and DRAM technology is necessary to complete the design of a high-performance DRAM

10  chip.  A limited number of participants in the SRAM and DRAM markets have the necessary

11  marriage of experience to develop a high-performance DRAM chip.

12         21.     Second, the high-performance DRAM product is different in kind from the

13  conventional DRAM and SRAM products.  A competitor in either one of those markets must

14  invest substantial time, energy, and costs to design and develop a product that will satisfy the

15  high-performance DRAM market.  Very few companies are able and willing to do this, not only

16  because of the high costs, but because the market is highly specialized and narrow.  Great risk

17  exists that a company entering the market may be without a customer base sufficient to justify the

18  expense of market entry and future variable costs, much less to guarantee profit.

19         22.     Third, while any memory chip manufacturer without its own chip fabrication, or

20  "fab," faces the challenge of establishing a good relationship with an independent fab to

21  manufacture chips, this problem is particularly difficult for manufacturing of high-performance

22  DRAM products.  High-performance DRAM typically involves a smaller number of wafers per

23  run compared to traditional DRAM.  Only a few independent fabs are willing to operate as a

24  foundry (i.e., willing to manufacture integrated circuits for a third party), and of those foundries,

25  even fewer are willing to give up their right to compete in a market in exchange for the business

26  of manufacturing the small number of wafers generally required by high-performance DRAM

27  manufacturers.  As a result, a high-performance DRAM manufacturer generally must give costly

28  concessions to its foundry to ensure the foundry will not compete against it.  As the foundry

1    controls, in large part, a manufacturer's wafer costs, it is critical to a manufacturer that the

2    foundry not compete against it.

3           23.     Because of the barriers to entering the high-performance DRAM market, system

4    manufacturers, like Cisco, typically require at least two suppliers of critical components  to

5    minimize risk.  If one supplier encounters production, financial, or other problems, the customer

6    may obtain additional quantities of the component from the other supplier, while either seeking a

7    new supplier or waiting for the problems with the first supplier to resolve.  Without a second

8    supplier, the manufacturer risks disruptions in the supply of its products to its own customers.

9           24.     Because systems manufacturers require two suppliers of critical components, both

10    the first and the second supplier can exercise market or monopoly power.  The ability of one

11    supplier to competitively discipline the second supplier is severely limited.  Because the customer

12    requires two separate suppliers, it must make sufficient quantity commitments to the second

13    supplier.  Otherwise, the second supplier will not be in a position to satisfy the customer's needs

14    if something happens to disrupt availability from the first supplier.  That is because the actual

15    high-performance DRAM product for each customer is customized, so the supplier needs certain

16    scale (which requires certain quantity commitments) to make it worthwhile to develop both the

17    product and the production facilities to make the product.  As a result, any one supplier cannot

18    substantially increase output to competitively discipline a second supplier with market power.

19                       **GENERAL ALLEGATIONS**

20           25.     In or around January 2007, GSI Tech sought to retain United Memories to perform

21    design and development services for an LLDRAM chip according to GSI Tech's specifications.

22    GSI Tech approached United Memories about a potential project to design a 576Mb second

23    generation LLDRAM chip (the "576Mb chip") based upon a Micron RLDRAM-II specification.

24           26.     United Memories promoted itself as particularly appropriate for the project based

25    on its affiliation with its parent company, ProMOS, one of the few DRAM fabs operating as a

26    foundry.  Availability of a fab was essential to the success of the project as more fully alleged

27    below.  United Memories represented to GSI Tech that it could leverage its experience with its

28    parent company to efficiently and effectively complete the project.

27.     Although United Memories had experience in the design of DRAM chips, it did not at that time have any building block, history, or capability in the design of LLDRAM chips. For example, United Memories did not know how to design or implement a boundary scan.  In contrast, GSI Tech had the necessary knowledge and experience in LLDRAM technology by virtue of its SRAM expertise, and would be able to impart its knowledge to United Memories in the course of the project.

### *The Atris Opportunity*

28.     In late February 2007, one of GSI Tech's primary customers, Cisco, issued a request for information ("RFI") regarding a second, more advanced LLDRAM chip, Atris.

29.     As the largest purchaser of high-performance DRAM, a prospective contract with Cisco could provide GSI Tech with an opportunity to enter this market for at least two reasons. First, Cisco would qualify GSI Tech's products, which would provide sufficient reputational support to assure sales to other potential customers for GSI Tech's high-performance DRAM. Second, a contract with Cisco would provide sufficient scale to GSI Tech to make it economically feasible for GSI Tech to invest the resources necessary to enter the high-performance DRAM market.

30.     GSI Tech approached United Memories about working with GSI Tech as a contract designer on this second potential project.  The two companies agreed to work together on the development of both the 576Mb and Atris LLDRAM chips.  Because of United Memories' inexperience with LLDRAM chips, the parties decided that United Memories would first design the 576Mb chip (for which a specification was already in existence) and would then leverage the work product and know-how developed in the course of designing the 576Mb chip to develop the Atris chip.

31.     GSI Tech worked with Cisco and Renesas to develop the Atris specification.  GSI Tech involved United Memories, as its contract design vendor, in the development of the specification.

/////

/////

32.     Cisco sought two secure suppliers for the Atris chip.  While the specification was still in development, in 2007, Cisco selected GSI Tech and Renesas as suppliers for the Atris chip.

### The 576Mb Low Latency DRAM Agreement

33.     During the period in which GSI Tech, United Memories, Cisco, and Renesas were developing the Atris specification, GSI Tech was in ongoing discussions with United Memories about the terms of the contract for the 576Mb project.

34.     The parties agreed and acknowledged United Memories would be exposed to GSI Tech's highly confidential, proprietary information and trade secrets in the course of performing the design and development services contemplated under the contract with United Memories, including but not limited to:  the specifications and performance characteristics of the LLDRAM Product (defined below) already under development by GSI Tech and others; foundational information on chip design; chip design review analysis; and improvements and corrections to circuitry design.

35.     Although United Memories, as a contract design vendor, did not directly compete with GSI Tech itself, it designs products for other clients—including its parent company, ProMOS—that could compete in the same markets as GSI Tech.  On April 18, 2007, GSI Tech sent an email to United Memories expressing concern that United Memories could use GSI Tech's confidential information and trade secrets to assist a GSI Tech competitor, or could deliver the same or similar project to a direct competitor.  GSI Tech explained that it would not want United Memories to so assist a competitor.  United Memories' CEO, Bob Gower, responded by email on April 24, 2007, asking GSI Tech to trust United Memories, representing that United Memories is sensitive to conflicts of interest among its clients.  United Memories promised it would not take any business that would put a competitor in business against GSI Tech.

36.     United Memories' ability to use information learned at GSI Tech's expense to assist GSI Tech's competitors to its detriment rendered it necessary that any agreement between GSI Tech and United Memories contain provisions precluding United Memories from designing, developing or contributing to the design or development of an LLDRAM product for itself or

others.  United Memories acknowledged that GSI Tech would not enter into any agreement with United Memories without a non-compete provision in place precluding United Memories from participating in the design and development of an LLDRAM product either for its own account or in collaboration with another party for a reasonable period of time.

37.     On or around May 1, 2008, GSI Tech and United Memories entered into an Agreement titled "United Memories – GSI Tech Product Design and Development Agreement, 576 Mb Low Latency DRAM."  A true and correct copy of the Agreement is attached as Exhibit 1.

38.     The Agreement required United Memories to design an LLDRAM chip according to the specifications set forth in Exhibit A to the Agreement (the "Product" or "LLDRAM Product") and to complete the project milestones set forth in Exhibit B to the Agreement on or before the milestone completion date.  Although the Agreement pertained to the development of the 576Mb chip, GSI Tech and United Memories agreed that the design work for the 576Mb chip was a stepping stone from which the design of the Atris chip would be substantially advanced or, as they referred to it, "leveraged."

39.     GSI Tech and United Memories agreed that the LLDRAM chips to be designed under the Agreement would be manufactured at the ProMOS fab owned by United Memories' parent company.  United Memories' relationship with ProMOS was an important consideration for GSI Tech in contracting with United Memories.  The Hynix process and associated design rules used by the ProMOS fab cannot be used by a fab using a different process and associated design rules, for example, which is why the Agreement required GSI Tech to provide design rules and associated parameters if the LLDRAM "Product is designed for manufacture at a fab other than ProMOS." Agreement, § II.1.2(b).  As discussed below, United Memories proceeded to design the LLDRAM chip for manufacture at ProMOS according to its rules and protocols.

40.     The Agreement's Recitals memorialized the importance of the confidentiality and non-compete provisions as material inducements for GSI Tech to contract with United Memories.

41.     Article VI.1 of the Agreement obligated United Memories to keep all of GSI Tech's confidential information strictly confidential, and not use or disclose GSI Tech's

confidential information except as necessary to exercise its rights and fulfill its obligations under the Agreement (the "Confidentiality Obligation").

42.     Article III.1 assigned to GSI Tech broad IP ownership rights, including sole ownership of all deliverables, the specification of the product, the layout (database) of the product, and other forms of intellectual property:

> GSI shall have sole ownership of all deliverables and the Product, and all associated intellectual property rights (excluding solely any Project Patents that United Memories owns under the terms of Article IV) and all other works of authorship, information fixed in any tangible medium of expression (whether or not protectable under copyright laws), inventions (whether or not protectable under patent laws), discoveries, designs, developments, suggestions, ideas, improvements, know-how, and other intellectual property rights conceived, developed or reduced to practice by GSI, alone or with others, during the course of the Project (collectively, the "GSI IP")[.]  This includes, without limitation, the following:  the specification of the Product, the layout (database) or the Product, circuit simulations and/or HDL descriptions of the Product.  United Memories hereby irrevocably transfers, conveys and assigns to GSI all of its right, title and interest in and to all GSI IP.

43.     Article III.6 of the Agreement (the "Non-Compete Obligation") obligated United Memories as follows:

> [Except for the Product being designed and developed by United Memories for GSI Tech hereunder,] United Memories agrees it shall not, directly or indirectly, design or develop, or contribute to the design or development of, a Low Latency DRAM Product (as defined below) during the term of this Agreement.  "Low Latency DRAM Product" means a latency optimized and/or address rate optimized memory product that employs a capacitive charge-based memory cell technology, including, but not limited to, RLDRAM and FCRAM products.

44.     Pursuant to Article VII.2, the term of the Agreement began on May 1, 2008 and was to end five years from May 1, 2008, "unless earlier terminated by either party pursuant to this

Article VII."  But because of the importance of preserving the protections afforded to GSI Tech under the Non-Compete and Confidentiality Obligations in the event of an early termination of the Agreement, Article VII.5 of the Agreement provided the following survival provisions:  "[t]he provisions of Articles III [which includes the Non-Compete Obligation] … of this Agreement shall survive expiration or termination of this Agreement permanently.  Article VI [which includes the Confidentiality Obligation] shall survive for ten (10) years any expiration or termination of this Agreement."

45.     Pursuant to Articles VII.3 and VII.4, early termination of the Agreement was allowed only on the other party's bankruptcy or insolvency or for a material breach of the Agreement.

46.     Paragraph X.9 of the Agreement provides that in the event of any controversy, claim, or dispute between the parties arising out of or relating to the Agreement, the prevailing party shall be entitled to recover reasonable expenses, attorneys' fees, and costs.

47.     In exchange for United Memories' design services, the Agreement required GSI Tech to pay United Memories $75,000 concurrently with the execution of the Agreement, and certain specified amounts at the successful completion of each milestone.  The total contemplated payments to United Memories for the performance of all of its obligations under the Agreement was $850,000.

48.     At the time of contracting, United Memories and GSI Tech both understood that the high-performance DRAM market is an extremely small and highly specialized segment of the DRAM market and was expected to remain a small and highly specialized, high-performance segment of the DRAM market.

### *United Memories Begins Designing The 576Mb LLDRAM Chip For Manufacture At ProMOS, But ProMOS Becomes Insolvent In December 2008.*

49.     United Memories designed the 576Mb for manufacture at ProMOS.  Because each fab develops and observes different design rules and manufacturing protocols, it is customary to select a specific fab for the manufacture of chips under development.  If the selected fab becomes unavailable for the manufacture of chips, the design work must be substantially redone to

1    conform to the design rules and manufacturing protocols of the replacement fab unless the

2    replacement fab uses the same manufacturing process and design rules as the original fab.

3        50.     During the course of the project, United Memories received GSI Tech's

4    confidential and proprietary information.  For example, to facilitate design of the 576Mb chip,

5    and considering that United Memories had no prior history with LLDRAM products, GSI Tech

6    sent one of its engineers to United Memories' Colorado facilities to perform simulation and

7    circuit verification for two months.  GSI Tech's engineer advanced United Memories' abilities to

8    simulate and verify the Atris chip and other LLDRAM chips.

9        51.     GSI Tech also participated in chip design review meetings and suggested critical

10   improvements and corrections to United Memories' circuitry design during a July 2008 design

11   review meeting at United Memories' Colorado headquarters attended by GSI Tech and United

12   Memories engineers and executives.  GSI Tech provided confidential, proprietary, and trade

13   secret information to United Memories throughout United Memories' performance under the

14   Agreement.

15       52.     GSI Tech sent full and complete payment to United Memories upon the

16   completion of all project milestones through milestone number 4, which had a completion date of

17   October 30, 2008, and United Memories sent the required documentation for each completed

18   milestone to GSI Tech's California headquarters.  GSI Tech also made payments to United

19   Memories for additional work under Article II of the Agreement.  The last payment sent to United

20   Memories (before United Memories' purported termination of the Agreement as discussed below)

21   was on December 18, 2008.  As of that date, GSI Tech had paid United Memories a total of

22   $542,400 which constituted full payment for all services performed by United Memories to that

23   point.

24       53.     Milestone number 5, the next phase of services contemplated under the

25   Agreement, involved the testing of the LLDRAM product designed by United Memories.  Under

26   the terms of the Agreement, milestone number 5 was to be completed by January 30, 2009[2].

27   _____

28   [2] The Agreement mistakenly references the completion date for this milestone as January 30,
     2008.

1    During December 2008, however, news reports in trade and technology publications such as EE

2    Times reported that ProMOS was insolvent and seeking bailouts from the Taiwanese government.

3    *See*, *e.g.*, http://eetimes.com/electronics-news/4080816/Rumor-mill-TSMC-Micron-Nanya-eye-

4    ProMOS.

5         54.     In light of ProMOS's reported insolvency, GSI Tech expressed to United

6    Memories concerns about United Memories' ability to proceed to the completion of the remaining

7    milestones (5 and 6) which called for manufacturing and testing at the ProMOS fab.  A chip

8    designed on one process technology—here, the ProMOS-Hynix process technology—cannot be

9    manufactured at a fab employing a different process technology.  And it was not feasible to

10   manufacture the 576Mb chip at a Hynix-based fab other than ProMOS, as none offered foundry

11   services for LLDRAM products.  As a result, all parties agreed that it made no economic sense to

12   incur the costs of completion of milestones 5 and 6 by manufacturing and testing the 576Mb chip

13   using the ProMOS process technology.

