UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | | |
|---|---|---|
| GSI TECHNOLOGY, INC., a Delaware Corporation | ) ) ) | Case No.: C 13-1081 PSG |
| Plaintiff, | ) ) | **ORDER DENYING MOTIONS TO STRIKE AND DENYING MOTION FOR PRELIMINARY INJUNCTION** |
| v. | ) ) | |
| UNITED MEMORIES, INC., a Colorado Corporation, | ) ) ) | **(Re: Docket Nos. 82, 90, 102)** |
| Defendant. | ) ) ) | |

In this breach of contract and unfair competition case, Plaintiff GSI Technology, Inc.

("GSI") moves for a preliminary injunction to prevent Defendant United Memories, Inc. ("UMI")

and its agents from working on Cisco Systems, Inc.'s ("Cisco") Atris chip.  UMI moves to strike

exhibits and theories associated with the preliminary injunction motion it argues were not properly

disclosed.  After denying a motion for a temporary restraining order,[1] the court authorized

extensive expedited discovery on the pending preliminary injunction motion[2] and heard extended

---

[1] *See* Docket No. 24.

[2] *See id.*

1

Case No.: 13-1081 PSG
ORDER

**United States District Court**
For the Northern District of California

oral argument on the motion.[3]  The court also permitted supplemental briefing after the argument.[4]

Having considered the papers and arguments of counsel, the court DENIES both motions.

## I.       BACKGROUND

GSI is a corporation that designs, develops, and markets a wide range of high-performance

memory products, including Static Random Access Memory ("SRAM") and Low Latency

Dynamic Random Access Memory ("LLDRAM") products.[5]  UMI is a semiconductor memory

design company that provides integrated circuit design and layout services to other companies,

especially regarding Dynamic Random Access Memory ("DRAM").[6]  UMI is a wholly-owned

subsidiary of ProMOS Technologies, Inc. ("ProMOS"), a foundry that owns a semiconductor

fabrication plant ("fab") in Taiwan.[7]

In early 2007, GSI approached UMI with a proposal to design a 576 Mb, second-generation

Low Latency DRAM chip ("LLDRAM").[8]  In February 2007, Cisco issued a Request For

Information ("RFI") for a separate project, a third-generation 1.2 Gb LLDRAM chip, which Cisco

would later name "Atris."[9]  GSI received the RFI and contacted UMI to gauge its interest in aiding

GSI in this project.[10]  In doing so, GSI learned that Cisco also had approached ProMOS and UMI

directly about designing Atris.[11]  UMI told Cisco it would design the chip, but advised against

---

[3] *See* Docket No. 117.

[4] *See* Docket No. 125, 127.

[5] *See* Docket No. 1.

[6] *See id.*

[7] *See* Docket No. 109-3 ¶ 8.

[8] *See* Docket No. 82-1, Ex. D. at 99:4-15.

[9] *See* Docket No. 82-1, Ex. A.

[10] *See id.*

[11] *See id.*

Case No.: 13-1081 PSG
ORDER

Cisco attempting to produce the chip itself, given Cisco's lack of expertise and infrastructure in that particular area.[12]  UMI agreed with GSI that the 576 Mb chip project for GSI and the Atris project for Cisco were similar and involved the same DRAM specification,[13] and so GSI and UMI decided to work together to try to "leverage the two design products."[14]  From an early stage in both projects, then, there was an understanding that both parties would work together first in developing the 576Mb chip for GSI, and then leverage that experience and knowledge to design Atris for Cisco.[15]  From that point, Cisco, GSI, and UMI often discussed the Atris project together.[16]

Later in 2007, GSI was awarded a bid by Cisco as one of the two suppliers for the Atris chip.[17]  The other chosen supplier was NEC Electronics Corporation, now known as Renesas Electronics Corporation ("Renesas").

A.      **GSI and UMI Memorialize the 576 Mb Agreement**

In May 2008, GSI and UMI executed a contract governing the development of the 576 Mb chip (the "576 Mb Agreement").  The Agreement is governed by Colorado law.  During negotiations over the contract, GSI expressed concerns about UMI utilizing GSI information to aid GSI's competitors:

> While UMI clearly would not deliver this self-same project to two customers… one can imagine another customer (e.g. Cisco or ProMOS) showing up on your doorstep asking for something darn similar… during the project or even after.  Clearly, GSI would not be enthusiastic about UMI participating in the creation of a competitor, particularly since the

---

[12] *See id.*

[13] *See* Docket No. 109-1, Ex. B at 53-54, 57.

[14] *Id.*

[15] *See id.*

[16] *See* Docket 109-1, Ex. I, J.

[17] *See* Docket No. 82-1, Ex. F at 61.

Case No.: 13-1081 PSG
ORDER

experience gained by UMI on GSI's dime would contribute to the success of such an undertaking.[18]

After some discussion, the parties agreed to include a "Noncompete Clause" in the 576 Mb Agreement:

> [Except for product to be designed and delivered by UMI for GSI hereunder,] UMI agrees it shall not, directly or indirectly, design or develop, or contribute to the design or development of, a Low Latency DRAM Product (as defined below) during the term of this Agreement.  "Low Latency DRAM Product" means a latency optimized and/or address rate optimized memory product that employs a capacitive charge-based memory cell technology, including, but not limited to, RLDRAM and FCRAM products.[19]

The 576 Mb Agreement further provides a "Confidentiality Provision" governing the use of any confidential information exchanged by the parties:

> The Receiving Party shall keep in confidence all of the Disclosing Party's Confidential Information received by it.  All Confidential Information received by the Receiving Party shall be kept strictly confidential and shall not be used or disclosed to any person or entity by the Receiving Party except as necessary to exercise its rights and fulfill its obligations under this Agreement.  The Receiving Party shall take all reasonable steps to prevent unauthorized disclosure or use of the Disclosing Party's Confidential Information and to prevent it from falling into the public domain or into the possession of unauthorized persons…[20]

"Confidential Information" is explicitly defined by the 576 Mb Agreement as follows:

> All non-public information that the party disclosing the information (the "Disclosing Party") *designates* at the time of disclosure as being confidential, or if disclosed orally or visually is identified as such prior to the receiving party (the "Receiving Party") within thirty (30) days, or which, *under the circumstances* surrounding disclosure, the Receiving Party *knows or has reason* to know should be treated as confidential without the need to be marked as "confidential."[21]

The 576 Mb Agreement also included an "IP Ownership Clause," which provided that GSI will assume ownership of the product to be designed and delivered by UMI:

---

[18] Docket No. 82-1, Ex. J.

