1  JEFFREY M. SHOHET (Cal. Bar No. 067529)
   jeffrey.shohet@dlapiper.com
2  BROOKE KILLIAN KIM (Cal. Bar No. 239298)
   brooke.kim@dlapiper.com
3  KELLIN M. CHATFIELD (Cal. Bar No. 288389)
   kellin.chatfield@dlapiper.com
4  **DLA PIPER LLP (US)**
   401 B Street, Suite 1700
5  San Diego, CA  92101-4297
   Tel:  619.699.2700
6  Fax:  619.699.2701

7  RAJIV DHARNIDHARKA (Cal. Bar No. 234756)
   rajiv.dharnidharka@dlapiper.com
8  **DLA PIPER LLP (US)**
   2000 University Avenue
9  East Palo Alto, CA  94303-2214
   Tel:  650.833.2000
10 Fax:  650.833.2001

11 Attorneys for Plaintiff and Counter-Defendant
   GSI Technology, Inc.
12

13                    UNITED STATES DISTRICT COURT

14        NORTHERN DISTRICT OF CALIFORNIA, SAN JOSE DIVISION

15

16 GSI TECHNOLOGY, INC., a Delaware        CASE NO.  Civ. Action No. 13-CV-1081-PSG
   Corporation,
17                                          **PLAINTIFF'S OPPOSITION TO MOTION**
          Plaintiff and Counter-Defendant,  **FOR SUMMARY JUDGMENT OF**
18                                          **DEFENDANT UNITED MEMORIES, INC.**
          v.
19                                          Complaint: Filed March 8, 2013
   UNITED MEMORIES, INC., a Colorado
20 Corporation, and INTEGRATED             Courtroom:  5
   SILICON SOLUTION, INC., a Delaware      Judge: Hon. Paul S. Grewal
21 Corporation,                            Hearing Date: February 3, 2015
                                           Hearing Time: 10:00 a.m.
22        Defendants and Counter-Claimants.

23

24

25

26

27

28

# TABLE OF CONTENTS

**Page**

I. INTRODUCTION. ................................................................................................ 1

II. STATEMENT OF FACTS. ................................................................................ 3

III. LEGAL STANDARD. ....................................................................................... 4

IV. SCOPE OF THE TRADE SECRET DISPUTE. ................................................ 5

    A. GSI's Trade Secret Disclosure. .................................................................. 5

    B. Scope of the Disputed Trade Secrets. ........................................................ 6

V. ISSUES TO BE DECIDED. ............................................................................... 7

VI. GSI OWNS THE SCHEMATICS, LIBRARY, AND COMPILATION. ............ 7

    A. The Schematics Are Deliverables. ............................................................. 7

    B. A Question of Fact Exists As to Whether the Compilation and Library Are Deliverables. ............................................................................................. 8

    C. UMI's Definition of "Deliverables" Is Untenable. ................................. 10

    D. The Compilation, Schematics, and Library Are Intellectual Property Rights Associated With the Product. .................................................................... 11

VII. UMI'S ARGUMENTS ARE NOT SUPPORTED BY THE PLAIN MEANING OF THE AGREEMENT. .................................................................................. 12

    A. "Milestones" vs. "Deliverables" .............................................................. 12

    B. UMI Labelled the Schematics "Confidential." ....................................... 13

    C. Intellectual Property Rights and "GSI IP." ............................................. 14

    D. GSI's Non-Exclusive License to UMI Intellectual Property. ................. 15

    E. Obligation to Reject Deliverables. .......................................................... 17

VIII. GSI ADEQUATELY MAINTAINED THE SECRECY OF ITS TRADE SECRETS. ....................................................................................................... 17

IX. TO THE EXTENT ANY ISSUE OF FACT EXISTS, THE MOTION IS PREMATURE AND MUST BE DENIED UNDER RULE 56(D). .................... 21

X. COSTS AND FEES. ......................................................................................... 23

XI. CONCLUSION. ................................................................................................ 24

1

## TABLE OF AUTHORITIES

2

**Page**

3

4

**CASES**

5

*Anderson v. Liberty Lobby, Inc.*,
477 U.S. 248 (1986) ........................................................................................... 5

6

7

*Bedard v. Martin*,
100 P.3d 584 (Colo. App. 2004) ...................................................................... 23

8

*Brock v. Weidner*,
93 P.3d 576 ....................................................................................................... 23

9

10

*Celotex Corp. v. Catrett*,
477 U.S. 317 (1986) ........................................................................................... 5

11

*Computer Assocs. Intern., Inc. v. Am. Fundware, Inc.*,
831 F. Supp. 1516 (D. Colo. 1993) ........................................................... 18, 20

12

13

*Courtesy Temporary Serv., Inc. v. Camacho*,
222 Cal. App. 3d 1278 (1990) .......................................................................... 18

14

15

*Gemisys Corp. v. Phoenix Am., Inc.*,
186 F.R.D. 551 (N.D. Cal. 1999) ..................................................................... 19

16

17

*Hsu v. Abbara*,
9 Cal. 4th 863 (1995) ....................................................................................... 23

18

*In re Mark Anthony Constr., Inc.*,
886 F.2d 1101 (9th Cir. 1989) .......................................................................... 11

19

20

*Jensen v. Redevelopment Agency of Sandy City*,
998 F.2d 1550 (10th Cir. 1993) ........................................................................ 19

21

22

*MAI Sys. Corp. v. Peak Computer*,
991 F.2d 511 (9th Cir. 1993) ...................................................................... 18, 19

23

*Mattel, Inc. v. MGA Enter., Inc.*,
782 F. Supp. 2d 911 (C.D. Cal. 2011) ........................................................ 18, 20

24

25

*Mineral Deposits Ltd. v. Zigan*,
773 P.2d 606 (Colo. App. Ct. 1998) ................................................................ 18

26

*Morlife, Inc. v. Perry*,
56 Cal. App. 4th 1514 (1997) ...................................................................... 18, 19

27

28

1

## TABLE OF AUTHORITIES
### (continued)

2

Page

3

*Mueller v. Auker*,
   576 F.3d 979 (9th Cir. 2009) ................................................................. 5

4

*Network Telecomm., Inc. v. Boor-Crepean*,
   790 P.2d 901 (Colo. Ct. App. 1990) ...................................................... 17

5

6

*Nissan Fire & Marine Ins. Co. v. Fritz Cos.*,
   210 F.3d 1099 (9th Cir. 2000) ................................................................ 5

7

8

*Pegasus Fund, Inc. v. Laraneta*,
   617 F.2d 1335 (9th Cir. 1980) ................................................................ 5

9

10

*Port-a-Pour, Inc. v. Peak Innovations, Inc.*,
   __ F. Supp. 2d __, 2014 WL 2766775 (D. Colo. June 17, 2014) ........................................... 18

11

*Poseidon Dev., Inc. v. Woodland Lane Estates, LLC*,
   152 Cal. App. 4th 1106 (2007) ............................................................... 23

12

13

*PQ Labs, Inc. v. Yang Qi*,
   No. 12-0450 CA, 2014 WL 334453 (N.D. Cal., Jan. 29, 2014) ........................................... 18

14

15

*Religious Tech. Ctr. v. Netcom On-Line Comm'ncs Servs., Inc.*,
   923 F. Supp. 1231 (N.D. Cal. 1995) ...................................................... 17

16

*Rockwell Graphic Sys., Inc. v. DEV Indus., Inc.*,
   925 F.2d 174 (7th Cir. 1991) ................................................................. 21

17

18

*SBM Site Servs., LLC v. Garrett*,
   2011 WL 7563785 (D. Colo. June 13, 2011) .......................................... 18

19

*Sprint PCS Assets, L.L.C. v. City of Palos Verdes Estates*,
   583 F.3d 716 (9th Cir. 2009) .................................................................. 4

20

21

*State ex rel. Riley v. Lorillard Tobacco Co., Inc.*,
   1 So. 3d 1 (Ala. 2008) ......................................................................... 11

22

23

*Web Comm'cns Group, Inc. v. Gateway 2000, Inc.*,
   889 F. Supp. 316 (N.D. Ill. 1995) ..................................................... 19, 20

24

STATUTES

25

Cal. Civ. Code 1717(b) ........................................................................ 23

26

Cal. Civ. Code § 1636 .......................................................................... 14

27

Cal. Civ. Code § 1641 .......................................................................... 10

28

1

## TABLE OF AUTHORITIES
### (continued)

2
**Page**

3   Cal. Civ. Code § 3426.1(d) ........................................................................................... 17

4   **OTHER AUTHORITIES**

5   Fed. R. Civ. Proc. 56(a) .................................................................................................. 4

6   Fed. R. Civ. Proc. 56(d) ......................................................................................... passim

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1   Plaintiff GSI Technology, Inc. ("GSI") submits the following opposition to the summary

2   judgment motion of Defendant United Memories, Inc. ("UMI").

