1   JEFFREY M. SHOHET (Cal. Bar No. 067529)
    jeffrey.shohet@dlapiper.com
2   BROOKE KILLIAN KIM (Cal. Bar No. 239298)
    brooke.kim@dlapiper.com
3   VERONICA JACKSON (Cal. Bar No. 243095)
    veronica.jackson@dlapiper.com
4   KELLIN M. CHATFIELD (Cal. Bar No. 288389)
    kellin.chatfield@dlapiper.com
5   **DLA PIPER LLP (US)**
    401 B Street, Suite 1700
6   San Diego, CA  92101-4297
    Tel:  619.699.2700
7   Fax:  619.699.2701

8   ANDREW P. VALENTINE (Cal. Bar No. 162094)
    andrew.valentine@dlapiper.com
9   RAJIV DHARNIDHARKA (Cal. Bar No. 234756)
    rajiv.dharnidharka@dlapiper.com
10  **DLA PIPER LLP (US)**
    2000 University Avenue
11  East Palo Alto, CA  94303-2214
    Tel:  650.833.2000
12  Fax:  650.833.2001

13  Attorneys for Plaintiff
    GSI Technology, Inc.
14

15              UNITED STATES DISTRICT COURT
16
        NORTHERN DISTRICT OF CALIFORNIA, SAN JOSE DIVISION
17

18  GSI TECHNOLOGY, INC., a Delaware
    Corporation,                              CASE NO.  13-CV-1081-PSG
19
            Plaintiff and Counter-Defendant,  **GSI TECHNOLOGY, INC.'S TRIAL BRIEF**
20
        v.                                    Trial Date:        October 26, 2015
21                                            Complaint Filed:   March 8, 2013
    UNITED MEMORIES, INC., a Colorado         Courtroom:         5
22  Corporation, and INTEGRATED               Judge:             Hon. Paul S. Grewal
    SILICON SOLUTION, INC., a Delaware
23  Corporation,

24          Defendants and Counter-Claimants.

25

26

27

28

# I.      INTRODUCTION.

The technology in this case – memory chips – is complex, but the story itself is simple: two companies stooping to unlawful conduct to displace another company all the while using its technology and violating its trust to do so.

After two years of hard-fought discovery, Plaintiff GSI Technology, Inc. ("GSI") uncovered the evidence confirming that Defendants United Memories, Inc. ("UMI") and Integrated Silicon Solution, Inc. ("ISSI") engaged in conduct to: (1) misappropriate GSI's trade secrets; (2) tortiously interfere with GSI's prospective economic relationship with Cisco Systems, Inc. ("Cisco"); (3) violate Section 17200 of the California Business & Professions Code with unfair conduct; (4) breach the contract between UMI and GSI; and (5) and defraud and make false promises to GSI.

Indeed, despite Defendants' repeated claims of innocence and attempts to blame GSI, GSI uncovered the truth:  after specifically investigating GSI's relationship with UMI and their development of 576Mb LLDRAM and 1.2 Gb LLDRAM (Atris) chips (beginning in March 2009), ISSI retained UMI in August 2012 and conspired to gain access to GSI's LLDRAM technology and to unfairly compete against it.  ISSI needed to use UMI's assistance and GSI's property – its circuit schematics – starting in August 2012 to be able to bid for Atris work against GSI.  After ISSI unfairly won the bid – via bid process ISSI would have had to forego without UMI's assistance and GSI's schematics – ISSI purchased GSI's schematics from UMI. Even today, All of the schematics at issue are owned by GSI under its Design and Development Agreement ("Agreement") with UMI and twenty-five of the schematics are GSI's trade secrets.  UMI and ISSI's use since fall 2012, and ISSI's subsequent acquisition in March 2013, of these schematics violated California's trade secret laws, intentionally interfered with GSI's business relationship with Cisco, and breached UMI's Agreement with GSI.

GSI also uncovered the evidence that UMI defrauded GSI and made false promises to GSI when establishing a working relationship with GSI.  In order to get GSI to retain UMI as a

1    designer, UMI made false promises about whether the work was for GSI's benefit or someone

2    else.  UMI contends that, despite representing to GSI that all of UMI's work at issue was for

3    GSI's benefit, UMI was all along actually performing the work for its parent company ProMOS

4    and for its own account so it could later be sold to someone else.

5         Defendants' misconduct put ISSI in a position to take the crucial Atris award from GSI,

6    effectively ousting GSI from Cisco's LLDRAM program by enabling ISSI to participate when it

7    otherwise would not be able to do so.  Indeed, had UMI and ISSI not conspired and engaged in

8    the unlawful conduct described above, GSI would have been the only bidder for the Atris second

9    source project in 2012, a project that both ISSI and GSI valued at approximately $40 million in

10   profit.  As a result, GSI will ask the jury for an award of $40 million, plus exemplary and punitive

11   damages.  This is not a question of why Cisco picked ISSI over GSI, it is a situation where the

12   only bidder would have been GSI but for UMI and ISSI's unlawful conduct and conspiracy.  For

13   the reasons discussed herein, GSI should prevail.

14   **II.      FACTUAL AND PROCEDURAL BACKGROUND.**

15        The Court is familiar, from numerous motions, with the background of this case.  GSI

16   summarizes only the key points here as background.  For a more detailed summary of the facts,

17   and citations to the record, please review GSI's motions for summary judgment directed at UMI

18   and ISSI, GSI's oppositions to Defendants' motions for summary judgment (Dkt. Nos. 564, 566,

19   624, 630, 660, and 670), and the Court's September 21, 2015 Order.

20        In March 2013, GSI filed suit against UMI based on the belief that UMI was violating the

21   non-compete provision of the Agreement prohibiting UMI from competing against GSI in the

22   design or development of an LLDRAM chip.  (Dkt. No. 1.)  GSI sought a preliminary injunction

23   to enjoin UMI's conduct and obtained expedited discovery for that purpose.  UMI argued GSI's

24   claims were baseless.  Discovery showed otherwise, revealing not only that UMI violated the

25   non-compete provision by working with ISSI since fall 2012 to compete for Atris against GSI

26   using GSI's design, but that UMI had already transferred an Atris database, which GSI believed

27   to contain GSI-owned schematics and other chip designs, to ISSI (one of GSI's biggest

28   competitors).  Documents produced in expedited discovery also revealed that as early as March

1  2009, ISSI knew – or at least had reason to know ████████████████████████ –

2  that UMI and GSI were collaborating in the design of LLDRAM chips, including the Atris chip.

