COLLEEN BAL, Cal. Bar No. 167637
JOHN P. FLYNN, Cal. Bar No. 141094
CHARLES T. GRAVES, Cal. Bar No. 197923
JOEL C. BOEHM (admitted *pro hac vice*)
JOSHUA A. BASKIN, Cal. Bar No. 294971
BRIANNA C. KOHR, Cal. Bar No. 300531
WILSON SONSINI GOODRICH & ROSATI, P.C.
One Market Plaza, Spear Tower, Suite 3300
San Francisco, CA 94105
TEL: 415-947-2000
FAX: 415-947-2099
Email: cbal@wsgr.com; jflynn@wsgr.com; tgraves@wsgr.com;
jboehm@wsgr.com; jbaskin@wsgr.com; bkohr@wsgr.com

ANTHONY J WEIBELL, Cal. Bar No. 238850
WILSON SONSINI GOODRICH & ROSATI, P.C.
650 Page Mill Road
Palo Alto, CA 94304-1050
Telephone: (650) 493-9300
Facsimile: (650) 565-5100
Email: aweibell@wsgr.com

*Attorneys for Defendant*
INTEGRATED SILICON SOLUTION, INC.

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | |
|---|---|
| GSI TECHNOLOGY, INC., a Delaware Corporation,<br><br>Plaintiff,<br><br>v.<br><br>UNITED MEMORIES, INC., a Colorado Corporation, and INTEGRATED SILICON SOLUTION, INC. a Delaware Corporation,<br><br>Defendants.<br><br>AND RELATED COUNTERCLAIMS. | CASE NO.: 5:13-cv-01081-PSG<br><br>**DEFENDANT INTEGRATED SILICON SOLUTION, INC.'S MOTION FOR JUDGMENT ON PARTIAL FINDINGS AND JUDGMENT AS A MATTER OF LAW RE: PLAINTIFF'S UCL AND TIPER CLAIMS**<br><br>Trial Date: Monday, Oct. 26, 2015<br>Dept.:      Courtroom 5, 4th Floor<br>Before:     Honorable Paul S. Grewal |

**TABLE OF CONTENTS**

<u>Page</u>

MOTION ...................................................................................................................1

MEMORANDUM OF POINTS AND AUTHORITIES ...........................................1

INTRODUCTION......................................................................................................1

ARGUMENT .............................................................................................................2

I.      THE COURT SHOULD GRANT JUDGMENT FOR ISSI ON THE UCL CLAIM ........2

        A.      GSI Was Required to Prove Harm to Competition of the Type the Antitrust
                Laws Were Enacted to Prevent ....................................................................2

        B.      GSI Failed to Prove Harm to Competition Because it Failed to Prove the
                Scope of the Relevant Competitive Market ...............................................6

                1.      GSI Was Required to Prove a Relevant Competitive Market ...................6

                2.      GSI Failed to Define or Present Evidence of the Relevant Market............8

        C.      GSI Failed to Prove Harm to Competition in Any Alleged Market........................9

        D.      ISSI's Conduct Was Protected Procompetitive Conduct ....................................11

                1.      Partnering with UMI ....................................................................12

                2.      GSI Failed to Prove that ISSI Made Any Disparaging Remarks
                        Regarding Cypress' ITC Lawsuit, Much Less That Such Remarks
                        Were Part of a Plan to Exclude GSI from the LLDRAM Market.............13

                3.      Hiring Anand Bagchi ...................................................................14

                4.      GSI has Failed to Prove That ISSI's Licensing Practices Were Not
                        Privileged ................................................................................15

                5.      Pursuing the Atris Contract with a Winning Bid ..................................16

                6.      Seeking to Become a Stronger Competitor Against the Likes of
                        Renesas and Micron by Acquiring GSI..............................................16

        E.      GSI Failed to Prove that ISSI Proximately Caused Any Harm to
                Competition ..............................................................................................17

II.     THE COURT SHOULD GRANT JUDGMENT AS A MATTER OF LAW IN
        FAVOR OF ISSI ON GSI'S TIPER CLAIM .................................................................17

III.    CONCLUSION .................................................................................................18

1

**TABLE OF AUTHORITIES**

2

<u>Page</u>

3

**CASES**

4

*AFMS LLC v. UPS Co.*, No. 10-5830, 2015 U.S. Dist. LEXIS 56977 (C.D. Cal.
    Apr. 30, 2015) .................................................................................................8

5

6

*Apple Inc. v. Psystar Corp.*, 586 F. Supp. 2d 1190 (N.D. Cal. 2008) ........................5, 6

7

*Belton v. Comcast Cable Holdings, LLC*, 151 Cal. App. 4th 1224 (2007) ....................4

*Bhan v. NME Hosps., Inc.*, 929 F.2d 1404 (9th Cir. 1991) ...........................................7

8

*Blizzard Entm't Inc. v. Ceiling Fan Software LLC*, 941 F. Supp. 2d 1227 (C.D. Cal.
    2013) ................................................................................................................6

9

10

*Blue Cross & Blue Shield United v. Marshfield Clinic*, 65 F.3d 1406 (7th Cir. 1995) ..................7

11

*Cel-Tech Commc'ns, Inc. v. Los Angeles Cellular Tel. Co.*, 20 Cal. 4th 163 (1999) ............. *passim*

12

*Chavez v. Whirlpool Corp.*, 93 Cal. App. 4th 363 (2001) ...........................................4

13

*City of San Jose v. Office of the Comm'r of Baseball*, 776 F.3d 686 (9th Cir. 2015) ...........5

14

*Cmty. Assisting Recovery, Inc. v. Aegis Sec. Ins. Co.*, 92 Cal. App. 4th 886 (2001) .......................13

15

*Della Penna v. Toyota Motor Sales, U.S.A., Inc.*, 11 Cal. 4th 376 (1995)................................12, 17

16

*DocMagic, Inc. v. Ellie Mae, Inc.*, 745 F. Supp. 2d 1119 (N.D. Cal. 2010) .....................................6

17

*Drum v. San Fernando Valley Bar Ass'n*, 182 Cal. App. 4th 247 (2010)......................................3

18

*Epicor Software Corp. v. Alternative Tech. Solutions, Inc.*, No. 13-00448, 2013
    U.S. Dist. LEXIS 109278 (C.D. Cal. June 21, 2013)..........................................6

19

20

*Equifax, Inc. v. F.T.C.*, 618 F.2d 63 (9th Cir. 1980) .......................................................7

21

*Gemini Aluminum Corp. v. Cal. Custom Shapes*, 95 Cal. App. 4th 1249 (2002) ...............11, 12, 13