14        55.     During the course of many meetings, phone conversations, and email

15   correspondence between representatives of United Memories, GSI Tech, and ProMOS in or about

16   December 2008 through mid-2009, the parties discussed and agreed that United Memories could

17   no longer proceed with the Agreement due to ProMOS's financial difficulties and potential

18   insolvency.

19        56.     Because of ProMOS's unavailability, GSI Tech never issued to ProMOS wafer

20   starts as contemplated by the Agreement.  The design work for which United Memories had been

21   paid more than $540,000 by GSI Tech had to be substantially redone under the design rules and

22   processes of a new fab resulting in the loss of some of GSI Tech's time-to-market advantage.

23        ***United Memories Confirms The Agreement's Purpose Has Been Frustrated.***

24        57.     On July 20, 2009, United Memories sent GSI Tech a letter (the "Letter")

25   confirming GSI Tech's understanding that the purpose of the Agreement had been frustrated:

26        This letter is to inform GSI that United Memories considers the [Agreement] to be

27        terminated 30 days after you receive this letter.  It is apparent that the intent of the

28   /////

1  agreement on [sic] longer exist [sic] and that GSI does not plan to satisfy section II.1.2(a)

2  Provide sufficient wafer starts …

3  Attached hereto as Exhibit 2 is a true and correct copy of the Letter.

4      58.    The testing and manufacturing of the 576Mb chip designed by United Memories

5  was for GSI Tech's benefit.  Although GSI Tech was obligated to provide sufficient wafer starts

6  to facilitate United Memories' performance of testing work under milestone 5, GSI Tech was

7  relieved of any such obligation due to ProMOS's insolvency as alleged above and because the

8  purpose of the Agreement had been frustrated.  In any event, any failure on the part of GSI Tech

9  to issue the wafer starts would simply relieve United Memories of its obligations under milestone

10  5 but would not constitute a material breach of the Agreement on the part of GSI Tech,

11  particularly given that GSI Tech paid United Memories for all work performed by United

12  Memories and, under Article VII.6, GSI Tech had the right to terminate the Agreement at any

13  time as long as it had paid for work "successfully completed" to that point.

14      59.    Because the letter accurately stated that the intent of the Agreement no longer

15  existed, and because GSI Tech was working on developing the 576Mb chip using another design

16  and fab, GSI Tech did not respond to the Letter.

17      60.    The Non-Compete Obligation of the Agreement remained in effect at least until

18  April 30, 2013[3] (the stated term of the Agreement) regardless of any termination or expiration of

19  the Agreement.

20  61.    On July 20, 2009, the same day United Memories sent GSI Tech the letter

21  purporting to terminate the Agreement upon expiration of 30 days, ██████████████

22  ████████████████████████████████████████

23  ████████████████████████████████████

24  ██████████.

25  /////

26

27  ─────────────────────

28  [3] April 30, 2013 marked the end of the stated "term" of the Agreement which, as specified in
Article III.6, reflected the Agreement of the Parties as to a reasonable period of time for the Non-
Compete Obligation to remain in effect.

1   62.    Later in 2009, because of the delay in GSI Tech's ability to deliver an Atris chip to

2   Cisco caused by ProMOS's failure and United Memories' inability to complete the Agreement,

3   Cisco dropped GSI Tech as a supplier for the Atris chip.

4                                    ***The Second Atris Bid***

5   63.    NEC/Renesas served (and still serves) as the sole supplier of the Atris chip for

6   Cisco.  Cisco grew concerned, however, that Renesas would likely be acquired by another

7   company, or would become insolvent, which might disrupt its supply of Atris parts, and for this

8   reason and the reasons described above, required a second suppler of Atris.  In mid-2012, Cisco

9   issued another RFI for a second source supplier.

10   64.    A contract with Cisco was GSI Tech's primary opportunity to enter into the high-

11   performance DRAM market as an effective competitor.  As before, qualification of GSI Tech's

12   high-performance DRAM products by Cisco would provide sufficient reputational support to

13   make GSI Tech a key player in the market from the outset.  That fact combined with the

14   ████████████████████████████████████████████████████████, with the

15   Cisco contract, GSI Tech could gain market share from Renesas and the Micron/Integrated

16   Silicon partnership.

17   65.    Because high-performance DRAM products are a unique market segment,

18   competition is concentrated.  Sales are usually made through a bidding process.  Bidders may

19   partner with a design company like United Memories to provide a value-added product at an

20   attractive price point for customers.

21   66.    GSI Tech submitted a bid for the Atris award.  Throughout 2012, Cisco

22   communicated with GSI Tech, requesting follow up information relating to the bid.

23   67.    GSI Tech's only competition for the bid was Integrated Silicon.  At the time of the

24   bid, Integrated Silicon was already an established player in the high-performance DRAM market,

25   so while it wanted the contract, the contract did not promise the same market-entering benefits to

26   Integrated Silicon as it did for GSI Tech.

27   /////

28   /////

DLA Piper LLP (US)
San Diego

WEST\242220864.9

-15-

**Defendants Begin a Conspiracy to Attain the Atris Bid Through
Unlawful Means and to Push GSI Tech Out of the High-Performance DRAM Market**

68. ██████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████   ███████████████████████████
██████████████████████.

69.     Shortly after ██████████████████████████████, Integrated Silicon

acquired a second advantage to bolster its bid.  By September 2012, Cisco's requests for more

information relating to GSI Tech's bid took a different tone.  The Cisco employee in charge of the

Atris bid process, Anand Bagchi, requested a meeting with GSI Tech.  On September 21, 2012,

while GSI Tech and Integrated Silicon were still in negotiations with Cisco for and refining their

bids relating to the Atris project, Mr. Bagchi called a meeting with Didier Lasserre and John

Senechal of GSI Tech, wherein Mr. Bagchi insisted that GSI Tech describe every minutiae of its

Atris bid and probed GSI Tech for details.

70.     GSI Tech, believing that it was providing this information to Cisco in an attempt

to win its potential customer's business, provided to Mr. Bagchi during that meeting important

confidential information about the bid it was intending to submit including a complex pricing

matrix, its capabilities, and its plan to complete the Atris design.  GSI Tech even provided a

creative solution to address a problem facing both bidders—the recapture of non-recurring

engineering expenses.  This was a significant deal point that Cisco expected both GSI Tech and

Integrated Silicon to address in their respective bids.  The approach by each bidder to this issue

could potentially mean the difference in the award of the bid.

71.     Within about two weeks of this unusual meeting, Mr. Bagchi abruptly left Cisco

and began working for GSI Tech's direct competitor on the Atris bid, Integrated Silicon.  At

/////

_____

[4] ██████████████████████████████████████████████████
███████████████████████████████████████████████████████████
████████████████████████████████████████████"

1   Integrated Silicon, Mr. Bagchi became the primary person responsible for Integrated Silicon's

2   Atris bid.

3       72.      Therefore, on information and belief, Mr. Bagchi and Integrated Silicon knew that

4   Mr. Bagchi would be joining Integrated Silicon at the time Mr. Bagchi insisted that GSI Tech

5   share the details of its proposed bid with him.  Mr. Bagchi, on behalf of Integrated Silicon, used

6   his position at Cisco to obtain competitively sensitive information and unfairly used that

7   information to win the Cisco bid.

8       73.



15      75.                                          , Integrated Silicon learned Cisco awarded

16   the Atris bid to it

18      76.

22                                  , *Integrated Silicon Conspires with United Memories to*
   *Circumvent the Non-Compete and to Conceal Its Anticompetitive and Racketeering Acts*

24      77.

DLA PIPER LLP (US)
SAN DIEGO

WEST\242220864.9

SECOND AMENDED COMPLAINT
CASE NO.  13-CV-1081-PSG



DLA Piper LLP (US)
San Diego

WEST\242220864.9

SECOND AMENDED COMPLAINT
CASE NO.  13-CV-1081-PSG

1  ███████████████████████████████████████████████████

2  ████████████████████████████████████████

3          ***Integrated Silicon Furthers The Conspiracy Through Disparagement***

4          84.     In general, the relationship GSI Tech enjoyed with Integrated Silicon began to

5  deteriorate throughout 2012.  Whereas in 2011, the two entities were fierce competitors but

6  always on cordial and professional terms, by 2012, Integrated Silicon began an aggressive

7  campaign to discredit GSI Tech and to disparage its capabilities in the high-performance DRAM

8  and other markets with GSI Tech's customers and investors.  This campaign was led from the top

9  of Integrated Silicon by its President and CEO, Scott Howarth, and extended to Integrated

10 Silicon's other employees, particularly its sales team.

11         85.     On or about April 17 or 18, 2012, a sales person with Integrated Silicon (with the

12 last name Schwartz) told executives of one of GSI Tech's important customers, Alcatel Lucent,

13 that GSI Tech would lose an important case brought by the International Trade Commission (the

14 "ITC case"), and that the loss could make GSI Tech an unreliable supplier of SRAM chips.

15 When Alcatel Lucent inquired, Scott Howarth confirmed Mr. Schwartz's statements.

16         86.     On or about May 21 or 22, 2012, Scott Howarth made false, anticompetitive, and

17 disparaging statements at an investor conference, baselessly claiming that GSI Tech would lose

18 the ITC case, indicating that a loss in the case would make it impossible for GSI Tech to import

19 its products.  Mr. Howarth went so far as to suggest that GSI Tech would not survive financially.

20         87.     Also in 2012, Integrated Silicon's sales people began disparaging GSI Tech's

21 business, suggesting to potential customers that GSI Tech was incapable of producing high-

22 quality DRAM products.[5]

23         88.     Each of the statements made by Mr. Howarth and the Integrated Silicon sales team

24 were false.  GSI Tech won the ITC case, is financially strong, and currently markets quality

25 DRAM products.

26

27 ─────────────────────
[5] While not actionable, the Court observed United Memories repeating similar disparaging comments at the hearing
28 on GSI Tech's Motion for Preliminary Injunction.  Specifically, and completely out of context, United Memories
disparaged GSI Tech's DRAM capabilities, business acumen, and financial management.

89.     Integrated Silicon's false and disparaging comments are anticompetitive.  The financial stability of a supplier, for example, is important because financial instability in a supplier can lead to a disruption in the supply of component parts, causing delay in the customer's final product.  That is why, in fact, customers like Cisco seek two suppliers.  Moreover, disparaging comments to investors lead to difficulties in raising funds.

### FIRST CLAIM FOR RELIEF
**(Sherman Act, Section 1, 15 U.S.C. § 1 Against All Defendants)**

90.     GSI Tech incorporates the allegations of paragraphs 1 through 89 and 122 through 248 by reference as though fully set forth herein.

91.     The relevant product market is high-performance DRAM.  The relevant geographic market is worldwide.

92.     The antitrust conspiracy includes three companies, but functionally only two separate economic entities.

93.     Integrated Silicon is the first center of decision-making, or the first economic entity.  Integrated Silicon and GSI Tech compete in both the high-performance DRAM and SRAM markets, and according to Integrated Silicon's own statements "significant customer overlap" exists between the two companies.

94.     United Memories and ProMOS, collectively, is the second center of decision-making, or the second economic entity ("UMI/ProMOS").  ████████████

███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

██████████

95.     UMI/ProMOS is a potential competitor of both GSI Tech and Integrated Silicon in the market for high-performance DRAM.  Indeed, ProMOS's potential to become a competitor in the high-performance DRAM market was made clear to GSI Tech during negotiations related to the first Atris bid.  ████████████████████████████████████████████

1 ████████████████████████████████████████████████

2 ████████████████████████████████████████████

3 █████████████████████████████████████████████████

4 █████████████████████████████████████████████████

5 ██████████████████████████████████████████████████

6 ███████████████████████████████████████████

7  96. ████████████████████████████████████████

8 ████████████████████████████████████████ More recently, UMI/ProMOS's potential to

9 become a competitor in the high-performance DRAM market has moved closer to reality, as

10 UMI/ProMOS's strategic partner, Elpida, was recently acquired by Micron, a key industry player

11 and existing supplier of high-performance DRAM.  Thus, UMI/ProMOS now has a strategic

12 partnership with Micron.

13  97.  UMI/ProMOS is one of the few companies that could be a legitimate competitor in

14 the high-performance DRAM market. ████████████████████████████████████████

15 ████████████████████████████████████████ The difficulty GSI Tech

16 faced in negotiating a non-compete agreement with ProMOS in 2007 and 2008 also suggests that

17 ProMOS desired to be a part of this new, important, and emerging market.  But UMI/ProMOS is

18 not currently a threat to enter the high-performance DRAM market because it has an

19 understanding or agreement with Integrated Silicon that it will not separately enter the market.

20  98.  Integrated Silicon and UMI/ProMOS engaged in a conspiracy, through a series of

21 oral and written agreements, to keep GSI Tech from effectively entering and competing in the

22 high-performance DRAM market.  Included within this conspiracy was a market-allocation

23 agreement or understanding between Integrated Silicon and UMI/ProMOS that UMI/ProMOS

24 would not separately enter the high-performance DRAM market, except as part of a venture with

25 Integrated Silicon; the market would be allocated to Integrated Silicon, in exchange for fees and

26 UMI/ProMOS's agreement to engage in conduct to keep GSI Tech from competing in the high-

27 performance DRAM market.  Thus, in addition to other anticompetitive conduct, the conspiracy

28 /////

1   between Integrated Silicon and UMI/ProMOS called for a boycott of GSI Tech from competing

2   in the high-performance DRAM market.

3        99.    The parties agreed to keep their conspiracy secret from GSI Tech. ███████

4   ████████████████████████████████████████████████████████████

5   ████████████████████████████████████████████████████

6   ████████████████████████████████████████████████████████████

7   ██████████████████████████████████████████████████

8   ███████████████████████████████████

9        100.    Integrated Silicon and UMI/ProMOS engaged in multiple acts in furtherance of the

10   conspiracy.  As described above, Integrated Silicon, fraudulently obtained GSI Tech's proprietary

11   bid information during the course of the Cisco bid process. █████████████████████

12   ██████████████████████████████████████████████████

13   ██████████████████████████████████████████████████████

14   ███████████████

15        101.    Both companies hid their anticompetitive acts from GSI Tech, and in fact,

16   developed an elaborate fraudulent scheme ██████████████████████████

17   ████████████████████████████████████

18        102.    In addition, Integrated Silicon, as part of the conspiracy, unfairly obtained further

19   GSI Tech confidential information by utilizing Mr. Bagchi to obtain these secrets while Mr.

20   Bagchi was employed by Cisco.  Integrated Silicon, on information and belief, paid Mr. Bagchi

21   for these secrets by employing him to lead its efforts to compete for the Atris award.