[19] Docket No. 1, Ex. A., Art. III.6.

[20] *Id.* at Art. I.1.

[21] *Id.* at Art. VI.1 (emphasis added).

4

Case No.: 13-1081 PSG
ORDER

> GSI shall have sole ownership of all deliverables and the Product, and all associated intellectual property rights [excluding only Project Patents owned by UMI not applicable here] and all other works of authorship, information fixed in any tangible medium of expression (whether or not protectable under copyright laws), inventions (whether or not protectable under patent laws), discoveries, designs, developments, suggestions, ideas, improvements, know-how, and other intellectual property rights conceived, developed or reduced to practice by GSI, alone or with others, during the course of the Project.[22]

Curiously, nothing in the 576 Mb Agreement ever addresses or even mentions Atris.

B.    **UMI Begins Work on the 576 Mb Chip**

Starting in May 2008, shortly after executing the Agreement, UMI began designing the 576 Mb chip.  At the same time, UMI also worked with GSI in strategizing how to pitch their proposed joint approach to Cisco.  For example, regarding their strategy for a design review meeting between Cisco and GSI and what UMI could offer, GSI's David Chapman ("Chapman") wrote to UMI's lead designer Jon Faue ("Faue"), "Our plan is credible... 576Mb first, 1.2Gb next, using what we learned the first time around... supported by what was learned on the commodity DRAMs of the same process."[23]  Faue responded, "yeah, good points, I agree []completely."[24]  Regarding the same meeting, Faue provided additional input on the matter, noting that "UMI will start the Atris design as soon as the 576RL2 is completed... The basic design is of course highly leveraged from the 576RL2."[25]

On October 1, 2008, Faue emailed GSI to explain that, while UMI was still two months away from providing deliverables to GSI on the 576 Mb project, UMI was "already way beyond

---

[22] *Id.* at Art. III.6.

[23] Docket No. 82-1, Ex. M.

[24] *Id.*

[25] *Id.*, Ex. L.

Case No.: 13-1081 PSG
ORDER

United States District Court
For the Northern District of California

the point of conception" for the Atris chip and could design it quickly by leveraging knowledge from the 576 Mb chip.[26]

C.      **The GSI-UMI Relationship Deteriorates and Eventually Ends**

In late 2008, GSI learned that ProMos was insolvent and was seeking money from the Taiwanese government.[27]  In the wake of the global economic meltdown then taking place, Taiwan's entire DRAM industry was in crisis, with some news reports speculating as to whether the government would implement a "bailout" of the industry.  In March 2009, the Taiwanese government indicated it might fund the consolidation of the weaker Taiwanese foundries into a new company, including ProMos' foundries.[28]  GSI expressed concerns to UMI as to whether the news would hinder UMI and ProMos' ability to proceed with the project.[29]  UMI told GSI that ProMos believed that "the current government strategy is to let the DRAM guys fail and then buy their assets after they go bankrupt," which would include ProMos.[30]  UMI also admitted that the future of the ProMos foundry was uncertain.[31]  GSI decided that it would not make sense for UMI to continue designing the 576 Mb chip, which was designed specifically to be manufactured at ProMos' fab, if ProMos would later be unavailable to manufacture the chips.[32]  GSI accordingly decided not to proceed under the 576 Mb Agreement and did not issue "wafer starts," which was a prerequisite for the next Milestone under the Agreement.[33]

---

[26] *Id.,* Ex. O.

[27] *See id.,* Ex. R.

[28] *See id.,* Ex. T.

[29] *See id.,* Ex. U.

[30] *Id.,* Ex. AS.

[31] *See id.,* Ex. Q.

[32] *See id.,* Ex. I at 88:21-90:8, Ex. F. at 133:13-34.

[33] *See* Docket No. 1, Ex. A., Art. II.1.2(a).

6

Case No.: 13-1081 PSG
ORDER

After GSI communicated to UMI that it would not be proceeding on the 576 Mb chip project, UMI offered to sell GSI all of the UMI Atris design work it had completed and maintained in a schematics database until that date for ████████[34]  GSI's Vice President of Marketing recommended to GSI''s management team that GSI make the purchase:

> Work on the [Atris] design is continuing… Cadence schematic are now complete from pads to core… We do not yet own those schematics. ████████████████████████  They will pass on to the new owners of UMI unless we secure them.[35]

GSI also considered purchasing UMI outright.[36]  During this exchange, GSI never told UMI that the schematics database was confidential or was GSI's intellectual property.[37]  GSI decided not to purchase the database from UMI.

Several months later, on July 20, 2009, UMI sent GSI a letter to formally terminate the 576 Mb Agreement 30 days after GSI's receipt of the letter.[38]  UMI's letter purported to terminate because "[i]t is apparent that the intent of the agreement [no] longer exist[s] and that GSI does not plan to satisfy section II.1.2 (a) Provide sufficient wafer starts."[39]  The letter also stated that "[t]o the best of [UMI's] knowledge, no GSI confidential information has been given to UMI by GSI.  If this is not a true statement please identify the confidential material(s) and we will promptly return them to GSI."[40]  GSI did not respond.

---

[34] *See* Docket 109-1, Ex. V-Z; Ex. P; Ex. G at 181:12-182:4; Ex. K at 132:8-24, 247:4-248:19.

[35] *See id.*, Ex. V, Z.

[36] *See id.*, Ex. P.

[37] *See* Docket No. 109-3 ¶¶ 10-12.

[38] *See* Docket No. 82-1, Ex. V.

[39] *Id.*

[40] *Id.*

Case No.: 13-1081 PSG
ORDER

1    GSI nevertheless continued on its own to develop both the 576 Mb chip and Atris.

2    Ultimately, GSI selected a different foundry and process technology.[41]  The redesign of the 576 Mb

3    chip delayed GSI's progress – GSI made the chip available for customer sampling in May 2011.[42]

4    In mid-2010, Cisco told GSI that because of GSI's delays, it would not be using GSI as a supplier

5    for Atris.[43]

6    **D.    The Renewed Atris Bid**

7        In mid-2012, Cisco became concerned that it did not have a second supplier for Atris and

8    issued another RFI to find one.[44]  GSI and another company, Integrated Silicon Solutions, Inc.