3   **I.     INTRODUCTION.**

4   GSI hired UMI to create a 576Mb low latency DRAM ("LLDRAM") memory chip, which

5   UMI delivered to GSI in a database, consisting of the chip layout, circuit schematics, and library,

6   among other items.  GSI paid UMI over $500,000 for this work, and became the owner of all

7   intellectual property in the chip and its component deliverables.  At the same time, GSI and UMI

8   intended to collaborate on a second related project, the so-called "Atris" memory chip.  While

9   still in partnership with GSI on the 576Mb and Atris chips, UMI copied schematics from the

10  576Mb database—which were owned by GSI—directly into the new Atris database.

11  When the parties' business relationship later became unworkable, UMI immediately and

12  secretly conceived a plan to take advantage of GSI's trade secrets.  UMI sent GSI a seemingly

13  innocuous letter purporting to confirm the end of the parties' business relationship.  ████████

14  ██████████████████████████████████████████████████████████

15  ████████████████████████████████████████████████████

16  ██████████████████████████████████████████████████████████

17  ████████████████████████████████

18  UMI now seeks to dodge liability for its blatant misappropriation by asserting a flawed

19  interpretation of the Agreement which parses intellectual property ownership in a manner

20  unsupported by the text of the Agreement and contrary to common sense.  The Agreement assigns

21  to GSI ownership of, among other things, the Product,[1] all deliverables, and all intellectual

22  property associated with the Product and deliverables.  It required UMI to "deliver" circuit

23  schematics and a layout, and other items, to GSI.  As "deliverables" under any reasonable

24  interpretation of the Agreement, GSI owns the trade secrets it paid UMI to create.

25  UMI now argues that the schematics are not "deliverables" under the Agreement, and

26  therefore, belong to UMI, but this position arose only after the initiation of litigation.  ████████

---

[1] The Product is defined in the Agreement as the design for a DRAM chip according to a certain specification, and ultimately became the 576Mb LLDRAM chip.  (Agreement, Kim Decl., Ex. A, at Recital C, 1.7.)

1 ████████████████████████████████████████████████████

2 ████████████████████████████████████████████████

3 ██████████████████████████████████████████████████████

4 ████████████████████████████████████████████████

5          In the face of these admissions made by UMI during the performance of the Agreement,

6 UMI identified no evidence supporting its post-litigation interpretation of the Agreement.  To the

7 extent the Court finds the Agreement ambiguous (GSI argues it is not ambiguous), or looks to

8 evidence to determine whether the trade secrets at issue in the litigation satisfy the definition of

9 "deliverables" or intellectual property associated with the Product, UMI cannot be entitled to

10 summary judgment because it failed to present any such evidence (and even if it could, such

11 evidence would do nothing more than create a disputed issue of material fact).

12          UMI also seeks a safe harbor from its misappropriation by attempting to blame GSI for

13 not maintaining the secrecy of its trade secrets.  GSI reasonably protected its trade secrets from

14 this type of disclosure:  It required UMI (the only outside party with access to the trade secrets) to

15 enter into a confidentiality agreement limiting UMI employee access to its trade secrets and

16 preventing subsequent disclosure.  It ensured the trade secrets were marked "confidential."

17 Although GSI believes its efforts were more than reasonable under the circumstances, if any

18 doubt exists, the question of whether GSI's efforts were sufficient is a question of fact that must

19 be presented to the jury.

20          Finally, to the extent the Court finds that GSI has been unable to present sufficient

21 evidence in support of its opposition, GSI requests that the motion be denied or deferred under

22 Federal Rule of Civil Procedure 56(d) for the purposes of conducting further discovery.

23          UMI cannot avoid liability with this smoke-and-mirrors motion.  The motion argues for an

24 unreasonable interpretation of the Agreement, and fails to identify any admissible evidence

25 supporting such an interpretation.  UMI is not entitled to judgment as a matter of law and,

26 therefore, the motion should be denied.

27 /////

28 /////

## II.    STATEMENT OF FACTS.

In January 2007, GSI approached UMI with a proposal to develop a second-generation LLDRAM chip, a memory chip with much of the functionality of a SRAM chip.  (Dkt. 82, Ex. A-C.)  The project ultimately became known as the "576Mb chip."  (Dkt. 82, Ex. A-C and D at 99:4-15.)  GSI, a leading designer and manufacturer of SRAM products, would serve as the memory chip manufacturing backhouse and contribute expertise in SRAM design.  (Agreement, Kim Decl., Ex. A, at Recital B; Deposition of David Chapman, Kim Decl., Ex. B, at 157:15-158:11; Deposition of Ramaa Iyer ("Iyer Depo."), Kim Decl., Ex. C, at 169:11-22.)  UMI, a freshman to the sophisticated architecture of LLDRAM chip design, would provide its DRAM design expertise and perform the initial design work, with GSI's guidance.  (Dkt. 82, Ex. E at 38:10-40:2; Agreement, Kim Decl., Ex. A, at Recitals A and C and II.1.1)

The Agreement delineates ownership of intellectual property associated with the project. The text of the relevant provision (the "Ownership Provision") states:

ARTICLE III: <u>Ownership</u>

III.1    **GSI shall have sole ownership of all <u>deliverables</u> and the Product, and all associated intellectual property rights (excluding solely any Project Patents[2] that UMI owns under the terms of Article IV)** and all other works of authorship, information fixed in any tangible medium of expression (whether or not protectable under copyright laws), inventions (whether or not protectable under patent laws), discoveries, designs, developments, suggestions, ideas, improvements, know-how, and other intellectual property rights conceived, developed or reduced to practice by GSI, alone or with others, during the course of the Project (**collectively, the "GSI IP"**)  **This includes, <u>without limitation, the following: the specification of the Product, the layout (database) of the Product, circuit simulations and/or HDL descriptions of the Product</u>.  UMI hereby irrevocably transfers, conveys and assigns to GSI all of its right, title and interest in and to all GSI IP**. UMI will execute such documents, render such assistance, and take such other action as GSI may reasonably request, at GSI's reasonable expense, to apply for, register, perfect, confirm and protect GSI's rights to the GSI IP. **UMI hereby grants to GSI, under all of UMI's intellectual property rights, a worldwide, non-exclusive, perpetual, irrevocable, fully paid, royalty-free, transferable license, under all UMI's intellectual property rights (including, without limitation, any Project Patents) to** (a) make, have made, use, offer for sale, sell, have sold and import products and to practice any methods, and (b) use, reproduce, modify, distribute, perform, display, create derivative works of, offer for sale, sell, have sold, import, make, have made and otherwise fully exploit any and all intellectual property **that has been created,**

---

[2] "Project Patents" refers to inventions a UMI engineer alone makes in the course of performance of UMI's development obligations under the Agreement.  (Agreement, Kim Decl., Ex. A, at IV.1.)

**conceived, developed, reduce to practice, licensed, or otherwise acquired by UMI <u>prior to the execution of, or independent from, this Agreement</u> that is incorporated by UMI into the Product or other deliverables owned by GSI hereunder** in any manner and through any medium, whether known or to become known. GSI shall also have the right to sublicense the foregoing rights and licenses granted herein through multiple tiers.