3         Based on what it learned in expedited discovery, in October 2013, GSI amended its

4  complaint to assert causes of action against both UMI and ISSI.  The amended complaint includes

5  the original breach of contract claim against UMI, as well as claims for misappropriation of trade

6  secrets, tortious interference with prospective economic relationship, fraud, false promise, and

7  unfair competition.[1]  Defendants again argued GSI's claims were baseless.  Once again, discovery

8  proved otherwise – establishing that the bulk of what GSI suspected when it filed its complaint

9  was true – beginning in August 2012, UMI and ISSI acted in concert to misappropriate GSI's

10 trade secrets schematics and to incorporate other GSI schematics into an Atris design for ISSI, so

11 that ISSI would be equipped to compete against GSI and steal the Atris bid.  Among other things,

12 in ███████████████████████████████████████████, which UMI had

13 worked into an Atris design for ISSI at least six months earlier.  █████████████████

14 ████████████████████████████████████████████████████

15 ████████████████  Based on timesheets and invoices GSI requested from UMI in summer

16 2013, but which UMI produced at the close of discovery in April 2015, GSI learned that UMI

17 began using those schematics for ISSI in 2012, to enable ISSI to be able to compete in the bidding

18 process for the Atris award.  According to their timesheets, several UMI engineers spent

19 extensive time from August to December 2012 working for ISSI on the Atris design, nearly all of

20 whom worked on UMI's design for GSI.  The revision dates and history for the trade secrets

21 schematics themselves, likewise show that they were misappropriated (used) in the fall of 2012

22 (i.e., during the Cisco bid process) to design ISSI's Atris chip.

23         The facts further indicate Defendants were culpable and knew what they were doing was

24 wrong.  Specifically, discovery and rulings of this Court establish:

25         • ████████████████████████████████████████████████

26         ████████████████████████████

---

[1] GSI's federal claims and intentional interference with contract claim were dismissed, but the
essential facts underlying the allegations supporting those claims remain in the case.  GSI
reserves its right to conform the pleadings to the proof at the close of all evidence.

1   • At that time, GSI and UMI were working together on the design for the 576Mb
2       LLDRAM chip and Atris chip.
3   • The Agreement, executed in May 2008, contains a non-compete provision
4       (prohibiting UMI from designing an LLDRAM chip for a competitor of GSI prior
5       to May 2013), an ownership provision (under which GSI "solely owns" all
6       deliverables to the contract) and a confidentiality provision.
7   • Pursuant to that Agreement, UMI delivered schematics for the 576Mb LLDRAM
8       chip to GSI in December 2008, January 2009, and June 2009.
9   • In March 2009, UMI told ISSI that UMI designed a 576Mb RLDRAM chip and
10      had a 1.2Gb (Atris) paper design.  Based on ISSI's own investigation, ISSI knew
11      this design work was for GSI.
12  • UMI also told ISSI, in March 2009, in the same correspondence, that UMI could
13      not work with ISSI on such projects due to UMI's "conflict with our other
14      customer [GSI]."
15  • ISSI continued to monitor UMI and GSI in 2009 and 2010.
16  • By April 2009, UMI seriously believed it could go out of business.
17  • A few months after UMI's March 2009 communications with ISSI, in July 2009,
18      UMI sent a letter to GSI purporting to "terminate" the 576Mb Agreement because
19      the intent of the Agreement no longer existed.
20  • The same day UMI sent its July 2009 letter, UMI reached out to Cisco for help
21      finding an alternative partner for Atris.



27  • Three years later, in January 2012, Cisco issued a second RFI for a second source
28      supplier for Atris.

1 ████████████████████████████████████

2 ████████████████████████████████████

3 ████████████████████████████████████

4 ████████████████████████████████

5 ██████████████████████████████

6 • When Cisco issued its second RFI for Atris in 2012, ████████████

7 ████████████████████████████████████

8 ████████████████████████████████

9 ██████████████████████████████.

10 • Unable to design the chip, ISSI approached UMI for help in August 2012 and was

11 told █████████████████████

12 ████████████████████████████████████

13 ████████████████████████████████████

14 ████████████████████

15 • Also in September 2012, ISSI hired Anand Bagchi of Cisco.  Mr. Bagchi led the

16 Atris proposal process while at Cisco.

17 • ██████████████████████████████

18 ██████████████████████████████████

19 ████████████████████████████████████

20 ████████████████████████████

21 ███████████████████████████████████

22 ████████████████████████████████████

23 ████████████████████████████████████

24 ██████████████████████████████████

25 ████████████████████████████████████

26 ████████████

27 █████████████████████████████████████

28 █████████████████████████████████

DLA PIPER LLP (US)
EAST PALO ALTO

WEST\261235806

GSI TECHNOLOGY, INC'S TRIAL BRIEF
CASE NO. 13-CV-1081-PSG

1

2

3

4       •    In November 2012, after it partnered with UMI and after

5    ISSI submitted its final Atris bid, based

6    on ISSI's work with UMI

7

8       •    Cisco announced the winner of the Atris bid in December 2012.  GSI was shocked

9           to learn it did not win the bid, knowing it was the only company with a near-

10          complete design of the chip.

11      •    In January 2013, GSI sent a letter to UMI attaching the 576Mb Agreement and

12          referencing UMI's non-compete obligations.

13      •    Within a week, the UMI designers who designed GSI's 576Mb chip started to

14          become employed by ISSI, one of them bringing with him a copy of GSI's letter.

15      •    In early 2013, UMI began to transfer its "Atris" database to ISSI, which ISSI later

16          renamed "Itasca" internally.  The transfer was completed and ISSI paid UMI in

17          late March 2013, after this lawsuit was filed and after ISSI's VP of Marketing

18          advised his CEO that UMI was "careful" when it transferred the IP to ISSI.

19      •

20

21



22          These facts are not subject to reasonable dispute.  Defendants are stuck with the fact they

23   used GSI's schematics – schematics GSI owns pursuant to its Agreement with UMI –  beginning

24   in August 2012 to enable ISSI to bid for and win the Atris second source opportunity.  ISSI could

25   not have competed for the bid without conspiring with UMI.  Defendants likewise cannot evade

26   the fact that

27   including GSI's 25 576Mb Trade Secret Schematics.  UMI cannot avoid

28   its non-compete agreement with GSI or that the Agreement with GSI contains an ownership

1  provision.  ISSI cannot deny that it conducted an investigation into the work UMI performed for

2  GSI in 2009, and it cannot deny that it knew that " █████████████████████████████████

3  ███████  Indeed, the circumstantial evidence shows that ISSI actually knew of the exact terms of

4  the Agreement, including the non-compete provision.  And the direct evidence conclusively

5  confirms that ISSI employee Kim Hardee actually knew the exact terms of the Agreement,

6  including the non-compete provision.

7      Instead of facing the facts, Defendants have tried to muddle them with baseless

8  accusations (which are unduly prejudicial and not relevant to the claims in this case, and should

9  therefore be excluded from trial)[2] and arguments that create false timelines.  Defendants'

10 positions lack merit.  As the evidence at trial will show, Defendants are liable and GSI is entitled

11 to $40 million in actual damages.  Defendants acted willfully and maliciously, warranting

12 exemplary and punitive damages.