22

*Girafa.com, Inc. v. Alexa Internet, Inc.*, No. 08-02745 RMW, 2008 U.S. Dist.
    LEXIS 78260 (N.D. Cal. Oct. 6, 2008) .............................................................5

23

*In re Cipro Cases I & II*, 61 Cal. 4th 116 (2015)...............................................1, 6, 9, 10

24

*In re Firearm Cases*, 126 Cal. App. 4th 959 (2005) ...................................................17

25

*K.C. Multimedia, Inc. v. Bank of America Tech. & Operations, Inc.*, 90 Cal. Rptr.
    3d 247 (2009) ................................................................................................15

26

*Kaplan v. Burroughs Corp.*, 611 F.2d 286 (9th Cir. 1979)......................................1, 10

27

*Levitt v. Yelp! Inc.*, 765 F.3d 1123 (9th Cir. 2014) .................................................4, 5

28

*Malaney v. UAL Corp.*, No. 10-02858-RS, 2010 U.S. Dist. LEXIS 106049 (N.D. Cal. Sept. 27, 2010) ........................................................................................7

*Marsh v. Anesthesia Servs. Med. Grp., Inc.*, 200 Cal. App. 4th 480 (2011) ...............................6, 10

*McWane, Inc. v. FTC*, 783 F.3d 814 (11th Cir. 2015) ........................................................3

*Morgan, Strand, Wheeler & Biggs v. Radiology, Ltd.*, 924 F.2d 1484 (9th Cir. 1991) .......................................................................................................7, 8

*Oracle Am., Inc. v. Cedarcrestone, Inc.*, 938 F. Supp. 2d 895 (N.D. Cal. 2013) ...........................6

*People's Choice Wireless, Inc. v. Verizon Wireless*, 131 Cal. App. 4th 656 (2005) ......................6

*Plush Lounge Las Vegas LLC v. Hotspur Resorts Nev. Inc.*, 371 F. App'x 719 (9th Cir. 2010) .........................................................................................................8

*Procongps, Inc. v. Star Sensor LLC*, No. 11-3975 SI, 2011 U.S. Dist. LEXIS 137366 (N.D. Cal. Nov. 29, 2011) .................................................................5, 10

*Rebel Oil Co. v. Atl. Richfield Co.*, 51 F.3d 1421 (9th Cir. 1995) .........................................7

*RLH Indus., Inc. v. SBC Commc'ns, Inc.*, 133 Cal. App. 4th 1277 (2005) ...............................5, 10

*Shvarts v. Budget Grp., Inc.*, 81 Cal. App. 4th 1153 (2000) ..............................................13

*Silguero v. Creteguard, Inc.*, 187 Cal. App. 4th 60 (2010) ................................................14

*Silicon Image, Inc. v. Analogix Semiconductor, Inc.*, No. 07-0635 JCS, 2007 U.S. Dist. LEXIS 39599 (N.D. Cal. May 16, 2007) .......................................................5

*Silvaco Data Sys. v. Intel Corp.*, 109 Cal. Rptr. 3d 27 (2010) ...........................................15

*Sterling Merch., Inc. v. Nestle, S.A.*, 656 F.3d 112 (1st Cir. 2011) .....................................16

*Stewart v. Gogo, Inc.*, No. C-12-5164-EMC, 2013 U.S. Dist. LEXIS 51895 (N.D. Cal. Apr. 10, 2013) .........................................................................................6

*Sybersound Records, Inc. v. UAV Corp.*, 517 F.3d 1137 (9th Cir. 2008) ..................................5

*Tuck Beckstoffer Wines LLC v. Ultimate Distribs.*, 682 F. Supp. 2d 1003 (N.D. Cal. 2010) .......................................................................................................4

*U.S. Aluminum Co. of Am.*, 148 F.2d 416 (2d Cir. 1945) .................................................16

**STATUTES**

15 U.S.C. § 45(a) ........................................................................................3

Cal. Bus. & Prof. Code § 16600 .......................................................................13, 14

Cal. Bus. & Prof. Code § 17200, *et seq.* ................................................................1

Cal. Civil Code § 1608 ....................................................................................13

Cal. Civil Code § 1936(m)(2) ............................................................................13

**RULES**

Fed. R. Civ. P. 50(a)...........................................................................................................1

Fed. R. Civ. P. 52(c)...........................................................................................................1

**MISCELLANEOUS**

1 ABA Section of Antitrust Law, Antitrust Law Developments 589 (7th ed. 2012).......................7

William Holmes & Melissa Mangiaracina, Antitrust Law Handbook § 7:2 (2014) .........................3

## MOTION

Defendant Integrated Silicon Solution, Inc. ("ISSI"), ISSI hereby moves the Court for an order: (1) pursuant to Fed. R. Civ. P. 52(c), granting judgment in favor of ISSI on GSI's claim for violation of Cal. Bus. & Prof. Code § 17200, *et seq.* ("UCL"), which claim has been tried to the Court; and (2) pursuant to Fed. R. Civ. P. 50(a), granting judgment as a matter of law in favor of ISSI on GSI's claim for tortious interference with prospective economic relations ("TIPER"), because a violation of the UCL is a necessary element of GSI's TIPER claim.

The Court must rule on the UCL claim before the jury is charged. The only way the jury may be charged on the TIPER claim is if the Court rules in favor of GSI on the UCL claim. If the Court rules in favor of ISSI, the jury will never be charged on the TIPER claim.

## MEMORANDUM OF POINTS AND AUTHORITIES

### INTRODUCTION

GSI's UCL/unfair claim fails for two fundamental reasons.

First, to prove the claim, GSI was required to prove substantial harm to overall competition in the relevant market. Injury to GSI is not injury to competition. As the Court previously recognized in granting ISSI's motion to dismiss GSI's antitrust claims, even "the elimination of a single competitor, standing alone, does not prove anticompetitive effect." ECF No. 227 at 7 (citing *Kaplan v. Burroughs Corp.*, 611 F.2d 286, 291 (9th Cir. 1979)). Thus, to prove harm to competition, GSI was first required to establish an economically viable product market, and then to prove that ISSI's conduct "play[ed] enough of a role in that market to impair competition significantly." *In re Cipro Cases I & II*, 61 Cal. 4th 116, 157 (2015).