22        103.    Without GSI Tech's confidential information, trade secrets, and intellectual

23   property, Integrated Silicon and UMI/ProMOS would not have been able to keep GSI Tech from

24   winning the Cisco contract and effectively entering the market for high-performance DRAM.

25   Thus, the conspiracy between Integrated Silicon and UMI/ProMOS successfully eliminated GSI

26   Tech as a competitive threat to Integrated Silicon's market power and supra-competitive profits in

27   the high-performance DRAM market.

28   /////

104.     Integrated Silicon and its co-conspirator, UMI/ProMOS, understood that if GSI Tech obtained the Cisco contract, Integrated Silicon would lose market power and face competitive discipline by GSI Tech in the high-performance DRAM market.

105.     In addition, Integrated Silicon's agreements and conduct create a dangerous probability that Integrated Silicon will succeed in achieving monopoly power in the high-performance DRAM market through anticompetitive means.  That is, Integrated Silicon's anticompetitive acts against GSI Tech create a strong likelihood that GSI Tech will at least be delayed and potentially be prevented from succeeding in its efforts to enter the high-performance DRAM market as an effective competitor.  As a result, Integrated Silicon will not have serious competition for second supplier positions for customers like Cisco.

106.     Defendants' conduct harmed competition by impeding the entry of a crucial competitor—GSI Tech—into the high-performance DRAM market.  GSI Tech presented a prospective alternative to Integrated Silicon for customers in that highly concentrated market that other companies cannot fulfill.  Without GSI Tech in the market, Integrated Silicon can charge supra-competitive prices for lower-quality products.  This harms competition itself because customers must pay higher prices for lower quality goods and have fewer supplier choices.

107.     In the absence of Defendants' anticompetitive conduct, GSI Tech would have (1) won the Cisco bid, providing it with immediate market share and credibility in its entry into the high-performance DRAM market; (2) faced fewer obstacles in selling to high-performance DRAM market customers because those customers would not have considered Defendants' disparaging, anticompetitive, and false remarks about GSI Tech and its ability and stability in the high-performance DRAM market; (3) entered the high-performance DRAM market as an effective competitor, making it more competitive by providing suppliers with a real alternative to Integrated Silicon.

108.     Absent competition from GSI Tech, Integrated Silicon can offer its high-performance DRAM products at higher prices and lower quality because customers require two suppliers, and Integrated Silicon would be the default first or second supplier.  These effects are

/////

1  solidified and exacerbated by the high barriers to entry and Integrated Silicon's present market

2  power.

3       109.   As evidence, Integrated Silicon acknowledged in a May 1, 2013 press release that,

4  not only does it continue to "gain momentum with [its] RLDRAM® memory products," but

5  because of its successful Atris second-source supplier bid, Integrated Silicon anticipated "further

6  market share gains and revenue growth in the coming quarters."

7       110.   Competition was also harmed through Integrated Silicon's market allocation

8  agreement with UMI/ProMOS whereby UMI/ProMOS agreed to stay out of the high-performance

9  DRAM market (as well as participate in the anticompetitive conspiracy against GSI Tech) in

10 exchange for payment.

11      111.   GSI Tech was injured by Defendants' anticompetitive conduct, which kept GSI

12 Tech from winning the Cisco bid and from becoming a key competitor in the high-performance

13 DRAM market.  GSI Tech lost not only profits from future contracts, but as a result of Integrated

14 Silicon's campaign of disparagement, also lost potential business in the high-performance DRAM

15 and other markets, and financial flexibility with investors.

16      112.   Defendants' conduct violates Section 1 of the Sherman Act, 15 U.S.C. § 1, by

17 unlawfully allocating markets and precluding and foreclosing GSI Tech from entering and

18 competing in the market for high-performance DRAM.  Defendants' conduct also amounts to a

19 boycott of GSI Tech from the high-performance DRAM market, as well as straightforward

20 anticompetitive and exclusionary conduct.

21      113.   Defendants' conduct is a *per se* violation of Section 1 of the Sherman Act because

22 it involves a horizontal agreement that lacks any redeeming competitive benefit.  Defendants'

23 conduct is of a nature and type that is always anticompetitive, and therefore qualifies as a *per se*

24 antitrust violation under present law.

25      114.   In the alternative, Defendants' conduct violates Section 1 of the Sherman Act

26 under the rule of reason or quick-look analysis.

27      115.   Integrated Silicon by itself (and collectively with UMI/ProMOS) has market

28 power in the worldwide market for high-performance DRAM sufficient to appreciably restrain

competition in that market.  Significant barriers prevent entry into this market, and current suppliers cannot substantially increase quantity in response to the exercise of market power by Integrated Silicon and United Memories/ProMOS.

116.    Defendants Integrated Silicon and UMI/ProMOS made several oral and written agreements (including written agreements to transfer United Memories' employees, intellectual property, and confidential information to Integrated Silicon), which constitute a conspiracy under Section 1 of the Sherman Act.

117.    Defendants' conduct harms competition in the high-performance DRAM market by foreclosing and removing an effective competitor to that market that would have restrained the exercise of market power by Integrated Silicon (and UMI/ProMOS).  Thus, Defendants can and will charge supra-competitive prices in that market, while providing a lower-quality product. Lower output in the relevant market is also a likely economic effect of defendants' anticompetitive conduct.

118.    Defendants' conduct has injured GSI Tech by depriving it of business and profits in the high-performance DRAM market, and by harming its business and financial flexibility in this and other markets through Defendants' disparaging, anticompetitive, and false statements about GSI Tech.

119.    Defendants' conduct lacks any business justification, efficiencies, or redeeming competitive value.  The anticompetitive effects of Defendants' conduct therefore substantially outweighs the non-existent competitive benefits.

120.    Defendants' conduct has a substantial effect on interstate commerce, as high-performance DRAM chips are sold to companies throughout the United States and the world, who in turn incorporate them into products and services sold throughout the United States and the world.

121.    GSI Tech is entitled to recover treble damages under Section 4 of the Clayton Act, 15 U.S.C. § 15, and to injunctive relief under Section 16 of the Clayton Act, 15 U.S.C. § 26.

/////

/////

**SECOND CLAIM FOR RELIEF**

**(Sherman Act, Section 2, 15 U.S.C. § 2 Against Integrated Silicon)**

122.    GSI Tech incorporates the allegations of paragraphs 1 through 121 and 133 through 248 by reference as though fully set forth herein.

123.    Integrated Silicon's conduct violates Section 2 of the Sherman Act, 15 U.S.C. § 2, by attempting to monopolize the market for high-performance DRAM through anticompetitive conduct directed toward GSI Tech.

124.    The relevant product market is high-performance DRAM. The relevant geographic market is worldwide.

125.    Integrated Silicon has market power in the worldwide market for high-performance DRAM sufficient to appreciably restrain competition in that market.

126.    Integrated Silicon has a specific intent to monopolize, and to destroy competition in the market for high-performance DRAM. It knowingly and purposely engaged in a conspiracy with UMI/ProMos to unlawfully obtain GSI Tech's intellectual property and confidential information through both UMI/ProMos and a Cisco employee. Defendants' attempts to hide this conspiracy from GSI Tech is further evidence of Defendants' specific intent. Integrated Silicon also knowingly and purposely made disparaging, anticompetitive, and false statements to customers and investors of GSI Tech. These acts were done with the purpose of foreclosing GSI Tech from entering the high-performance DRAM market, so Integrated Silicon could continue to exercise market power, and could eventually obtain monopoly power in that market.

127.    There is a dangerous probability that, unless restrained by this Court, Integrated Silicon will succeed in acquiring, maintaining, and/or expanding its monopoly power in the high-performance DRAM market through unlawful means, in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2.

128.    Integrated Silicon's conduct harms competition in the high-performance DRAM market by foreclosing and removing a competitor to that market that would have restrained Integrated Silicon's exercise of market power. Thus, Integrated Silicon can and will charge supra-competitive prices in that market, while providing a lower-quality product. Lower output

1   in the relevant market is also a likely economic effect of Integrated Silicon's anticompetitive

2   conduct.

3   129.   Integrated Silicon's conduct has injured GSI Tech by depriving it of business and

4   profits in the high-performance DRAM market, and by harming its business and financial

5   flexibility in this and other markets through Integrated Silicon's disparaging, anticompetitive, and

6   false statements about GSI Tech.

7   130.   Integrated Silicon's conduct lacks any business justification, efficiencies, or

8   redeeming competitive value.  The anticompetitive effects of this conduct therefore substantially

9   outweighs the non-existent competitive benefits.

10   131.   Integrated Silicon's conduct has a substantial effect on interstate commerce, as

11   high-performance DRAM are sold to companies throughout the United States and the world, who

12   in turn incorporate them into products and services sold throughout the United States and the

13   world.

14   132.   GSI is entitled to recover treble damages under Section 4 of the Clayton Act, 15

15   U.S.C. § 15, and to injunctive relief under Section 16 of the Clayton Act, 15 U.S.C. § 26.

16   **THIRD CLAIM FOR RELIEF**
   **(Civil Violations of the Racketeering Influenced and**
17   **Corrupt Organizations Act, 18 U.S.C. § 1961(c), Against All Defendants)**

18   133.   GSI Tech incorporates the allegations of paragraphs 1 through 132 and 152

19   through 248 by reference as though fully set forth herein.

20   134.   Defendants' actions constitute a civil violation of the RICO Act under 18 U.S.C.

21   § 1962(c).

22   135.   Integrated Silicon and United Memories created, participated in, and perpetuated

23   an enterprise that engaged and continues to engage in a pattern of racketeering activities,

24   including wire and mail fraud, which has directly injured GSI Tech.

25   136.   Around July of 2009, United Memories and Jon Faue created an enterprise for the

26   purpose of engaging in, and which engages in, a pattern of racketeering activities as defined by 18

27   U.S.C. §1961(a)(1), the fraudulent activities of which directly and proximately harmed and

28

continue to harm GSI Tech.  As of August 2012, the enterprise had expanded to include ProMOS, various ProMOS officers, directors, and employees; Integrated Silicon; various Integrated Silicon officers, directors, and employees; and at least six United Memories employees, temporarily working at Integrated Silicon (Larry Aldrich, Doug Butler, Kim Hardee, Carol Gruenschlaeger, Steve Eaton, and Brad Lovell).  Together, these entities, by and through their officers, directors, employees, and agents, as alleged herein, and individuals created, participated in, and perpetuated a RICO enterprise as defined by 18 U.S.C. §1961(a)(4) (the "Enterprise").

137.     The Enterprise, at the direction of Defendants, is engaged in and effects interstate commerce.  The Enterprise engages in interstate mail and wire fraud and has acted to exclude GSI Tech from the interstate market for high-performance DRAM chips.  Defendants' conduct has a substantial effect on interstate commerce, as high-performance DRAM chips are sold to companies throughout the United States and the world, who in turn incorporate them into products and services sold throughout the United States and internationally.

138.     Through a pattern of calculated, fraudulent emails and mailings, each of which is a predicate act of wire fraud or mail fraud under 18 U.S.C. §1961(1)(B), Defendants intended to and did:  (1) harm GSI Tech's business relationship with Cisco; (2) confuse, mislead, and deceive Cisco into approving and selecting Integrated Silicon over GSI Tech as the second source supplier of the Atris chip; (3) misappropriate GSI Tech's confidential and proprietary information; and (4) confuse, mislead, and deceive Cisco into believing that the development of the Atris chip stemmed from the sole creative efforts and proprietary information of Integrated Silicon and United Memories.

139.     Among the acts of Defendants in furtherance of this Enterprise, the predicate acts of mail and wire fraud include a pattern of mailings and emails transmitted by wire, as described in the following paragraphs:

140.

1

2

3

4          In performing the

5   foregoing act of wire fraud, United Memories, directed and controlled the Enterprise to

6   commence its fraud and deception upon Cisco, and harmed GSI Tech's relationship with Cisco.

7          141.   On or around August 2, 2012, the Enterprise expanded to include Integrated

8   Silicon and a number of its directors, officers, and employees, all of whom joined the Enterprise

9   for the ongoing common purpose of harming GSI Tech's business relationship with Cisco,

10  misappropriating GSI Tech's confidential and proprietary information, and confusing,

11  misleading, and deceiving Cisco into believing that the development of the Atris chip stemmed

12  from the sole creative efforts and proprietary information of Integrated Silicon and United

13  Memories.

14

15          Through each of these predicate acts of wire

16  fraud, Defendants directed and controlled the Enterprise to carry out its common purpose of fraud

17  and deception, and harming GSI Tech's relationship with Cisco.

18          142.

19

20

21

22          Integrated Silicon's email and the Integrated

23  Silicon-United Memories presentation slides were reasonably calculated to deceive Cisco by

24  deceitfully concealing the other reasons that Integrated Silicon had partnered with United

25  Memories:  to confuse, mislead, and deceive Cisco into believing that the development of the

26  Atris chip would stem from the sole creative efforts and proprietary information of Integrated

27  Silicon and United Memories.  In performing the foregoing act of wire fraud, Defendants directed

28  /////

1 and controlled the Enterprise to mislead Cisco as to the true source of Defendants' design for the

2 Atris chip and, as a result, interfered with Cisco's relationship with GSI Tech.

3     143.   ██████████████████████████████

4 ██████████████████████████████

5 ████████████████████████████████████

6 In performing the foregoing act, Defendants directed and controlled the Enterprise to deceive GSI

7 Tech by affirmatively misrepresenting and deceitfully concealing ████████████████

8 ████████████████████████████████████████

9 ████████████████████████████████

10 ████████████████████████████████

11 ████████████████████████████████

12 ██████████████████████████████████

13 ████████████████████████████████████

14 ████████████████████████████████

15 ███████████

16     144.   ████████████████████████████████████

17 ██████████████████████████████████

18 ████████████████████████████████████

19 ██████████████████████████████

20 ██████████████████   In performing the foregoing acts,

21 Defendants directed and controlled the Enterprise to take the actions necessary to continue their

22 common purpose of harming GSI Tech's business relationship with Cisco, misappropriating GSI

23 Tech's confidential and proprietary information, and confusing, misleading, and deceiving Cisco

24 into believing that the development of the Atris chip stemmed from the sole creative efforts and

25 proprietary information of Integrated Silicon and United Memories.

26     145.   ██████████████████████████████████

27 ██████████████████████████████████

28 ██████████████████████████████████

1 

2 

3 

4 

5 

6 

7 

8 

9 the

10 enterprise's fraudulent purposes and perpetuated the deception against GSI Tech and Cisco.  In

11 performing the foregoing acts, Defendants directed and controlled the Enterprise to carry out its

12 common scheme to deceive Cisco and harm GSI Tech's business relationship with Cisco.