9    ("ISSI") submitted proposals in response to the RFI, and the decision appears to have come down

10   to a choice between the two.[45]

11       In August 2012, ISSI approached UMI and ProMos about a design project involving Atris.

12   On September 24, 2012, ISSI told Cisco that it was "co-developing" the Atris chip with UMI,

13   which would help it "accelerate time-to-market."[46]  UMI participated in several pitch meetings

14   between ISSI and Cisco.[47]  ████████████████████████████

15   ████████████████████████████████████████[48]  On December 4, 2012,

16   having reviewed both GSI and ISSI's proposals, Cisco chose ISSI as the second supplier for

17   ───────────────────────

18   [41] *See id.*, Ex. D at 78:4-79:3, Ex. I at 110:21-112:23.

19   [42] *See id.*, Ex. X.

20   [43] *See id.*, Ex. F at 180:24-181:24, 183:20-185:6; Ex. Y 81:18-83:1.

21   [44] *See id.*, Ex. Y at 90:3-20, 91:15-25, 92:13-93:2.

22   [45] *See id.* at 90:21-91:10; Ex. Z.

23   [46] *Id.*, Ex. AC.

24   [47] *See id.*, Ex. AB, AD.

25   [48] *See id.*, Ex. AE.

Case No.: 13-1081 PSG
ORDER

Atris.[49]  Cisco informed GSI that it was not selected because GSI lacked experience in DRAM.[50]

The meeting minutes indicated that Cisco felt comfortable with the combination of "ISSI with UMI

design team."[51]

UMI and ISSI began work on the Atris chip.  In late 2012, UMI and ISSI drafted a

Memorandum of Understanding ("MOU") memorializing the parties' collaboration on the Atris

project, providing that "UMI will develop for ISSI a DRAM design ("Design" which complies

with the [Atris] specification."[52]  During this time, ISSI told UMI that they had to "employ UMI

employees as ISSI employees," although ISSI's email does not explain why that was so.[53]  ISSI

and UMI executed an Asset Transfer Agreement, whereby five UMI employees "temporarily"

resigned from UMI and were offered work at ISSI with an expected end date of October 30, 2013,

or the approximate end of the employees' expected work on the Atris project.[54]  Those five

employees – Larry Aldrich, Doug Butler, Kim Hardee, Carol Gruenschlaeger, and Steve Eaton –

nevertheless continue to maintain ties with UMI.  ISSI would pay their salaries and benefits, but

each employee would continue to work in their UMI office space, using their UMI telephone

number and computer.[55]  ISSI would pay a monthly fee to UMI for overhead, space, and software

---

[49] *See id.*

[50] *See* Docket No. 109-1, Ex. R at 87:20-88:11; Ex. AG.

[51] *Id.*

[52] *See id.*, Ex. AG.

[53] *Id.*, Ex. AH.

[54] *See id.*, Ex. AI at ¶ 7.1; *see e.g., id.,* Ex. AT.

[55] *See id.*, Ex. AI, Ex. AQ, Ex. U at 181:9-16, 184:24-186:13, 186:24-187:16, 189:19-190:21, 193:14-194:25, 195:10, 196:11, 197:1-197:18, 208:24-209:12, 211:18-212:9.

Case No.: 13-1081 PSG
ORDER

costs covering the five transferred employees.[56] █████████████████████████████

███████████████████████████████[57]

## II.   LEGAL STANDARDS

The decision to issue a preliminary injunction is largely within the discretion of the district court.[58]  A preliminary injunction is "an extraordinary remedy that may only be awarded upon a clear showing that plaintiff is entitled to such relief."[59]  A prerequisite to any equitable relief, including a preliminary injunction, is that legal remedies would be inadequate.[60]  A plaintiff seeking preliminary injunctive relief must demonstrate (1) that he is likely to succeed on the merits, (2) that he is likely to suffer irreparable harm in the absence of preliminary injunctive relief, (3) that the balance of equities weighs in his favor, and (4) that an injunction is in the public interest.[61]  Where there are "serious questions going to the merits" and "the balance of hardships tips sharply in the plaintiff's favor," a preliminary injunction may still be granted so long as the plaintiff shows the other factors are also present.[62]  *Winter* "did not alter [the district court's] ability to balance the elements of the preliminary injunction test, so long as a certain threshold showing is made on each factor."[63]

---

[56] *See id.*, Ex. AQ.

[57] *See id.*, Ex. AI.

[58] *See Indep. Living Ctr. of S. Cal., Inc. v. Maxwell-Jolly*, 572 F.3d 644, 651 (9th Cir. 2009).

[59] *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008).

[60] *Cf. Weinberger v. Romero-Barcelo*, 456 U.S. 305, 312 (1982) ("The Court has repeatedly held that the basis for injunctive relief in the federal courts has always been irreparable injury and the inadequacy of legal remedies").

[61] *Id.* at 20; *Stormans, Inc. v. Selecky*, 586 F.3d 1109, 1127 (9th Cir. 2009).

[62] *Alliance for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1135 (9th Cir. 2011).

[63] *Leiva-Perez v. Holder*, 640 F.3d 962, 966 (9th Cir. 2011).

Case No.: 13-1081 PSG
ORDER

# III.    DISCUSSION

## A.    Likelihood of Success on the Merits

To prove a likelihood of success on the merits, a plaintiff need not prove its case to an absolute certainty – it only needs to show a reasonable probability, or at an "irreducible minimum," a "fair chance" of success on the merits.[64]  The burdens of proof at the preliminary injunction stage track the burdens that would apply at trial – the plaintiff must demonstrate that it is likely to succeed on its affirmative claims and the defendant must show that any affirmative defense it relies upon is likely to succeed.[65]  GSI contends that it is likely to succeed on both its breach of contract claims and unfair competition claim.

### 1.    Breach of Contract

Under Colorado law, breach of contract requires the plaintiff to prove (1) a contract exists, (2) the plaintiff performed or was justified in not performing, (3) the defendant failed to perform, (4) the plaintiff as a result suffered damages.[66]  There is no question that the 576 Mb Agreement was a valid contract that existed between GSI and UMI.  GSI argues that it performed its obligations under the Agreement until ProMos' financial hardship frustrated the purpose of the Agreement.[67]  GSI claims UMI breached the Agreement, causing GSI to lose Cisco's second Atris bid.  GSI argues that UMI breached three separate clauses of the Agreement: the Noncompete Clause, the Confidentiality Provision, and the IP Ownership Clause. The court examines the sufficiency of each theory in turn.