(Agreement, Kim Decl., Ex. A, at III.1 (emphasis added).)

Under the Agreement, ownership of intellectual property defaults to GSI, which owns (a) all deliverables; (b) the design for the 576Mb product; (c) all intellectual property rights associated with the deliverables and the design for the 576Mb product; and (d) all intellectual property rights conceived, developed, or reduced to practice by GSI alone or with others during the course of the project.  (*Id.*)  The Agreement also grants GSI a license to all intellectual property created or acquired by UMI prior to the execution of, or independent from, the Agreement (as well as patentable inventions created solely by UMI in the course of the project) and which are incorporated by UMI into the Product or other deliverables.  (*Id.* at III.1, IV.1.)

█████████████████████████████████████████████████████████████

█████████████████████████████████████████████████████████

████████████  (*See, e.g.*, UMI_0001784-85 and UMI_0012116, Kim Decl., Exs. D and E.)  UMI subsequently wholesale copied schematics directly from the 576Mb chip database into the database for the Atris chip UMI and GSI had agreed to co-develop.  Although GSI was unaware of UMI's misconduct until years later, the GSI—UMI business relationship broke down for other reasons in mid-2009.  (*See* Dkt. 1, Exhibit B.)  █████████████████████████

█████████████████████████████████████████████████████████████

█████████████████████████████████████████████████████████

██████████

## III.   LEGAL STANDARD.

Summary judgment is appropriate only if there is "no genuine issue as to any material fact and [] the moving party is entitled to judgment as a matter of law."  Fed. R. Civ. Proc. 56(a); *see also Sprint PCS Assets, L.L.C. v. City of Palos Verdes Estates*, 583 F.3d 716, 720 (9th Cir. 2009).

/////

1   The moving party bears the burden of establishing that there are no genuine factual issues.

2   *Pegasus Fund, Inc. v. Laraneta*, 617 F.2d 1335, 1339 (9th Cir. 1980).

3   Where the movant does not have the ultimate burden of proof at trial, it must produce

4   evidence that negates an essential element of the non-moving party's claims, or must show that

5   the non-moving party does not have enough evidence of an essential element to carry its ultimate

6   burden of persuasion at trial.  *Nissan Fire & Marine Ins. Co. v. Fritz Cos.*, 210 F.3d 1099, 1102

7   (9th Cir. 2000).  The moving party must identify those portions of the pleadings, depositions,

8   discovery responses, and affidavits which demonstrate the absence of a genuine issue of material

9   fact.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  "The evidence of the nonmovant is to

10  be believed, and all justified inferences are to be drawn in his favor."  *Anderson v. Liberty Lobby,*

11  *Inc.*, 477 U.S. 248, 255 (1986); *see also Mueller v. Auker*, 576 F.3d 979, 991 (9th Cir. 2009).  "If

12  reasonable minds could differ as to the import of the evidence," summary judgment must be

13  denied.  *Anderson*, 477 U.S. at 250-51.

14  **IV.      SCOPE OF THE TRADE SECRET DISPUTE.**

15  At the outset, to reduce confusion, it is necessary to outline the trade secrets identified by

16  GSI and identify the trade secrets regarding which UMI disputes ownership.

17  **A.      GSI's Trade Secret Disclosure.**

18  GSI has identified two sets of trade secrets in this litigation relating to the 576Mb chip and

19  the Atris chip, respectively.  UMI seeks summary judgment solely with respect to the 576Mb

20  trade secrets.[3]  (Dkt. 321 at 1.)

21  GSI defined the 576Mb trade secrets as the chip layout, library, and schematics of the

22  576Mb chip, specifically including the following five trade secrets (and their individual

23  components identified by Bates range as ordered):

24         •  Coherent Register "write" phase design;

25         •  Output Impedance Calibration design;

26         •  Boundary scan design;

27  [3] ISSI seeks to join UMI's summary judgment motion.  (Dkt. 333.)  If summary judgment is
granted, the trade secret claim still stands as to ISSI as this motion does not address the Atris
28  Trade Secrets, which are asserted against ISSI.  (*See* Dkt. 188-2, 44-4.)

1      •   Reduced latency design; and

2      •   Broadside column address design.

3 (GSI's Supplemental Trade Secret Disclosure, Kim Decl., Ex. F, at 1-5.)  GSI also identified the

4 complete collection of the layout, library, and schematic database, as delivered by UMI to GSI on

5 June 9, 2009, as a compilation trade secret (the "Compilation").[4]  (*Id.*)

6        Thus, GSI claims trade secret rights in the *compilation* of the information UMI delivered

7 to GSI as the complete set of information necessary to develop the 576Mb chip (and thus, UMI,

8 not GSI, is responsible for the "nonsensical" way in which the Compilation trade secret was

9 delivered, *see* MSJ at 14), as well as certain of the individual components of the Compilation—

10 i.e., the chip layout, library, and certain schematics relating to the coherency register design,

11 output impedance calibration design, boundary scan design, reduced latency design, and

12 broadside column address design.[5]  (*Id.*)

13      **B.**     **Scope of the Disputed Trade Secrets.**

14        Although unclear, GSI understands UMI's position with respect to each of the trade

15 secrets to be as follows:

16      •   <u>Compilation</u>.  UMI objects to GSI's ownership of the compilation, calling it a

17          "land grab" of the included materials.  (MSJ, at 19.)

18      •   <u>Chip Layout</u>.  UMI does not take issue with GSI's ownership of the 576Mb chip

19          layout.  (MSJ, at 6, 16.)

20      •   <u>Schematics and Library</u>.  UMI contends the schematics and library were not

21          deliverables under the Agreement, and therefore belong to UMI, not GSI.

22        As UMI does not take issue with GSI's ownership of the chip layout, the motion must be

23 denied with respect to that portion of the claim.

24 [4] UMI attacks GSI's disclosure because it includes UMI's internal emails.  But that is how the database was delivered to GSI.  Those emails were included by UMI presumably because they

25 discuss the implementation of the design which is reflected in the 576Mb chip.  In other words, they reflect information which UMI believed important to the 576Mb design.

26 [5] Enlightened by recent discovery, GSI is in the process of a significant trade secret analysis with the intent of narrowing the trade secrets at issue, and has communicated the same to Defendants.

27 (Email from Rajiv Dharnidharka to Constance Ramos, *et al.*, Declaration of Rajiv Dharnidharka ("Dharnidharka Decl."), Ex. 1; *see also* Dharnidharka Decl., ¶ 4).  GSI believes portions of this

28 motion will be mooted by GSI's analysis and revised disclosure.  (*Id.*)

GSI addresses UMI's arguments relating to the Compilation, schematics, and library below.  For the purposes of this motion only, the Compilation, schematics, and library shall be referred to as the "576 Trade Secrets."

**V.      ISSUES TO BE DECIDED.**

The issue to be decided is whether UMI is entitled to summary judgment on GSI's trade secret misappropriation claim (based solely on the 576Mb Trade Secrets) on the grounds that:

(1)      UMI claims GSI does not own the 576Mb Trade Secrets, but where the Agreement at issue expressly assigns ownership of those trade secrets to GSI; and

(2)      UMI claims GSI did not protect the 576Mb Trade Secrets, but where the design agreement contains substantial protections against disclosure, GSI relied on "confidential" markings on the trade secrets, and GSI took internal steps to protect against their disclosure.

Additionally, if the Court is unable to deny UMI's motion for summary judgment based on the evidence presented, a secondary issue is whether the motion should be denied or deferred under Federal Rule of Civil Procedure 56(d) because discovery is ongoing and facts essential to resolve the dispute are not presently available to GSI.

**VI.     GSI OWNS THE SCHEMATICS, LIBRARY, AND COMPILATION.**

GSI purchased each of the 576Mb Trade Secrets from UMI, and accordingly, the Agreement assigns ownership of each of the 576Mb Trade Secrets to GSI.  GSI is rightfully the owner of the schematics and the layout, and indeed, all deliverables relating to the 576Mb chip and associated intellectual property (except for certain patents not relevant here).