13 **III.    GSI WILL PREVAIL ON ITS CLAIMS AT TRIAL.**

14     **A.    Defendants' Misappropriation of GSI's Trade Secrets.**

15     Despite being caught using GSI's 576Mb Trade Secret Schematics beginning in August

16 2012, Defendants contend they are not liable for trade secret misappropriation.  Despite the

17 ownership provision of the Agreement that "GSI shall have sole ownership," UMI claims that it

18 owns the schematics; ISSI contends that it was an "innocent" and unknowing purchaser; and

19 Defendants claim that the trade secrets were readily ascertainable.  These arguments will fail.

20 The key facts, which disprove Defendants' protestations of innocence, are discussed below.

21         *i.    GSI Owns the 576Mb Trade Secrets.*

22     GSI owns all "deliverables" under the Agreement with GSI, including the 576Mb

23 schematics.  No party disputes that GSI solely owns "all deliverables" and associated intellectual

24 property rights under Section III.1 of the Agreement.  UMI contends, however, that the

25 schematics designed and delivered to GSI do not qualify as "deliverables."  The Court already

26 rejected this argument in ruling on UMI's motion for summary judgment seeking an order that

27 GSI did not own the 576Mb schematics.

28 _____
[2] *See e.g.* GSI's Motion in Limine No. 5.

UMI's position is legally and factually unfounded.  Although "deliverables" is not a defined term, the Agreement does specify what UMI was obligated to "deliver" to GSI.  Specifically, the Agreement obligated UMI to timely "[d]eliver the items listed in Exhibit B."  The deliverables identified in Exhibit B include all circuit and HSPICE schematics.  As the schematics are "deliverables" under the Agreement, they are owned by GSI.  Moreover, the schematics were *actually delivered* to GSI.  UMI delivered the preliminary database for the 576Mb chip, including its schematics and layout, in December 2008, and delivered updated and revised materials in January and June 2009.  And, ███████████████████████████████ ███████████████████████████████████████████████████████████████ ███████████████ UMI even refers to the schematics as "deliverables" on its website, and ███████████████████████████████████████████████████████.  The schematics, therefore, are deliverables and owned by GSI.

### ii.     Defendants' Conduct Qualifies as Misappropriation.

Misappropriation is defined by California Civil Code Section 3426.1(b) as:

(1) Acquisition of a trade secret of another by a person who knows or has reason to know that the trade secret was acquired by improper means; or

(2) Disclosure or use of a trade secret of another without express or implied consent by a person who:

    (A) Used improper means to acquire knowledge of the trade secret; or

    (B) At the time of disclosure or use, knew or had reason to know that his or her knowledge of the trade secret was:  (i) Derived from or through a person who had utilized improper means to acquire it; (ii) Acquired under circumstances giving rise to a duty to maintain its secrecy or limit its use; or (iii) Derived from or through a person who owed a duty to the person seeking relief to maintain its secrecy or limit its use; or

    (C) Before a material change of his or her position, knew or had reason to know that it was a trade secret and that knowledge of it had been acquired by accident or mistake.

Defendants' conduct falls squarely within this definition.

### a.     UMI Misappropriated GSI's 576Mb Trade Secrets.

UMI misappropriated GSI's 576Mb Trade Secret Schematics by using them for the benefit of ISSI beginning in or around August 2012 and then later transferring them to ISSI in

1    March 2013.  UMI's anticipated defense that its conduct could not be misappropriation because

2    the schematics were based on UMI's own "know-how" and therefore owned by UMI fails.  Under

3    the 576Mb Agreement, GSI owned all "deliverables" – including the schematics – regardless of

4    whether they were leveraged from UMI's prior know-how.  Indeed, the language of the design

5    agreement originally proposed by UMI stated that GSI would only own "newly created" material.

6    That language, however, was dropped in favor of the broader ownership provision of the final

7    Agreement.  Moreover, the Agreement contained a confidentiality provision requiring UMI to

8    protect GSI's confidential information.  UMI knew that GSI owned the deliverables under the

9    Agreement and that it had to protect that information.  UMI's decisions both to use them for

10   ISSI's benefit and to later sell them to ISSI are misappropriations.

11                    ***b.        ISSI Misappropriated GSI's 576Mb Trade Secrets.***

12          ISSI misappropriated GSI's 576Mb Trade Secrets by:  (1) incorporating GSI's 576Mb

13   Trade Secrets (through UMI as its contract designer[3]) into ISSI's Atris design beginning in

14   August 2012; (2) subsequently acquiring the trade secrets in full in the Asset Transfer from UMI

15   in March 2013; and (3) ███████████████████████████████████████n.  There is

16   no question that ███████████████████████████████████████████████████

17   ████████████████████████████████████████████████████████████

18   ██████████████████████████████████████████████████████████████

19   ████████████████.  UMI and ISSI have both admitted UMI's work on these schematics

20   through interrogatory responses.  Likewise, ████████████████████████████████

21   ████████████████████████████████, which allowed ISSI to participate in the bid

22   process and eventually win the bid.  As GSI's expert Robert Murphy will testify, the current ISSI

23   Atris design ██████████████████████████████████.

24          The issue to resolve at trial, therefore, is whether ISSI knew, or should have known, that

25   UMI was using GSI's trade secrets in ISSI's design in August 2012, and whether ISSI knew,

26   when it later acquired the Atris database from UMI in March 2013, it included GSI's trade

27

28   [3] Conspiracy liability makes ISSI equally liable for UMI's use of GSI's trade secrets.  *See Applied Equipment Corp. v. Litton Saudi Arabia Ltd.*, 7 Cal.4th 503,510-511 (1994).

1  secrets.  The answer to both questions is yes.

2       In 2009, ██████████████████████████████████ and

3  conducted a months-long investigation into the LLDRAM designs UMI did for GSI, learning one

4  of the chips was a 576Mb RLDRAM designed to a 72nm process.  At the same time, ISSI learned

5  UMI had a "paper design" of a 1.2Gb RLDRAM (Atris), which was also designed for UMI's

6  "other customer" – the same "other customer" for whom UMI told ISSI that it designed the

7  576Mb chip (and who ISSI knew was GSI).

8       This was not information ISSI learned and then forgot.  ███████████████████

9  ████████████████████████████████████████████████████████████

10  ████████████  During this same time, he had meetings with Cisco about Atris and a meeting with

11  UMI about an allegedly separate product.

12       Two years later, when ISSI still did not have a chip design and, admittedly, ████████

13  ██████████████████████████████████████, it went directly to UMI – the near

14  bankrupt, obscure company in Colorado Springs.  ISSI did not contact any other design firms.

15  ████████████████████████████████████████████████████████████████

16  ████████████████████████████" ISSI asked no questions – it knew what UMI meant.