GSI utterly failed to prove harm to competition. It presented no economic or other analysis, let alone any expert testimony, to define the contours of a relevant product market. While GSI alleged in its complaint, and confirmed in its pretrial brief, its belief that the relevant market is the "market for LLDRAM," it provided no evidence to support that market, as opposed to some other market encompassing sales of LLDRAM and Atris (such as the market for high performance memory chips, SRAM, or DRAM). Likewise, GSI presented no evidence whatsoever that ISSI's conduct had any negative effect on overall competition in the relevant market. While

few witnesses had anything to say about the market, the few that did unanimously agreed that it is dominated by other large, multi-national companies (e.g., Micron, Renesas, Samsung, SK Hynix, etc.), suggesting that ISSI is insignificant and lacks any power to affect competition. GSI argues that it "lost in a competition where, but for UMI and ISSI, GSI would have been the only bidder for the Atris second source award." GSI Tr. Br. (ECF No. 800) at 20. The fact that GSI lost a competitive bid is not harm to competition. It is the essence of competition.

Second, GSI failed to prove any conduct that would support a UCL claim. Every type of conduct that GSI identified in its pretrial brief (alleged disparagement, interference with a non-compete agreement, use of GSI's information to win the Atris bid, acquisition strategy, Micron license) has been shown at trial to constitute behavior that falls within California's competition privilege – which protects even rough and hard fought competition because it is good for consumers – and therefore cannot support a UCL claim as a matter of law.

Because GSI failed to establish the required harm to competition, ISSI is entitled to judgment on the UCL claim. And because successfully proving a UCL claim is a necessary element of GSI's TIPER claim, ISSI is also entitled to judgment on the TIPER claim.

## ARGUMENT

## I.    THE COURT SHOULD GRANT JUDGMENT FOR ISSI ON THE UCL CLAIM

### A.    GSI Was Required to Prove Harm to Competition of the Type the Antitrust Laws Were Enacted to Prevent

At the pretrial conference, the Court asked whether proving "harm to competition," as defined by antitrust jurisprudence, is just one "alternative" way to prevail on a UCL claim in a competitor (non-consumer) case, and in particular whether the language of *Cel-Tech* "suggest[s] that even in the absence of a threat or a harm to competition, one may . . . maintain a claim." ECF No. 906 at 26:14-16. Controlling California and Ninth Circuit authority answers that question with a definitive *no*. As explained below, no published California appellate or Ninth Circuit

authority has ever sustained a competitor UCL claim after *Cel-Tech* absent proof of harm to competition.[1] And indeed, GSI does not dispute that it must prove harm to competition. ECF No. 906 at 12:15-17; *see also* ECF No. 800 at 14 ("'Unfair' business practices under section 17200 reach any conduct that significantly threatens or harms competition"); *see also id.* at 15 (listing the allegations that GSI contends show "harm to competition").

In *Cel-Tech*, the California Supreme Court ruled that to protect vigorous "procompetitive" conduct, the harm element of a UCL competitor claim must be measured against the harm element required for an antitrust claim. *Cel-Tech Commc'ns, Inc. v. Los Angeles Cellular Tel. Co.*, 20 Cal. 4th 163, 186-187 (1999). As the Court explained, "we must require that any finding of unfairness to competitors under section 17200 be *tethered* to some legislatively declared policy or *proof of some actual or threatened impact on competition*."[2] 20 Cal. 4th at 186-187 (emphasis added). Thus, "[i]n competitor cases, a business practice is 'unfair' *only* if it 'threatens an incipient violation of an antitrust law, or violates the policy or spirit of one of those laws because its effects are comparable to or the same as a violation of the law, or *otherwise significantly threatens or harms competition*.'" *Drum v. San Fernando Valley Bar Ass'n*, 182 Cal. App. 4th 247, 254 (2010) (emphasis added) (quoting *Cel-Tech*, 20 Cal. 4th at 187).

Despite the disjunctive phrase "comparable to or the same" in the *Cel-Tech* definition of "unfair," no conduct can violate the "policy or spirit" of the antitrust laws unless it poses a significant threat to competition. *Cel-Tech*, 20 Cal. 4th at 187. That is because "[i]njury to a com-

---

[1] Counsel for ISSI reviewed the 197 published California appellate and Ninth Circuit appellate decisions that cite to *Cel-Tech*. In not one of these cases did the court sustain a UCL/unfair claim against a competitor without a showing of harm to competition.

[2] In searching to define a standard for "unfair" conduct under the UCL, the California Supreme Court in *Cel-Tech* turned to section 5 of the Federal Trade Commission Act (15 U.S.C. § 45(a)) for "guidance" and determined that for "a claim of unfair competition between direct competitors, the relevant jurisprudence would be that arising under section 5's prohibition against 'unfair methods of competition.'" 20 Cal. 4th at 186. Section 5 jurisprudence recognizes that "'[f]or the most part . . . the [Federal Trade Commission Act] has been held coterminous with the Sherman and Clayton Acts,'" and requires "harm to competition." *McWane, Inc. v. FTC*, 783 F.3d 814, 827 n.10, 835 (11th Cir. 2015) (quoting William Holmes & Melissa Mangiaracina, Antitrust Law Handbook § 7:2 (2014)).

petitor is not equivalent to injury to competition [and] only the latter is the proper focus of anti-trust laws." *Id.* at 186.   Accordingly, although a competitor plaintiff need not prove other elements of an antitrust claim (e.g. intent, motive) to prove a UCL violation, the plaintiff must at least prove significant harm to competition, just as would be required to demonstrate an antitrust injury under state and federal antitrust jurisprudence. *Cel-Tech*, 20 Cal. 4th at 186-187; *id.* at 189 ("[P]ractices that have the *effect* of harming competition may be unfair even if done without the *purpose* necessary to violate [an antitrust law].") (some emphasis in original).   Thus, while a UCL claim is sweeping in scope, the effect of the challenged conduct must meet a firmly established, objective standard.  *See id.* at 185 (noting that an "undefined standard of what is unfair" might improperly "lead to the enjoining of *pro*competitive conduct and thereby undermine consumer protection.") .

Consequently, no California appellate authority has ever found any conduct to fall within the *Cel-Tech* definition of "unfair" for competitor cases where that conduct did not pose a significant harm to competition under antitrust jurisprudence.  Controlling authority expressly requires courts to use the same standard of harm to competition that is used for state and federal antitrust claims: "[t]o permit a separate inquiry into essentially the same question under the unfair competition law would only invite conflict and uncertainty and could lead to the enjoining of procompetitive conduct." *Belton v. Comcast Cable Holdings, LLC*, 151 Cal. App. 4th 1224, 1240 (2007) (product tying arrangement was not a violation of UCL where it did not unreasonably impair competition under antitrust jurisprudence). Under this rule, "the determination that the conduct is not an unreasonable restraint of trade [under antitrust jurisprudence] necessarily implies that the conduct is not 'unfair' toward consumers." *Chavez v. Whirlpool Corp.*, 93 Cal. App. 4th 363, 375 (2001).