13        146. 

14 

15 

16 

17 

18 United Memories' email and the later transfer furthered

19 the enterprise's fraudulent purposes and perpetuated the deception against GSI Tech by

20 concealing the nature of the relationship between Integrated Silicon and United Memories and

21 misappropriating GSI Tech's confidential and proprietary information.  In performing the

22 foregoing acts, Defendants directed and controlled the Enterprise to carry out its common scheme

23 to deceive Cisco and harm GSI Tech's business relationship with Cisco.

24        147. 

25 

26 

27 

28 Integrated Silicon's presentation slides were reasonably calculated to deceive Cisco

into believing that the Atris chip was being developed through the sole creative efforts and intellectual property of Integrated Silicon and United Memories.  In performing the foregoing act, Defendants directed and controlled the Enterprise to carry outs its common scheme to deceive Cisco and harm GSI Tech's business relationship with Cisco.

148.    The unlawful enterprise was created at least as early as July of 2009 for the common purpose of confusing, misleading, and deceiving Cisco into selecting Integrated Silicon over GSI Tech as the second source supplier of the Atris chip and harming GSI Tech's business. As a result of Defendant's misrepresentations and deceitful concealments by interstate mail and wire (email), GSI Tech lost the Atris second source supplier award to Integrated Silicon and suffered monetary damages in an amount unknown to GSI Tech at this time but in excess of $75,000, exclusive of interest and costs.  Defendant's misrepresentations and deceitful concealments have and will continue to substantially affect and hinder GSI Tech's ability to design, develop, market, and sell its high-performance memory products.

149.    Under the direction and control of Defendants, the conduct of the Enterprise continues to: (1) harm GSI Tech's business relationship with Cisco; (2) misappropriate GSI Tech's confidential and proprietary information; and (3) develop the Atris chip under the guise that its creation—and eventual production and sale—derived from the sole creative efforts and proprietary information of Integrated Silicon and United Memories.

150.    The foregoing conduct by Defendants was the direct and proximate cause of the injuries suffered by GSI Tech, including but not limited to the loss of the Cisco business relationship, the theft of GSI Tech's proprietary information, and the resulting eventual production and sale of the Atris chip by Defendants as they have successfully deprived GSI Tech of a business opportunity.

151.    GSI Tech has been damaged by Defendants' conduct in an amount to be established at trial but which is in excess of $75,000, exclusive of interest and costs.  Pursuant to 18 U.S.C. § 1964(c), GSI Tech demands treble damages, according to proof at trial, and the costs of this suit, including reasonable attorneys' fees.

/////

**FOURTH CLAIM FOR RELIEF**

**(Civil Violations of the Racketeering Influenced and Corrupt
Organizations Act, 18 U.S.C. § 1961(d), Against All Defendants)**

152.    GSI Tech incorporates the allegations of paragraphs 1 through 151 and 157 through 248 by reference as though fully set forth herein.

153.    Defendants agreed to participate in the Enterprise as alleged in paragraphs 134 through 151.  In particular, Defendants conspired to carry out a common scheme over the interstate wire and mail, for the purpose of: (1) harming GSI Tech's business relationship with Cisco; (2) confusing, misleading, and deceiving Cisco into approving and selecting Integrated Silicon over GSI Tech as the second source supplier of the Atris chip; (3) misappropriating GSI Tech's confidential and proprietary information; and (4) confusing, misleading, and deceiving Cisco into believing that the development of the Atris chip stemmed from the sole creative efforts and proprietary information of Integrated Silicon and United Memories.

154.    Therefore, Defendants have conspired to violate 18 U.S.C. § 1962(c), in violation of 18 U.S.C. § 1962(d).

155.    The foregoing conduct by Defendants was the direct and proximate cause of the injuries suffered by GSI Tech, including but not limited to the loss of the Cisco business opportunity, the theft of GSI Tech's proprietary information, and the resulting eventual production and sale of the Atris chip by Defendants as they have successfully deprived GSI Tech of a business opportunity.

156.    GSI Tech has been damaged by Defendants' conduct in an amount to be established at trial but which is in excess of $75,000, exclusive of interest and costs.  Pursuant to 18 U.S.C. § 1964(c), GSI Tech demands treble damages, according to proof at trial, and the costs of this suit, including reasonable attorneys' fees.

**FIFTH CLAIM FOR RELIEF**

**(Declaratory Relief, 28 U.S.C. § 2201 *et seq*., Against United Memories)**

157.    GSI Tech incorporates the allegations of paragraphs 1 through 156 and 162 through 248 by reference as though fully set forth herein.

158.    An actual and immediate controversy has arisen and now exists between the parties regarding the validity, interpretation and enforceability of the Agreement.

159.    GSI Tech seeks a judicial determination of the respective rights and obligations of GSI Tech and United Memories under the facts and Agreement alleged herein.  Specifically, GSI Tech requests an entry of judgment in its favor declaring that (a) GSI Tech's failure to provide wafer starts was not a breach of a material obligation on its part under the Agreement; (b) even if it were a material obligation, (1) the inability of ProMOS to manufacture the wafers/chips (A) relieved GSI Tech of such dependent duty under the Agreement and (B) estopped United Memories from subsequently claiming that GSI Tech breached the Agreement or (2) United Memories failed to initiate a meet and confer process which was a condition precedent to claiming material breach of the Agreement; and (c) even if the Agreement terminated early, the survival clause provides that the Non-Compete Obligation and Confidentiality Obligation remain in effect through at least April 30, 2013.

160.    GSI Tech seeks a further judicial determination that Atris is a "Low Latency DRAM" project, within the meaning of Article III.6 of the Agreement, and that United Memories' assisting Integrated Silicon in connection with Atris violated Articles III.1, III.6, and IV.1 of the Agreement.

161.    A judicial declaration is necessary and appropriate at this time for each party to ascertain its rights and obligations to each other and to avoid the hardship caused on the parties by a protracted dispute and further delay.

## SIXTH CLAIM FOR RELIEF
### (Breach of Contract Against United Memories)

162.    Plaintiff incorporates the allegations of paragraphs 1 through 161 and 170 through 248 by reference as though fully set forth herein.

163.    The Agreement is a valid, enforceable contract between GSI Tech and United Memories.

164.    GSI Tech has performed all conditions, covenants, and promises required to be performed on its part under the Agreement or GSI Tech's performance has been excused.

1      165.    United Memories negotiated and agreed to the Non-Competition, GSI IP, and

2   Confidentiality Obligations for the protection of GSI Tech's trade secrets.

3      166.    As set forth in more detail above, United Memories agreed to not design or

4   develop or contribute to the design or development of an LLDRAM Product for a period of five

5   years from the commencement of the Agreement or through April 30, 2013, or to otherwise use

6   GSI Tech's confidential, proprietary and know-how information.

7      167.    United Memories breached and continues to breach the Non-Compete Obligation

8   by █████████████████████████████████████████████████████████████

9   █████████████████████████████████████████████████████

10  █████████████████████████████████████████████████████

11  █████████████████████████████████████████████████████████████

12  ███████████████████████████████████████████████████████████

13  ██████████████████████████████████████████████████████████

14  ████████████████████████████████

15      168.    ████████████████████████████████████████████████████████

16  ███████████████████████████████████████████████████████████████

17  ███████████████████████████████████████████████████████████

18  █████████████████████████████████████████████████████████

19  ███████████████████████████████

20      169.    As a direct and proximate result of United Memories' ongoing breaches of the

21  Non-Compete, GSI IP, and Confidentiality Obligations, GSI Tech has been deprived of the

22  material benefits of the Agreement and suffered monetary damages in an amount unknown to GSI

23  Tech at this time but in excess of $75,000, exclusive of interest and costs.  Also as a direct and

24  proximate result of United Memories' breaches as alleged herein, United Memories has been

25  unjustly enriched and GSI Tech has been irreparably injured and damaged in amounts not fully

26  capable of determination, including but not limited to lost profits and loss of goodwill and

27  reputation.  Unless the actions of United Memories in violation of the Non-Compete and

28  /////

1   Confidentiality Obligations are enjoined, GSI Tech will continue to suffer irreparable injury and

2   damages.

3                                    **SEVENTH CLAIM FOR RELIEF**

    **(Unfair Competition, Violation of California Business & Professions Code §§ 17200 *et seq.***
4   **And/Or Colorado Revised Statute § 6-1-101, *et seq.* Against United Memories)**

5          170.    Plaintiff incorporates the allegations of paragraphs 1 through 169 and 182 through

6   248 by reference as though fully set forth herein.

7          171.    United Memories' actions discussed herein constitute unfair competition within

8   the meaning of California Business and Professions Code sections 17200, *et seq.*, and/or

9   Colorado Revised Statute sections 6-1-101, *et seq.* (collectively, the "UCL").

10         172.    United Memories violated the UCL by ███████████████████

11   ████████████████████████████████████████████████

12   ███████████████████████████████████████████

13   ████████████████████████████████████████████

14         173.    United Memories also violated the UCL by representing to GSI Tech that ███████

15   ██████████████████████████████████████████

16   ██████████████████████████████████████████

17   ██████████████████████████████████████████

18   ████████████████████████████████████████████

19   ███████

20         174.    More specifically, at the outset of their relationship, █████████████████

21   ████████████████████████████████████████

22   ████████████████  Based on this relationship of trust and representation, GSI Tech selected

23   United Memories to design the 576Mb and Atris chips in collaboration with GSI Tech.  United

24   Memories learned to design these chips at GSI Tech's expense and in fact, █████████████

25   ████████████████████████████████████████████████

26   ██████████████████████████████

27         175.    When the 576Mb chip project failed due to the insolvency of United Memories'

28   parent company, █████████████████████████████████████

1 ████████████████████████████████████████████

2 ████████████████████████████████████████████

3 ████████████████████████████████████████

4 ██████████████████████████████████████████

5 ██████████████████████████████████████████████

6 ████████████████████████████████████████

7        176.    ██████████████████████████████████

8 ██████████████████████████████████████████████

9 ████████████████████████████████████████████

10 ██████████████████████████████████████████████

11 ████████████████████████████████████████████

12 ████████████████████████████████

13        177.    United Memories would never have been in a position ████████████

14 ████████████████████████████████████████████████

but for GSI Tech's involving United Memories in the original Atris project in 2007-2009 and in

the 576Mb chip project.  GSI Tech would never have done so had it known that United Memories

would later use what it had learned to assist a competitor to design and develop the very same

chip.

       178.    United Memories was unjustly enriched by ██████████████████████

████████████████████████████████████████████████

████████████████████████

       179.    Unless the foregoing alleged actions of United Memories are enjoined, GSI Tech

will continue to suffer injury and damage including monetary damages as well as the loss of

reputation, goodwill and other intangibles.

       180.    GSI Tech is entitled to preliminary and permanent injunctive relief ordering

United Memories to cease its acts of unfair competition and disgorge all profits resulting

therefrom, and to restitutionary relief requiring United Memories to return to GSI Tech all sums

by which it was unjustly enriched.

DLA Piper LLP (US)
San Diego

WEST\242220864.9

1    181.    United Memories' conduct in violation of the UCL was undertaken in bad faith.

2    Under Colorado Revised Statute section 6-1-113, if applicable, GSI Tech is also entitled to

3    damages and treble damages.

4                          **EIGHTH CLAIM FOR RELIEF**

5    **(Unfair Competition, Violation of California Business & Professions
     Code §§ 17200 *et seq*. Against Integrated Silicon)**

6    182.    Plaintiff incorporates the allegations of paragraphs 1 through 181 and 190 through

7    248 by reference as though fully set forth herein.

8    183.    Integrated Silicon's actions discussed herein constitute unfair competition within

9    the meaning of California's UCL.

10   184.    Integrated Silicon fraudulently obtained detailed information relating to GSI

11   Tech's proposed Atris bid to Cisco, which it then used to its advantage in the Atris bidding

12   process.

13   185.    Aware that United Memories had an obligation to not compete with GSI Tech,

14   Integrated Silicon attempted to acquire GSI Tech for the additional purpose (beyond keeping GSI

15   Tech out of the high-performance DRAM market) of absolving itself and United Memories of

16   potential liability.  Integrated Silicon concealed from GSI Tech the reasons behind its attempted

17   acquisition.

18   186.    ████████████████████████████████████████

19   ████████████████████████████████████████████

20   ████████████████████████████████████████████████

21   ██████████████

22   187.    Integrated Silicon has represented and continues to represent to Cisco that the

23   Atris chip it will deliver derives from the sole creative efforts and proprietary information of

24   Integrated Silicon and United Memories, ████████████████████████

25   ████████████████████████████████████████████

26   ████████████

27   188.    As a result of Integrated Silicon's conduct, GSI Tech lost the Atris second source

28   supplier award to Integrated Silicon.  Integrated Silicon's misrepresentations have and will

DLA PIPER LLP (US)
SAN DIEGO

1  continue to substantially affect and hinder GSI Tech's ability to design, develop, market, and sell

2  its high-performance memory products.

3      189.    GSI Tech is entitled to preliminary and permanent injunctive relief ordering

4  Integrated Silicon to cease its acts of unfair competition and disgorge all profits resulting

5  therefrom, and to restitutionary relief requiring United Memories to return to GSI Tech all sums

6  by which it was unjustly enriched.

7                          **NINTH CLAIM FOR RELIEF**
                           **(Fraud Against United Memories)**
8

9      190.    Plaintiff incorporates the allegations of paragraphs 1 through 189 and 204 through

10 248 by reference as though fully set forth herein.

11     191.    In 2007, 2008, and 2009, United Memories repeatedly represented to GSI Tech

12 that its work in developing the Atris chip was in collaboration with and for the benefit of GSI

13 Tech as the potential chip vendor to Cisco on the project.

14     192.    ████████████████████████████████

15 ████████████████████████████████████████

16 ████████████████████████████████████

17 ████████████████████████████████████████

18 ████████████████████████████████████

19 ████████████████████████████████████

20 ████████████████████████

21     193.    ████████████████████████████████████████

22 ████████████████████████████████████

23 ██████████████████

24     194.    United Memories continued to engage in a pattern of representations and conduct

25 consistent with its prior representations and GSI Tech's understanding that United Memories was

26 working on Atris with and for the benefit of GSI Tech. ████████████████

27 ████████████████████████████████████████

28 /////

195.     United Memories worked jointly with GSI Tech to prepare for meetings with and to provide information to Cisco as the project moved forward.  United Memories also assisted in developing GSI Tech's Atris design and production schedule, which GSI Tech provided to Cisco.