---

[64] *Pimentel v. Dreyfus,* 670 F.3d 1096, 1106 (9th Cir. 2012); *See also Berda v. Grand Lodge of IAM*, 584 F.2d 308, 315 (9th Cir. 1978).

[65] *Perfect 10, Inc. v. Amazon.com, Inc.*, 508 F.3d 1146, 1158 (9th Cir. 2007).

[66] *See W. Distrib. Co. v. Diodosio*, 841 P.2d 1053, 1058 (Colo. 1992).

[67] *See* Docket No. 82-1, Ex. I at 33:16-34:20, 88:21-89:5.

Case No.: 13-1081 PSG
ORDER

**a.     The Noncompete Clause**

GSI first asserts that UMI breached the Noncompete Clause in their contract, which provided that UMI would not compete against GSI in the relevant market for five years after the start date of the contract.  Competition was defined by the contract as any activity where UMI directly or indirectly, designs, develops, or contributes to an LLDRAM product, defined as "a latency optimized and/or address rate optimized memory product that employs a capacitive charge-based memory cell technology, including, but not limited to, RLDRAM and FCRAM products."[68] GSI asserts that UMI did so by assisting ISSI in developing the Atris chip for Cisco.

UMI challenges the enforceability of the noncompete provision.  Under Colorado law, covenants not to compete are void and prohibited unless they fit within a statutorily-enumerated exception:[69]

> (a) Any contract for the purchase or sale of a business or the assets of a business;
> (b) Any contract for the protection of trade secrets;
> (c) Any contractual provision providing for recovery of the expense of educating and training an employee who has served an employer for a period of less than two years;
> (d) Executive and management personnel and officers and employees who constitute professional staff to executive and management personnel.[70]

GSI argues that the contract fits under the second exception.  For this exception to apply, the purpose of the covenant not to compete must be for the protection of an actual trade secret.[71] Whether information constitutes a trade secret is a question of fact, and under Colorado law a trade secret is defined as "any scientific or technical information, design, process, procedure, formula… or other information relating to any business or profession" which is secret, of value, and subject to measures taken by the owner to prevent the secret from becoming available to people other than

---

[68] Docket No. 1, Ex. A., Art. III.6.

[69] *See Harvey Barnett, Inc. v. Shidler*, 143 F. Supp. 2d 1247, 1253 (D. Colo. 2001).

[70] Colo. Rev. Stat. Ann. § 8-2-113.

[71] *Nutting v. RAM Sw., Inc.*, 106 F. Supp. 2d 1121, 1126 (D. Colo. 2000).

Case No.: 13-1081 PSG
ORDER

those whom the owners allows to have limited access.[72]  Here, GSI merely asserts that the 576 Mb

Agreement's Noncompete Clause was for the purpose of protecting its "confidential information."

Confidential information of course may not rise to the level of trade secret, for example, if it holds

no value or if adequate protective measures were not taken.  However, because the parties' recitals

expressly identify the protection of trade secrets as a purpose of the Noncompete Clause,[73] the

court finds that GSI has made a sufficient showing that the Noncompete Clause was drafted for the

purpose of protecting legitimate trade secrets.

Even if the trade secret exception applies, the Noncompete Clause's protection must be

reasonable in duration and scope.[74]  Despite originally suggesting the relevant language, UMI takes

issue with the fact that the Noncompete Clause is five years in duration and is not limited to any

geographical area.[75]  GSI responds that there is at least a reasonable chance that a five-year,

geographically-unlimited covenant not to compete is reasonable given the sensitive nature of the

information and the broad market involved, especially in an age where business is often conducted

on the worldwide level.[76]  The court agrees.  Especially considering the sophistication of the

parties, which presumably would allow them to bargain over whether the Noncompete Clause was

reasonable, GSI has presented at least a reasonable likelihood that the Noncompete Clause is

---

[72] *Id.;* Colo. Rev. Stat. Ann. § 7-74-102.  Although GSI suggests that it does not need to show the trade secret actually meets the Colorado statute, its own cases suggest otherwise.  *See, e.g., Gold Messenger, Inc. v. McGuay,* 937 P.2d 907, 910 (1997) (considering whether the information intended to be covered by the covenant not to compete was a trade secret under the Colorado statute); *Energex Enterprises, Inc. v. Anthony Doors, Inc.*, 250 F. Supp. 2d 1278, 1282 (D. Colo. 2003) (same).

[73] *See* Docket No. 1, Ex. A at 1.

[74] *Harrison v. Albright*, 577 P.2d 302, 304 (Colo. Ct. App. 1977).

[75] *See id.* (affirming that five-year, 50-mile noncompete clause was reasonable).

[76] *Cf. Energex*, 250 F. Supp. 2d at 1283 (holding that ten-year noncompete provision which was limited geographically to all locations where competitor's product was sold was not presumptively reasonable).

13

Case No.: 13-1081 PSG
ORDER

enforceable under Colorado law.  Of course, additional facts may ultimately show the Noncompete Clause was nevertheless unreasonable – for example, if the clause would completely preclude UMI and its employees from engaging in its chosen trade[77] – but those facts are not before the court, and so it cannot and does not consider them here.

The parties next dispute whether Atris technically qualifies as an LLDRAM product under the Agreement.  UMI presents evidence that suggests Atris is not "latency optimized," and instead has a primary design emphasis on high bandwidth with random access and low power, with only a secondary emphasis on achieving low latency.[78]  Comparisons of technical specifications notwithstanding, the court finds convincing the overwhelming evidence that the parties involved in developing the Atris chip – Cisco, GSI, Renesas, and critically, UMI – all have characterized the chip as an LLDRAM product.[79]  For example, Renesas, the only current supplier of Atris, markets it as an LLDRAM product.[80]  This is enough to establish a reasonable probability that Atris qualifies as an LLDRAM product under the Agreement.

UMI counters that even if Atris is covered by the Noncompete Clause, the clause is no longer in effect because UMI terminated the Agreement at least as of July 20, 2009, when UMI sent its termination letter.  But this interpretation ignores several clauses in the contract which taken together establish the effective term of the Noncompete Clause.  The Noncompete Clause specifically states that it is in effect for "the term of the Agreement."[81]  The term of the Agreement is defined in Section VII.2 as five years from the effective date of the contract, or May 1, 2008.