**A.      The Schematics Are Deliverables.**

No party disputes that GSI owns "all deliverables" and associated intellectual property rights under section III.1 of the Agreement.  (MSJ, at 6.)  Although "deliverables" is not a defined term, the Agreement does specify what UMI was obligated to "deliver" to GSI.  (Agreement, Kim Decl., Ex. A, at II.1.1(b).)  Specifically, the Agreement obligated UMI to timely "[d]eliver the items listed in Exhibit B."  (*Id*.)  The deliverables identified in Exhibit B include all circuit and HSPICE **schematics**.  (*Id.* at Exhibit B.)  As the schematics are "deliverables" under the Agreement, they are owned by GSI.  (*Id.* at II.1.1(b), III.1, and Exhibit B.)

1    To the extent any ambiguity in the Agreement exists as to whether schematics are

2  deliverables and reference to parol evidence is necessary to resolve such ambiguity, the

3  admissible evidence indicates that, prior to the initiation of litigation, UMI agreed that schematics

4  are "deliverables" under the Agreement:



12   Thus, the schematics are deliverables.  At a minimum UMI has not established that

13  schematics are not deliverables as an undisputed fact.

14   **B.    A Question of Fact Exists As to Whether the Compilation and Library Are**
      **Deliverables.**

15

16   Importantly, although schematics and other items are identified as "deliverables" under

17  the Agreement, "deliverables" is not defined in the Agreement and nothing in the Agreement

18  otherwise limits the definition of "deliverables."  (*Id*., *passim*.)  A common sense interpretation of

19  "deliverables" includes everything the performing party created and delivered to the receiving

20  party under a contract, excluding anything contractually reserved by the performing party as its

21  own property.

22   For items not specifically identified as a deliverable in the Agreement, a question of fact

23  arises as to whether such items are or are not a "deliverable."  UMI presents no admissible

24  *evidence* that the Compilation and library fall outside the definition of "deliverable."

25  /////

26  ───────────────
    [6] Significantly, the list of deliverables in the presentation closely follows the deliverables
    identified in Exhibit B, confirming the parties' understanding that the term "deliverables" under
27  the Agreement incorporates all items listed in Exhibit B, including schematics.  (*Compare*
    UMI_0001159-80, Kim Decl., Ex. G, at UMI_0001178 *and* Agreement, Kim Decl., Ex. A, at
28  Exhibit B.)

1    To the contrary, the available evidence supports GSI's contention that the Compilation

2    and library are "deliverables."  GSI submits that the question of whether an item is an

3    "deliverable" should be informed by (1) whether the Agreement expressly or tacitly required UMI

4    to deliver the item to GSI, (2) whether UMI actually delivered the item to GSI, (3) whether the

5    item is similar to other "deliverables" named in the Agreement, and (4) whether the item is one

6    for which the Agreement gives GSI only a non-exclusive license (i.e., Project Patents or

7    intellectual property that UMI created, conceived, developed, reduced to practice, licensed or

8    acquired "prior to the execution of, or independent from" the Agreement).

9    ████████████████████████████████████████████████████████

10   ████████████████████████████████████████████████████████

11   ████████████████████████████████████████████████████████

12   ████████████████████████████████████████████████

13   ████████████████████████████████████████████████████████

14   ████████████████████████████████████████████████████████

15   ████████████████████████████████████████  GSI owns the individual

16   deliverables under the Agreement, and therefore, also owns the deliverables collectively.  The

17   Compilation is, as a whole, the work product GSI hired UMI to complete.  (Agreement, Kim

18   Decl., Ex. A, at II.1.1 and Exhibit B.)  It is the very thing for which GSI paid UMI.  (*See id.*)

19   ████████████████████████████████████████████████████████

20   ████████████████████████████████████████████████

21   █████████████████████████████████████████  Nowhere does the

22   Agreement reserve for UMI any intellectual property rights in the Compilation as a whole.

23   (Agreement, Kim Decl., Ex. A, *passim* and III.1 (reserving UMI's intellectual property rights

24   with respect only to Project Patents and intellectual property developed prior to or independent of

25   the Agreement).)

26   The 576Mb library is also a deliverable.  UMI actually delivered the library to GSI, as

27   necessary for GSI's continued production of the 576Mb chip.  (Declaration of Paul Chiang, ¶¶ 5-

28   9.)  The library is included in the layout database, which GSI owns under the Agreement.  (*Id.* at

¶ 7; Agreement, Kim Decl., Ex. A, at III.1.)  Nothing in the Agreement specifically reserves for UMI ownership in the library, nor has UMI presented evidence that the library was developed prior to or independent of the Agreement.  (Agreement, Kim Decl., Ex. A, *passim*; MSJ, *passim*.) Thus, the available admissible evidence indicates that GSI owns all intellectual property rights associated with the library.

In contrast to this evidence supporting GSI's contention that the Agreement assigns ownership of the Compilation and library to GSI, UMI presents no evidence that it owns either. (MSJ, *passim*.)  UMI has not identified any portion of the Compilation or library which constitute a Project Patent or which UMI acquired prior to or independent of the Agreement.  (*Id.*) Although GSI contends the evidence cited provides sufficient basis on which to conclude that GSI owns the Compilation and library, to the extent any doubt exists, UMI has not presented any evidence establishing that GSI cannot, as a matter of law, prove ownership.  (*Id.*)  UMI fails to meet its burden on summary judgment.  At best, a disputed issue of material fact exists as to whether the Compilation and library are "deliverables" under the Agreement.

### C.    UMI's Definition of "Deliverables" Is Untenable.

To circumvent the language of the Agreement, UMI creates a self-serving definition of "deliverable" not supported by the Agreement.  UMI argues that the "deliverables" under the Agreement are limited to those specifically listed in the Ownership Provision:

> GSI shall have sole ownership of …  This includes, <u>without limitation</u>, the following: the specification of the Product, the layout (database) of the Product, circuit simulations and/or HDL descriptions of the Product.

(*Id.* at III.1.)  However, nothing in the Agreement indicates that the list to which UMI points is a list of "deliverables," much less an *exclusive* list.  In fact, in the context of the paragraph, the list actually refers to items over which GSI has "sole ownership."

More importantly, as noted above, the list is expressly *non-exhaustive*:  "This [GSI IP] includes, **without limitation**… ."  (*Id.* at III.1.)  UMI's suggestion that this list defines the only "deliverables" under the Agreement renders the "without limitation" language meaningless, in violation of traditional canons of construction.  Cal. Civ. Code § 1641.  Indeed, that the contract expressly declares the list *non-exhaustive* by definition means that all items similar to the listed

DLA PIPER LLP (US)
EAST PALO ALTO

WEST\253919384.2

1  items are implicitly included.  *See In re Mark Anthony Constr., Inc.*, 886 F.2d 1101, 1106 (9th

2  Cir. 1989) (in construing a statute, the word "include" generally implies that the terms listed are

3  an *inexhaustive* list of examples); *State ex rel. Riley v. Lorillard Tobacco Co., Inc.*, 1 So. 3d 1

4  (Ala. 2008) (applying *In re Mark Anthony* in a contractual setting).  Thus, UMI's reliance on the

5  list of ownership items as defining the sole deliverables under the Agreement is misplaced.

6  **D.  The Compilation, Schematics, and Library Are Intellectual Property Rights**
   **Associated With the Product.**

7

8  Finally, that GSI owns the 576Mb Trade Secrets is clear under an additional provision in

9  the Agreement.  No party disputes that GSI owns all intellectual property rights, "excluding

10  solely any Project Patents," associated with the Product as a whole.  (MSJ, at 6.)  The "Product"

11  refers to a DRAM chip developed pursuant to the designated specification.  (Agreement, Kim

12  Decl., Ex. A, Recital C.)  Because the trade secret rights "associated" with a product cannot refer

13  merely to the product itself (which is not, as a whole, subject to trade secret protection), it must

14  refer to the information, methods, techniques, or processes used to create the product.[7]

15  Ownership of the 576 Trade Secrets, including the Compilation, schematics, and library

16  used to create the chip, rightfully belong to GSI under the Agreement.