17       When ████████████████████████████████████████████████████████

18  ████████████████████████████████████████████████████

19  ████████████████████████████████████████████████████

20  ████████████████████████████████████████████████████████████

21  ████████████  Again, ISSI did not stop to ask questions or halt the project.  Instead, it

22  greenlighted UMI's use of those schematics in the fall of 2012 to begin the design for ISSI and

23  began negotiating an agreement in which ISSI would own all UMI work product.  Moreover, in

24  October 2012, ████████████████████████████████████████████████

25  ██████████████████████████████"

26       This was the substance of ISSI's knowledge when it pitched its design – by UMI – to

27  Cisco and submitted an Atris bid.  And, this was ISSI's knowledge in 2013 when it signed the

28  Asset Transfer Agreement.  By the time ISSI completed the asset transfer, it had hired six UMI

1    employees who originally designed the 576Mb schematics sold to ISSI for GSI.  At least one of

2    those employees reviewed the ownership, non-compete, and survival provisions of the GSI

3    agreement right around the time he moved to ISSI.  This means Mr. Bagchi and the six former

4    UMI employees (seven people working on the project for ISSI) all had actual knowledge or had

5    reason to know that the 576Mb Trade Secrets belong to GSI.  "A company is deemed to have

6    notice of any facts its employees or agents "ought, in good faith and the exercise of ordinary care

7    and diligence, to communicate to the [company]."  *See* 9/21/15 Order (citing Cal. Civ. Code

8    § 2332; *Hatfield v. Levy Bros.*, 18 Cal. 2d 798, 806 (1941) (where employee, acting within the

9    scope of his employment, had knowledge, the employer cannot assert he had no knowledge;

10   knowledge is imputed); *O'Riordan v. Fed. Kemper Life Assur.*, 36 Cal. 4th 281, 288 (2005);

11   *People v. Forest E. Olson, Inc.*, 137 Cal. App. 3d 137, 139–40 (1982); *Allergan, Inc. v. Merz*

12   *Pharms.*, No. SACV 11-446 AG (Ex), 2012 WL 781705, at *12–13 (C.D. Cal. Mar. 9, 2012));

13   *see also Potter Voice Techs., LLC v. Apple Inc.*, 24 F. Supp. 3d 882, 886–87 (N.D. Cal. 2014).

14                    ***iii.       GSI's Trade Secrets Are Not Readily Ascertainable.***

15        Defendants hope to advance a "readily ascertainable" defense to GSI's 576Mb trade secret

16   claim at trial.  To show ready ascertainability, a defendant must demonstrate that the discovery

17   can be made analyzing and combing multiple sources with a modest effort.  *Morlife, Inc. v. Perry,*

18   56 Cal. App. 4th 1514, 1522 (1997); *see also* CACI No. 4420.

19        Defendants' "readily ascertainable" defense has been based on two arguments.  First, that

20   GSI's trade secrets could be easily reverse engineered.  However, Defendants abandoned this

21   argument.  Second, Defendants argue that GSI's trade secrets can be readily created from public

22   information.  ISSI's only evidence to support its contention that the trade secrets can be

23   determined from publicly available sources is a single conclusory opinion from ISSI's expert that

24   GSI's schematics could be readily ascertained from public sources.  This is not evidence that

25   supports Defendants' defense.  UMI bases its defense on convoluted interrogatory responses it

26   served after the close of discovery (and after several motions to compel by GSI that the Court

27   granted).

28   /////

1    Defendants have offered no facts showing the amount of time or cost to design the

2  schematics from public sources (including the ones cited in UMI's tardy interrogatory responses),

3  probably because those facts would not support their position.  For three years, ISSI courted the

4  Atris bid, but never developed schematics for Atris (unlike GSI). ████████████████████

5  █████████████████████████████████████████████████████████████████

6  ██████████████████████████████████████████, which would not be the

7  case if GSI's schematics were readily ascertainable.  And, ██████████████████████

8  █████████████████████████████████████████████████████

9  ██████████████████████████████████████████████████████████

10 ████████████████████████  If any of these schematics were readily ascertainable, ISSI

11 could swap out the GSI schematics with actual schematics available in the public.

12    Further, Defendants deem the ISSI schematics to be "Highly Confidential" and AEO as

13 part of this litigation.  If they were easily and readily obtainable and in the public domain, as ISSI

14 claims, then ISSI would not need to protect its schematics from public disclosure.

15    Accordingly, Defendants cannot, as a matter of law, succeed on this defense at trial.

16         *iv.*    ***Defendants' Conduct Qualifies as Willful and Malicious Warranting***
               ***Exemplary Damages.***
17

18    Moreover, GSI is entitled to exemplary damages because Defendants' misappropriation

19 was willful and malicious.  *See* Cal. Civ. Code § 3426.3(c).  Willfulness is defined as

20 "willingness to commit the act or engage in the conduct in question."  *Ajaxo, Inc. v. E\*Trade*

21 *Group, Inc*., 135 Cal. App. 4th 21, 66 (2005).  To prove malice, a plaintiff must show only the

22 defendant's "conscious disregard" for the rights of others.  *Simon v. San Paolo U.S. Holding Co.,*

23 *Inc.*, 35 Cal. 4th 1159, 1181 (2005). "Conscious disregard" exists where the defendant was aware

24 of the probable consequences of his actions and willfully and deliberately failed to avoid them.

25 *Taylor v. Super. Ct*., 24 Cal. 3d 890, 895–96 (1979).  Defendants' knowing misappropriation of

26 GSI' trade secrets first by use, and later by acquisition, as set forth above, was willful and

27 malicious.

28 /////

1    Further, ISSI's failure to investigate the ownership of the schematics it used and acquired

2    – despite the numerous red flags – warrants exemplary damages, because malice can be shown by

3    a defendant's knowledge of and failure to avoid undue consequences.  *See J.R. Norton Co. v.*

4    *Gen. Teamsters, Warehousemen & Helpers Union,* 208 Cal. App. 3d 430, 444–45 (1989).

5    Circumstantial evidence indicating a defendant was aware of a fact, but avoided learning its full

6    extent and failed to take action is sufficient to meet this threshold.  *Id.*  Willful blindness cannot

7    shield a party from a finding of malice.  *See id.*  ISSI received repeated warning signs that it was

8    using and later acquiring GSI's trade secrets.  Rather than fully investigate and avoid the

9    consequences, ISSI consciously elected not to ask questions that may have upset its plan to hire

10   UMI and obtain GSI's trade secrets so that it could compete for the Atris second source award.

11   **B.    Defendants Tortiously Interfered with GSI's Prospective Economic**
        **Relationship with Cisco.**
12

13   Defendants tortiously interfered with GSI's prospective economic relationship with Cisco

14   if:  (1) there was an economic relationship between GSI and Cisco with the potential for

15   economic benefit to GSI; (2) Defendants knew of the relationship, or potential relationship; (3)

16   Defendants engaged in wrongful conduct; (4) with the intent to disrupt the relationship, or the

17   knowledge that a disruption was likely to occur; (5) the relationship with Cisco was disrupted;

18   and (6) GSI was harmed as a result.  *See Buckaloo v. Johnson*, 14 Cal.3d 815, 827 (1975); CACI

19   No. 2202.  Here, Defendants' independently wrongful conduct included engaging in unfair

20   competition.  The evidence establishes each of these elements.