Following this controlling California precedent, the Ninth Circuit has interpreted the *Cel-Tech* standard as a "requirement that the effect of [defendant's] conduct amounts to a violation of antitrust laws 'or otherwise significantly threatens or harms competition.'" *Levitt v. Yelp! Inc.*, 765 F.3d 1123, 1137 (9th Cir. 2014); *accord Tuck Beckstoffer Wines LLC v. Ultimate Distribs.*, 682 F. Supp. 2d 1003, 1019 (N.D. Cal. 2010) ("To prevail under the 'unfair' prong, [plaintiff]

must establish harm to competition, not merely harm to itself.").[3] The Ninth Circuit further holds that "the determination that the conduct is not an unreasonable restraint of trade [under antitrust jurisprudence] necessarily implies that the conduct is not 'unfair' toward consumers." *City of San Jose v. Office of the Comm'r of Baseball*, 776 F.3d 686, 691-692 (9th Cir. 2015).

Therefore, under both controlling California and Ninth Circuit authority, there is no "relevant distinction in the standards" for the element of harm to competition for an antitrust claim and the harm to competition required for a UCL claim. *Apple Inc. v. Psystar Corp.*, 586 F. Supp. 2d 1190, 1204 (N.D. Cal. 2008). Hence, even in cases where the plaintiff can show some conceivable harm to competition, the challenged conduct does not violate the UCL if it does not meet the test for harm to competition under antitrust jurisprudence. *See, e.g.*, *RLH Indus., Inc. v. SBC Commc'ns, Inc.*, 133 Cal. App. 4th 1277, 1286-87 (2005) (no UCL violation despite exclusion of competitor where competition remained in the market among other competitors); *City of San Jose*, 776 F.3d at 691-692 (no UCL violation where MLB refused to allow the Oakland A's baseball team to relocate to San Jose because such conduct was tolerated by the antitrust laws); *Levitt*, 765 F.3d at 1136-37 (allegation that Yelp "harms competition by favoring businesses that submit to Yelp's manipulative conduct … to the detriment of competing businesses that decline" failed to show "violations of antitrust principles"); *Sybersound Records, Inc. v. UAV Corp.*, 517 F.3d 1137, 1140, 1153 (9th Cir. 2008) (no UCL violation where plaintiff's competitor lied to customers that its karaoke records were 100 percent licensed because such conduct was not "an incipient violation of antitrust law").

---

[3] *See also Procongps, Inc. v. Star Sensor LLC*, No. 11-3975 SI, 2011 U.S. Dist. LEXIS 137366, at *9-10 (N.D. Cal. Nov. 29, 2011) (although a UCL plaintiff need not prove "an antitrust violation," it must prove "conduct that significantly threatens or harms competition"; the fact that plaintiff "lost at least one customer" is not enough); *Girafa.com, Inc. v. Alexa Internet, Inc.*, No. 08-02745 RMW, 2008 U.S. Dist. LEXIS 78260, at *5, *9 (N.D. Cal. Oct. 6, 2008) (*Cel-Tech*'s definition of "unfair" "requires an 'actual or threatened impact on competition,' not just harm to a competitor."); *Silicon Image, Inc. v. Analogix Semiconductor, Inc.*, No. 07-0635 JCS, 2007 U.S. Dist. LEXIS 39599, at *19 (N.D. Cal. May 16, 2007) ("[plaintiff] will be required to establish that [defendant's] conduct harms competition as a whole and not just [plaintiff]").

**B. GSI Failed to Prove Harm to Competition Because it Failed to Prove the Scope of the Relevant Competitive Market**

**1. GSI Was Required to Prove a Relevant Competitive Market**

To prove the harm to competition required to support a UCL claim, GSI had to "delineate a relevant market and show that [ISSI's conduct] plays enough of a role in that market to impair competition significantly." *In re Cipro*, 61 Cal. 4th at 157; *see also Marsh v. Anesthesia Servs. Med. Grp., Inc.*, 200 Cal. App. 4th 480, 494-495 (2011) ("To examine if [defendant's] alleged anticompetitive actions had any basis in reason, we next consider the extent to which [plaintiff] can adequately plead the existence of the relevant market, as a means of demonstrating how the alleged unlawful conduct had evident adverse effects upon competition within that market."). Its failure to do so is fatal to GSI's claim.  *See, e.g.*, *Stewart v. Gogo, Inc.*, No. C-12-5164-EMC, 2013 U.S. Dist. LEXIS 51895, at *16 (N.D. Cal. Apr. 10, 2013) ("there is no basis to assert an unfair business practice in violation of § 17200" where plaintiff failed to allege facts showing "substantial foreclosure of competition in the relevant market"); *Oracle Am., Inc. v. Cedarcrestone, Inc.*, 938 F. Supp. 2d 895, 908 (N.D. Cal. 2013) (dismissing UCL claim where plaintiff "fails to allege the requisite market power to support its [UCL claim]"); *Blizzard Entm't Inc. v. Ceiling Fan Software LLC*, 941 F. Supp. 2d 1227, 1237 (C.D. Cal. 2013) (dismissing UCL claim where plaintiff failed to plead facts showing "a legally cognizable market"); *Epicor Software Corp. v. Alternative Tech. Sols., Inc.*, No. 13-00448, 2013 U.S. Dist. LEXIS 109278, at *11 (C.D. Cal. June 21, 2013) (plaintiff's UCL claim failed where plaintiff failed to allege "any facts regarding [defendant's] market power in the relevant market"); *DocMagic, Inc. v. Ellie Mae, Inc.*, 745 F. Supp. 2d 1119, 1147 (N.D. Cal. 2010) ("[Plaintiff] has not alleged facts showing that [defendant's] conduct violated the Sherman Act by posing a dangerous threat of monopoly in the [relevant] market. As a result, any claims [plaintiff] might be asserting under the UCL's unfair prong necessarily fail as well."); *Apple Inc.*, 586 F. Supp. 2d at 1203-04 (UCL claim necessarily failed where plaintiff failed "to plead relevant antitrust markets" and alleged "only unilateral anticompetitive conduct"); *People's Choice Wireless, Inc. v. Verizon Wireless*,

131 Cal. App. 4th 656, 672 (2005) (no UCL violation where plaintiffs defined the relevant market too narrowly).

Defining the relevant market to show effects on competition is "a highly technical economic question" that generally cannot be answered without expert testimony. *Morgan, Strand, Wheeler & Biggs v. Radiology, Ltd.*, 924 F.2d 1484, 1490 (9th Cir. 1991) (rejecting witness opinions on relevant market because they were not "experts qualified to opine on [this] highly technical economic question"). This highly technical economic question "requires both a geographic and a product dimension." *Bhan v. NME Hosps., Inc.*, 929 F.2d 1404, 1413 (9th Cir. 1991). The relevant product market is "determined by the reasonable interchangeability of use or the cross-elasticity of demand between the product itself and substitutes for it," where "'cross-elasticity of demand' is the degree to which purchasers will accept substitute products based upon changes in characteristics such as price." *Malaney v. UAL Corp.*, No. 10-02858-RS, 2010 U.S. Dist. LEXIS 106049, at *20-21 (N.D. Cal. Sept. 27, 2010) (citation omitted).