196.     When United Memories employees had questions about the Cisco specification, they communicated them to Cisco through GSI Tech.

197.     All of these actions had the effect of confirming and maintaining the representation that United Memories was working on the Atris project with and for the benefit of GSI Tech.

198.     These representations were material because, but for United Memories' representations and assurances that it was acting on behalf of GSI Tech in performing its work on Atris, GSI Tech would not have assisted United Memories and would have taken action to stop United Memories from performing work on the Atris chip.  Indeed, had United Memories disclosed that it was pursuing Atris for its own account in 2007-2008, GSI Tech would never have entered into the Agreement in May, 2008 without addressing United Memories' conduct as it would have been in violation of the Agreement and GSI Tech would not have permitted United Memories to incorporate its IP into the Atris layout, library, and schematic database.

199.     United Memories disclosed after the filing of this lawsuit that its work on the Atris chip in 2007, 2008, and 2009 was for its own account and benefit and not jointly with or for the benefit of GSI Tech.

/////

200.    Based on the circumstances and context, and on information and belief, United Memories intended that GSI Tech rely upon its representations that it was performing work on Atris jointly with and for the benefit of GSI Tech.  The factual context of the representation is sufficient to reasonably and plausibly infer scienter:  Had United Memories not led GSI Tech to believe that its work on Atris was for the benefit of GSI Tech, GSI Tech would have ended its relationship with United Memories and not placed United Memories in a position to assist a competitor of GSI Tech in connection with Atris.  Moreover, GSI Tech would never have allowed United Memories to be in a position to incorporate GSI Tech's IP into the Atris layout, library, and schematic database.

201.    GSI Tech reasonably relied upon United Memories' representations.  GSI Tech had no reason to doubt United Memories' commitment to work exclusively with GSI Tech, particularly where United Memories had previously represented to GSI Tech that it could trust United Memories and that it would never put a competitor in business against GSI Tech.

202.    As a result of United Memories' representations, GSI Tech continued to work with United Memories under the 576Mb chip project and did not assert its claims for breach of the Non-Compete provision against United Memories, which enabled United Memories to continue to develop, and subsequently sell to GSI Tech's competitor, the Atris schematic database and layout (using the database and layout of the 576Mb chip GSI Tech paid United Memories to develop).  But for United Memories' misrepresentation, GSI Tech would have refused to permit United Memories to incorporate GSI Tech's IP into the Atris layout, library, and schematic database.

203.    As a result of United Memories' fraud, GSI Tech suffered monetary damages in an amount unknown to GSI Tech at this time but in excess of $75,000, exclusive of interest and costs.  On information and belief, United Memories intentionally mislead GSI Tech into believing United Memories was working on Atris jointly with and for the benefit of GSI Tech, so as to lull GSI Tech into permitting United Memories to use GSI Tech's IP in developing the Atris chip.  On information and belief, United Memories knowingly misrepresented facts to GSI Tech for the purpose of concealing its theft of GSI Tech's IP in order to gain a commercial advantage.  United

1    Memories' conduct was willful, malicious, oppressive, and fraudulent, and warrants an award of

2    punitive damages against United Memories.

3                              **TENTH CLAIM FOR RELIEF**
                              **(False Promise Against United Memories)**
4

5         204.    Plaintiff incorporates the allegations of paragraphs 1 through 203 and 214 through

6    248 by reference as though fully set forth herein.

7         205.    ███████████████████████████████████████

8    ████████████████████████████████████████████████████████

9    ████████████████████████████████████████████████████████

10   ████████████████████████████████████████████████████████

11   ████████████████████████████████████████████████████████

12   ████████████████████████████████████████████████████████

13   ████████████████████████

14        206.    United Memories' promise was important to GSI Tech, as both parties

15   acknowledged that United Memories would gain considerable amounts of confidential GSI Tech

16   information in the course of the relationship. ████████████████████████

17   ████████████████████████████████████████████████████████

18   ████████████████████████████████████████████████████████

19   ████████████████████████████████████████████████████████

20   ████████████████████████████████████████████████████████

21   ████████████████████████████████████████████████████████

22   ████████████████████████████████████████████████████████

23   ████████████████████████████████████

24        207.    Based on the circumstances and context, and on information and belief, United

25   Memories had no intention of performing its promise to GSI Tech. ████████████████

26   ████████████████████████████████████████████████████████

27   ████████████████████████████████████ United Memories' work on Atris

28   beginning in 2007 was—if not for GSI Tech—a project that would put a competitor, whether

1   United Memories or a future client of United Memories, in business against GSI Tech.  Thus,

2   United Memories intended to, and in fact immediately did, violate its promise to not engage in

3   work which would assist in the development of a competitor.

4        208.   Based on the circumstances and context, and on information and belief, United

5   Memories intended GSI Tech to rely on this promise.  The factual context of the representation is

6   sufficient to reasonably and plausibly infer scienter:  According to the recitals in the Agreement,

7   GSI Tech would not have hired United Memories in the absence of its promise to not compete

8   with GSI Tech.

9        209.   GSI Tech reasonably relied upon United Memories' false promise.  GSI Tech had

10   no reason to doubt United Memories, particularly given that United Memories concurrently

11   represented to GSI Tech that it could trust United Memories.

12        210.   United Memories did not perform its promise.  As before, United Memories

13   immediately began developing a competitive Atris chip to enable United Memories or a GSI Tech

14   competitor to compete against GSI Tech.

15        211.   As a result of United Memories' false promise, GSI Tech entered into the

16   Agreement, paid United Memories to learn to design the 576Mb chip, which was leveraged into

17   the Atris schematic, library, and database, ████████████████████████████████████

18   ████████████████████

19        212.   ████████████████████████████████████████████████

20   ████████████████████████████████████████████████████

21   ████████████████████████████████████████████████

22   ████████████████████████████████████████████████

23   ████████████████████████████████████████████████████

24   ████

25        213.   As a result of United Memories' false promise, GSI Tech suffered monetary

26   damages in an amount unknown to GSI Tech at this time but in excess of $75,000, exclusive of

27   interest and costs.  On information and belief, United Memories promised GSI Tech to not take

28   projects that would put a competitor in business against GSI Tech knowingly and for the

1   improper purpose of inducing GSI Tech to enter into the Agreement and to permit United

2   Memories to incorporate its IP into the Atris layout, library, and schematic database, ████

3   ████████████████████████████████   United Memories' conduct was willful, malicious,

4   oppressive, and fraudulent, and warrants an award of punitive damages against United Memories.

5                                  **ELEVENTH CLAIM FOR RELIEF**

6   **(Misappropriation of Trade Secrets Under the Uniform Trade Secrets Act, Colo. Rev.
    Stat. § 7-74-101 and/or Cal. Civ. Code § 3426, *et seq.*, Against All Defendants)**

7         214.    Plaintiff incorporates the allegations of paragraphs 1 through 213 and 231 through

8   248 by reference as though fully set forth herein.

9         215.    Under the Agreement, GSI Tech exclusively owned the 576Mb chip layout,

10  library, and schematic database.  United Memories delivered the initial version of the layout and

11  schematic database to GSI Tech on December 20, 2008, and delivered the final version on June 3,

12  2009.

13        216.    The 576Mb chip schematic database and layout are the formula or pattern for the

14  creation of GSI Tech's version of the 576Mb chip.  The schematic database is a two-dimensional

15  computer-generated drawing identifying the general layout of the components of the 576Mb chip.

16  The layout (also called the mask layout or mask design) is a three-dimensional rendering of the

17  architecture of the 576Mb chip.  The schematic database is used to create the layout, and the

18  layout is used by the fab to create the masks for the chip.

19        217.    Although the 576Mb chip is based on a Micron spec, GSI Tech's design of the

20  chip (as completed by United Memories in 2008 and 2009) is unique and not like any other chip.

21  Had it been taken into production, GSI Tech's version of the 576Mb chip based on United

22  Memories' design would have had unique performance characteristics, deriving from the special

23  characteristics of the design.

24        218.    The 576Mb layout has independent economic value because it was secret.  If any

25  third party learned of the layout of the chip, it would have an advantage in designing the

26  architecture of a 576Mb low-latency DRAM chip or any low latency DRAM chip, which is

27  generally not known in the industry.  Low latency architecture is distinct from any other DRAM

28  /////

architecture and only a handful of companies have attempted to design such an architecture.  Each company's low latency architecture is distinct.

219.    The 576Mb chip schematic database has independent economic value because it was secret.  If any third party learned of the schematics for the chip, it would have an advantage in the development of a schematic or layout for the 576Mb chip or any low latency DRAM chip, including Atris.

220.    GSI Tech maintained as secret the 576Mb chip layout and schematic database, disclosing them only to its contract designer, United Memories, and took reasonable steps to maintain the secrecy of the layout and database.  The layout and database were maintained in a restricted area on GSI Tech's server and only employees working on the 576Mb chip had access to the layout and database.  All employees with access to the layout and database executed a non-disclosure agreement preventing further disclosure, and were instructed to treat them as confidential.

221.    United Memories misappropriated the 576Mb chip layout and schematic database by incorporating them into its Atris layout and schematic database, ███████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

███████████████████████████████████████████████████████

██████████████████████████████████████████████████████

███████████████████████████

222.    GSI Tech believed in 2007, 2008, and 2009 that United Memories was developing the Atris layout and schematic database in conjunction with and for the benefit of GSI Tech, and based on this belief, gave United Memories permission to leverage and incorporate the 576Mb chip layout and schematic database into the Atris layout and schematic database.  On these facts, United Memories misappropriated the 576Mb chip layout and database ████████████████████

████████████████████

223.    GSI Tech discovered only through the course of this litigation that United Memories acted for its own account and was not working on Atris in conjunction with and for the

1    benefit of GSI Tech.  On these facts, United Memories engaged in misappropriation by obtaining

2    GSI Tech's permission to incorporate elements of the 576Mb layout and schematic database into

3    the Atris layout and schematic database through deceptive conduct (deceiving GSI Tech that

4    United Memories was designing Atris in connection with and for the benefit of United

5    Memories).

6        224.    As a result of United Memories' misappropriation, 

7

8        225.

9

10

11

12

13

14

15        Additionally, Mr. Bagchi, before departing Cisco for Integrated Silicon, was privy to the

16    details of GSI Tech's second Atris bid, as a part of which GSI Tech conveyed its prior

17    relationship working with United Memories on Atris.

18        226.

19

20

21

22

23

24

25

26        227.

27

28

1

2

3

4

5

6        228.    Integrated Silicon continues to use GSI Tech's trade secrets to this date,

7

8

9        229.    As a result of the misappropriation of GSI Tech's trade secrets, GSI Tech suffered

10  monetary damages in an amount unknown to GSI Tech at this time but in excess of $75,000,

11  exclusive of interest and costs, and Defendants have been unjustly enriched by the improper sale

12  of GSI Tech's trade secrets.  GSI Tech is entitled to recover compensatory damages, and

13  Defendants must disgorge any benefit received from the improper sale of GSI Tech's trade

14  secrets.  In the alternative, GSI Tech seeks a reasonable royalty for Defendants' improper use of

15  GSI Tech's trade secrets.

16        230.    Defendants' misappropriation was calculated, willful, and malicious.  United

17  Memories was aware that GSI Tech was the sole owner of the 576Mb chip layout and schematic

18  database under the Agreement.

19

20

21

22

23

24

25

26

27

28  /////

DLA Piper LLP (US)
San Diego

WEST\242220864.9

SECOND AMENDED COMPLAINT
CASE NO.  13-CV-1081-PSG

1   ████████████████████████████████████████████████████████████

2   ████████████████████████████████████████████

3                       **TWELFTH CLAIM FOR RELIEF**

4        **(Intentional Interference with Contract Against Integrated Silicon)**

5        231.    Plaintiff incorporates the allegations of paragraphs 1 through 230 and 238 through

6   248 by reference as though fully set forth herein.

7        232.    A valid contract existed between GSI Tech and United Memories.  The non-

8   compete provision of the Agreement was in force through at least May 1, 2013 and the GSI IP

9   and confidentiality provisions of the Agreement remain in force.

10       233.    On information and belief, Integrated Silicon knew of the Agreement between GSI

11  Tech and United Memories. ████████████████████████████████████████

12  ████████████████████████████████████████████████████████

13  ████████████████████   Additionally, Integrated Silicon learned during the course of hiring

14  United Memories for the second Atris bid that it previously worked on Atris with GSI Tech, and

15  GSI Tech told Mr. Bagchi, now an employee of Integrated Silicon, that it had previously worked

16  on Atris with United Memories.  In the technology industry, it is standard practice for a customer

17  to include non-compete, IP assignment, and confidentiality provisions in design contracts.

18       234.    Integrated Silicon intentionally induced United Memories to breach the non-

19  compete, GSI IP, and confidentiality provisions of the Agreement.  Specifically, aware of United

20  Memories obligations, ████████████████████████████████████████████

21  █████████████████████████████████████████████████████

22  ████████████████████████████████████████████████████

23  ████████████████████████████████████████████████

24  █████████████████████████████████████████████████████

25  ███████████████████████████████████████████

26       235.    United Memories, in fact, breached its contractual obligations to GSI Tech by

27  competing against GSI Tech and disclosing, using, and misappropriating GSI Tech's confidential

28  and proprietary information and intellectual property.

236.     As a result of Integrated Silicon's acts of interference, GSI Tech suffered monetary damages in an amount unknown to GSI Tech at this time but in excess of $75,000, exclusive of interest and costs.

237.     On information and belief, Integrated Silicon knowingly and intentionally interfered with GSI Tech's contract with United Memories with reckless disregard for GSI Tech's rights.  Integrated Silicon knew that GSI Tech was bidding on the Atris award, and engaged in egregious and malicious misconduct (including anticompetitive, racketeering, and fraudulent acts) to disrupt GSI Tech's Agreement with United Memories for the purpose of ████████ ████████████████████—a key component to its winning bid—and eliminating GSI Tech from the market.  Integrated Silicon's conduct was willful, malicious, oppressive, and fraudulent, and warrants an award of punitive damages against Integrated Silicon.

**THIRTEENTH CLAIM FOR RELIEF**
**(Intentional Interference with Prospective**
**Economic Advantage Against All Defendants)**

238.     Plaintiff incorporates the allegations of paragraphs 1 through 237 by reference as though fully set forth herein.

239.     At all times relevant, GSI Tech and Cisco had an economic relationship.  Cisco is an important customer of GSI Tech and accounts for a substantial portion of GSI Tech's total sales in any given year. █████████████████████████████ ██████████████████████████████████ ████████████████████████

240.     In 2007, Cisco selected GSI Tech as one of two suppliers for the Atris chip.  In 2009, Cisco terminated its relationship with GSI Tech as a second source supplier for Atris due to delays and uncertainties in the completion of the design work as alleged above.