---

[77] *See id.* (citing *Nutting*, 106 F. Supp. 2d at 1124) (considering as a main factor the agreement's effect "limit[ing] the defendant's ability to make a living at its chosen trade").

[78] *See* Docket No. 97-1 ¶ 10, Ex. C.

[79] *See* Docket No. 82-1, Ex. Q, AL, AM, AN.

[80] *See* Docket No. 97-1 ¶ 9, Ex. AL, Ex. BH at 16:6-23.

[81] Docket No. 1, Ex. A., Art. III.6.

Case No.: 13-1081 PSG
ORDER

Section VII.5 of the Agreement provides that the provisions of Article III (which includes the Noncompete Clause) "shall survive expiration or termination of this Agreement permanently." This does not mean that the Noncompete Clause itself would survive indefinitely, which might render the clause invalid[82] and would contradict the specified five-year term established in the Noncompete Clause itself.  The survival term instead merely indicates that UMI's noncompete obligations remain fixed at five years after execution of the Agreement, regardless of termination or expiration of the Agreement.

GSI also has established a reasonable likelihood that UMI breached the Noncompete Clause by aiding ISSI beginning in August 2012.  UMI helped pitch ISSI's bid for the project to Cisco. After ISSI received the bid, UMI offered to lend several of its employees to work at ISSI and directly develop Atris.  While the five employees working on the Atris chip are technically no longer UMI employees, the mere provision of these employees, given the circumstances, clearly aided in ISSI's development of Atris. ███████████████████████████ There also is some indication that UMI's Faue appears to still provide technical assistance on the Atris chip to those employees as well as ISSI.[83]  All this constitutes competition against GSI in the relevant field.

UMI argues finally that the statute of limitations bars this claim because GSI clearly knew that UMI was working with Cisco, starting from when GSI, UMI, and Cisco discussed the Atris chip in the 2008-2009 period.  While creative, UMI's argument mischaracterizes the law.  Where a contract contains a "continuing duty to perform," a new cause of action accrues for each breach,

---

[82] *See M.R. Mansfield Realty Inc. v. Sunshine,* 561 P.2d 342, 344 (Colo. App. 1976) (in choosing between two interpretations, a contract should be given the meaning that would make it valid and binding).

[83] *See* Docket No. 82-1, Ex. Y at 135:6-18; Ex. AY.

Case No.: 13-1081 PSG
ORDER

**United States District Court**
For the Northern District of California

with its own statute of limitations period.[84]  Obligations to refrain from competing in business constitute such a "continuing duty to perform."[85]  UMI's 2008-2009 discussion with GSI and Cisco on the Atris project as a possible sequel to the 576 Mb chip is distinct from UMI's 2012-2013 work supporting ISSI on its own Atris bid.  It is unreasonable to conflate the two for purposes of calculating the statute of limitations when GSI would have no reason to know of the second breach merely by knowing of the first.  The relevant statute of limitations therefore began to run in late 2012, when GSI began to suspect that UMI was working with ISSI.

In sum, although further discovery might show otherwise, for purposes of a preliminary injunction GSI has shown the requisite "fair chance" that UMI breached the Noncompete Clause of the 576 Agreement.

### b.     Confidentiality Provision

GSI also contends that UMI breached the Confidentiality Provision of the Agreement by creating ▇▇▇▇▇▇ the Atris database that UMI had previously developed in 2007-2009.  Relevant to this claim is UMI's motion to strike GSI's IP Ownership Clause theory because it was not disclosed in GSI's complaint.  Under the Federal Rules of Civil Procedure, if a party fails to provide information in its initial disclosures, the party cannot use that information at a hearing or trial unless the failure was substantially justified and is harmless.[86]  In its complaint, GSI did not allege that UMI breached the Confidentiality Provision.  However, in its initial brief for a Temporary Restraining Order and Preliminary Injunction,[87] GSI did claim that UMI misappropriated its confidential information, which gave UMI fair notice that it intended to make

---

[84] *Neuromonitoring Assoc. v. Centura Health Corp.* Case No. 11-CA-1391, 2012 WL 3518017, at *7 (Colo. Ct. App. Aug. 16, 2012).

[85] *Id.*, at *6 (citing 10 Arthur L. Corbin, *Corbin on Contracts* § 956 (interim ed. 2007)).

[86] Fed. R. Civ. P. 26 and 37; *Durand v. Stonehouse Court Associates, LLC*, 473 Fed. App'x 667, 669 (9th Cir. 2012).

[87] *See* Docket No. 9.

Case No.: 13-1081 PSG
ORDER

such a claim.  The fact that GSI did not name which clause was implicated by that argument until the present motion was filed does not mean that UMI was deprived of fair notice.  UMI's motion to strike this theory is therefore DENIED.[88]

Turning to the merits of this claim, the Confidentiality Provision protects "all non-public information" that is either designated as confidential, or which, under the circumstances of the disclosure, the receiving party would know or have reason to know that the disclosure is confidential.[89]  But GSI has not shown that any of the information contained in the Atris database ██████████ was considered confidential, either by designation or under the circumstances. GSI's theory is that when UMI developed the 576 Mb database for GSI, UMI received GSI's confidential information, and later UMI used that confidential information in creating the separate Atris database.

In support of its theory, GSI essentially argues that the Atris database was "highly leveraged" from the 576 Mb database, and so the court should conclude that some GSI confidential information had to have been misappropriated along the way.  But GSI never identifies or explains exactly what information UMI received from GSI that might be included in the database at issue, and whether that information was either labeled as confidential or treated as such.  Even though GSI has not yet had the chance to inspect the Atris database, it presumably would know what confidential information it transferred to UMI during the course of the parties' collaboration on the 576 Mb chip project.  Without any specific identification of at least this information, the court cannot presume that UMI violated the Confidentiality Provision.  If, for example, UMI merely

---

[88] For similar reasons, the motion to strike GSI's theory that the ██████████████ was a breach of the IP Ownership Provision also is DENIED.  In previous hearings, GSI alluded to misappropriation of its intellectual property and UMI's control and access to the Atris database. UMI's motion to strike Exhibit AF (email correspondence between GSI and ISSI) and the Murphy Declaration (additional evidence countering UMI's arguments) is DENIED because the nondisclosure does not appear intentional and was in the midst of expedited discovery leading up to this hearing.  In any event, UMI had a full opportunity to respond to these exhibits both at the hearing and in post-hearing briefing.

[89] Docket No. 1, Ex. A at Art. VI.1 (emphasis added).