17  *  *  *

18  GSI owns all deliverables and the Product under the Agreement.  UMI presents no

19  evidence that the 576Mb Trade Secrets are not "deliverables" or intellectual property associated

20  with the Product or deliverables; rather, it relies solely on the contention, unsupported by the

21  Agreement, that the 576Mb Trade Secrets could never be deliverables or intellectual property

22  associated with the Product.  As GSI points out, that is simply not true.  Moreover, to the extent

23  the Court has any doubt as to the meaning of "deliverables" or "Product," or whether the trade

24  _____

25  [7] Trade secret protection necessarily attaches to the designs and processes used to create the
   product, and not merely the product itself.  Trade secret protection cannot attach to a product as a
   whole where the parties contemplate sale of the product to the public.  Any different
26  interpretation of the Agreement is illogical:  If trade secret protection did not attach to the design
   and processes used to create the product, and UMI retained ownership of such designs and
27  processes, then Article IV of the Agreement—which preserves for UMI the right to patent
   inventions made in the course of the design—would be rendered unnecessary.  If UMI owned the
28  designs and processes, UMI could patent them without express authorization in the Agreement.

1  secrets are deliverables or Product (or intellectual property associated with the same), a question

2  of material fact exists.  ████████████████████████████████████████████

3  ███████████████████████████████████████████████████████████████████

4  ████████████████████████████████████████████████████

5  ███████████████████████████████  Thus, to the extent the Court finds the

6  Agreement ambiguous, the Court should deny summary judgment on the grounds that UMI has

7  not met its burden of establishing an absence of evidence with respect to a material fact.

8  **VII.    UMI'S ARGUMENTS ARE NOT SUPPORTED BY THE PLAIN MEANING OF**
   **THE AGREEMENT.**

9

10  UMI advances five arguments disputing GSI's ownership rights, none of which are

11  congruent with the plain language of the Agreement.

12  **A.    "Milestones" vs. "Deliverables"**

13  UMI first argues that, despite being listed in Exhibit B, schematics are "milestones," and

14  not deliverables.  The consideration UMI promised in Article II.1.1 was to "deliver" all items

15  listed in Exhibit B "on our before the milestone dates indicated."  (Agreement, Kim Decl., Ex. A,

16  at II.1.1(b).)  The relevant portion of Exhibit B appears as follows:

17  **EXHIBIT B**

18  **PROJECT MILESTONES**

19

| Project Milestone | Date | Payment |
|---|---|---|
| 1. Signing of Contract | May. 01, 2008 | $75K |
| 2. Preliminary Design Review | July 15, 2008 | $100K |
| Chip Architecture Defined | | |
| Chip Floor Plan | | |
| 1st Pass Design of Critical Path Circuits | | |
| 1st Pass Critical Path Simulation Results | | |
| Layout of Some Critical Blocks (Sense Amps, Row Decoder) | | |
| Chip Size Estimate | | |
| Preliminary Testing Plan | | |
| 3. Tape Out of Database | Oct. 15, 2008 | $150K |
| All Circuit Schematics | | |
| HSPICE Schematics and Parasitics | | |
| LVS Hierarchy | | |
| HSPICE Hierarchy | | |
| Signal/Circuit Matrix | | |
| Pad Locations | | |
| Fuse Locations | | |
| Full Simulation Files | | |

1   (*Id.*, Exhibit B (emphasis added).)  The plain reading of Article II.1.1 and Exhibit B requires UMI

2   to deliver by the "Tape Out of Database" milestone date (tentatively, October 15, 2008), all of the

3   items listed below that milestone, including all schematics.  (*Id.* at II.1.1(b) and Exhibit B.)  The

4   milestone is tape-out, but the items listed under the milestone title are the items to be delivered, or

5   the "deliverables."  (*Id.*) ███████████████████████████████████████████████

6   ████████████████████████████████████████████████████████████████████████

7   ██████████████████████████████████████████████

8       **B.      UMI Labelled the Schematics "Confidential."**

9           UMI next points to the fact that the schematics it delivered to GSI were marked as

10  "United Memories, Inc. Confidential" (as opposed to "GSI Confidential") as further support that

11  it owned the schematics.  (MSJ, at 17.)  A label placed on property is not determinative of title to

12  the property.  The Agreement—not the label—determines title.

13          Moreover, in the circumstances of this case, it was perfectly reasonable for GSI not to

14  question the exact text of the confidential designation on its trade secrets, so long as UMI

15  included a label.  As a practical matter, UMI generated the 576Mb Trade Secrets, and therefore,

16  had the first opportunity to label them.  (Agreement, Kim Decl., Ex. A; Deposition of Didier

17  Lasserre, Kim Decl., Ex. I, at 246:22-248:20; Chiang Decl., ¶ 11.)  At the time the 576Mb

18  deliverables were transferred to GSI, UMI and GSI were not adversaries, but were engaged in a

19  mutual business partnership, a partnership in which UMI was not only contractually obligated to

20  protect GSI's interest, but had a business motivation to do so.  (*Compare* Deposition of Lee-Lean

21  Shu, Kim Decl., Ex. J, at 88:20-90:8 *and* Deposition of David Chapman, Kim Decl., Ex. B, at

22  268:16-24 *and* Dkt. 1, Exhibit B *with* UMI_0001784-85, Kim Decl., Ex. D *and* UMI_0012116,

23  Kim Decl., Ex. E; *see also* Chiang Decl., ¶ 6.)  GSI's ownership interests were protected by the

24  Agreement.  (Agreement, Kim Decl., Ex. A, at III.1.) ████████████████████████

25  ████████████████████████████████████████████████████████████████████████

26  ██████████████████████████████████████████  Thus, when

27  UMI labelled GSI's trade secrets as "UMI Confidential," rather than "GSI Confidential," GSI had

28  no reason to believe that UMI's actions were anything other than routine practice, and certainly

WEST\253919384.2

1   could not have anticipated UMI would argue for a change in ownership on that basis.[8]  (Chiang

2   Decl., ¶¶ 12-14.)

3         **C.**     **Intellectual Property Rights and "GSI IP."**

4         UMI contends that, even if GSI owns the schematics underlying the 576Mb chip layout, it

5   does not own the intellectual property incorporated into the schematics.  UMI reasons that the

6   intellectual property "assignment" of the Ownership Provision applies only to GSI IP, which in

7   turn UMI argues does not encompass the schematics.  (MSJ, at 17.)  UMI's argument is wrong

8   for two reasons.  First, the Agreement expressly assigns to GSI all intellectual property associated

9   not only with GSI IP, but also with the deliverables (including the 576Mb Trade Secrets):  "GSI

10  shall have sole ownership of all deliverables and the Product, and **all associated intellectual**

11  **property rights** (excluding solely any Project Patents UMI owns under the terms of Article

12  IV)… ."  (*Id.*)  Said another way, GSI owns all intellectual property rights, including trade

13  secrets, associated with the deliverables and the Product.[9]  (*Id.*)

14        Second, "GSI IP" is not limited, as UMI suggests (*see* MSJ, at 15 n.12), to merely

15  intellectual property conceived, developed, or reduced to practice by GSI.  The relevant portion of

16  the provision reads:

> 17 GSI shall have sole ownership of all deliverables and the Product, and all associated
> 18 intellectual property rights (excluding solely any Project Patents that UMI owns
> under the terms of Article IV) and all other works of authorship, information fixed
> 19 in any tangible medium of expression (whether or not protectable under copyright
> laws), inventions (whether or not protectable under patent laws), discoveries,
> 20 designs, developments, suggestions, ideas, improvements, know-how, and other
> intellectual property rights conceived, developed or reduced to practice by GSI,
> 21 alone or with others, during the course of the Project (**collectively, the "GSI IP"**)
> …UMI hereby irrevocably transfers, conveys and assigns to GSI all of its right, title
> 22 and interest in and to all GSI IP.