21   GSI and Cisco had an actual and potential economic relationship.  Cisco was one of GSI's

22   primary customers, and it previously awarded Atris to GSI.  Defendants knew of the relationship

23   since 2007, when ███████████████████████████████████ and when UMI knew

24   that Cisco awarded GSI the first Atris contract.  Knowing GSI was the frontrunner and desiring to

25   take over this position, ISSI engaged in a pattern of unfair conduct intended to oust GSI from the

26   LLDRAM market.  UMI and ISSI's conduct is discussed above and below.  When Defendants

27   engaged in this misconduct, they intended to exclude GSI from the LLDRAM market, disrupt

28   GSI's relationship with Cisco – and take that relationship for ISSI.  Defendants actually disrupted

1   that relationship when ISSI was awarded the Atris bid as a result of its unlawful acts.

2   Accordingly, GSI will prevail on this claim at trial.

3        GSI is also entitled to punitive damages on this claim.  Punitive damages may be awarded

4   where the Defendants' conduct is "malicious, oppressive or in reckless disregard of the plaintiff's

5   rights."  Ninth Circuit Manual of Model Jury Instructions, No. 5.5; Cal Civ. Code § 3294.

6   Defendants' conduct, knowingly engaging in anti-competitive conduct to deprive GSI of the Atris

7   award and overall Cisco business, was malicious, oppressive, and violated GSI's rights.

8        **C.      Defendants' Conduct Violated Section 17200 of the Calfornia Business and**

9        **Professions Code.**

10       Section 17200 of California's Business and Professions Code is "sweeping, embracing

11  'anything that can properly be called a business practice and that at the same time is forbidden by

12  law.'" *Cel-Tech Commc'ns, Inc. v. Los Angeles Cellular Tel. Co.*, 20 Cal. 4th 163, 180 (1999)

13  (internal citations omitted).  It is intended to reach unfair and unlawful practices that may not fall

14  within the precise contours of existing torts and statutory violations. *Id*. at 181.  In other words,

15  courts are "not impotent to frustrate its consummation because the scheme is an original one." *Id*.

16  (internal quotation marks and citation omitted).  Rather, courts are given express authority to hold

17  entities liable for any "unfair" business practice.  Cal. Bus. & Prof. Code § 17200.

18       GSI asserts a claim under the "unfair" prong of Section 17200 and seeks injunctive relief

19  barring Defendants from engaging in further wrongful acts and requiring a return of GSI's

20  property.  "Unfair" business practices under section 17200 reach any conduct that significantly

21  threatens or harms competition, even conduct not specifically prohibited by some other law. *Cel-*

22  *Tech*, 20 Cal. 4th at 187.

23       ISSI and UMI engaged in unfair conduct that significantly threatens and harms

24  competition, because it excludes GSI from the market and limits competition over price and

25  product quality.  The Court already observed that Defendants' conduct, considered together,

26  "smacks of antitrust-like misconduct" and that this conduct "goes beyond ISSI leveraging GSI

27  trade secret assets to cement its position with Cisco, including ISSI's licensing practices and

28  acquisition strategy," and interfering with the GSI-UMI non-compete.  (Dkt. No. 227 at 16:12-14;

Sept. 21, 2015 Order.)  Indeed, the evidence shows Defendants launched a months-long campaign to remove GSI as a competitor in the LLDRAM market, particularly for Cisco's LLDRAM business.  This included:

- ISSI and UMI's collusion to breach the non-compete by creating a "conflict" between GSI and UMI;

- ████████████████████████████████████████████████
  ████████████████████████████

- ISSI and UMI's collusion to use GSI's schematics to enable ISSI to compete for the Atris, stealing it from GSI;

- ████████████████████████████████████████████████
  and

- Defendants' collusion to breach UMI's non-compete agreement with GSI.

Documents from ISSI demonstrate the harm this conduct poses to competition. ██
████████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████  The harm to competition is also demonstrated by ISSI's
████████████████████████████████████████  even though GSI, not ISSI, meets the higher speed parameters.

### D.   UMI Breached its Contract with GSI.[4]

There is no dispute that there was a written contract between UMI and GSI.  There also is

_____

[4] GSI also has a declaratory judgment claim that seeks a judicial determination of the respective rights and obligations of GSI and UMI with respect to certain provisions of the Agreement. Specifically, GSI requests an entry of judgment in its favor declaring that:  (A) GSI's failure to provide wafer starts was not a breach of a material obligation on its part under the Agreement; (B) even if it were a material obligation, (1) the inability of UMI's parent company (ProMOS) to manufacture the wafers/chips (a) relieved GSI of such dependent duty under the Agreement and (b) estopped UMI from subsequently claiming that GSI breached the Agreement, or (2) UMI failed to initiate a meet and confer process which was a condition precedent to claiming material breach of the Agreement; and (C) even if the Agreement terminated early, the survival clause provides that the non-compete obligation survives for five years and the confidentiality obligation survives for ten years.  GSI further seeks a judicial determination that Atris is a "Low Latency DRAM" project, within the meaning of Article III.6 of the Agreement, and that UMI's assisting ISSI in connection with Atris violated Articles III.1, III.6, and IV.1 of the Agreement.

no dispute that the Agreement contained:  (1) a non-compete provision that UMI could not

complete (or assist another in competing) against GSI; (2) a confidentiality provision that

obligated UMI not to disclose confidential information and to keep such information confidential;

and (3) an ownership provision.  The ownership provision stated:

> "GSI shall have sole ownership of all deliverables and the Product,
> and all associated intellectual property rights (excluding solely any
> Project Patents  that UMI owns under the terms of Article IV) and
> all other works of authorship, information fixed in any tangible
> medium of expression (whether or not protectable under copyright
> laws), inventions (whether or not protectable under patent laws),
> discoveries, designs, developments, suggestions, ideas,
> improvements, know-how, and other intellectual property rights
> conceived, developed or reduced to practice by GSI, alone or with
> others, during the course of the Project (collectively, the "GSI
> IP")[.]  This includes, without limitation, the following: the
> specification of the Product, the layout (database) of the Product,
> circuit simulations and/or HDL descriptions of the Product. . . ." .

UMI breached each of these provisions.

### i.        UMI Breached the Non-Compete Provision.

The Court has ruled that the non-compete provision is unambiguous and that the five year

term of the non-compete obligation does not expire even if the Agreement were terminated ("that

means that upon termination UMI may not compete for the full five years.") (9/21/2015 Order,

Dkt No. __, p. 25.)  UMI breached the non-compete provision of the Agreement by assisting ISSI

with its Atris design.  Beginning in August 2012, UMI lent ISSI assistance in the Atris bid, which

included working with the 576Mb schematics and ███████████████████████████."