Products are considered to be in the same market if their manufacturers can easily switch production capabilities from one product to another.[4] Such "cross-elasticity of supply" is "the extent to which producers of one product would be willing to shift their resources to producing another product in response to an increase in the price of the other product." 1 ABA Section of Antitrust Law, Antitrust Law Developments 589 (7th ed. 2012). "[I]f a hypothetical monopolist in cars would not be able to raise prices above the competitive level because suppliers of trucks would simply begin making cars, then suppliers of cars cannot be considered to be competing in a product market that includes cars alone." *Id.*; *see also Equifax, Inc. v. F.T.C.*, 618 F.2d 63, 66

---

[4] *See, e.g.*, *Rebel Oil Co. v. Atl. Richfield Co.*, 51 F.3d 1421, 1436 (9th Cir. 1995) ("The ease by which marketers can convert their full-serve facilities to increase their output of self-serve gasoline requires that full-serve sales be part of the relevant market; it is immaterial that consumers do not regard the products as substitutes, that a price differential exists, or that the prices are not closely correlated."); *Blue Cross & Blue Shield United v. Marshfield Clinic*, 65 F.3d 1406, 1410-11 (7th Cir. 1995) (holding that the proper market includes the services offered by HMOs as well as various fee-for-service plans, since both are provided by the same physicians "who can easily shift from one type of service to another if a change in relative prices makes one type more lucrative than others").

1   (9th Cir. 1980) ("It is well settled that cross-elasticity of supply is a valid basis for determining

2   that two commodities should be within the same market").

3       Because analysis of all of these complicated economic factors is such "a highly technical

4   economic question" that generally requires experts, courts frequently reject market definitions

5   that are not supported by expert testimony. *See Morgan, Strand*, 924 F.2d at 1490 (rejecting wit-

6   ness opinions on relevant market because they were not "experts qualified to opine on [this]

7   highly technical economic question"); *accord Plush Lounge Las Vegas LLC v. Hotspur Resorts*

8   *Nev. Inc.*, 371 F. App'x 719, 721 (9th Cir. 2010) (where expert testimony had been stricken, par-

9   ty "had insufficient evidence to sustain a jury verdict on its proposed market definition"); *AFMS*

10  *LLC v. UPS Co.*, No. 10-5830, 2015 U.S. Dist. LEXIS 56977, at *36-37 (C.D. Cal. Apr. 30,

11  2015) ("Without any expert testimony to opine on the scope of the relevant market, it is difficult

12  to see how Plaintiff could meet its evidentiary burden").

13              **2.    GSI Failed to Define or Present Evidence of the Relevant Market**

14      In GSI's trial brief, GSI refers to itself as "a competitor in the LLDRAM market, particu-

15  larly for Cisco's LLDRAM business." ECF No. 800 at 15. But at trial, GSI presented no evi-

16  dence to support this—or any other—market definition:

17      • no expert (or even lay) testimony conducting the highly technical economic anal-

18          ysis necessary to establish the relevant market;

19      • no evidence of the universe of relevant competitors and potential competitors;

20      • no definition of the relevant product market;

21      • no evidence of the cross-elasticity of demand;

22      • no evidence of the cross-elasticity of supply; and

23      • no analysis of how customers and competitors respond to increased prices in the

24          market.

25      The evidence GSI presented at trial—although wholly inadequate to allow the Court to

26  reach any conclusion about the scope of the relevant market—suggested that the relevant market

27  is much larger than merely a market "for LLDRAM" or "for Cisco's LLDRAM business." For

28  example, Didier Lasserre, GSI's Vice President of Sales, testified that the market included at

1   least DRAM, high-performance DRAM, and SRAM. Trial Tr. Vol. 2 at 334:14-335:6. He also

2   conceded that these different types of memories can compete against each other depending on

3   the application. For example, Mr. Lasserre testified that SRAM and high-performance DRAM

4   have overlapping applications. Trial Tr. Vol. 2 at 335:25-336:2; 336:5-336:7. He further conced-

5   ed that the potential customers for high-performance DRAM are not limited to just Cisco, but

6   include at least all of "the same ones that use [GSI's] SRAMS." *Id.* at 337:22-337:21-24.

7       Mr. Lasserre's testimony also suggests that there are many actual and potential competi-

8   tors in the relevant market, not just Micron, Renesas, ISSI and GSI, including at least those com-

9   petitors that offer high-performance DRAM products. These include Micron, Renesas, ISSI, GSI,

10  Samsung, Toshiba, Hynix, and Infineon. *See id.* at 338:7-16; 348:17-25. The actual relevant

11  market would likely include additional companies, including other DRAM and SRAM compa-

12  nies that could and would be willing to convert their production of traditional DRAM and SRAM

13  into production of high-performance DRAM for Cisco when the price is right. Anand Bagchi,

14  Director of Strategic Marketing at ISSI and former Technical Leader in the Global Supplier

15  Management organization at Cisco, testified that several additional products compete with high-

16  performance DRAM products. *See* Trial Tr. Vol. 11 at 2505:1-2506:13 (identifying Mosys's

17  Bandwidth Engine (BE) product, Micron's Hybrid Memory Cube (HMC) product, Samsung's

18  High Bandwidth Memory (HBM) product, SK Hynix's HBM products in the market).

19      In short, GSI failed to prove a relevant market and therefore cannot prove that ISSI's

20  conduct "play[ed] enough of a role in that market to impair competition significantly." *Cipro*, 61

21  Cal. 4th at 157.

22      **C.    GSI Failed to Prove Harm to Competition in Any Alleged Market**

23      Even if GSI had proven the existence of a relevant competitive market for LLDRAM

24  products or otherwise (it did not), its UCL claim fails because GSI completely failed to prove

25  significant harm to competition within that market. GSI's claimed harm to competition is prem-

26  ised solely on the theory that ISSI's conduct was intended "to remove GSI as a competitor in the

27  LLDRAM market." Trial Br. at 15:2.

28

ISSI's MOT. FOR JMOL                    -9-
RE: UCL AND TIPER CLAIMS
NO. 5:13-cv-01081-PSG

1    But GSI did not prove that it was actually excluded from the market, much less that if it

2  had been, that would constitute harm to competition.  On the contrary, GSI itself elicited testi-

3  mony that it is currently selling its LLDRAM products and therefore has not been excluded from

4  the market. *See, e.g.*, Trial Tr. Vol. 2 at 336:16-17 ("Q. When did the company start designing

5  LLDRAM chips? A. We started working on LLDRAM in 2007."); 339:2-6 (Q. At some point,

6  did ISSI become a competitor of GSI's in the LLDRAM market? A. They did. Q. Do you know

7  when ISSI first had an LLDRAM chip for sale? A. About the same time as us. I want to say it

8  was in 2011."); ECF No. 811 at 3 (declaration from nonparty Renesas confirming that GSI is a

9  competitor with Renesas "for the memory business of customer Cisco Systems, Inc. (which is at

10  issue in this case) as well as similar business with other customers").