241.     In 2012, Cisco was again in the market for a second source supplier of the Atris chip.  GSI Tech was the most likely candidate to win the bid, which would have resulted in substantial economic benefit to GSI Tech.  GSI Tech was likely to win because it had participated in the development of the specification of the chip, had previously been awarded a supplier relationship with respect to Atris, and had a favorable time-to-market advantage over any other

1  potential supplier.  Other than Renesas (the first source supplier of Atris to Cisco), GSI Tech was

2  the only memory supplier in the market with experience in the development of the Atris chip.

3       242.    United Memories knew of GSI Tech's relationship with Cisco because GSI Tech

4  involved United Memories in its relationship with Cisco in connection with their efforts to design

5  Atris in 2007, 2008, and 2009.  On information and belief, United Memories knew that GSI Tech

6  was bidding for the Atris award in 2012.

7       243.    Integrated Silicon also knew of GSI Tech's relationship with Cisco.  █████

8  ████████████████████████████████████████████████████████████████

9  ████  Integrated Silicon knew that GSI Tech was bidding for the Atris award in 2012 because the

10 person primarily responsible for Integrated Silicon's Atris bid, Mr. Bagchi, learned that GSI Tech

11 was bidding on the award while managing the Atris bidding process for Cisco.

12      244.    Based on the circumstances and context, and on information and belief,

13 Defendants intended to disrupt the relationship between GSI Tech and Cisco.  Defendants—

14 knowing that GSI Tech was bidding on the Atris project and knowing the importance of the Cisco

15 relationship to GSI Tech—conspired to undermine GSI Tech's relationship with Cisco.  █████

16 ████████████████████████████████████████████████████████████████

17 ████████████████████████████████████████████

18 ████████████████████████████  Integrated Silicon used information

19 learned through Mr. Bagchi to unfairly compete against GSI Tech and damaged GSI Tech's

20 standing in the high-performance DRAM market through its campaign of disparagement.

21      245.    Defendants' conduct was independently wrongful because, as described more fully

22 above, its conduct was anticompetitive, racketeering, fraudulent, involved misrepresentation and

23 misappropriation of trade secrets, and violated the UCL.

24      246.    As a result of Defendants' acts of interference, GSI Tech lost the Atris second

25 source supplier award to Integrated Silicon.  ████████████████████████

26 ████████████████████████████████████████████████████

27 ████████████████████████████████████████████████████

28 ████████████████████████████████████████████████████

247.   As a result of Defendants' acts of interference, GSI Tech suffered monetary damages in an amount unknown to GSI Tech at this time but in excess of $75,000, exclusive of interest and costs.  GSI Tech has also been irreparably harmed by the loss of an important business opportunity and goodwill.

248.   On information and belief, Defendants knowingly and intentionally interfered with the relationship between Cisco and GSI Tech with reckless disregard for GSI Tech's rights. Defendants knew that GSI Tech was bidding on the Atris award, and engaged in egregious misconduct (including anticompetitive, racketeering, and fraudulent acts) to keep GSI Tech from securing the award.  In fact, on information and belief, Defendants were motivated to disrupt the GSI Tech / Cisco relationship so as to secure work for themselves on the Atris project and to keep GSI Tech out of the high-performance DRAM market.  Defendants' conduct was willful, malicious, oppressive, and fraudulent, and warrants an award of punitive damages against Defendants.

## **PRAYER FOR RELIEF**

1.   United Memories be preliminarily and permanently enjoined and restrained from:

- Directly or indirectly, designing or developing, or contributing to the design or development of, or assisting others in the design or development of, a Low Latency DRAM Product;

- Divulging, furnishing, or making accessible to any person GSI Tech's confidential information or trade secrets or any trade secret or confidential information, specifically including any and all Intellectual Property derived from the 576Mb chip project;

- Engaging in "unfair competition" in violation of California Business and Professions Code Sections 17200 and 17203 or Colorado Revised Statutes 6-1-101, *et seq.*; and

- All other activities identified in GSI Tech's proposed order granting preliminary injunction.

/////

1       2.       Integrated Silicon be preliminarily and permanently enjoined and restrained from:

2           • ██████████████████████████████████

3           █████████████████████████████████████

4           █████████████████████████████████████

5           ██████████████████

6           • ████████████████████████████████████

7           ████████████████████████████████████

8           ██████████████████████████████████████

9           ███

10          • ████████████████████████████████████

11          ██████████████████████████████████

12          ██████████████████████████████████████

13          █████████ and

14          • Engaging in "unfair competition" in violation of California Business and

15           Professions Code Sections 17200 and 17203.

16       3.       Compensatory damages according to proof.

17       4.       Treble damages.

18       5.       Restitution.

19       6.       Disgorgement of gains, profit, and advantages derived from the activities

20            complained of herein.

21       7.       Punitive and exemplary damages.

22       8.       For attorneys' fees and costs of suit herein pursuant to statute or as otherwise may

23            be allowed by law.

24       9.       Pre-and post-judgment interest, as permitted by law.

25      10.      Such other and further relief as the Court may deem just and proper.

26   /////

27   /////

28   /////

1

**JURY DEMAND**

2      GSI Tech hereby demands a trial by jury for each and every one of the foregoing claims

3  for relief so triable.

4  Dated:  October __, 2013                    DLA PIPER LLP (US)

5                                              By ___/s/ Jeffrey M. Shohet_____

6                                                 JEFFREY M.  SHOHET
                                                 Attorneys for Plaintiff

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## TABLE OF CONTENTS – EXHIBITS

| Exhibit | Description | Pages |
|---------|-------------|-------|
| 1 | Agreement Between GSI and UMI | 54-71 |
| 2 | Letter to GSI from UMI | 72-73 |

# EXHIBIT 1

# UMI – GSI Product Design and Development Agreement
## 576 Mb Low Latency DRAM

THIS PRODUCT DESIGN AND DEVELOPMENT AGREEMENT is between United Memories, Inc., a Colorado U.S.A. corporation ("UMI"); and GSI Technology, Inc., a Delaware corporation ("GSI").

## W I T N E S S E T H:

### RECITALS:

A.     UMI is experienced in the development and design of semiconductor memory components and UMI's employees based at UMI's headquarters facility in Colorado Springs, Colorado, U.S.A. have expertise in the design of semiconductor memory components.

B.     GSI is experienced in the production, packaging, and sales of semiconductor memory components.

C.     GSI wishes to retain UMI to design a DRAM chip according to the specifications set forth in Exhibit A attached hereto and incorporated herein by this reference (the "Product").

D.     UMI is willing to undertake the design of the Product in consideration of payments provided herein.

E.     UMI and GSI wish to set forth herein certain agreements covering and relating to their respective rights and obligations with respect to the Product and other matters as provided herein.

F.     UMI and GSI acknowledge that the low latency / high random address rate DRAM market is a very small and highly specialized segment of the DRAM market and is expected to remain a small and highly specialized, high performance segment of the DRAM market.

G.     UMI and GSI acknowledge that because of UMI's position as a contract memory design service provider, the exposure UMI will gain in the course of providing contract design services to GSI's confidential, proprietary information and trade secrets, and UMI's potential ability to use said information to assist potential competitors to GSI to produce low latency / high random address rate DRAMs to compete with GSI, make the non-compete provisions of this Agreement are necessary to protect GSI's trade secrets and legitimate and significant business interests.  In the absence of the restrictions contained in this Agreement, GSI would not have considered selecting UMI to manufacture produce low latency / high random address rate DRAM products and would not have considered sharing GSI's trade secrets with UMI.

NOW, THEREFORE, in consideration of the Recitals and the mutual covenants contained herein and for other good and valuable consideration, the receipt and adequacy of which are hereby acknowledged, UMI and GSI hereby agree as follows:

*ℓϚ*

Exhibit 1, Page 000055

# UMI – GSI Product Design and Development Agreement
## 576 Mb Low Latency DRAM

ARTICLE I:    Definitions.

When used in this Agreement, the following terms shall have the following respective meanings:

I.1     "Confidential Information" means all non-public information that the party disclosing the information (the "Disclosing Party") designates at the time of disclosure as being confidential, or if disclosed orally or visually is identified as such prior to disclosure and summarized, in writing, by the Disclosing Party to the receiving party (the "Receiving Party") within thirty (30) days, or which, under the circumstances surrounding disclosure, the Receiving Party knows or has reason to know should be treated as confidential without the need to be marked as "confidential."

I.2     "Dollars" or "$" means United States Dollars.

I.3     "Effective Date" has the meaning set forth in Section 7.1.

I.4     "Fab" means a factory where devices such as semiconductors are manufactured.

I.5     "Project" means the design and testing of the Product.

I.6     "Project Patent" has the meaning set forth in Section 4.1.

I.7     "Product" has the meaning set forth in Recital C and as specified in Exhibit A.

I.8     "Trade Secret" means information, including a formula, pattern, compilation, program, device, method, technique or process, that:

(a)     Derives independent economic value, present or potential, from not being generally known to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from its disclosure or use; and

(b)     Is the subject of efforts that are reasonable under the circumstances to maintain its secrecy.

I.9     "Manufacturing Release" means the product has passed GSI internal qualification requirements (GSI Spec B-004.2, Appendix 1) and is achieving repaired probe yield within 10 percentage points of ProMOS product of similar density in the same process technology.

ARTICLE II:    The Project: Development and Design of the Product and UMI's Remuneration.

II.1     In order for UMI to design and develop the Product as soon as possible, UMI and GSI shall undertake and carry out their respective responsibilities with respect to the Project as described in Sections 2.1.1 and 2.1.2, and shall assist and cooperate with each other in the performance of their respective tasks, in commercial good faith and with the goal of completing the Project as soon as possible, but in no event later than the completion date set forth in the development schedule set forth on Exhibit B.

Exhibit 1, Page 000056

# UMI – GSI Product Design and Development Agreement
## 576 Mb Low Latency DRAM

II.1.1   UMI shall do the following:

(a)   Design the Product (including, without limitation, circuit simulation and layout), at UMI's Colorado facility, including any future minor design modifications required to make the Product meet the requirements of Exhibit A.  If the requirements of Exhibit A are changed after the Effective Date and, as a result, a major product design modification or redesign is required in order to meet the revised requirements, such as circuit resimulation and redesign of peripheral circuits, then any agreed upon supplemental payments to UMI for such major design modifications will be incremental to the payments already provided for in this Agreement. The amount of any supplement payments will be negotiated in good faith between GSI and UMI, if and when necessary as a result of a material change in the time or cost for performance.  If such a redesign is required, the due dates for all remaining milestones that have not been attained shall also be renegotiated in good faith. No changes to the amounts payable under this Agreement or the due dates for performance shall be effective and binding on the parties unless agreed upon in writing by the other party in a written amendment to this Agreement.

(b)   Deliver the items listed in Exhibit B (attached hereto and incorporated herein by this reference) on or before the milestone dates indicated; and

(c)   Provide adequate and sufficient work space at the Colorado Springs facility for GSI engineer(s) participation in the Project according to the schedule of Exhibit C.

(d)   Provide consulting support of failure analysis efforts undertaken by GSI on a timely basis at fees negotiated in good faith for a period of three (3) years after Manufacturing Release.

II.1.2   GSI shall do the following:

(a)   Provide sufficient wafer starts (at GSI's expense) to perform the required development and provide all necessary raw materials, including masks and reticles; and

(b)   If the Product is designed for manufacture at a Fab other than ProMOS, provide design rules, electrical rules, HSPICE parameters on each transistor, layout rules, layer tables, DRC/LVS rule file, sheet resistances, contact resistances, and parasitic capacitances for the chosen Fab.

II.2   At the completion of each item of 2.1.1 and Exhibit B, UMI shall deliver to GSI the relevant deliverables accompanied by a written certification of the completion of such item. At the completion of each item of 2.1.2, GSI shall, upon request, deliver to UMI written certification of the completion of such item.  If either party believes an item of 2.1.1, Exhibit B or 2.1.2 is incomplete, the parties shall meet and resolve the issue in good faith negotiations.

II.3   During the Project, representatives of UMI and GSI shall meet as frequently as may be required to assess the progress of the Project against the time line schedule on Exhibit B

Exhibit 1, Page 000057

# UMI – GSI Product Design and Development Agreement
## 576 Mb Low Latency DRAM

for their respective performances of services as provided in Sections 2.1.1 and 2.1.2 and Exhibit B (Project Milestones). In addition, it is expected that GSI engineers will participate in the Project as outlined in Exhibit C.

II.4     For and in consideration of UMI's services to be rendered as provided in this Article II, GSI shall pay to UMI the following amounts according to II.5:

II.4.1   Seventy Five Thousand Dollars ($75,000) concurrently with the execution of this Agreement.

II.4.2   One Hundred Thousand Dollars ($100,000) at the successful conclusion of the preliminary design review specified by Project Milestone No. 2 of Exhibit B.

II.4.3   One Hundred Fifty Thousand Dollars ($150,000) at the successful tape out of the database specified by Project Milestone No. 3 of Exhibit B.

II.4.4   Two Hundred Thousand Dollars ($200,000) at the successful conclusion of the final design review specified by Project Milestone No. 4 of Exhibit B.

II.4.5   Two Hundred Fifty Thousand Dollars ($250,000) at the successful conclusion of the testing of the Product specified by Project Milestone No. 5 of Exhibit B.

II.4.6   Seventy Five Thousand Dollars ($75,000) at Manufacturing Release specified by Project Milestone No. 6 of Exhibit B.

II.5     At the successful completion of each Project Milestone described in Section 2.4, UMI shall invoice GSI at the address given in 10.8 herein. GSI shall pay such invoice within thirty (30) calendar days or shall object in writing within thirty (30) days to UMI to such payment. If GSI objects to payment, UMI has ten (10) calendar days to prove such payment is due. If a disagreement still exists, the two parties shall meet within twenty (20) calendar days to resolve the issue in good faith negotiations. If the parties cannot resolve the disagreement or issue within three (3) business days after commencement of such meeting, then a party may pursue any rights or remedies available to it under this Agreement, at law or in equity. For the avoidance of doubt, any payments based on completion of the any milestone shall not be payable until GSI's acceptance of the relevant deliverable associated therewith, as set forth in Section 2.7 below.

II.6     UMI acknowledges and agrees that time is of the essence for the provision of services hereunder and that the full and timely provision of all services hereunder is a material condition of this Agreement. Notwithstanding the foregoing, the due date for any deliverable, the performance of which was delayed on account of failure of GSI to complete any of its prerequisite obligations in timely fashion, shall be extended by one (1) day for each day of GSI's lateness, except to the extent GSI's lateness is due to an act or omission of UMI. Further, the due date for any deliverable to be provided by GSI to UMI under the development schedule, performance of which was delayed on account of failure of UMI to complete any of its prerequisite obligations in timely fashion, shall be extended by one (1) day for each day of

Exhibit 1, Page 000058

## UMI – GSI Product Design and Development Agreement
### 576 Mb Low Latency DRAM

UMI'S lateness.  Any such extension of time for GSI's performance hereunder shall be in addition to any other rights or remedies of GSI, whether available under this Agreement, at law or in equity.