17

Case No.: 13-1081 PSG
ORDER

leveraged publicly-known, standard features of chip architecture, that information would be part of the public domain and would not be confidential.  Indeed, the 576 Mb Agreement itself prohibits application of the confidentiality obligation where the information "was in the public domain at the time it was disclosed" or "was known to the receiving party at the time of disclosure absent an obligation of confidentiality."[90]  The provision thus cannot be a gag order on any information disclosed by GSI to UMI during the course of the 576 Mb Agreement.

The parties' previous dealings regarding the Atris database also provide little confidence at this point that the database contains confidential information.  When UMI sent GSI its termination letter, UMI specifically queried if GSI had passed on any confidential information to UMI during the course of the 576 Mb Agreement.  GSI did not respond.  Later, when UMI offered to sell GSI the Atris database, GSI did not tell UMI it was in breach of their Agreement.  GSI even acknowledged internally that the Atris database was owned by UMI, not GSI.  With no designation or indication from GSI that any of this information was confidential, how could UMI have reason to know that the database included confidential information?  GSI falls short on demonstrating a likelihood of success on this claim.

### c.     IP Ownership Clause

GSI next argues that UMI breached the IP Ownership Clause by ██████████████████ Similar to GSI's Confidentiality Provision Claim, GSI fails to identify exactly what intellectual property was misappropriated.  The IP Ownership Provision has three clauses, providing that GSI has sole ownership of the (1) deliverables of the 576 Mb Agreement, (2) the Product and all associated IP rights, excluding UMI's Project Patents, and (3) "all other works of authorship… and

---

[90] Docket No. 1, Ex. A., Art. VI.2.

Case No.: 13-1081 PSG
ORDER

other intellectual property rights conceived, developed, or reduced to practice by GSI, alone or with others, during the course of the Project."[91]

GSI has not shown how the Atris database includes information in any of these three categories. GSI again presents UMI communications indicating that the Atris database was "highly leveraged" from 576 Mb database.[92] Even if UMI used some information it also used in compiling the 576 Mb schematics, GSI completely fails to explain why that information is (1) a deliverable under the 576 Mb project, (2) otherwise protectable under GSI's copyright, trade secret, or patent rights and is not in the public domain, or (3) was developed by GSI, alone or with others, during the course of the project. As to the first category, Atris appears to be "orders of magnitude more complex" than the 576 Mb chip, and so does not appear to be a mere copy of the 576 Mb product.[93] As to the second category, GSI has done nothing to show this information is protectable under intellectual property rights. Can GSI prevent UMI from using its general skills, knowledge, and experience, even if learned from its work on the 576 Mb project, for an indefinite period? Mere overlap in standard chip architecture, if in the public domain, cannot be covered by GSI's rights under the provision. As to the third category, GSI has not established that it developed or contributed any information used in the Atris database.

Evidence provided by UMI supports its contention that the Atris database does not contain GSI's proprietary information. Equally convincing here as it was regarding the Confidentiality Provision is the fact that when UMI offered to sell the Atris database to GSI, GSI declined without objecting that the database contained GSI property, and further acknowledged that GSI "did not yet own those schematics…[which would] pass on to the new owners of UMI unless we secure

---

[91] *Id.* at Art. III.6.

[92] *See* Docket No. 97 at 8-10.

[93] Docket No. 109-1, Ex. AP at 207:7-20.

Case No.: 13-1081 PSG
ORDER

them."[94]  A blanket assertion that the Atris database probably was "highly leveraged" or "based"

on the 576 Mb chip database is not enough to satisfy GSI's burden of showing a reasonable

likelihood that UMI violated the IP Ownership Provision.

### 2.   Unfair Competition Claim

California's Unfair Competition Law ("UCL") provides that any person who engages in

unfair competition "may be enjoined in any court of competent jurisdiction."[95]  Unfair competition

is any practice whose harm to the victim outweighs any benefits.[96]  "Only when the act constituting

breach is unfair, unlawful, or fraudulent for some additional reason may that act also violate the

UCL."[97]  The entirety of GSI's claim boils down to a contention that while the parties were

negotiating the Agreement, UMI told GSI "trust me," which "lulled" GSI into a false relationship

of trust and sense of security.[98]  But making a representation of "trust me" is not enough to show

that UMI's breach of the Noncompete Clause was independently unfair, unlawful, or fraudulent in

some way.  Because GSI's UCL allegations and proof do not extend beyond what it used to prove

UMI breached the 576 Mb Agreement, GSI's unfair competition claim cannot be said to have the

"fair chance" of success needed to support the requested injunction.

### B.   Irreparable harm

To establish it has a right to a preliminary injunction, the plaintiff must demonstrate "a

significant threat of irreparable injury."[99]  When the plaintiff has shown it will suffer "substantial

---

[94] *See id.*, Ex. V, Z.

[95] Cal. Bus & Prof. Code § 17203.

[96] *Olsen v. Breeze, Inc.*, 48 Cal. App. 4th 608, 618 (1996).

[97] *Ford v. Lehman Bros. Bank, FSB*, Case No. 12-00842 CRB, 2012 WL 2343898, at *9 (N.D. Cal. June 20, 2012).

[98] *See* Docket No. 82.

[99] *Simula, Inc. v. Autoliv., Inc.*, 175 F.3d 716, 724 (9th Cir. 1999).

20

Case No.: 13-1081 PSG
ORDER

injury that is not accurately measurable or adequately compensable by money damages, irreparable is a natural sequel."[100]  GSI makes three claims that irreparable harm will ensue without a preliminary injunction: UMI will continue to aid others in unfairly competing against GSI, UMI will misappropriate GSI's proprietary information, and UMI will be unable to satisfy any monetary judgment rendered against it.  Because GSI has only shown it is likely to succeed on its breach of the Noncompete Clause claim, the court considers only the irreparable harm stemming from that breach.[101]

### 1.      Loss of Business Opportunity

GSI's repeatedly highlights that it lost a substantial business opportunity, Cisco's second Atris bid, due to UMI's breach of the Noncompete Clause.  GSI's theory is that but-for UMI's aid to ISSI, ISSI would not have received the Cisco Atris bid, and GSI would have.  UMI challenges the causation of GSI's theory, countering that Cisco chose ISSI for other reasons unrelated to UMI's aid.[102]  It does appear that other factors appear to have weighed into the award of the Atris bid which had more to do with GSI's own shortcomings rather than UMI's participation.  GSI therefore has not established that the irreparable harm it complains of was fairly traceable to UMI's actions.  What UMI's argument additionally makes clear, however, is that at this time, the court cannot impose equitable relief remedying what GSI argues is irreparable harm – the court cannot

---

[100] *Ross-Simons of Warwick, Inc. v. Baccarat, Inc.*, 102 F.3d 12, 18 (1st Cir. 1996).