23  /////

---

[8] At most, UMI's labelling of the schematics as "United Memories, Inc. Confidential" might be
25  relevant to UMI's state of mind regarding ownership of the schematics.  But where a contract is
unambiguous, its plain meaning governs.  Cal. Civ. Code § 1636.  To the extent UMI argues that
26  the contract is ambiguous, future discovery (which will likely include the depositions of the
parties and their respective executives) is necessary to ascertain the parties' respective intents in
27  entering into the Agreement.
[9] That GSI has admitted that UMI created the schematics has no bearing on who owns the
28  schematics, as suggested by UMI.  (MSJ, at 18.)  Ownership is determined by the Agreement.

1   (Agreement, Kim Decl., Ex. A, at III.1 (emphasis added).)  "GSI IP" does not include merely the

2   last category in the list ("and other intellectual property rights conceived, developed or reduced to

3   practice by GSI, alone or with others, during the course of the Project"), but all of the property

4   owned by GSI, including all deliverables and the Product, and all associated IP rights.  (*Id.*)  UMI

5   provides no reason for its arbitrary inclusion of only the last category of intellectual property in

6   the definition of "GSI IP."  "Collectively" is a term of inclusion, not exclusion, and by default,

7   should include all items in a list unless expressly excluded, which is not the case here.[10]

8         Thus, GSI owns the intellectual property underlying the 576Mb Trade Secrets because it

9   has "sole ownership" over all intellectual property associated with the deliverables and Product,

10  and for the additional reason that UMI assigned any intellectual property rights in the GSI IP,

11  which includes the 576Mb Trade Secrets, to GSI.  (*Id*. at III.1.)

12        **D.     GSI's Non-Exclusive License to UMI Intellectual Property.**

13        UMI argues that GSI merely had a non-exclusive license to the schematics at issue, and

14  hyperbolizes that any interpretation of the Agreement which assigns ownership of the schematics

15  to GSI (as the plain language does) amounts to a "catch-all" assignment of *all* of UMI's know-

16  how and non-public information to GSI.  To the contrary, the Agreement strikes a fair balance,

17  granting ownership of the schematics and certain deliverables (and associated intellectual

18  property rights) created at GSI's expense to GSI, but expressly (and only) preserving for UMI its

19  pre-existing intellectual property, intellectual property developed independent of the Agreement,

20  and Project Patents.

21  /////

22  
23  [10] Indeed, other references in the Agreement implicitly interpret "GSI IP" broadly.  For example, in Article III.2, UMI agrees to waive all moral rights (such as the right of identification of authorship) to all GSI IP and derivatives.  (*Id.* at III.2.)  The Agreement would not require UMI to waive moral rights in ideas generated by GSI during the course of the project, but fail to require UMI to waive moral rights with respect to the product itself.  It does not make business sense for GSI to protect itself with respect to tangential intellectual property conceived during the course of the project but fail to protect itself with respect to the project at the heart of the Agreement.  If the parties intended "GSI IP" to be as narrowly read as UMI suggests, the Agreement would have some other reference to moral rights with respect to the project and the deliverables, but there is not.  Further, Article III.3 refers to "the GSI IP assigned to GSI in Section 3.1 above"—another broad reference to "GSI IP" as including all intellectual property assigned by virtue of Section 3.1.

1    After describing GSI's ownership of the project and all deliverables (including the

2    schematics described in Exhibit B), the Agreement provides:

> UMI hereby grants to GSI, under all of UMI's intellectual property rights, a
> worldwide, non-exclusive, perpetual, irrevocable, fully paid, royalty-free,
> transferable license, under all UMI's intellectual property rights (**including,
> without limitation, any Project Patents**) to (a) make, have made, use, offer for
> sale, sell, have sold and import products and to practice any methods, and (b) use,
> reproduce, modify, distribute, perform, display, create derivative works of, offer
> for sale, sell, have sold, import, make, have made and otherwise fully exploit any
> and all intellectual property that has been created, conceived, developed, reduce to
> practice, licensed, or **otherwise acquired by UMI prior to the execution of, or
> independent from, this Agreement** that is incorporated by UMI into the Product
> or other deliverables owned by GSI hereunder in any manner and through any
> medium, whether known or to become known.  GSI shall also have the right to
> sublicense the foregoing rights and licenses granted herein through multiple tiers.

10   (Agreement, Kim Decl., Ex. A, at III.1.)

11   Nowhere does Article III.1 include schematics, Compilation, or library in the list of items

12   to which GSI merely has a non-exclusive license; and in fact, Article II.1.1(b) and Exhibit E

13   identify schematics as a "deliverable" owned by GSI.  (*See id.*)

14   Instead, by virtue of Article III.1, GSI's non-exclusive license attaches to intellectual

15   property UMI contributed to the Product or deliverables and which was developed (1) prior to the

16   execution of the Agreement; or (2) independent from the Agreement.  (*Id.*)  Additionally, under

17   Articles III.1 and IV, GSI is entitled to a non-exclusive license to any patentable inventions

18   developed solely by UMI in the course of the project.  (*Id.* at III.1 and IV.)  This is a sensible

19   approach:  If UMI brings its own know-how to the project, or solely develops a patentable

20   invention in the course of the project, UMI retains its intellectual property rights, but grants GSI a

21   license to that intellectual property so that GSI may produce the Product without infringing on

22   UMI's independent intellectual property rights.  However, to suggest, as UMI does, that GSI

23   owns only the Product and deliverables, without the associated intellectual property, is not only

24   contradicted by the plain language of the Agreement (*see id.* at III.1), but it leads to an absurd

25   result where GSI owns merely a copy of what it purchased and does not control the intellectual

26   property underlying the Product itself.

27   By contrast, the 576 Trade Secrets, aside from being defined as owned by GSI, are not

28   similar to the types of rights reserved for UMI—"solely any Project Patents" and intellectual

1   property developed independent of the project.  Indeed, even UMI admits that the schematics at

2   issue were "all used by UMI in furtherance of the Contract" (MSJ, at 19) and not something

3   developed by UMI in advance of or independent of the Agreement.  Notably, UMI has presented

4   no evidence indicating that any of the trade secrets contain information which UMI conceived or

5   developed prior to or independent of the Agreement, or which incorporate a patentable invention

6   of UMI.  As such, no evidence supports UMI's argument that any of the intellectual property at

7   issue is of the type to which GSI has merely a non-exclusive license.

8           **E.      Obligation to Reject Deliverables.**

9           UMI finally contends that GSI waived its ownership of the 576Mb Trade Secrets because

10  it accepted the deliverables, notwithstanding UMI's "confidential" label.  Article II.7 grants GSI

11  the ability to reject deliverables if they do not meet the technical specification.  (Agreement, Kim

12  Decl., Ex. A, at II.7.)  This section ensures that UMI's work meets the technical requirements of

13  the Agreement.  (*See id.*)  Nowhere does the provision require or even permit GSI to reject

14  substantial technical deliverables merely because they are improperly labelled.  (*See id.*)  Even if

15  GSI were required to reject UMI's deliverables for labelling errors, accepting a labelling error is

16  not the same as accepting a change in ownership.  To suggest that acceptance of a document

17  improperly labelled somehow changes the ownership of the document is a complete corruption of

18  the language and intent of Section II.7.  In any case, the significance, if any, of GSI's failure to

19  comment on UMI's inclusion of its name on the designation of confidential material is not

20  determinable on summary judgment.

21  **VIII.  GSI ADEQUATELY MAINTAINED THE SECRECY OF ITS TRADE SECRETS.**

22          At every step, GSI took reasonable efforts to maintain the secrecy of its trade secrets, and

23  UMI presents no admissible evidence to the contrary.  Trade secrets remain protectable so long as

24  the owner has taken "efforts that are *reasonable* under the circumstances to maintain its secrecy."

25  Cal. Civ. Code § 3426.1(d) (emphasis added).  "Efforts at maintaining secrecy need not be

26  extreme, just reasonable under the circumstances."  *Religious Tech. Ctr. v. Netcom On-Line*

27  *Comm'ncs Servs., Inc.*, 923 F. Supp. 1231, 1254 (N.D. Cal. 1995); *accord Network Telecomm.,*

28  *Inc. v. Boor-Crepean*, 790 P.2d 901, 902 (Colo. Ct. App. 1990) (efforts need not be extreme or

1    unduly expensive).  The owner must have "intended its [information] to remain secret and

2    undertook steps to secure that end."  *Morlife, Inc. v. Perry*, 56 Cal. App. 4th 1514, 1523 (1997).