According to UMI employee time records, from August to December 2012, UMI employees

spent as many as 8 hours a day on the project.  UMI's eventual release of key employees to ISSI

and transfer of the asset database to assist ISSI in its Atris design was a further breach of this

provision, as was the ongoing involvement of ████████████████████████████

███████████████████████████████.

On its face, this conduct constitutes a breach of the non-compete provision.

/////

1   UMI tries to escape liability by arguing that:  (1) Atris is not an "LLDRAM" as defined by

2   the Agreement, and therefore there was no breach; (2) the non-compete provision terminated in

3   July 2009; (3) the non-compete provision is unenforceable; and (4) GSI waived enforcement of

4   the non-compete.  The latter three arguments were rejected by the Court, which found the non-

5   compete survived UMI's attempts to terminate the Agreement in 2009, is enforceable, and that

6   GSI did not waive the non-compete provisions.  (9/21/2015 Order at 25-26, 28-29.)  As to

7   whether Atris is an LLDRAM, the evidence shows that it is.

8          *a.*       ***Atris is an LLDRAM.***

9        The scope of the non-compete provision is as follows:  "UMI agrees it shall not, design or

10   develop, directly or indirectly, or contribute to the design and development of, a Low Latency

11   DRAM Product (as defined below)."  Low Latency DRAM is defined to include RLDRAM

12   products.  Accordingly, the non-compete provision extends to activities relating to Atris because

13   Atris is a LLDRAM product, as is common knowledge throughout the industry.

14        The overwhelming evidence shows "Atris" is an LLDRAM.  UMI's CEO at the time of

15   negotiating the contract, Bob Gower, admitted that he believed at the time of executing the

16   Agreement that LLDRAM included Atris.

17   Throughout the

18   relationship, GSI and UMI referred to the Atris project as an LLDRAM or RLDRAM project.  In

19   March 2009, UMI tried to sell to GSI its design work performed on the Atris project, referring to

20   it as a "1.2Gb Low Latency DRAM."  That same month, UMI described its Atris design to ISSI

21   as "1.2Gb RLDRAM" paper design.

22        Indeed, every major player in the industry characterizes Atris as an LLDRAM or

23   RLDRAM chip.  Renesas, the only supplier of the Atris chip at present, advertises and markets

24   the device as an LLDRAM-III chip.  Cisco's own website describes the Atris as an "LLDRAM3."

25   While ISSI takes no position on UMI's argument that Atris is not an LLDRAM,

26

27

28

DLA Piper LLP (US)
East Palo Alto

WEST\261235806

1    Finally, GSI's expert, Robert Murphy, has also detailed why Atris falls within the LLDRAM

2    definition.

3              ii.      **UMI Breached the Confidentiality and Ownership Provisions.**

4         UMI breached the Confidentiality and Ownership provisions by using the 576Mb

5    schematics in the Atris design for ISSI and then selling to ISSI the Atris schematic database,

6    ████████████████████████████████████████████████████████████████████

7    ███████████████████████ and marked as "confidential" under the Agreement. ████████████

8    ████████████████████████████." The use and disclosure of these schematics is, as a

9    matter of law, a breach of the Agreement's confidentiality and ownership provisions. GSI will

10   prevail on this claim, as UMI can present no evidence to the contrary.

11        **E.    Fraud and False Promise by UMI.**

12        UMI has essentially conceded the factual elements of GSI's fraud and false promise

13   claims. UMI admits that it made false representations or promises to GSI in 2007 and 2008, with

14   the intent that GSI rely upon the statements. GSI will testify to the remaining elements – that it

15   reasonably relied and was harmed – at trial.

16        In 2007 and 2008, UMI represented to GSI that it would not "put a competitor" in

17   business against GSI. Specifically, after GSI expressed concern that UMI could use information

18   gained while designing the 576Mb chip to put a competitor in business against GSI, UMI's CEO

19   told GSI to "Trust me," and represented that it would not "take any business that would put a

20   competitor in business against GSI." UMI reassured GSI that "if a potential customer were to

21   come to UMI asking for a FCDRAM, [UMI] would not take the business." UMI also frequently

22   represented to GSI that UMI's work on the 576Mb chip and Atris was for GSI's benefit. Mr.

23   Gower, who was UMI's CEO at the time, testified that he expected GSI to rely upon his

24   statements. And, UMI understood that GSI did in fact rely upon these statements.

25        However, UMI now claims that the work it did in developing an Atris design leveraged

26   from the 576Mb design, and any work UMI did on the 576Mb design prior to the parties'

27   execution of the 576Mb Agreement in May 2008, was actually for "itself" or "ProMOS" and not

28   for GSI's benefit. At his deposition, Mr. Faue, UMI's current CEO and the chief designer on the

1    576Mb and Atris projects, testified that UMI did no work for GSI in 2007 and had "no

2    commitment" at that point to GSI with respect to any RLDRAM work.

3         Mr. Faue testified that in 2007, even as UMI and GSI were exchanging and memorializing

4    their plan to work on the two projects together, UMI was actually not doing any work for GSI,

5    but rather, any RLDRAM work UMI did was for its own benefit or that of its parent company,

6    ProMOS.  This was during the exact time that UMI was telling GSI to "trust" UMI and that UMI

7    would not "take any business that would put a competitor in business against GSI."  Mr. Faue

8    admitted that as of March 2008, any RLDRAM-related work UMI did was still for its own benefit

9    and not GSI's.  Mr. Faue admitted that at the time he made certain statements to Mr. Chapman

10   regarding how the 576Mb could be "leveraged" into an Atris design, he believed such statements

11   to be inaccurate.  Moreover, Mr. Faue admitted UMI never told GSI that it did not believe Atris

12   could be leveraged from the 576Mb.  Mr. Faue also admitted that UMI never told GSI that it was

13   designing Atris for itself rather than for GSI.

14        In other words, UMI admits to fraud and making false promises.[5]  It also admits that it

15   intended GSI to rely upon these statements.  As GSI's witnesses will testify, they did in fact rely

16   upon these statements and were harmed as a result.  Accordingly, GSI will prevail on its fraud

17   and false promise claims at trial.

18        **F.     Defendants' Tortious and Unlawful Conduct Caused GSI's Harm.**

19        Defendants argue that, regardless of their misconduct, Cisco's decision to award ISSI the

20   Atris bid was an "intervening" action by a third party, relieving Defendants of liability.

21   Defendants' position is wrong.  Defendants miss the point – without their tortious conduct, ISSI

22   never would have been able to submit an Atris bid at all, or design an Atris chip.

23        Specifically, ISSI could not have submitted plans to design an Atris chip – or designed the

24   chip– if:  (1) UMI had not breached its contract with GSI; (2) ISSI had not retained the services of

25   UMI's employees, knowingly in breach of UMI's contract with GSI; (3) ISSI had not hired a

26

27   _____
     [5] UMI has offered this testimony as evidence GSI does not "own" the 576Mb schematics
     transferred to ISSI.  But, as discussed, *supra*, GSI owned all deliverables under the contract and
28   there is no dispute these deliverables were sent.  UMI cannot defeat the clear ownership
     provisions through its fraud.