11    Moreover, even if the loss of the Atris bid had somehow prevented GSI from otherwise

12  competing for similar contracts with Cisco or other suppliers (and again the evidence is that it

13  did not), "the elimination of a single competitor, standing alone, does not prove anticompetitive

14  effect." ECF No. 227 at 7 (quoting *Kaplan v. Burroughs Corp.*, 611 F.2d 286, 291 (9th Cir.

15  1979)). The same is true for UCL claims. *Marsh*, 200 Cal. App. 4th at 501-502 (plaintiff's al-

16  leged exclusion from the market insufficient to prove UCL violation); *RLH*, 133 Cal. App. 4th at

17  1285-86 (no UCL violation from exclusion of plaintiff from market where competition continued

18  among remaining three competitors); *Procongps, Inc.*, 2011 U.S. Dist. LEXIS 137366, at *9-10

19  (fact that plaintiff "lost at least one customer" is not enough harm to competition for a UCL

20  claim).  Evidence at trial demonstrated that even if GSI had been removed from the market, it

21  would not play "enough of a role" in the larger relevant market "to impair competition signifi-

22  cantly." *Cipro*, 61 Cal. 4th at 157.  For instance, if the relevant market were limited to

23  LLDRAM, as GSI advocates, the loss of GSI would still not eliminate the remaining competition

24  between the dominant players in the alleged market: Renesas and Micron. Indeed, GSI has con-

25  ceded that Micron and Renesas are the dominant players and the primary suppliers of high-

26  performance DRAM. *See* Second Amended Complaint ¶¶ 17-19, 53, 63-64, 96, 241; Trial Tr.

27  Vol. 3 at 480:7-14, Vol. 5 at 994:2-15. GSI failed to prove that competition between Renesas,

28  Micron, and ISSI would be at all impaired by the loss of GSI.  *See RLH*, 133 Cal. App. 4th at

1285-86 (the exclusion of a potential fourth competitor from the market did not violate the UCL where competition remained among the remaining three competitors). And GSI failed to prove that the theoretical exclusion of GSI hindered competition from other existing and potential players in the market, such as competitors like Samsung, Toshiba, Infineon, Hynix, etc. GSI's UCL claim, which is based entirely on the allegation that GSI has been hindered in selling LLDRAM products, therefore fails.

Thus, even if GSI had managed to prove a relevant market, its claim would fail for complete lack of evidence of harm to that market.

### D.    ISSI's Conduct Was Protected Procompetitive Conduct

Because GSI failed to show harm to competition in a relevant market, its UCL claim fails. The Court need go no further.

Nevertheless, consideration of the conduct GSI alleges to be unfair underscores the lack of any viable UCL claim. Each instance of alleged unfair conduct is not anticompetitive, but rather privileged, *procompetitive* conduct. GSI argues that "unfair" competition by ISSI disrupted GSI's relationship with Cisco by causing GSI to lose the Atris bid. But "California law has long recognized a 'competition privilege' which protects one from liability for inducing a third person not to enter into a prospective contractual relation with a business competitor. . . . One may compete for an advantageous economic relationship with a third party as long as one does not act improperly or illegally." *Gemini Aluminum Corp. v. Cal. Custom Shapes*, 95 Cal. App. 4th 1249, 1256 (2002). The competition privilege can only be lost if "conduct is independently actionable." *Id.* at 1259.

This sensitivity to the benefits of competition is deeply rooted in California law and is reflected in *Cel-Tech* itself as the reason why conduct among competitors is actionable only if does not fall within a legislative safe harbor and meets the "harm to competition" test:

> An undefined standard of what is "unfair" fails to give businesses adequate guidelines as to what conduct may be challenged and thus enjoined . . . In some cases, it may even lead to the enjoining of *pro*competitive conduct and thereby undermined consumer protection, the primary purpose of the antitrust laws.  "Because ours is a culture firmly wedded to the social rewards of commercial contests, the law usually takes care to draw lines of legal liability in a way that maximizes areas of competition free of legal penalties."

1   20 Cal. 4th at 185 (*citing Della Penna v. Toyota Motor Sales, U.S.A., Inc*., 11 Cal. 4th 376, 392
2   (1995)).

3       Here, every instance of alleged unfair conduct asserted by GSI is procompetitive conduct
4   protected by the competition privilege because it is not "independently actionable." *Gemini Alu-*
5   *minum*, 95 Cal. App. 4th at 1259. Indeed, the testimony at trial has only served to emphasize that
6   GSI lost the Atris bid because it failed to be responsive to its customer's (Cisco's) concerns.  IS-
7   SI, on the other hand, listened to Cisco and offered Atris chips at lower cost and with a more sta-
8   ble foundry, responding to customer concerns exactly in the manner that competition is intended
9   to promote. GSI complains that ISSI's behavior was unfair, but in fact, it was quintessential
10  competition. "Courts must be careful not to make economic decisions or prevent rigorous, but
11  fair, competitive strategies that all companies are free to meet or counter with their own strate-
12  gies.  Companies that cannot compete with others that are more capable or efficient may lawfully
13  fail." *Cel-Tech*, 20 Cal. 4th at 185.