II.7     Upon delivery of each deliverable to GSI, GSI will review the applicable deliverable to determine whether it conforms to the applicable portions of the specifications and the requirements of this Agreement. GSI will accept or reject each deliverable in writing within thirty (30) days after receipt; provided, however, that if a particular deliverable reasonably cannot be reviewed and tested within such 30-day period, GSI shall have such additional time to perform acceptance testing on that deliverable as may reasonably be required.  If GSI fails to accept or reject a deliverable in writing within the specified time period, then, within thirty (30) days of a request by UMI, GSI must provide written notice of acceptance or rejection. Otherwise the deliverable will be considered accepted.  GSI may reject any deliverable that does not conform to the applicable portions of the specifications or the requirement of this Agreement. GSI may provide notice to UMI describing such deliverable's deficiencies ("Deficiencies"). Within thirty (30) days of receiving each report regarding Deficiencies (or such longer period of time that may be authorized by GSI in writing) (the "Correction Period"), UMI shall correct the Deficiencies so that the applicable deliverable conforms to the applicable portion of the specifications and the requirements of this Agreement. Following correction, UMI shall immediately redeliver the corrected deliverable to GSI, which corrected deliverable shall be subject to the approval procedure set forth in this Section 2.7.  This acceptance testing procedure will be repeated with respect to each revised deliverable until it is accepted by GSI. Notwithstanding the foregoing, if GSI rejects a deliverable after two (2) or more correction attempts by UMI, GSI shall have the right to terminate this Agreement immediately upon written notice to UMI.  In such case, UMI shall immediately refund to GSI all fees paid by GSI under this Agreement.  The foregoing remedy shall be in addition to any other rights or remedies of GSI, whether available under this Agreement, at law or in equity.  Payment shall not constitute acceptance.

ARTICLE III:   Ownership.

III.1     GSI shall have sole ownership of all deliverables and the Product, and all associated intellectual property rights (excluding solely any Project Patents that UMI owns under the terms of Article IV) and all other works of authorship, information fixed in any tangible medium of expression (whether or not protectable under copyright laws), inventions (whether or not protectable under patent laws), discoveries, designs, developments, suggestions, ideas, improvements, know-how, and other intellectual property rights conceived, developed or reduced to practice by GSI, alone or with others, during the course of the Project (collectively, the "GSI IP")  This includes, without limitation, the following:  the specification of the Product, the layout (database) of the Product, circuit simulations and/or HDL descriptions of the Product. UMI hereby irrevocably transfers, conveys and assigns to GSI all of its right, title and interest in and to all GSI IP.  UMI will execute such documents, render such assistance, and take such other action as GSI may reasonably request, at GSI's reasonable expense, to apply for, register, perfect, confirm and protect GSI's rights to the GSI IP.  UMI hereby grants to GSI, under all of UMI's intellectual property rights, a worldwide, non-exclusive, perpetual, irrevocable, fully paid,

$\ell s$

Exhibit 1, Page 000059

# UMI – GSI Product Design and Development Agreement
## 576 Mb Low Latency DRAM

royalty-free, transferable license, under all UMI's intellectual property rights (including, without limitation, any Project Patents) to (a) make, have made, use, offer for sale, sell, have sold and import products and to practice any methods, and (b) use, reproduce, modify, distribute, perform, display, create derivative works of, offer for sale, sell, have sold, import, make, have made and otherwise fully exploit any and all intellectual property that has been created, conceived, developed, reduce to practice, licensed, or otherwise acquired by UMI prior to the execution of, or independent from, this Agreement that is incorporated by UMI into the Product or other deliverables owned by GSI hereunder in any manner and through any medium, whether known or to become known. GSI shall also have the right to sublicense the foregoing rights and licenses granted herein through multiple tiers.

III.2     UMI hereby waives any and all moral rights, including, without limitation, any right to identification of authorship or limitation on subsequent modification that UMI (or its employees, agents or consultants) has or may have in any GSI IP and any derivatives, improvements or modifications thereof.

III.3     UMI agrees that if, GSI is unable because of UMI's unavailability, dissolution or incapacity, refusal to act or failure to act in a timely manner such that intellectual property rights protection may be impaired, to secure UMI's signature to apply for, or pursue, any application for any United States or foreign patents or mask work or copyright registrations covering the GSI IP assigned to GSI in Section 3.1 above, UMI hereby irrevocably designates and appoints GSI and its duly authorized officers and agents as UMI's agent and attorney in fact, to act for, and in UMI's behalf and stead, to execute and file any such applications and to do all other lawfully permitted acts to further the prosecution and issuance of patents, copyright and mask work registrations thereon with the same legal force and effect as if executed by UMI.

III.4     Execution of this Agreement shall not include any rights for UMI to use, or any interest in or to, any trademark, service mark or trade name of GSI.

III.5     Execution of this Agreement shall not include any rights for GSI to use, or any interest in or to, any trademark, service mark or trade name of UMI.

III.6     [Except for the Product being designed and developed by UMI for GSI hereunder,] UMI agrees it shall not, directly or indirectly, design or develop, or contribute to the design or development of, a Low Latency DRAM Product (as defined below) during the term of this Agreement. "Low Latency DRAM Product" means a latency optimized and/or address rate optimized memory product that employs a capacitive charge-based memory cell technology, including, but not limited to, RLDRAM and FCRAM products.

ARTICLE IV:   Project Patents.

IV.1     If, during the course of the Project, a UMI engineer alone makes any patentable inventions in the course or performance of UMI's development obligations hereunder, that invention and any resulting patent shall be owned by UMI (each, a "UMI Project Patent"). All costs for the patent filing and prosecution with respect to a UMI Project Patent shall be UMI's responsibility.

Exhibit 1, Page 000060

# UMI – GSI Product Design and Development Agreement
## 576 Mb Low Latency DRAM

IV.2    If, during the course of the Project, a GSI engineer alone makes any patentable inventions in the course or performance of GSI's development activities, that invention and any resulting patent shall be owned by GSI (each, a "GSI Project Patent"). All costs for the patent filing and prosecution with respect to a GSI Project Patent shall be GSI's responsibility.

IV.3    UMI shall apply for, prosecute and maintain the UMI Project Patents at all times during and after the term of this Agreement. The application filings, prosecution, maintenance and payment of all fees and expenses, including legal fees, relating to the UMI Project Patents shall be the responsibility of UMI. Patent attorneys chosen by UMI shall handle all patent filings and prosecutions, on behalf of UMI; provided, however, that GSI shall be entitled to review and comment upon and approve all actions undertaken in the prosecution of all patents and applications. If UMI declines to apply for, prosecute or maintain any UMI Project Patent, GSI shall have the right to pursue the same at GSI's expense and UMI shall have no rights under GSI's interest therein.

IV.4    If UMI decides not to, abandons or fails to apply for, prosecute or maintain any UMI Project Patents (each, an "Abandoned Patent Right"), UMI shall give sufficient and timely written notice to GSI of not less than thirty (30) days so as to permit GSI to apply for, prosecute and maintain each such Abandoned Patent Right. GSI will have the option, at its sole election, to assume all rights and obligations with respect to the prosecution and maintenance of each such Abandoned Patent Right. In the event GSI exercises its option, UMI shall transfer and assign its rights in, to and under each such Abandoned Patent Right to GSI and transfer the file histories and GSI will then be responsible for assuming the prosecution and maintenance of each such Abandoned Patent Right at GSI's own expense. UMI will also provide GSI with all information necessary or useful for the filing and prosecution of each such transferred Abandoned Patent Right. UMI shall cooperate fully with GSI to perfect such assignment, including, without limitation, taking such actions and promptly executing such documents as may be necessary or reasonably required.

IV.5    If UMI learns of the infringement of any UMI Project Patent by a third party, UMI shall promptly notify GSI in writing and provide GSI with any evidence possessed by UMI of such infringement. At any time, GSI may ask UMI to file, prosecute, and settle any suit or action for any actual or suspected infringement of any UMI Project Patent and UMI agrees to take all such actions as requested by GSI or assign ownership of such UMI Project Patent to GSI, as instructed by GSI. UMI shall promptly execute all papers and perform all such other acts as may be reasonably required by GSI in order to bring such suits or actions or make such assignments to GSI.

Exhibit 1, Page 000061

## UMI – GSI Product Design and Development Agreement
### 576 Mb Low Latency DRAM

ARTICLE V: <u>Certain Warranties, Disclaimers of Warranties and Limitations of Liability</u>.

V.1     The payments to UMI and the substance of the other rights and duties of GSI and UMI set forth in this Agreement have been negotiated in reliance on, and are based upon the applicability and enforceability of, the warranties, disclaimers of warranties and limitations of liability contained in this Article V.

V.2     UMI represents and warrants to GSI only, and not to any third party (including, but not limited to, any customers (retail or wholesale) or sub-licensees of GSI), that (i) UMI shall abide by the terms and conditions of this Agreement and perform its services to be rendered as provided in Article II in commercial good faith, and in a professional and workmanlike manner by qualified personnel in full compliance with all relevant laws, ordinances, rules and regulations; (ii) services to be performed by UMI will not constitute breach of contractual obligations of UMI with any third parties; and (iii) UMI's design of the Product shall conform in accordance with the specifications set forth in Exhibit A. In the event that within six (6) months from the completion of the Project pursuant to Article II, the Product supplied by UMI to GSI does not perform in accordance with the requirements of Exhibit A, UMI shall promptly correct or modify such deliverables so that they are so performing and without any additional charge to GSI. If UMI materially breaches the warranty contained in this Section 5.2, GSI shall have the right to terminate this Agreement by delivering to UMI written notice of such termination pursuant to Section 7.3, without limiting any other rights or remedies available to GSI, whether under this Agreement, at law or in equity.

V.3     Except specifically as provided in this Article V, UMI makes no warranties to GSI or to any other party by virtue of this Agreement and UMI expressly disclaims all warranties, whether express, implied or arising by usage of trade, including all implied warranties of merchantability and fitness for a particular purpose, with respect to UMI's services to be provided pursuant to this Agreement. GSI shall not make or pass on to its customers (wholesale or retail) or sub-licensees any warranty or representation on behalf of UMI. Except for a breach of confidentiality obligations under Article 6 or a claim for indemnification made under Section 5.5, a party shall not be liable to the other for any consequential, incidental, special or punitive losses or damages under any circumstances whatever, whether asserted as a claim in contract, tort, negligence, product liability or strict liability and whether arising out of or resulting from any matter, information or thing made available or not made available under this Agreement or the use thereof. Except as specifically provided in this Article V and without limiting any warranty made by UMI or other obligation of UMI hereunder, including, without limitation, those with respect to the design, development and correction of the Product, UMI has not undertaken, and shall not have, any responsibility or liability whatever for the inability of GSI to manufacture the Product on a commercial scale or for the quality or performance of any of the Product, or for any claims of any third parties arising from any use of any of the Product.

V.4     A party shall not be liable to the other or to any third party by reason of termination of this Agreement for compensation, reimbursement or damages on account of any loss of prospective profits on anticipated sales or on account of expenditures, investments, leases, employment or labor contracts or other commitments relating to the business or goodwill of such party notwithstanding any law to the contrary. Without limiting the generality of the foregoing,

Exhibit 1, Page 000062

## UMI – GSI Product Design and Development Agreement
### 576 Mb Low Latency DRAM

GSI assumes all risks arising out of or relating to its inability to meet any commitments made to, and/or perform any agreements entered into with, any customer (wholesale or retail) or sub-licensee of GSI in the event of any termination of this Agreement, and UMI assumes all risks arising out of or relating to its decision to hire any employees for performing under this Agreement and its inability to meet any commitments made to, and/or perform any agreements entered into with, any GSI contractor in the event of any termination of this Agreement .

V.5     UMI shall provide GSI with all information and services necessary or useful to support the defense of GSI, its officers, directors, affiliates, employees, agents, resellers, distributors and customers  from and against any claim, action, suit or proceeding brought by a third party alleging infringement, misappropriation or violation of that party's patent, copyright, trade secret or other intellectual property rights by any deliverables provided hereunder, including the Product.

V.6     If upon inspection of any/all deliverables the manufacture, use or sale of any Product and/or deliverable is, in GSI's opinion, likely to become subject to an infringement suit, UMI shall recommend and make such design modifications, as seem prudent to GSI and UMI and/or provide non-monetary support to GSI in GSI attempts to obtain licenses to necessary intellectual property

ARTICLE VI:   Confidentiality.

VI.1     Each party acknowledges that in the course of the performance of this Agreement, it may obtain the Confidential Information of the other party.  The Receiving Party shall keep in confidence all of the Disclosing Party's Confidential Information received by it. All Confidential Information received by the Receiving Party shall be kept strictly confidential and shall not be used or disclosed to any person or entity by the Receiving Party except as necessary to exercise its rights and fulfill its obligations under this Agreement.  The Receiving Party shall take all reasonable steps to prevent unauthorized disclosure or use of the Disclosing Party's Confidential Information and to prevent it from falling into the public domain or into the possession of unauthorized persons.  Only UMI and GSI personnel needing access to such Confidential Information to effect the intent of this Agreement shall receive such information and who have entered into written confidentiality agreements with the Receiving Party which protects the Confidential Information of the Disclosing Party, and then only to the extent needed. The Receiving Party shall immediately give notice to the Disclosing Party of any unauthorized use or disclosure of Disclosing Party's Confidential Information.  The Receiving Party agrees to assist the Disclosing Party in remedying such unauthorized use or disclosure of its Confidential Information.

VI.2     These obligations shall not apply to the extent that Confidential Information includes information which:

VI.2.1  was in the public domain at the time it was disclosed;

VI.2.2  was known to the receiving party at the time of disclosure absent an obligation of confidentiality;

Exhibit 1, Page 000063

## UMI – GSI Product Design and Development Agreement
### 576 Mb Low Latency DRAM

VI.2.3  is disclosed with the prior written approval of the disclosing party;

VI.2.4  is inherently disclosed by the Product once on sale (wholesale or retail);

VI.2.5  is developed by the Receiving Party without any use of, or reference to, the Confidential Information;

VI.2.6  becomes known to the Receiving Party from a source other than the Disclosing Party without breach of this Agreement by the Receiving Party and absent an obligation of confidentiality; or

VI.2.7  is disclosed to a third party by the Disclosing Party free of any obligation of confidence.