[101] *See Developmental Servs. Network v. Douglas*, 666 F.3d 540, 544 (9th Cir. 2011) (holding that "if a plaintiff fails to show that he has some chance on the merits, that ends the matter").

[102] UMI points to a myriad of other possible reasons for Cisco's choosing ISSI over GSI: Cisco's statements that it chose ISSI because it wanted a "more established DRAM supplier" than GSI, that it did not feel comfortable with GSI's foundry, and that UMI's participation in ISSI's project "was not a significant discussion point" during the selection committee meeting.  *See, e.g.,*, Docket No. 102-1, Ex. R at 87:20-88:11; Ex. AG; Ex. G at 148:5-8, 239:8-25; Ex. F at 118:9-119:18, 126:2-15, 126:22-127:3, 127:8-17, 129:12-130:10.

Case No.: 13-1081 PSG
ORDER

require Cisco to reopen bidding and choose GSI as a supplier because Cisco is not a party to this

suit and has not been shown to have acted in concert with UMI.[103]

More importantly, GSI's argument focuses almost entirely on the past.  UMI's aid, in the

form of its provision of employees ███████████████, has already occurred.  Although

past harm may support a contention that there is a "threatened loss of a prospective customer" and

may support a finding of irreparable harm,[104] and a mere possibility of losing a customer may

qualify as irreparable harm,[105] movants must nonetheless identify a "specific threat of future

irreparable harm."[106]  GSI has not alleged any future business that it is likely to lose, but instead

focuses on the Cisco bid, which has already come and gone.[107]  As to potential future harm, by

GSI's own admission the Noncompete Clause expired on May 1, 2013.[108]  UMI and its employees

are now free to compete against GSI in the LLDRAM market.  If the court were to extend the

Noncompete Clause past its expiration at this juncture, it would run afoul of the well-established

---

[103] *See* Fed. R. Civ. P. 65(d)(2).  The fact that the court *See also* § 2948.1 Grounds for Granting or Denying a Preliminary Injunction—Irreparable Harm, 11A Fed. Prac. & Proc. Civ. § 2948.1 (2d ed.) ("only when the threatened harm would impair the court's ability to grant an effective remedy is there really a need for preliminary relief").

[104] *Stuhlbarg Intern. Sakes Co., v. John D. Brush and Co., Inc.*, 240 F.3d 832, 841 (9th Cir. 2001) (emphasis added).

[105] *See Richmond Technologies, Inc. v. Aumtech Bus. Solutions*, Case No. 11-CV-02460-LHK, 2011 WL 2607158, at *22 (N.D. Cal. July 1, 2011).

[106] *Villegas v. Schulteis*, Case No. 1:09-cv-00493-awi-sko pc, 2010 WL 3341888, *3 (E.D. Cal Aug. 25, 2010) (emphasis added).  *See also Winter*, 555 U.S. at 22 ("Issuing a preliminary injunction based only on a possibility of irreparable harm is inconsistent with our characterization of injunctive relief as an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief"); *City of Los Angeles v. Lyons*, 461 U.S. 95, 111 (1983) ("The equitable remedy is unavailable absent a showing of irreparable injury, a requirement that cannot be met where there is no showing of any real or immediate threat that the plaintiff will be wronged again—a 'likelihood of substantial and immediate irreparable injury'").

[107] *See Los Angeles Mem'l Coliseum Comm'n v. Nat'l Football League*, 634 F.2d 1197, 1201 (9th Cir. 1980) ("the party seeking such relief must demonstrate a significant threat of injury from an impending violation… or from a contemporary violation likely to continue or recur") (internal quotations omitted).

[108] *See* Docket No. 127 at 2.

22

Case No.: 13-1081 PSG
ORDER

United States District Court
For the Northern District of California

purpose of a preliminary injunctive relief, which is to prevent future irreparable harm before a final judgment on the merits can be made, not to remedy past harms.[109]  While courts have extended covenants not to compete past their expiration, they have done so in the context of permanent injunctions, not a preliminary injunction.[110]

### 2. Misappropriation of Confidential and Proprietary Information

GSI next argues that misappropriation of proprietary information can support a finding of irreparable harm.[111]  While this is correct, infringement or misappropriation of proprietary information alone does not create a presumption of irreparable harm.[112]  As previously noted, GSI has not made a satisfactory showing that UMI is likely to have disclosed confidential or proprietary information to others.  Accordingly, GSI also has failed to show that it will likely suffer irreparable harm from GSI's disclosure of confidential or proprietary information.[113]

---

[109] *See id.*; *Conte v. Transglobal Assets*, 2012 WL 4092717, at *2 (D. Nev. Sept. 17, 2012).

[110] *Atmel Corp. v. Vitesse Semiconductor Corp.*, 30 P.3d 789, 796 (Colo. App. 2001) (abrogated on other grounds) (reversing trial court's grant of preliminary injunction even though noncompete provision had expired because "injunctive relief based on a restrictive employment agreement must be co-extensive with the terms of the contract").  *Contrast Actuant Corp. v. Huffman*, Case No. CV-04-998-HU, 2005 WL 396610, at *18-25 (D. Or. Feb. 18, 2005) (where noncompete provision had not yet expired but defendant moved for summary judgment that plaintiff could not obtain a permanent injunction extending past expiration of the noncompete provision, ruling that the court had equitable powers to extend such a provision.  On plaintiff's concurrent motion for preliminary injunction, the court denied the motion pending a further hearing, finding that there were many disputes of material fact to resolve); *Presto-X-Co. v. Ewing*, 442 N.W.2d 85, 90 (Iowa 1989) (holding that a permanent injunction extending past expiration date of the covenant not to compete was warranted to accomplish "full and complete justice between the parties").

[111] *See TMX Funding, Inc. v. Impero Tech, Inc.*, Case No. C 10-00202 JF, 2010 WL 1028254, at *7 (N.D. Cal. Mar. 18, 2010).