3    "Reasonable efforts" might include advising others of the existence of a trade secret, limiting

4    access to the information on a "need to know basis," or requiring employees to sign

5    confidentiality agreements.  *See Courtesy Temporary Serv., Inc. v. Camacho*, 222 Cal. App. 3d

6    1278, 1288 (1990); *MAI Sys. Corp. v. Peak Computer*, 991 F.2d 511, 521 (9th Cir. 1993); *see*

7    *also Port-a-Pour, Inc. v. Peak Innovations, Inc.*, ___ F. Supp. 2d ___, 2014 WL 2766775, *17-18

8    (D. Colo. June 17, 2014); *SBM Site Servs., LLC v. Garrett*, 2011 WL 7563785, *10 (D. Colo.

9    June 13, 2011); *see also Mineral Deposits Ltd. v. Zigan*, 773 P.2d 606, 608 (Colo. App. Ct.

10   1998).

11         Marking a document as "confidential" is not determinative of an owner's reasonable

12   efforts to maintain secrecy.  *Computer Assocs. Intern., Inc. v. Am. Fundware, Inc.*, 831 F. Supp.

13   1516, 1524 (D. Colo. 1993); *Mattel, Inc. v. MGA Enter., Inc.*, 782 F. Supp. 2d 911, 959 (C.D.

14   Cal. 2011); *Port-a-Pour, Inc.*, 2014 WL 2766775 at *17-18 (finding trade secret protection in the

15   absence of confidential labels); *PQ Labs, Inc. v. Yang Qi*, No. 12-0450 CA, 2014 WL 334453, *4

16   (N.D. Cal., Jan. 29, 2014).

17         GSI undertook reasonable efforts to protect the secrecy of its trade secrets.  First, knowing

18   that UMI would be the principal designer, but not the owner, of the trade secrets, GSI

19   contractually obligated UMI—the only outside source with access to the trade secrets—to

20   maintain their confidentiality.  (Agreement, Kim Decl., Ex. A, at III.1.)  Under the Agreement,

21   UMI was required to keep confidential information secret and to take "all reasonable steps to

22   prevent unauthorized disclosure or use of the disclosing Party's Confidential Information and to

23   prevent it from falling into the public domain or into the possession of unauthorized persons."

24   (*Id.* at VI.1.)  UMI could show trade secret information only to persons requiring access to "effect

25   the intent of this Agreement."  (*Id.*)  All employees of UMI accessing GSI's trade secrets were

26   required to enter into a written confidentiality agreement with UMI.  (*Id.*)

27         The Agreement further requires UMI to designate written materials and documents

28   containing trade secret information as confidential and secret.  (*Id.* at VI.3.)  In a belt and

1    suspenders approach, the Agreement protects GSI from UMI's use of trade secret information

2    with a competitor through a five-year non-compete provision.  (*Id.* at VII.5.)

3         As the creator of the work product embodying the trade secrets, UMI was responsible for

4    marking the trade secrets as confidential, which it did.  (*Id.* at VI.1.)  No further action was

5    required on GSI's part.[11]  (*See id.*)  Once the trade secrets were transferred to GSI, GSI continued

6    reasonable efforts to protect against disclosure, including limiting access to the schematics on a

7    "need to know basis" and requiring all employees to execute a confidentiality agreement.

8    (Declaration of Douglas Schirle ("Schirle Decl."), ¶ 4; Chiang Decl., ¶ 15.)  The confidentiality

9    agreement, among other things, requires employees to maintain the confidentiality of proprietary

10   and trade secret information and prohibits employees from removing such information from the

11   company's premises.  (Schirle Decl., Ex. 1.)  GSI also ensures all confidential materials given to

12   customers are marked as confidential.  (Deposition of Lee-Lean Shu, Kim Decl., Ex. J, at 253:2-

13   25.)  This is sufficient to satisfy GSI's obligation to make reasonable efforts to maintain secrecy.

14   *See Morlife*, 56 Cal. App. 4th at 1521 (finding reasonable efforts where company limited

15   circulation of its trade secrets and advised employees in employment agreement and employee

16   handbook that information was confidential); *MAI Sys.*, 991 F.2d at 521 (finding reasonable

17   efforts where company required employees to sign confidentiality agreements regarding trade

18   secrets).

19        UMI relies on *Gemisys Corp. v. Phoenix Am., Inc.*, 186 F.R.D. 551 (N.D. Cal. 1999), for

20   the position that GSI's failure to re-label the trade secrets UMI generated and transferred to GSI

21   as "UMI Confidential" materials is dispositive of the issue of secrecy.  UMI misreads *Gemisys*[12]

---

22   [11] UMI seems to argue that GSI failed to protect the confidentiality of its documents because it
     did not object to the way in which UMI labeled it ("UMI Confidential" as opposed to "GSI
23   Confidential").  However, GSI was entitled to rely upon UMI's label—which was sufficient to
     cause any person with access to protect against disclosure—and the Agreement, which assigns
24   ownership of certain trade secrets to GSI, regardless of their label.

25   [12] *Gemisys* actually says that "failure by a party to mark its alleged trade secret as confidential or
     trade secret precludes in many cases trade secret protection for those materials."  *Gemisys*, 186
26   F.R.D. at 558.  In fact, the *Gemisys* court identifies only two cases in which the failure to mark
     trade secrets contributed to a finding that such trade secrets were not protectable, in each of
27   which, the failure to mark trade secrets was one of *several* factors weighing against trade secret
     protection.  *Id.* citing *Jensen v. Redevelopment Agency of Sandy City*, 998 F.2d 1550, 1557 (10th
28   Cir. 1993); *Web Comm'cns Group, Inc. v. Gateway 2000, Inc.*, 889 F. Supp. 316, 320 (N.D. Ill.
     1995).  Even in *Gemisys*, the failure to mark trade secrets was far from the only factor considered

1   and misstates the law in California and Colorado.  The District of Colorado has explicitly held

2   that the marking of trade secrets is not dispositive of their trade secret status, stating that

3   "[w]hether the [allegedly trade secret software materials] themselves were marked confidential is

4   only one factor to be considered.  Distribution of software under other confidential restraints may

5   also suffice."  *Computer Assocs. Intern.*, 831 F. Supp. at 1524; *see also Mattel, Inc.*, 782 F. Supp.

6   at 959.

7         UMI relies on a single piece of evidence in support of its argument that GSI did not

8   adequately protect its trade secrets—a letter dated in July 2009 in which UMI states that it does

9   not believe that it is in possession of confidential information "given to UMI by GSI."  (MSJ, at

10  23; *see also* Dkt. 1, Exhibit B.)  UMI asked GSI to respond if the statement were untrue, and rests

11  its defense on GSI's lack of response.  Why GSI did not respond and whether that arises to the

12  level of a waiver of trade secret protection is a question of fact.  However, at least two reasonable

13  inferences that must be taken from the letter indicate that GSI's failure to respond cannot be

14  dispositive of this issue.  First, UMI asked GSI to respond if GSI was aware of any confidential

15  information <u>given by GSI to UMI</u>.  The 576Mb Trade Secrets were transferred from <u>UMI to GSI</u>,

16  so GSI had no obligation to identify the trade secrets in response.  Additionally, UMI (having

17  created the materials pursuant to the Agreement) was already aware of GSI's ownership claim

18  regarding those items and under an obligation to protect them.