1  team to design its chip, which would use UMI's pre-existing work (owned by GSI); (4) ISSI had

2  not used GSI trade secret information; and (5) ISSI had not engaged in other acts of unfair

3  competition, ███████████████████████████

4      The evidence shows ISSI lacked the technical ability to develop Atris on its own. ██

5  ████████████████████████████████████████

6  ████████████████████████████████████████.

7  The same was true in 2012 – the ability of ISSI's engineers to design the product was dubious, at

8  best.  ISSI's internal design team was unable to hit the highest speed grade on its less-complicated

9  576Mb RLDRAM chip and did not design (but licensed from Micron) its other RLDRAM chip,

10  the "RL3." ████████████████████████████

11  ████████████████████████████████████████

12  ████████████████████████████████████████

13  ███████████████████████████████████."

14      To overcome shortcomings of its own engineering team, ISSI had to engage in the bad

15  acts described above with UMI to displace GSI from the market and win the Atris bid.  And it

16  worked.  GSI lost in a competition where, but for UMI and ISSI, GSI would have been the only

17  bidder for the Atris second source award.  Further, ISSI then hired several UMI employees that

18  worked on LLDRAM for GSI and bought the GSI schematics.  ISSI always understood it would

19  own UMI's work-product, based upon the 72nm RLDRAM database. ████████████

20  ████████████████████████████████████████

21  ████████████████████████████████████████

22  ████████████████████████████████████████

23  ████████████████████████████████████████

24  ████████████████████████████████████████

25  ████████████████████████████████████████

26  ████████████████████████████████████████

27  ███████████████.  The sole LLDRAM expertise UMI brought to the table was its work on

28  GSI's 576Mb chip and the schematics owned by GSI.  So the expertise ██████████

-20-

1   ████████████ was GSI's property, including its trade secrets, and UMI's experience,

2   leveraged by ISSI only through a knowing violation of UMI's non-compete obligations.  Without

3   GSI's property, including the trade secrets, and UMI's partnership, ████████████

4   ████████████

5        Indeed, ████████████████████████████████

6   ███████.  ISSI's technical capability came from the UMI employees who were ineligible to assist

7   in competing against GSI and from GSI's 576Mb schematics.

8        **G.      GSI's Damages Calculations Are Reasonable.**

9        As calculated by GSI's damages expert, GSI has suffered damages of more than $40

10   million caused by ISSI and UMI before considering exemplary damages, punitive damages,

11   recoverable attorneys' fees, and costs.  In short, this is the value of winning the Atris second-

12   source bid from Cisco.  This number comes in large part from ISSI's own "Atris Business Case"

13   analysis of the Atris bid, which happens to come up with numbers very close to what GSI

14   independently calculated when considering bidding for the work.  On the low end, if all factors

15   are tilted in favor of Defendants (such as price, volume, and discount rate); GSI's damages are

16   still $20 million.

17        UMI's damages expert does not offer an opinion about the amount of damages and ISSI's

18   damages expert claims the entire value of the Atris second-source contract is about $2 million.

19   No publicly traded company – certainly not ISSI or GSI – would invest the time and money

20   chasing Atris and RLDRAM if the expected profit was only $2 million.

21        Notwithstanding these reasonable and conservative calculations, GSI expects Defendants

22   will argue that GSI's measure of damages, based on future sales of memory chips to Cisco, is too

23   speculative and that the harm was not foreseeable.  These arguments are unfounded as a factual

24   matter.

25        GSI's damages calculation is not speculative, because, as noted above, it is based upon

26   Cisco's projections of demand for Atris chips – projections both ISSI and GSI adopted and used

27   in evaluating the business case for the Atris proposal.  The threshold for establishing damages is

28   low, requiring only that the entitlement to damages be established with reasonable certainty – a

1   concept not subject to quantification and certainly met by the evidence showing, but for ISSI's

2   misconduct, GSI would have been the only bidder and thus only company capable of obtaining

3   the Atris award.  *See Onyx Pharms., Inc. v. Bayer Corp.*, 863 F. Supp. 2d 894, 902 (N.D. Cal.

4   2011) ("Bayer can point to no case, nor has Judge Patel or this Court uncovered such a case, in

5   which California courts have mandated a percentage of certainty above 57% in order to constitute

6   'reasonable certainty.'").  Beyond that, the amount of damages needs only to be based on a

7   "reasonable basis."  *ATS Prods. Inc. v. Ghiorso*, No. C10-4880 BZ, 2012 WL 253315, at *1 (N.D.

8   Cal. Jan. 26, 2012).  This is plainly met here.

9         Further, the damages were reasonably foreseeable to both defendants.  UMI knew, since

10  2007, that GSI sought to provide Atris chips to Cisco.  UMI also knew that GSI believed it would

11  be harmed if UMI used GSI's technology and intellectual property to assist GSI's competitor –

12  that is why the parties agreed to a non-compete provision.  Indeed, the Recitals for the Agreement

13  state that:  "because UMI's position as a contract memory service provider," and UMI's ability to

14  use what it learned working for GSI to assist a GSI competitor, the non-compete provision was

15  "necessary."  The Recitals go on to state:  the "non-compete provision of this Agreement is

16  necessary to protect GSI's trade secrets and legitimate and significant business interests.  In the

17  absence of the restrictions contained in the Agreement, GSI would not have considered selecting

18  UMI . . . ."  ISSI knew that GSI was its competitor for the Atris bid, and ISSI knew Cisco's

19  projections *and* GSI's pricing for Atris.

## IV.   DEFENDANTS' EQUITABLE DEFENSES ARE FOR THE COURT TO DECIDE AND SHOULD BE REJECTED.

22        Defendants have asserted several pro forma affirmative defenses, each of them lacking in

23  merit.  By and large, these defenses are issues for the Court, not the jury, to resolve.  And,

24  because they are likely to distract and bias a jury on issues not relevant to Defendants' liability,

25  any consideration should be after trial and should not be presented to the jury, as further

26  explained in GSI's Motion in Limine No. 5, filed concurrently herewith.

27  /////

28  /////

1    **A.    Defendants Cannot Prevail on a "Bad Faith" Defense.**

2    For all of the reasons identified in GSI's motion for summary judgment, Defendants

3    cannot prevail on this "defense" – no matter the outcome at trial.  *See* Cal. Civ. Code § 3426.4.

4    Even if ISSI were to prevail at trial, it would have to show both that GSI's trade secret claim was

5    "objectively specious" and that it was brought or maintained in subjective bad faith before it

6    could obtain attorneys' fees.  *See FLIR Sys., Inc. v. Parrish*, 174 Cal. App. 4th 1270, 1275–76

7    (2009).  Objective speciousness exists only where "there is a complete lack of evidence to support

8    the claim."  *Id*. at 1276.  Subjective bad faith "means the action was commenced or continued for

9    an improper purpose, such as harassment, delay, or to thwart competition."  *SASCO v. Rosendin*

10   *Elec., Inc*., 207 Cal. App. 4th 837, 847 (2012) (internal citations omitted).