14                          **1.      Partnering with UMI**

15      GSI's claim that ISSI should have known that UMI had an operative noncompete agree-
16  ment with GSI is untenable given that the UMI and GSI witnesses who (unlike ISSI) actually
17  knew about the 2008 Agreement and read its terms believed that the noncompete was expired.
18  Trial Tr. Vol. 3 at 496:9-24 (D. Lasserre); Vol. 4 at 817:10-25 (D. Chapman); Vol. 6 at 1408:5-
19  14 (B. Gower); 1569:9-16 (J. Faue); Exs. 4596; 4600; 4909. The evidence at trial proved that
20  everyone involved with that agreement believed the GSI-UMI agreement had expired in August
21  2009. Indeed, GSI's witnesses testified that they reviewed the GSI-UMI agreement looking for
22  ways to use that contract against UMI, and after reviewing it, concluded that the agreement was
23  expired. Trial Tr. Vol. 3 at 496:9-24. Thus, even if ISSI had read that contract during the relevant
24  time (it did not), there is no reasonable basis to infer that ISSI should have understood that
25  agreement to mean something different than what the actual parties to the agreement believed it
26  to mean. The most that can be said about ISSI's work with UMI is that ISSI told Cisco it would
27  work with UMI and then later contracted with UMI. Because there is nothing independently ac-

28

tionable about that, it is privileged competition that cannot support a UCL claim.  *Gemini Alumi-num*, 95 Cal. App. 4th at 1259.

ISSI's work with UMI is protected for an additional reason. In *Cel-Tech*, the California Supreme Court held that "[w]hen specific legislation provides a 'safe harbor,' plaintiffs may not use the general unfair competition law to assault that harbor." 20 Cal. 4th at 182; *see also Cmty. Assisting Recovery, Inc. v. Aegis Sec. Ins. Co.*, 92 Cal. App. 4th 886, 894-95 (2001) (no Section 17200 claim where Insurance Code permitted conduct); *Shvarts v. Budget Grp., Inc.*, 81 Cal. App. 4th 1153, 1159 (2000) (same where Civil Code Section 1936(m)(2) permitted conduct). One of the safe harbors provided by the California Legislature protects employee mobility and declares that "every contract by which anyone is restrained from engaging in a lawful profession, trade, or business of any kind is to that extent void." Cal. Bus. & Prof. Code § 16600; *see also* Cal. Civil Code § 1608 ("entire contract is void" if any consideration "is unlawful"). Thus, even if ISSI had actual knowledge of the noncompete (which even GSI does not claim), ISSI's work with UMI in the face of the noncompete could not support a UCL claim as a matter of law.  Because the noncompete is illegal in California, ISSI's partnering with UMI and hiring UMI employees falls within a protected safe harbor. GSI's UCL claim thus fails to the extent it is premised on conduct regarding an out-of-state non-compete that is illegal and a nullity under California law.

### 2.  GSI Failed to Prove that ISSI Made Any Disparaging Remarks Regarding Cypress' ITC Lawsuit, Much Less That Such Remarks Were Part of a Plan to Exclude GSI from the LLDRAM Market

GSI failed to prove its disparagement allegations.  GSI has not proven that anyone from ISSI said anything about the ITC lawsuit that was not objectively true, and that GSI did not disclose itself in its filings with the Securities Exchange Commission. *See* Exs. 2612, 2613.  It was always true that GSI might lose the ITC lawsuit, that it might be prohibited from selling or distributing its accused SRAM products in the United States as a result, and that such a result would significantly harm GSI's business. *See* Ex. 2612 at 13-14, 22, 24; Ex. 2613 at 17-18.  It was also always true that uncertainty regarding the outcome of the ITC case caused GSI's customers and

potential customers to seek alternative or second sources of supply.  *Id.*  GSI disclosed all of these things, repeatedly, in its quarterly and annual filings with the SEC.

As GSI's own disclosures demonstrate, the possibility that GSI might have lost the ITC action was objectively true.[5]  So was the likelihood that an adverse outcome would cause significant harm to GSI's business.  Moreover, the evidence established that any comments made by ISSI were in response to customer inquiries, which GSI's own witness admitted were perfectly appropriate – in other words, privileged.[6]  The one customer witness called by GSI admitted the same thing.[7]

GSI offered no proof that any statement attributed to ISSI personnel was anything but the truth offered in response to inquiries from customers and potential customers.  The accusation that any such statement was part of a plan to exclude GSI from the RLDRAM market, which was not even the subject of the ITC action (that was SRAM), is baseless.

### 3.   Hiring Anand Bagchi

ISSI's hiring of Anand Bagchi was privileged, procompetitive conduct.  Cal. Bus. & Prof. Code § 16600; Omnibus MIL order (ECF No. 896) at 9; *Silguero v. Creteguard, Inc.*, 187 Cal. App. 4th 60, 69 (2010) ("no actionable wrong is committed by a competitor who hires away his competitor's employees who are not under contract, so long as the inducement to leave is not

---

[5] *See* Trial Tr. Vol. 3 at 462:4-9 (D. Lasserre cross-examination: "Q. And ISSI expressed the opinion that you would lose the ITC case as far as you were concerned; correct? A. That is correct. Q. Now, at that time it was possible that GSI might lose the ITC case; correct?" A. It was possible."); 463:16-18 (D. Lasserre cross-examination: "Q. . . . . A statement that GSI could lose its ITC lawsuit is not false at all, is it?" A. There's a possibility that we can lose, that's not false.")

[6] *See* Trial Tr. Vol. 3 at 469:1-7 (D. Lasserre cross: "Q. You don't know whether conversation between ISSI and your customers pertaining to whether GSI might lose its ITC case, you don't know whether those were initiated by your customers or at ISSI, do you?" A. I do not."); Ex. 242; Trial Tr. Vol. 11 at 2603:3-5 (ISSI "received a few panic phone calls from customers asking if ISSI can cross and sample to GSI"); 2603:23-25 (same); 2604:16-21 (same); 2605:4-8 (same); 2606:20-24 (same); 2607:10-13 (same); 2608:12-22 (same); 2629:10-17 (same).

[7] *See* Trial Tr. Vol. 8 at 1711:9-11 (Mr. Reif: "But I want to make sure that Mr. Schwartz [of ISSI] is presented appropriately and fairly, and my personal opinion is [he] didn't do anything wrong.").  Mr. Reif gave this testimony on his own, in response to the question "Were you excited about coming here today?"  *Id.* at 1711:1-2.

1   accompanied by unlawful conduct"). It therefore cannot support a UCL violation. *Cel Tech*, 20

2   Cal. 4th at 178.

3         GSI has argued that Mr. Bagchi transferred GSI's bid-related trade secrets to ISSI when

4   Mr. Bagchi joined ISSI from Cisco in October 2012.  But the Court has already rejected the ar-

5   gument that Mr. Bagchi transferred any bid-related trade secrets that were owned by GSI.  ECF

6   No. 807 at 11-13. To the extent GSI claims that Mr. Bagchi's conduct was unfair because he

7   forwarded some other information, that argument is preempted by the UTSA.  *See* Summary

8   Judgment Order, ECF No. 807, at 15-16 ("a party cannot escape the UTSA's preemptive effect

9   by labelling the information it seeks to protect as something other than a trade secret.") (citing

10  *K.C. Multimedia, Inc. v. Bank of America Tech. & Operations, Inc.*, 90 Cal. Rptr. 3d 247, 264

11  (2009); *Silvaco Data Sys. v. Intel Corp.*, 109 Cal. Rptr. 3d 27, 53 (2010)).