A disclosure of Confidential Information that is disclosed pursuant to an order or requirement of a court, administrative agency, or other governmental body or otherwise required by law, shall not be considered to be a breach of this Agreement or a waiver of confidentiality for other purposes, provided that the receiving party shall as soon as practical give the disclosing party written notice of such order or requirement at least fourteen (14) days prior to disclosure of the confidential information to enable it to seek a protective order or otherwise prevent or limit such disclosure.

The burden of proof to establish that one of the foregoing seven exceptions applies shall be upon the Receiving Party.

VI.3     In furtherance, but not in limitation, of the provisions of Sections 6.1 and 6.2, each party shall use its customary and reasonable endeavors to cause all written materials and other physical documents and materials of all types relating to or containing confidential information or trade secrets disclosed by either party to the other under this Agreement, to be plainly marked to indicate the secret, proprietary and confidential nature thereof and to prevent the unauthorized use, disclosure or reproduction thereof, directly or indirectly.

VI.4     All the Confidential Information disclosed by GSI shall be and remain the sole property of GSI.  Upon the earlier of termination of this Agreement or GSI's request, UMI agrees, within ten (10) days after the termination, to return to GSI all of the Confidential Information of GSI in its custody, possession or control, and any copies of the same. In lieu of returning Confidential Information of GSI, UMI may destroy such Confidential Information and promptly certify destruction in writing.

VI.5     Notwithstanding Section 6.1, GSI may disclose the confidential information and Trade Secret and materials of UMI to (i) its subsidiaries which exercise sub-license under Section 3.1 and (ii) its and its subsidiaries' respective contractors and other third parties for the design, development, layout, manufacture, testing and packaging of the Product or derivative of the Product to the extent necessary to exercise their duty, provided that such disclosures shall be made under reasonable terms of confidentiality.

Exhibit 1, Page 000064

## UMI – GSI Product Design and Development Agreement
### 576 Mb Low Latency DRAM

VI.6    Notwithstanding any term in this Agreement to the contrary, GSI shall be entitled to retain copies of all UMI Confidential Information reasonably required to continue to develop, maintain, support the Product or any derivative products or otherwise exploit the Product or to exercise any other surviving rights and obligations of GSI pursuant to this Agreement.

ARTICLE VII:    Term and Termination.

VII.1    The effective date of this Agreement shall for all purposes be the date this Agreement is executed by UMI and GSI (the "Effective Date").

VII.2    The term of this Agreement shall commence on the Effective Date and shall expire and be ended at the close of business on the day five (5) years from the Effective Date, unless earlier terminated by either party pursuant to this Article VII, or upon the expiration of the three (3) year support period detailed in Article II, paragraph 1.1 (d).

VII.3    Either party may terminate this Agreement on thirty (30) days' written notice to the other party if such other party is in default or breach of or with respect to any material provision of this Agreement; provided, however, that if the party receiving such notice of termination cures the breach or default prior to the expiration of the thirty (30) day period or, if the breach is such that it cannot be cured within the thirty (30) day period, diligently commences to cure the same within such thirty (30) day period and prosecutes such cure uninterruptedly to completion, this Agreement shall continue in full force and effect.  The aggrieved party's right to terminate this Agreement pursuant to this Section 7.3 shall be in addition to any other right, remedy or benefit the aggrieved party may have under this Agreement or applicable law.

VII.4    Notwithstanding any other provision of this Agreement and in addition to any other right, remedy or benefit a party may have under this Agreement or applicable law, such party shall have the unconditional right to terminate this Agreement, effective immediately, if at any time if the other party is adjudged by a court of law to be bankrupt or insolvent, or files a petition in bankruptcy or an answer admitting the material facts recited in such petition if filed by another, or is put, or makes an election to go, into dissolution or liquidation, or otherwise discontinues its business, makes an assignment for the benefit of its creditors or enters into any other general arrangement with its creditors, or has a receiver or custodian of any kind appointed to administer any substantial amount of its property, or is placed or enters into any comparable situation under the laws of any state or province in which its operations may be conducted, or otherwise seeks to take advantage of any bankruptcy or insolvency statute now or hereafter in effect in any country.

VII.5    The provisions of Articles III, IV and V of this Agreement shall survive expiration or termination of this Agreement permanently.  Article VI shall survive for ten (10) years any expiration or termination of this Agreement.  The definitions and all other rights, duties and obligations of the parties that by their nature continue and survive shall survive any termination or expiration of this Agreement.

Exhibit 1, Page 000065

## UMI – GSI Product Design and Development Agreement
### 576 Mb Low Latency DRAM

VII.6    GSI may terminate this Agreement at any time by written notice. In such case, GSI shall remain responsible for making payment for work successfully completed to that point that has been accepted by GSI.

VII.7    Immediately upon termination, UMI shall collect and deliver to GSI in a manner reasonably prescribed by GSI, whatever work product then exists with regard to the Product.

ARTICLE VIII: Governmental Requirements.

VIII.1    In performing their respective duties hereunder and in carrying out their activities as part of the Project, each of GSI and UMI shall comply with all applicable laws, regulations, procedures, ordinances and rulings of any governmental authority having jurisdiction over them.

ARTICLE IX:    Certain Costs and Expenses of the Project.

IX.1    Each of UMI and GSI shall bear their respective costs incurred in the performance of the Project, including all direct and indirect costs of all personnel involved in the Project from time to time.

ARTICLE X:    Miscellaneous.

X.1    Independent Contractors.  It is understood and agreed that each of GSI and UMI are independent contractors and are, and shall continue to be, engaged in the conduct of their own respective businesses, including with respect to the design and development of the Product. Neither UMI nor GSI is to be considered the agent, joint venturer or employee of the other for any purpose, and neither party has the right or authority to enter into any contracts or assume obligations for the other or to give any warranty or make any representation on behalf of the other party except where and to the extent specifically authorized in writing to do so.

X.2    Entire Agreement.  This Agreement (including all exhibits hereto) contains the entire and only agreement of GSI and UMI with respect to the subject matter hereof, and supersedes entirely any and all other prior or contemporaneous agreements, either oral or written, between the parties with respect thereto.  No agreement, statement or promise relating to the subject matter of this Agreement which is not contained herein shall be valid or binding.

X.3    Assignment.  This Agreement shall be binding upon and inure to the benefit of the parties hereto and their successors and permitted assigns; provided, however, that neither party may assign its rights under this Agreement, in whole or in part, whether by contract, operation of law or otherwise, or to delegate any duties hereunder without the prior written consent of the other, except that GSI may assign its rights under this Agreement in connection with a merger, acquisition, divestiture, corporate reorganization or sale of all or substantially all of its assets to which this Agreement relates.  Any attempt by one party to assign its rights under this Agreement or to delegate any duties hereunder contrary to the provisions of this clause shall be null and void.

Exhibit 1, Page 000066

# UMI – GSI Product Design and Development Agreement
## 576 Mb Low Latency DRAM

X.4     Severability.  All agreements and covenants contained herein are severable and if any of them shall be held to be unenforceable or invalid, the remaining provisions or parts of this Agreement shall continue to remain in full force and effect and the unenforceable or invalid provision shall be amended to fulfill as closely as possible the original purpose of the unenforceable or invalid provision.

X.5     Governing Law.  This Agreement shall take effect under, be construed and enforced according to, and be governed by, the laws of the State of Colorado.

X.6     Changes or Amendment.  Any change, revision, termination, or attempted waiver of any of the provisions contained in this Agreement shall not be binding unless in writing and signed by the party against whom the same is sought to be enforced.  This Section 10.6 itself shall not be waived verbally.  This Agreement shall be amended or supplemented only by a written instrument duly executed by or on behalf of the parties hereto, and if and when so supplemented or amended shall include all such supplements and any amendments.

X.7     Construction Against Waiver.  No waiver of any term, provision or condition of this Agreement, whether by conduct or otherwise, in any one or more instances, shall be deemed to be or construed as a further or continuing waiver of any such term, provision or condition of this Agreement.

X.8     Notices.  All notices permitted or required to be given to the parties of this Agreement shall be in writing and delivered personally or sent by certified or registered airmail, return receipt requested, postage prepaid, by air courier, return receipt requested, or by telegram, telecopy or telex, addressed to the respective parties at the following addresses, unless another address is designated in writing in accordance with this Section 10.8:

       UMI:   United Memories, Inc.
              4815 List Drive, Suite 109
              Colorado Springs, Colorado  80919
              Phone: 719-594-4238
              Fax: 719-594-4939
              Attention:  President & CEO

       GSI:   GSI Technology, Inc.
              4131 Spicewood Springs Road
              Suite F-2
              Austin, TX  78759
              Phone:  512-346-7180
              Fax:  512-372-0446
              Attention:  David Chapman

Such notices shall be deemed to have been effectively given and received on the day of delivery if delivered personally, or, if by telegram, telecopy, telex, or air courier, on the next day following the sending of such notice by telegram, telecopy, telex, or air courier, and, if mailed, on the seventh (7th) business day following such mailing.

Exhibit 1, Page 000067

## UMI – GSI Product Design and Development Agreement
### 576 Mb Low Latency DRAM

X.9      Attorneys' Fees.  In the event of any controversy, claim or dispute between the parties hereto arising out of or relating to this Agreement, including, but not limited to, a controversy settled by arbitration, the prevailing party shall be entitled to recover from the losing party reasonable expenses, attorneys' fees and costs.

X.10     Acts of God.  If the performance by any party of any of its obligations under this Agreement shall be in any way prevented, interrupted, or hindered as a result of any force majeure, including, without limitation, war, civil disturbance, legislation or restriction of any governmental or other authority, fire, unavailability of materials or finished goods, delay of carriers, Act of God or any other similar circumstances beyond the reasonable control of such party, the obligations of the party concerned shall be wholly or partially suspended during the continuance and to the extent of such prevention, interruption of hindrance; provided, however, that local commercial unavailability of materials or finished goods shall not alone constitute force majeure for purposes hereof if such materials or finished goods are otherwise (even if at a higher cost) available.  A party unable to perform timely its obligations under this Agreement due to any of the foregoing reasons must take all reasonable steps to remedy its nonperformance or delay in performance with the least possible delay, and by doing whatever may reasonably be done to mitigate the adverse affect of its nonperformance upon the other party to this Agreement.  Such delay shall not be excused under this Section 10.10 for longer than sixty (60) days.

X.11     Counterparts.  This Agreement may be executed in counterparts, each of which shall be deemed an original for all purposes and all of which shall constitute one and the same Agreement.

X.12     Nature of Agreement and Relationship; Public Announcement.  The existence and terms of this Agreement are GSI's Confidential Information.  No public announcement or press release concerning this Agreement shall be made by UMI without GSI's prior written consent.

IN WITNESS WHEREOF, the parties have caused their duly authorized representatives to execute this Agreement as of the date set forth in the preamble hereof.

"GSI"                                          "UMI"

GSI Technology, Inc.                          United Memories, Inc.

By: _____          By: _____

Name: _CEE- CEAN  SHu_               Name: _RODAERT  L.  GOWER_

Title: _CEO_                          Title: _PRESIDENT & CEO_

Exhibit 1, Page 000068

## UMI – GSI Product Design and Development Agreement
### 576 Mb Low Latency DRAM

EXHIBIT A

PROJECT SPECIFICATION

Product Specification shall be as specified on the following two Micron Technologies, Inc. data sheets plus the associated IBIS and BSDL models:

Micron Data Sheet for Common I/O versions:
MT49H64M9
MT49H32M18
MT49H16M36
Date 03/08
Rev. D

Micron Data Sheet for Separate I/O versions:
MT49H64M9C
MT49H32M18C
Date 09/07
Rev. B

Exhibit 1, Page 000069

# UMI – GSI Product Design and Development Agreement
### 576 Mb Low Latency DRAM

---

## EXHIBIT B

### PROJECT MILESTONES

| Project Milestone | Date | Payment |
|---|---|---|
| 1. Signing of Contract | May. 01, 2008 | $75K |
| 2. Preliminary Design Review<br>　　Chip Architecture Defined<br>　　Chip Floor Plan<br>　　1st Pass Design of Critical Path<br>　　　Circuits<br>　　1st Pass Critical Path Simulation<br>　　　Results<br>　　Layout of Some Critical Blocks<br>　　　(Sense Amps, Row Decoder)<br>　　Chip Size Estimate<br>　　Preliminary Testing Plan | July 15, 2008 | $100K |
| 3. Tape Out of Database<br>　　All Circuit Schematics<br>　　HSPICE Schematics and Parasitics<br>　　LVS Hierarchy<br>　　HSPICE Hierarchy<br>　　Signal/Circuit Matrix<br>　　Pad Locations<br>　　Fuse Locations<br>　　Full Simulation Files | Oct. 15, 2008 | $150K |
| 4. Final Design Review<br>　　All Circuits Designed<br>　　Full Chip Simulation Results<br>　　Test Circuits Designed<br>　　Test Characterization Plan<br>　　Final Chip Size | Oct. 30, 2008 | $200K |
| 5. Test Characterization of the Product<br>　　Meets Target Specs | Jan. 30, 2008 | $250K |
| 6. Manufacturing Release<br>　　Yielding within 10 points of ProMOS 512M<br>　　product in same technology<br>　　Passes GSI internal qual | May 1, 2009 | $75k |

*ls*

Exhibit 1, Page 000070

**UMI – GSI Product Design and Development Agreement**
**576 Mb Low Latency DRAM**

EXHIBIT C

GSI Personnel Participation in Colorado Springs, CO.

| Type Engineer | Approximate Start Date | Months Duration |
|---|---|---|
| Design | June 15, 2008 | 1.0 |
| Layout | Aug 01, 2008 | 1.0 |
| Product | Nov. 01, 2008 | 0.5 |
| Test | Dec. 01, 2008 | 0.5 |

Exhibit 1, Page 000071

# EXHIBIT 2



# UNITED MEMORIES, INC. ————————————

Mr. David Chapman
July 20, 2009
GSI Technology, Inc.
4131 Spicewood Springs Road
Suite F-2
Austin, TX  78759

Dear David,

    This letter is to inform GSI that UMI considers the agreement titled <u>UMI-GSI Product Design and Development Agreement, 576 Mb Low Latency DRAM</u> to be terminated 30 days after you receive this letter. It is apparent that the intent of the agreement on longer exist and that GSI does not plan to satisfy section II.1.2 (a) Provide sufficient wafer starts .....

    To the best of our knowledge, no GSI confidential information has been given to UMI by GSI. If this is not a true statement please identify the confidential material(s) and we will promptly return them to GSI.

Sincerely,

Robert L. Gower
President and CEO
United Memories, Inc.

4815 LIST DRIVE, SUITE 109

COLORADO SPRINGS, CO 80919

TEL  (719) 594-4238

FAX (719) 594-4939

Exhibit 2, Page 000073