[112] *See Flexible Lifeline Sys., Inc. v. Precision Lift, Inc.*, 654 F.3d 989, 994-95 (9th Cir. 2011) (proclaiming that after *eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388 (2006), and *Winter,* 55 U.S. 7, irreparable harm must be explained and cannot be presumed in a copyright infringement case upon a showing of a likelihood of success on the merits).

[113] *See Developmental Servs. Network,* 666 F.3d at 544.

Case No.: 13-1081 PSG
ORDER

United States District Court
For the Northern District of California

### 3.   Judgment-Proof Defendant

GSI also urges the court to find irreparable harm because "UMI appears to be judgment-proof."[114]  "A judgment-proof defendant is not deterred by the threat of money damages," and so injunctive relief may be necessary to prevent irreparable harm.[115]  But GSI provides nothing but pure speculation to support this point.  GSI states that UMI "appears to be experiencing its own financial crisis due to lack of business" based on vague statements by UMI's lead designer, but provides no concrete evidence of UMI's inability to satisfy a money damages award.[116]  In fact, considering UMI received ███████████████████████████████[117] the court is skeptical that UMI is in such impending financial turmoil as GSI would seem to imply.

## C.   Balancing of the Equities

This factor requires the court to weigh the degree of harm that the plaintiff will suffer if the preliminary injunction is improperly denied as compared to the harm that the defendant will suffer if the preliminary injunction is wrongfully issued.[118]  If the injunction is not issued, GSI has not shown that it will suffer any irreparable harm.  The lost Cisco bid was in the past and now cannot be remedied with injunctive relief.  Any relief must come in the form of future monetary damages or other appropriate, permanent relief.  While a calculation of monetary damages might not be perfect down to the cent, reasonable estimations can be made of what fees GSI would have received had it received the Cisco bid.

---

[114] Docket No. 82 at 19.

[115] *Lakeview Tech., Inc. v. Robinson*, 446 F.3d 655, 657 (7th Cir. 2006); *see also WPIX, Inc. v. ivi, Inc.*, 691 F.3d 275, 286 (2d Cir. 2012) *cert. denied,* 133 S. Ct. 1585 (U.S. 2013).

[116] Docket No. 82 at 19.

[117] UMI received $250,000 for the Atris database.  *See* Docket No. 82-1, Ex. E. at 220:6-21.

[118] *Winter*, 555 U.S. at 24, *Earth Island Inst. v. Carlton*, 626 F.3d 462, 475 (9th Cir. 2010).

Case No.: 13-1081 PSG
ORDER

**United States District Court**
For the Northern District of California

Turning to UMI's potential hardship, it is unquestionable that UMI will suffer significant harm if the preliminary injunction is improperly granted.  UMI also will not be able to fulfill its obligations to ISSI, which would result in a loss of fees, as well as a breach of contract and perhaps several lawsuits against it.

**D.     Public Interest**

Courts are hesitant to impose a preliminary injunction where it will harm the interests of the public or uninvolved third parties.[119]  A preliminary injunction restricting UMI will have more widespread effects on ISSI, Cisco, and the public.  Many, including Cisco and ISSI and others in the DRAM supply chain, have invested significantly in this product.  The public has a substantial interest in the continued development of the DRAM market.  Halting the Atris project now, after several uninvolved parties have invested significant resources, would almost certainly cause major disruption to the Atris chip's progress to market.  Without any guarantee that doing so will give GSI the relief it seeks (i.e., award of the Cisco bid), halting the Atris chip now would not be in the public interest.

Further, the public has significant interest against unreasonably restraining an employee from engaging in his or her chosen employment.[120]  While it not clear that the contract at issue would apply to UMI's employees, the preliminary injunction proposed by GSI would restrict at least the five former employees' ability to engage in their current employment.  Although the overarching GSI-UMI contract invokes Colorado law, the five UMI's employees reside and work

---

[119] *See, e.g., Xfire Inc. v. IGN Entm't Inc.*, Case No. 06-6475 SI, 2006 WL 2990203, at *3 (N.D. Cal. Oct. 19, 2006) (denying request for temporary restraining order because injunction would prevent sales of a software gaming product, negatively impacting third parties not involved in the litigation).

[120] *Cerberonics, Inc. v. Unemployment Ins. Appeals Bd.,* 152 Cal. App. 3d 172, 177, 199 Cal. Rptr. 292 (Ct. App. 1984).  *Cf.* Cal. Bus. & Prof. Code § 16600 ("Except as provided in this chapter, every contract by which anyone is restrained from engaging in a lawful profession, trade, or business of any kind is to that extent void").

25

Case No.: 13-1081 PSG
ORDER

in California.[121]  In such circumstances, California courts have sometimes found that California has a greater material interest in the dispute and have chosen to apply its own laws in protecting employees against unreasonable restraints of trade.[122]  California has a strong interest in promoting employee mobility and providing clear guidelines to employees as to what they can and cannot bring to their future jobs.[123]  The former UMI employees, who did personally sign any noncompete agreement, might be found to be unreasonably restrained should a preliminary injunction be granted without consideration of their participation.

## IV.    CONCLUSION

UMI's motions to strike Exhibit AF, argument and evidence supporting GSI's Confidentiality Provision and IP Ownership claims, and the Murphy declaration are DENIED. GSI's motion for preliminary injunction also is DENIED.  To address further management of discovery and other pretrial matters, the parties shall appear on September 24 at 10:00 AM.

IT IS SO ORDERED.

Dated:  August 21, 2013

_____
PAUL S. GREWAL
United States Magistrate Judge

---

[121] *Cf. Application Grp., Inc. v. Hunter Grp., Inc.*, 61 Cal. App. 4th 881, 897 (1998).

[122] *See id.* (applying Cal. Bus & Prof. Code § 16600 despite the fact that California employee was under a Maryland employment contract with Maryland company, reasoning that California had a materially greater interest in the dispute).

[123] Tait Graves, *Nonpublic Information and California Tort Law: A Proposal for Harmonizing California's Employee Mobility and Intellectual Property Regimes Under the Uniform Trade Secrets Act*, UCLA J. L. & Tech., Spring 2006, at 1, 16 ("From a broader public policy perspective, the results would be disastrous for Silicon Valley companies, all of which benefit from the use of nonsecret information to develop innovative technologies. Former employees would have difficulty deciding with certainty what information they could or could not use at the next job. The UTSA itself would be rendered meaningless, because plaintiffs would have no reason to follow its strict guidelines.").

Case No.: 13-1081 PSG
ORDER