19        Second, the innocuous use of the term "confidential information" (which, incidentally, is

20  not capitalized) is not sufficient to put a party on notice that it must provide its business partner

21  with a full-blown trade secret disclosure, particularly when UMI was aware of the terms of the

22  contract and the trade secrets that it transferred to GSI.  At the time of the letter, GSI and UMI

23  were still on positive terms, even if their business relationship had ended, and GSI was entitled to

24  rely on the protections of the Agreement.  GSI had no reason to suspect that UMI was setting GSI

25  up to excuse its misappropriating of GSI's trade secrets.  Considering all reasonable inferences in

26

27  by the court.  *Id.* at 558-560.  The plaintiff provided its trade secrets to a competitor under a
    license imposing no duty of confidentiality, and did not limit the types of people at the competitor
    who were permitted to view the materials.  *Id.*  None of these facts are present in the instant

28  matter.

1    favor of the Plaintiff, nothing about the July 2009 letter (or GSI's failure to respond) waives

2    GSI's trade secret protection.[13]

3    **IX.    TO THE EXTENT ANY ISSUE OF FACT EXISTS, THE MOTION IS PREMATURE AND MUST BE DENIED UNDER RULE 56(D).**

4

5        Although GSI contends that UMI has not satisfied its burden on summary judgment,

6    should the Court be inclined to consider granting UMI's motion, GSI requests that the Court

7    nevertheless deny the motion or at least grant a continuance to complete discovery pursuant to

8    Rule 56(d).  Where a party cannot present "facts essential to justify its opposition," the Court may

9    deny summary judgment or grant a continuance for the purposes of discovery.  Fed. R. Civ. Proc.

10   56(d).

11       Discovery is ongoing.  The deadline to complete fact discovery is April 24, 2015.  (Dkt.

12   342.)  Significant portions of discovery have not been completed.  (Declaration of Rajiv

13   Dharnidharka, at ¶ 3.)  In particular, GSI's discovery has been delayed because it received the

14   database at issue in the case only a few months ago, and its expert's review of the database was

15   delayed due to the passing of the expert's wife.  (*Id.*)  GSI has communicated to Defendants that

16   (1) its expert is in the process of analyzing the assets UMI transferred to ISSI (*i.e.* the Atris

17   database) and comparing them to the 576 Mb trade secrets; (2) the results of this analysis will

18   likely lead to GSI narrowing its trade secret claim; and (3) GSI expects that this analysis will be

19   completed by mid- to late January.  (*Id.* at ¶ 4; *id.*, Ex. 1.)

20   /////

21   [13] UMI separately discusses the "boundary scan" trade secret.  The boundary scan trade secret
22   encompasses two pieces:  (1) the information GSI taught UMI about creating a boundary scan;
     and (2) the final boundary scan UMI delivered to GSI, as required by the Agreement.  The latter
     is properly addressed with the remainder of the 576 Mb Trade Secrets, as above.  With regard to
23   the information GSI employee, Ramaa Iyer, passed to UMI, GSI relied on the Agreement's
     protection of confidential information, which extends to information the receiving party has
24   reason to know should be treated as confidential without being so marked.  (Agreement, Kim
     Decl., Ex. A, at 1.1.)  UMI knew from the circumstances to treat the boundary scan information
25   conveyed by Ms. Iyer as confidential.  UMI was not aware of the information from the public
     domain, and its partner conveyed the information in the course of a business relationship.  As
26   Ms. Iyer testified, engineers have a "code of ethic" and know when to maintain information as
     confidential.  (Iyer Depo, Kim Decl., Ex. C, at 95:5-15.)  GSI relied on these protections.  At the
27   very least, whether GSI took adequate protections is a question of material fact which must be
     presented to the jury.  *See Rockwell Graphic Sys., Inc. v. DEV Indus., Inc.*, 925 F.2d 174, 176-77
28   (7th Cir. 1991).

1         If the Court is inclined to grant the motion, before doing so, GSI should be permitted to

2  take discovery on the following issues potentially relevant to this motion:

3          •  Bob Gower's understanding of the term "deliverable" at the time he executed the

4               contract (Mr. Gower is the former President and CEO of UMI and a third party to

5               this litigation);

6          •  Expert discovery on trade usage of the term "deliverable";

7          •  Expert discovery on trade practice with respect to assignation of intellectual

8               property rights in a design contract;

9          •  Expert discovery regarding whether the 576 Trade Secrets are similar to the

10             examples of deliverables and intellectual property associated with the Product

11             which are identified in the Agreement;

12          •  Admissions concerning UMI's contentions with respect to specific schematic and

13             layout files as to whether they are deliverables under the Agreement; and

14          •  UMI's practice and custom for designating work product prepared for others as

15             "confidential."

16  (*Id.* at ¶ 5.)

17         GSI intends to propound additional discovery on UMI relating to many of these topics.

18  (*Id.* at ¶ 6.)  Likewise, GSI propounded a first set of interrogatories on UMI over the summer of

19  2014 to which UMI has still not properly responded.  (*Id.* at ¶ 7.)  GSI has attempted to meet and

20  confer, but UMI still has not provided adequate responses.  (*Id.*; *see also id.*, Letter of Jeff Shohet

21  to Constance Ramos dated November 26, 2014, *id.*, Ex. 2; Letter of Constance Ramos to Jeff

22  Shohet dated January 7, 2015, *id.*, Ex. 3.)  This discovery includes interrogatories that, among

23  other things, ask UMI to describe the steps it took to protect the confidentiality of the deliverables

24  (Interrogatory No. 1) and which of its patents (and patent claims) contain IP included in the

25  deliverables (Interrogatory Nos. 12 and 13).  (*Id.* at ¶ 8; *id.*, Ex. 2.)

26         Discovery on these issues, along with completion of the analysis GSI's expert is presently

27  conducting, is necessary to fully oppose UMI's motion.  (*Id.* at ¶ 9.)  Although GSI has had to

28  fight hard for discovery in this case, at every turn, discovery has uncovered significant

1    misconduct by UMI.  UMI rushed to file this motion to cut off discovery prematurely.  Thus,

2    should the Court be inclined to consider granting any portion of UMI's motion, GSI requests that

3    the Court nevertheless deny the motion or at least grant a continuance to complete discovery

4    pursuant to Rule 56(d).

5    **X.     COSTS AND FEES.**

6          UMI summarily asserts that it is the prevailing party entitled to costs and fees if it

7    succeeds in its motion.  (MSJ, at 25 n.23.)  Should the Court grant UMI's motion, UMI is not

8    entitled to costs and fees at this juncture.  Costs and fees may be awarded to "the prevailing

9    party" under the Agreement.  (Agreement, Kim Decl., Ex. A, at X.9.)  A determination of which

10   party is the "prevailing party" for purposes of awarding costs and fees under a contractual fee-

11   shifting clause is made only on final resolution of *all* claims arising out of the contract by

12   comparing the extent to which each party succeeded in its contentions.  *Hsu v. Abbara*, 9 Cal. 4th

13   863, 876 (1995); *Poseidon Dev., Inc. v. Woodland Lane Estates, LLC*, 152 Cal. App. 4th 1106,

14   1120 (2007), as modified July 24, 2007; *see also* Cal. Civ. Code 1717(b) (the prevailing party

15   "shall be the party who recovered a greater relief in the action on the contract"); *Bedard v.*

16   *Martin*, 100 P.3d 584, 593 (Colo. App. 2004) (noting that the trial court "generally must select

17   one party as the overall winner for purposes of the fee-shifting agreement"); *Brock v. Weidner*, 93

18   P.3d 576, 579 (indicating that fee-shifting provisions "generally contemplate that the 'prevailing

19   party' will be entitled to recover its attorney fees and that there will be one winner and one loser

20   regarding payment of those fees.").  UMI's request is premature.

21   /////

22   /////

23   /////

24   /////

25   /////

26   /////

27   /////

28   /////

1   **XI.    CONCLUSION.**

2          For the foregoing reasons, GSI respectfully requests the Court deny UMI's motion for

3   summary judgment and request for costs and fees.

4   Dated:  January 13, 2015

5                                              DLA PIPER LLP (US)

6

7                                    By  /s/ *Brooke Killian Kim*
                                          JEFFREY M. SHOHET
8                                          BROOKE KILLIAN KIM
                                          KELLIN M. CHATFIELD
                                          RAJIV DHARNIDHARKA
9                                          Attorneys for Plaintiff

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28