11   As GSI discussed, at length, in its summary judgment papers, and as the evidence at trial

12   will show, GSI's claims are well-founded and based on substantial evidence, much of which GSI

13   discovered before filing suit.  This is not a case brought in bad faith, but one GSI filed to

14   vindicate its legal rights.

15   **B.    Defendants' Unclean Hands Defense Must Fail.**

16   A defense of unclean hands arises from the principle that "[h]e who comes into Equity

17   must come with clean hands."  *Blain v. Doctor's Co*., 222 Cal. App. 3d 1048, 1059 (1990).  It

18   requires a showing that the plaintiff engaged in misconduct directly related to the transaction at

19   issue.  *Minguez v. Arthur Young & Co*., 52 Cal. App. 4th 820, 846 (1997).  Unclean hands cannot

20   be used to turn a trial into an evaluation of the general morals of the parties.  *Id*.

21   Defendants' "unclean hands" defense dovetails with the "bad faith" defense and fails for

22   the same central reason – Defendants cannot point to any misconduct by GSI, which would

23   prevent recovery.  In particular, Defendants cannot point to any conduct by GSI that is

24   reprehensible enough that it would be inequitable for GSI to recover damages caused by

25   Defendants' own bad acts.

26   Moreover, California case law holds the doctrine of unclean hands is not a defense to an

27   unfair trade or business practices claim based on a violation of the Unfair Competition Law

28   (§ 17200 et seq.)  *Cortez v. Purolator Air Filtration Prods. Co*. 23 Cal. 4th 163, 179 (2000).  The

1    defense is unavailable, therefore, to GSI's section 17200 claims.

2        **C.      GSI's Claims are Timely.**

3        Both Defendants have asserted a statute of limitations defense, which appears to be based

4    on the theory that GSI unreasonably delayed in bringing suit, because GSI should have known in

5    2009 that UMI intended to misappropriate GSI's property. This position is meritless.

6        GSI learned the facts constituting its trade secret misappropriation claim during expedited

7    discovery in May 2013. Until then, GSI did not know that UMI and ISSI began to misappropriate

8    GSI's 576Mb trade secrets in Fall 2012 and then UMI sold the Atris database, which was

9    substantially "leveraged" from GSI's 576Mb database, to ISSI in March 2013. GSI's

10   misappropriation claim, filed less than five months after expedited discovery on October 3, 2013,

11   was certainly timely. *See* Cal. Civ. Code § 3426.6.

12       UMI has argued that GSI should have suspected in mid-2009 that UMI *intended* to sell

13   GSI's trade secrets to an unknown third party, and that the claim accrued at this time. Even

14   ignoring the factual problems in UMI's argument, it is legally absurd. A statutory period does not

15   begin to run until the plaintiff knew or should have known that a violation *actually* occurred.

16   *Menefee v. Ostawari*, 228 Cal. App. 3d 239, 245 (1991) ("a cause of action accrues when, under

17   the substantive law, the wrongful act is done and liability arises, i.e., when a suit may be

18   brought"). In other words, all elements of the claim must have actually taken place before the

19   statutory period begins running. To be certain, in March 2009, UMI's CEO told ISSI that it

20   would not work with ISSI because of a conflict with a customer (GSI). If UMI communications

21   to ISSI express that it would not engage in conduct that would misappropriate GSI's trade secrets

22   in 2009, certainly GSI had no independent basis at the time to suspect that UMI would

23   misappropriate its trade secrets.

24       Defendants' position is therefore unfounded.

25       **D.      GSI's Claims are Not Barred by Estoppel.**

26       Defendants have also asserted a series of defenses (estoppel, acquiescence, consent) based

27   on the notion that GSI somehow acquiesced to Defendants' misconduct because GSI did not

28   intervene and warn ISSI and UMI of their own malfeasance. These defenses fail because GSI had

1    no duty to warn ISSI or UMI and, in any event, neither Defendant can establish they relied on

2    GSI's silence.  Tellingly, Defendants have not identified a case imposing such a duty.  These

3    issues are addressed in GSI's opposition to ISSI's motion for summary judgment on this defense.

4            These defenses are merely Defendants' attempts to distract from the facts relevant to their

5    liability.  Indeed, as the facts reveal, GSI could not have had a duty to warn Defendants of their

6    own misconduct and could not have consented to or acquiesced in any misconduct for three very

7    important reasons.

8            ISSI was no innocent, inadvertent wrongdoer, and no jury would believe it to be.  ISSI

9    knew or, at a minimum, had a duty to investigate whether it was engaging in misconduct.  ISSI

10   moved forward anyway.  The ignorance of the party asserting equitable estoppel must be both

11   actual and permissible.  *Life v. Los Angeles Cnty.*, 227 Cal. App. 3d 894, 902 (1991).  Evidence

12   must show that the party asserting estoppel not only lacked actual knowledge of the facts, but that

13   he did not have notice of the facts sufficient to put a reasonably prudent person on inquiry.  *Cole*

14   *v. City of Los Angeles*, 187 Cal. App. 3d 1369, 1374 (1986).

15           GSI did not know ISSI misappropriated GSI's trade secrets until well after ISSI.  GSI

16   learned only after the filing of this lawsuit and only after discovery – at a point when ISSI had

17   ████████████████████████████████████████████████████████

18   ██████

19           Nor did ISSI rely upon any conduct by GSI.  ISSI received the last block of schematics

20   and completed its transaction with UMI with full knowledge of GSI's claims in this lawsuit.

21   ████████████████████████████████████████████████████████████

22   ██████████████████████████████████████████████████████████

23   ██████████████████████████.

24           For all of these reasons, Defendants' equitable defenses of estoppel, acquiescence, and

25   consent must fail.

26   ////

27   ////

28   ////

1 | **V.     CONCLUSION.**

2 |        It is undisputed that UMI and ISSI began using GSI's property, including trade secrets, in

3 | the fall of 2012.  It is undisputed that UMI transferred GSI's schematics to ISSI, including the 25

4 | 576Mb Trade Secret Schematics, in March 2013. ██████████████████████████████

5 | ████████████████████████████████████████████████████████████████

6 | ████████████.  GSI's actual damages are over $40 million and are supported by the facts and

7 | the law.  GSI is also entitled to exemplary damages, punitive damages, and attorneys' fees and

8 | costs.

9 | Dated:  September 22, 2015                    DLA PIPER LLP (US)

10 |                                              By  /s/ Rajiv Dharnidharka
                                                 JEFFREY M. SHOHET
11 |                                              ANDREW P. VALENTINE
                                                 RAJIV DHARNIDHARKA
12 |                                              BROOKE KILLIAN KIM
                                                 VERONICA L.JACKSON
13 |                                              KELLIN CHATFIELD

14 |                                              Attorneys for Plaintiff