12          **4.**      **GSI has Failed to Prove That ISSI's Licensing Practices Were Not**
                        **Privileged**

13

14        GSI failed to prove that ISSI licensed Micron's RLDRAM 3 in order to remove a key

15  competitor from the RLDRAM market; it is far from clear that GSI even tried to do so.  In any

16  event, the license granted by Micron to ISSI did no such thing.  There is no evidence that this

17  license restrained Micron or ISSI from competing with one another in any significant way.  The

18  license itself is not even in evidence.

19        What little evidence has been presented suggests that the Micron license helped ISSI to

20  enter the market and begin putting competitive pressure on the existing market participants.   In-

21  deed, Mr. Chapman testified, and internal GSI documents reflect, that Cisco developed the Atris

22  specification in response to the high power usage of Micron LLDRAM parts, including

23  RLDRAM 3.[8]  In other words, the only evidence in the record shows that the expansion of the

24  RLDRAM product line, including with ISSI's licensed products, created more consumer choice

25  by causing the introduction of the Atris specification into the market.

26  

27      [8] Trial Tr. Vol. 5 at 959:17-960:19; Ex. 4820.

28

There is nothing unlawful about taking a license to sell another competitor's products. GSI has failed to present any evidence that ISSI's license is anything other than privileged, pro-competitive conduct.

### 5. Pursuing the Atris Contract with a Winning Bid

GSI relies on a number of documents in which ISSI expresses a desire to win the Atris contract and to use that opportunity to expand its sales of other products to Cisco. In these documents, ISSI also recognized a competitive threat posed by GSI. Such competitive talk is the essence of procompetitive conduct and has never been held to harm competition. *See U.S. Aluminum Co. of Am.*, 148 F.2d 416 430 (2d Cir. 1945) (Hand, J.) ("The successful competitor, having been urged to compete, must not be turned upon when he wins."). As such, it cannot support GSI's UCL claim.

### 6. Seeking to Become a Stronger Competitor Against the Likes of Renesas and Micron by Acquiring GSI

Pretrial, GSI accused ISSI of offering to acquire GSI in order to eliminate it as a competitor. GSI Trial Br., ECF No. 800, at 14. The evidence at trial totally disproves that theory. GSI's witness at trial admitted they have no facts to suggest the acquisition offer had anything to do with the Atris award. *See* Trial Tr. Vol. 3 at 478:20-479:9; *see also* Vol. 11 at 2664:7-15 (Howarth testimony re acquisition offer).

Moreover, GSI failed to present any evidence to show that a merger of ISSI and GSI would pose a threat to competition in a market dominated by Micron and Renesas and in which the merged ISSI-GSI entity would have no market power. *See Sterling Merch., Inc. v. Nestle, S.A.*, 656 F.3d 112, 121-123 (1st Cir. 2011) (no harm to competition where competition remained despite merger resulting in 85% market share). In any event, GSI rejected the offer, thereby eliminating any alleged potential threat to competition. The acquisition offer cannot therefore support GSI's UCL claim.

*        *        *

1    In sum, none of the conduct identified by GSI or the Court supports a UCL claim because

2    it is privileged, procompetitive conduct that posed no threat of harm to competition of the type

3    that would violate the antitrust laws. GSI's UCL claim therefore fails.

4         **E.**     **GSI Failed to Prove that ISSI Proximately Caused Any Harm to Competition**

5        There is no UCL violation without a causal connection between the defendant's business

6    practices and the purported harm to competition. *Cel-Tech*, 20 Cal. 4th at 187 (conduct is "un-

7    fair" under the UCL only if that conduct itself "significantly threatens or harms competition"); *In*

8    *re Firearm Cases*, 126 Cal. App. 4th 959, 981 (2005) (plaintiff must establish that "business

9    practices are injurious in some causative way to consumers"; affirming dismissal of UCL claim

10   where causal connection to consumer harm was lacking).

11       Here, even if GSI had established any direct proof of harm to competition in a relevant

12   market by showing that GSI is now eliminated from competing for LLDRAM sales (it is not),

13   GSI failed to prove that ISSI's business practices were the proximate cause of such changes in

14   market conditions. To the contrary, as the Court has already recognized, the evidence proves that

15   GSI lost the first Atris opportunity in 2007 because it failed to deliver on its contract with Cis-

16   co—before ISSI was ever in the picture. *See* Summary Judgment Order, ECF No. 807 at 6:10-11.

17   And then GSI lost the second Atris opportunity because it failed to offer Cisco a competitively-

18   priced bid compared to ISSI's bid. *Id.* at 6:14-15. In fact, ISSI won the Cisco award because its

19   prices were lower—a pro-consumer, pro-competition action by ISSI. GSI has presented no evi-

20   dence to the contrary.

21       GSI's UCL claim thus fails for the additional reason that it failed to prove the required

22   causal connection between ISSI's conduct and any harm to competition.

23   **II.**     **THE COURT SHOULD GRANT JUDGMENT AS A MATTER OF LAW IN FAVOR OF ISSI ON GSI'S TIPER CLAIM**

24

25       Because GSI has conceded that its UCL claim is the only "hook for the TIPER claim,"

26   such that its TIPER claim will fall with its UCL claim, ECF No. 906 at 37:5-6, the Court should

27   grant judgment as a matter of law in favor of ISSI on the TIPER claim upon granting judgment

28   for ISSI on the UCL claim. *See Della Penna*, 11 Cal. 4th at 393 (requiring that plaintiff prove

1    that the "defendant's interference was wrongful 'by some measure beyond the fact of the inter-

2    ference itself'" as a TIPER claim element) (citations omitted).

3    **III.**    **CONCLUSION**

4       For the foregoing reasons, ISSI respectfully requests that the Court grant judgment on

5    partial findings in favor of ISSI on GSI's UCL claim and grant judgment as a matter of law in

6    favor of ISSI on GSI's TIPER claim.

7

8    Dated: November 17, 2015       WILSON SONSINI GOODRICH & ROSATI
                                        Professional Corporation

9                                           By: */s/ Colleen Bal*
                                               Colleen Bal

10

11                                         *Attorneys for Defendant*
                                        INTEGRATED SILICON SOLUTION, INC.

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28